# EXHIBIT B

CALPINE CORPORATION

$650,000,000 PRINCIPAL AMOUNT
7.75% CONTINGENT CONVERTIBLE NOTES DUE 2015

THIRD SUPPLEMENTAL INDENTURE

Dated as of June 23, 2005

WILMINGTON TRUST COMPANY

Trustee

**Table of Contents**

Page

## ARTICLE I DEFINITIONS

Section 1.01    Definitions.................................................................................... 1
Section 1.02    Other Definitions ......................................................................... 6

## ARTICLE II THE NOTES

Section 2.01    Form and Dating ........................................................................... 7
Section 2.02    Registrar, Paying Agent and Conversion Agent ...................... 8
Section 2.03    Transfer and Exchange ............................................................... 8

## ARTICLE III REDEMPTION AND PREPAYMENT

Section 3.01    Mandatory Redemption ............................................................... 8
Section 3.02    Optional Redemption Upon Conversion.................................... 9
Section 3.03    Purchase of Notes at Option of the Holder upon Change of Control ... 9
Section 3.04    Effect of Change of Control Purchase Notice............................ 13
Section 3.05    Deposit of Change of Control Purchase Price ......................... 14
Section 3.06    Notes Purchased in Part............................................................... 14
Section 3.07    Covenant to Comply With Securities Laws Upon Purchase of Notes 14
Section 3.08    Repayment to the Company.......................................................... 15

## ARTICLE IV COVENANTS

Section 4.01    Compliance Certificate ................................................................ 15
Section 4.02    Taxes.............................................................................................. 16
Section 4.03    Stay, Extension and Usury Laws ................................................ 16
Section 4.04    Corporate Existence ..................................................................... 16
Section 4.05    Calculations in Respect of Notes ............................................... 17

## ARTICLE V MERGER AND CONSOLIDATION OF COMPANY

Section 5.01    Lease of Properties....................................................................... 17

## ARTICLE VI DEFAULTS AND REMEDIES

Section 6.01    Events of Default .......................................................................... 17

## ARTICLE VII TRUSTEE

Section 7.01    Rights of Trustee........................................................................... 18
Section 7.02    Reports by Trustee to Holders of the Notes.............................. 18
Section 7.03    Eligibility; Disqualification ......................................................... 19

i

## ARTICLE VIII DEFEASANCE

Section 8.01    No Defeasance ......................................................................... 19

## ARTICLE IX AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders of Notes.................................... 19
Section 9.02    With Consent of Holders of Notes........................................ 19

## ARTICLE X CONVERSION

Section 10.01    Conversion Privilege............................................................ 20
Section 10.02    Conversion Procedure.......................................................... 23
Section 10.03    Taxes on Conversion............................................................ 24
Section 10.04    Company to Provide Stock ................................................... 24
Section 10.05    Adjustment of Conversion Price.......................................... 24
Section 10.06    Adjustment for Certain Changes of Control ........................ 28
Section 10.07    When No Adjustment Required........................................... 29
Section 10.08    When Adjustment May Be Deferred ................................... 30
Section 10.09    Successive Adjustments....................................................... 30
Section 10.10    Notice of Adjustment .......................................................... 30
Section 10.11    Notice of Certain Transactions ........................................... 30
Section 10.12    Effect of Reclassification, Consolidation, Merger, Share Exchange or
                 Sale on Conversion Privilege.............................................. 31
Section 10.13    Trustee's Disclaimer............................................................ 32
Section 10.14    Voluntary Reduction ........................................................... 32
Section 10.15    Conversion Value of Notes Tendered................................... 32

## ARTICLE XI SUBORDINATION

Section 11.01    Agreement to Subordinate ................................................... 34
Section 11.02    Default On Senior Debt ....................................................... 34
Section 11.03    Liquidation; Dissolution; Bankruptcy.................................. 35
Section 11.04    Subrogation........................................................................ 36
Section 11.05    Trustee To Effectuate Subordination ................................... 37
Section 11.06    Notice By The Company ...................................................... 37
Section 11.07    Rights Of The Trustee; Holders Of Senior Debt ................. 38
Section 11.08    Subordination May Not Be Impaired.................................... 39

## ARTICLE XII MISCELLANEOUS

Section 12.01    No Adverse Interpretation of Other Agreements.................... 40
Section 12.02    Severability ........................................................................ 40
Section 12.03    Table of Contents, Headings, etc ........................................ 40
Section 12.04    Ratification Of Original Indenture........................................ 40
Section 12.05    Trustee Not Responsible for Recitals ................................... 40
Section 12.06    Performance by Trustee ....................................................... 40
Section 12.07    Governing Law ................................................................... 40

## EXHIBITS

Exhibit A          Form of Note
Schedule A         Table of Additional Shares

THIRD SUPPLEMENTAL INDENTURE (the "Third Supplemental Indenture") dated as of June 23, 2005, between Calpine Corporation (the "Company"), a Delaware corporation, and Wilmington Trust Company (the "Trustee").

## WITNESSETH:

WHEREAS, the Company and the Trustee have entered into an Indenture, dated as of August 10, 2000, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000 (as so supplemented, the "Original Indenture" and, as further supplemented by the Second Supplemental Indenture, dated as of September 30, 2004, and this Third Supplemental Indenture, the "Indenture") which provides, among other things, for unsecured debentures, notes or other evidences of indebtedness to be issued by the Company from time to time in one or more series under the Indenture;

WHEREAS, the Original Indenture provides that the Company and the Trustee may enter into an indenture supplemental to the Original Indenture to establish the form or terms of Securities (as defined in the Original Indenture) of any series as provided by Sections 2.1 and 2.3 of the Original Indenture;

WHEREAS, the Board of Directors of the Company has duly adopted resolutions authorizing the Company to execute and deliver this Third Supplemental Indenture;

WHEREAS, pursuant to the terms of the Original Indenture, the Company desires to enter into this Third Supplemental Indenture to provide for the establishment of a new Series of its Securities to be known as its 7.75% Contingent Convertible Notes Due 2015 (the "Notes");

WHEREAS, the Company has requested that the Trustee execute and deliver this Third Supplemental Indenture and all things necessary to make (i) this Third Supplemental Indenture a valid instrument in accordance with its terms, and (ii) the Notes, when executed by the Company and authenticated and delivered by the Trustee, the valid obligations of the Company;

NOW THEREFORE, in consideration of the purchase and acceptance of the Notes by the Holders thereof, and for the purpose of setting forth, as provided in the Indenture, the form and terms of the Notes, the Company covenants and agrees with the Trustee as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Definitions.

(a)    Unless the context requires otherwise:

(i)    a term defined in the Original Indenture has the same meaning when used in this Third Supplemental Indenture unless the definition of such term is amended and supplemented pursuant to this Third Supplemental Indenture;

(ii)    a term defined anywhere in this Third Supplemental Indenture has the same meaning throughout;

(iii)    the singular includes the plural and vice versa;

(iv)    a reference to a Section or Article is to a Section or Article of this Third Supplemental Indenture; and

(v)    headings are for convenience of reference only and do not affect interpretation.

(b)    the following terms have the meanings given to them in this Section 1.01(b):

"Applicable Procedures" means, with respect to any transfer or transaction involving a Global Note or beneficial interests therein, the rules and procedures of the Depositary, for such Global Note, in each case to the extent applicable to such transaction and as in effect from time to time.

"Bid Solicitation Agent" means American Stock Transfer & Trust Company until the Company selects another bank, trust company or similar fiduciary agent, if any, to serve as Bid Solicitation Agent.

"Capital Stock" means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Change of Control" means the occurrence of any of the following:

2

(1) any Person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Exchange Act, acquires beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of transactions, of shares of the Company's Capital Stock entitling the Person to exercise 50% or more of the total voting power of all shares of the Company's Capital Stock that is entitled to vote generally in elections of directors, other than an acquisition by the Company, of any of its Subsidiaries or any of its employee benefit plans; or

(2) the Company merges or consolidates with or into any other Person, any merger of another Person into the Company, or the Company conveys, sells, transfers or leases all or substantially all of its assets to another Person, other than any transaction:

(a) that does not result in any reclassification, conversion, exchange or cancellation of outstanding shares of the Company's Capital Stock,

(b) pursuant to which the holders of the Company's Common Stock immediately prior to the transaction have the entitlement to exercise, directly or indirectly, 50% or more of the total voting power of all shares of Capital Stock entitled to vote generally in the election of directors of the continuing or surviving corporation immediately after the transaction, or

(c) which is effected solely to change the Company's jurisdiction of incorporation and results in a reclassification, conversion or exchange of outstanding shares of the Company's Common Stock solely into shares of Common Stock of the surviving entity.

"Common Stock" means shares of the Company's Common Stock, $0.001 par value per share, as they exist on the date of this Third Supplemental Indenture or any other shares of Capital Stock of the Company into which the Common Stock shall be reclassified or changed.

"Common Stock Price" on any date means the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date for the Company's Common Stock as reported in composite transactions on the principal United States securities exchange on which the Company's Common Stock is traded or, if its Common Stock is not listed on a United States national or regional securities exchange, as reported by the National Association of Securities Dealers Automated Quotation System ("NASDAQ").

"Conversion Agent" means the Agent of the Company pursuant to Section 2.02 hereof.

3

"Conversion Date" shall have the meaning as specified in Section 10.02 hereof.

"Conversion Price" means $4.00 per share of Common Stock, subject to the adjustments described in Section 10.05 hereof.

"Conversion Rate" means an amount of shares of Common Stock equal to $1,000 principal amount of Notes divided by the Conversion Price, which shall be 250.0000 per $1,000 principal amount of Notes as of the date of this Third Supplemental Indenture, subject to the adjustments described in Section 10.05 hereof.

"Fair Market Value" means the value that would be paid by a willing buyer to a willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company, whose determination shall be conclusive evidence of such determination (unless otherwise provided in this Indenture).

"Global Notes" means, individually and collectively, each of the Global Securities, substantially in the form of Exhibit A hereto.

"Market Price" means the average determined by the Company of the Common Stock Price of the shares for the five Trading Day period immediately preceding and including the third Trading Day prior to the applicable date fixed for the determination of stockholders entitled to receive any distribution described in Section 10.05, appropriately adjusted to take into account the occurrence, during the period commencing on the first of the Trading Days during such five Trading Day period and ending on such determination date, of any event described in Section 10.05; subject, however, to the conditions set forth in Section 10.07 and Section 10.08 hereof. If the shares of Common Stock are not listed on The New York Stock Exchange, then the Market Price shall be determined by the Company by reference to the Common Stock Price as reported by NASDAQ. In the absence of such quotations, the Company shall be entitled to determine in good faith the Market Price by reference to the Common Stock Price on any date on the basis of such quotations as it considers appropriate.

"Obligations" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness (including the Notes).

"Permitted Investments" means the following investments:

(i) any direct obligations of, or obligations fully and unconditionally guaranteed by, the United States of America, or any agency or instrumentality of the United States of America, the obligations of which are fully and unconditionally backed by the full faith and credit of the United States of America;

(ii) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof

4

and subject to supervision and examination by federal and/or state authorities, or incorporated under the laws of any other jurisdiction, so long as at the time of such investment or contractual commitment providing for such investment the unsecured commercial paper or other unsecured short-term debt obligations of such depository institution or trust company have credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(iii) repurchase obligations with respect to any security described in clauses (i) or (ii) above, in each case entered into with either (A) a depository institution or trust company (acting as principal) which in respect of its short-term unsecured debt has credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P or (B) a money market fund maintained by a broker which, in respect of its short-term unsecured debt, has credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(iv) unsecured debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof which have, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(v) unsecured commercial paper which has, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P; and

(vi) investments in money market funds or money market mutual funds which have, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P (including such funds for which the Trustee or any of its Affiliates is investment manager or advisor and for which the Trustee or any of its Affiliates may receive a fee).

"Prospectus Supplement" means that Prospectus Supplement dated June 20, 2005 relating to the offering of the Notes.

"S&P" means Standard & Poor's Ratings Group (or, if such entity ceases to rate the Notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other "nationally recognized statistical rating organization" (or successor concept) within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act (or successor provision) selected by the Company as a replacement agency).

"Senior Debt" means (A) all of the existing and future secured Indebtedness of the Company; (B) all of the following series of the Company's outstanding senior unsecured Indebtedness:

1.  the Company's 10 1/2% Senior Notes due 2006,

2.  the Company's 8 3/4% Senior Notes due 2007,

3. the Company's 7 7/8% Senior Notes due 2008,

4. the Company's 7 5/8% Senior Notes due 2006, and

5. the Company's 7 3/4% Senior Notes due 2009; and

(C) any deferrals, renewals or extensions of any of the foregoing.

"Subsidiary" means, as applied to any Person, any corporation, limited or general partnership, trust, association or other business entity of which an aggregate of at least 50% of the outstanding Voting Stock, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more Subsidiaries of such Person.

"Trading Day" means any regular or abbreviated trading day of The New York Stock Exchange.

"Trading Price" of the Notes on any date of determination means the average of the secondary market bid quotations per $1,000 principal amount of Notes obtained by the Bid Solicitation Agent for $5,000,000 principal amount of the Notes at approximately 3:30 p.m., New York City time, on such determination date from three independent nationally recognized securities dealers the Company selects, which may include the Underwriter; provided that if at least three such bids cannot reasonably be obtained by the Bid Solicitation Agent, but two such bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the Bid Solicitation Agent, this one bid shall be used. If the Bid Solicitation Agent cannot reasonably obtain at least one such bid or, in the Company's reasonable judgment, the bid quotations are not indicative of the secondary market value of the Notes, then the Trading Price of the Notes will be determined in good faith by the Bid Solicitation Agent, taking into account in such determination such factors as it, in its sole discretion after consultation with the Company, deems appropriate.

"Underwriter" means Goldman, Sachs & Co.

"Underwriting Agreement" means the Underwriting Agreement between the Company and the Underwriter dated June 20, 2005 relating to the issuance and sale of the Notes.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

Section 1.02    Other Definitions.

| Term | Defined in Section |
|---|---|
| "Additional Shares" | 10.01 |
| "Change of Control Notice" | 3.03 |

6

| Term | Defined in Section |
|---|---|
| "Change of Control Notice Date" | 3.03 |
| "Change of Control Purchase Date" | 3.03 |
| "Change of Control Purchase Notice" | 3.03 |
| "Change of Control Purchase Price" | 3.03 |
| "Conversion Value" | 10.15 |
| "Determination Date" | 10.15 |
| "Effective Date" | 10.06 |
| "Ex-Dividend Date" | 10.01 |
| "Expiration Time" | 10.05 |
| "Five Day Average Closing Stock Price" | 10.15 |
| "Net Shares" | 10.15 |
| "Net Share Amount" | 10.15 |
| "Payment Default" | 11.02 |
| "Pre-Dividend Sale Price" | 10.15 |
| "Principal Return" | 10.15 |
| "Principal Value Conversion" | 10.01 |
| "Purchased Shares" | 10.05 |
| "Quarter" | 10.01 |
| "Redemption Date" | 3.02 |
| "Redemption Price" | 3.02 |
| "Reference Date" | 10.05 |
| "Stock Price" | 10.06 |

## ARTICLE II

## THE NOTES

Section 2.01    Form and Dating.

The Notes shall be in denominations of $1,000 principal amount and integral multiples thereof.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Third Supplemental Indenture and the Company and the Trustee, by their execution and delivery of this Third Supplemental Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Third Supplemental Indenture, the provisions of this Third Supplemental Indenture shall govern and be controlling.

The Notes shall initially be issued in the form of a Global Security attached as Exhibit A hereto deposited upon issuance with the Trustee as Custodian for the Depositary and registered in the name of the Depositary or its nominee. Each Global Security shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes

from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges, repurchases, redemptions or conversions. Any endorsement of a Global Security to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by the Indenture.

Section 2.02    Registrar, Paying Agent and Conversion Agent.

In addition to Section 2.4 of the Original Indenture, the Company shall maintain an office or agency where Securities may be presented for conversion ("Conversion Agent"). The term "Conversion Agent" includes any additional conversion agent.

The Company may change any Registrar, Paying Agent or Conversion Agent for the Notes without notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Conversion Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Conversion Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Conversion Agent.

The Company initially appoints the Trustee to act as the Registrar, Paying Agent and Conversion Agent with respect to the Notes.

Section 2.03    Transfer and Exchange.

In addition to Section 2.7 of the Original Indenture, beneficial interests in a Global Security held by any beneficial owner of Notes may be exchanged by the Holder for Notes in definitive form upon request, but only upon at least 20 days' prior written notice given to the Trustee by or on behalf of the Depositary in accordance with Applicable Procedures.

Neither the Company nor the Trustee will be liable for any delay by the Holder of any Global Note or the Depositary in identifying the beneficial owners of Notes and the Company and the Trustee may conclusively rely on, and will be protected in relying on, instructions from the Holder of any Global Note or the Depositary for all purposes.

## ARTICLE III

## REDEMPTION AND PREPAYMENT

Section 3.01    Mandatory Redemption.

The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

Section 3.02    Optional Redemption Upon Conversion.

The Company shall have the right to redeem, at its option, any Notes tendered for conversion pursuant to Article 10 hereof if, on the date such Notes are tendered for conversion, the Company determines, in its sole judgment, that its then outstanding Indebtedness would prevent it from paying the Principal Return or delivering the Net Shares when due upon conversion as required by Section 10.02 hereof; provided that the Company shall not so redeem any Notes pursuant to this Section 3.02 if an Event of Default shall have occurred and be continuing (other than an Event of Default that would be cured by such redemption). The Company shall notify the Holder of such Notes of the Company's election to redeem such Notes pursuant to this Section 3.02 no later than the Determination Date in respect of such Notes tendered for conversion. Upon any such notification of an optional redemption, the Company shall not be required to pay or deliver, as the case may be, the Principal Return and Net Shares or any cash in lieu of fractional shares as required by Section 10.02, and payment or delivery of such Principal Return and Net Shares or cash in lieu of fractional shares shall be governed by this Section 3.02.

The redemption price for any Notes so redeemed shall be an amount in cash equal to the Principal Return and an amount of shares of Common Stock equal to the Net Shares, together with cash in lieu of any fractional shares (collectively, the "Redemption Price"), in each case in respect of such Notes tendered for conversion as set forth in Section 10.15. The redemption date for any such redemption shall be the Company shall be the seventh Business Day following the Determination Date in respect of such Notes tendered for conversion (the "Redemption Date").

No later than 10:00 a.m. (local time in the City of New York) on the Redemption Date in respect of such Notes, the Company shall deposit with the Conversion Agent money and shares of Common Stock sufficient to pay the Redemption Price on all Notes to be redeemed on that date. Upon such deposit of the Redemption Price, interest will cease to accrue on such Notes, such Notes will cease to be outstanding and all other rights of the Holder of such Notes will terminate. The Conversion Agent shall promptly return to the Company any money or shares of Common Stock deposited with the Conversion Agent by the Company in excess of the amounts necessary to pay the Redemption Price of all Notes to be redeemed on such date.

Section 3.03    Purchase of Notes at Option of the Holder upon Change of Control.

(a)    If a Change of Control occurs, a Holder of Notes will have the right, at its option, to require the Company to repurchase all of its Notes, or any portion thereof at a purchase price equal to the aggregate principal amount of the Notes repurchased plus any accrued and unpaid interest to, but excluding, the date of repurchase (the "Change of Control Purchase Price"). The Company shall repurchase all such Notes on the date that is 45 days after the date of the Change of Control Notice (as defined below) delivered by the Company (the "Change of Control Purchase Date"), subject to satisfaction by or on behalf of the Holder of the requirements set forth in Section 3.03(c).

9

Notwithstanding the foregoing provisions of this Section 3.03, no Holder shall have the right to require the Company to purchase its Notes upon a Change of Control if:

(1)   the Common Stock Price on The New York Stock Exchange for any five Trading Days within the period of 10 consecutive Trading Days ending immediately after the later of the Change of Control or the public announcement of such event, in the case of a Change of Control relating to an acquisition of Capital Stock, or the period of 10 consecutive Trading Days ending immediately before such event, in the case of Change of Control relating to a merger, consolidation or asset sale, equals or exceeds 105% of the Conversion Price of the Notes in effect on each of those Trading Days; or

(2)   all of the consideration (excluding cash payments for fractional shares and cash payments made pursuant to dissenters' appraisal rights) in a merger or consolidation otherwise constituting a Change of Control above consists of shares of common stock traded on a national securities exchange or quoted on the Nasdaq National Market (or will be so traded or quoted immediately following the merger or consolidation) and as a result of the merger or consolidation the Notes become convertible into such common stock.

For purposes of this Section 3.03,

(x) whether a person is a "beneficial owner" shall be determined in accordance with Rule 13d-3 under the Exchange Act; and

(y) "person" includes any syndicate or group that would be deemed to be a "person" under Section 13(d)(3) of the Exchange Act.

If the shares of Common Stock are not listed on The New York Stock Exchange at the relevant time, closing prices and Trading Days shall be calculated as reported by the NASDAQ.

At least three Business Days before the Change of Control Notice Date (as defined below), the Company shall deliver an Officer's Certificate to the Trustee specifying:

(i)   the information required by Section 3.03(b); and

(ii)   whether the Company desires the Trustee to give the Change of Control Notice required by Section 3.03(b).

(b)   No later than 30 days after the occurrence of a Change of Control, the Company shall mail a written notice of the Change of Control (the "Change of Control Notice" and the date of such mailing, the "Change of Control Notice Date") by

first-class mail to the Trustee and to each Holder (and to beneficial owners to the extent required by applicable law). The notice shall include a form of Change of Control Purchase Notice to be completed by the Holder that wishes to exercise rights under this Section 3.03 and shall state:

(1)     briefly, the events causing a Change of Control and the date of such Change of Control;

(2)     the date by which the Change of Control Purchase Notice pursuant to this Section 3.03 must be given, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(3)     the Change of Control Purchase Date, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(4)     the Change of Control Purchase Price, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(5)     the name and address of the Paying Agent and the Conversion Agent, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(6)     the Conversion Rate and any adjustments thereto;

(7)     that Notes must be surrendered to the Paying Agent, at any time on or prior to the 30th day after the Company delivers its Change of Control Notice, to collect payment, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(8)     that the Change of Control Purchase Price for any Note as to which a Change of Control Purchase Notice has been duly given will be paid promptly following the Change of Control Purchase Date as described in (7), if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(9)     briefly, the procedures the Holder must follow to exercise rights under this Section 3.03, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a);

(10)     briefly, the conversion rights, if any, of the Notes;

11

(11) that, unless the Company defaults in making payment of such Change of Control Purchase Price, interest on Notes surrendered for purchase by the Company will cease to accrue on and after the Change of Control Purchase Date, if a Holder has the right to require the Company to repurchase Notes pursuant to Section 3.03(a); and

(12) the CUSIP numbers of the Notes.

Simultaneously with the delivery of the Change of Control Notice to Holders, the Company shall, or, if the Company has requested that Trustee deliver the Change of Control Notice to Holders pursuant to Section 3.03(a), shall cause the Trustee to, at the Company's expense and in the Company's name, disseminate a press release through any of Dow Jones & Company, Inc., Business Wire, Bloomberg Business News or Reuters (or if such organizations are not in existence at the time of issuance of such press release, such other news or press organization as is reasonably calculated to broadly disseminate the relevant information to the public) containing this information, and the Company shall publish the information on the Company's Web site on the World Wide Web or through such other public medium as the Company may use at that time.

(c) A Holder may exercise its rights specified in Section 3.03(a) upon delivery of an irrevocable written notice of purchase (a "Change of Control Purchase Notice") to the Paying Agent at any time on or prior to the 30th day after the Company delivers its Change of Control Notice, stating:

(1) the certificate number of the Note which the Holder will deliver to be purchased;

(2) the portion of the principal amount of the Note which the Holder will deliver to be purchased, which portion must be $1,000 principal amount or an integral multiple thereof; and

(3) that such Note shall be purchased pursuant to the terms and conditions specified in this Section 3.03.

The delivery of such Note to the Paying Agent with the Change of Control Purchase Notice (together with all necessary endorsements), at any time on or prior to the 30th day after the Company delivers its Change of Control Notice, at the offices of the Paying Agent shall be a condition to the receipt by the Holder of the Change of Control Purchase Price therefor; provided, however, that such Change of Control Purchase Price shall be so paid pursuant to this Section 3.03 only if the Note so delivered to the Paying Agent shall conform in all respects to the description thereof set forth in the related Change of Control Purchase Notice.

The Company shall purchase from the Holder thereof, pursuant to this Section 3.03, a portion of a Note if the principal amount of such portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to the purchase of all of a Note also apply to the purchase of such portion of such Note. Any purchase by the Company contemplated pursuant to the provisions of this Section 3.03 shall be

12

consummated by the delivery of the consideration to be received by the Holder on the Change of Control Purchase Date.

(d)    The Company shall deposit cash at the time and in the manner as provided in Section 3.05, sufficient to pay the aggregate Change of Control Purchase Price of all Notes to be purchased pursuant to this Section 3.03.

Section 3.04    Effect of Change of Control Purchase Notice.

Upon receipt by the Paying Agent of the Change of Control Purchase Notice and the Note specified in Section 3.03(c), the Holder of the Note in respect of which such Change of Control Purchase Notice was given shall thereafter be entitled to receive solely the Change of Control Purchase Price with respect to such Note. Such Change of Control Purchase Price shall be paid to such Holder, subject to receipts of funds by the Paying Agent, promptly following the Change of Control Purchase Date with respect to such Note (provided the conditions in Section 3.03(c) have been satisfied). If the Paying Agent holds money sufficient to pay the Change of Control Purchase Price of the Notes on the Business Day following the Change of Control Purchase Date, then:

(1)    the Notes will cease to be outstanding;

(2)    interest will cease to accrue; and

(3)    all other rights of the Holder of the Notes will terminate.

This will be the case whether or not book-entry transfer of the Notes is made or whether or not the Notes are delivered to the Paying Agent.

Notes in respect of which a Change of Control Purchase Notice has been given by the Holder thereof may not be converted pursuant to the provisions hereof on or after the date of the delivery of such Change of Control Purchase Notice unless, such Change of Control Purchase Notice has first been validly withdrawn as specified in the following paragraph.

A Change of Control Purchase Notice may be withdrawn by means of a written notice of withdrawal delivered to the office of the Paying Agent in accordance with the Change of Control Purchase Notice at any time prior to the close of business on the last Business Day prior to the Change of Control Purchase Date, specifying:

(1)    the certificate number, if any, of the Note in respect of which such notice of withdrawal is being submitted;

(2)    the principal amount of the Note with respect to which such notice of withdrawal is being submitted; and

(3)    the principal amount, if any, of such Note which remains subject to the original Purchase Notice, and which has been or will be delivered for purchase by the Company.

There shall be no purchase of any Notes pursuant to Section 3.03 if there has occurred (prior to, on or after the giving, by the Holders of such Notes, of the required Change of Control Purchase Notice) and is continuing an Event of Default (other than a default in the payment of the Change of Control Purchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Notes (x) with respect to which a Change of Control Purchase Notice has been withdrawn in compliance with this Indenture, or (y) held by it during the continuation of an Event of Default (other than a default in the payment of the Change of Control Purchase Price with respect to such Notes) in which case, upon such return, the Change of Control Purchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 3.05    Deposit of Change of Control Purchase Price.

Prior to 10:00 a.m. (local time in the City of New York) on the Change of Control Purchase Date, the Company shall deposit with the Trustee or with the Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, shall segregate and hold in trust as provided in the Indenture) an amount of cash (in immediately available funds if deposited on such Business Day) sufficient to pay the aggregate Change of Control Purchase Price of all the Notes or portions thereof which are to be purchased as of the Change of Control Purchase Date.

Section 3.06    Notes Purchased in Part.

Any certified Note which is to be purchased only in part shall be surrendered at the office of the Paying Agent (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing) and the Company shall execute and the Trustee shall, upon receipt of a written order of the Company signed by two Officers, authenticate and deliver to the Holder of such Note, without service charge, a new Note or Notes, of any authorized denomination as requested by such Holder in aggregate principal amount equal to, and in exchange for, the portion of the principal amount of the Note so surrendered which is not purchased.

Section 3.07    Covenant to Comply With Securities Laws Upon Purchase of Notes.

When making any offers to purchase pursuant to the provisions of Section 3.03 hereof (if such offer or purchase constitutes an "issuer tender offer" for purposes of Rule 13e-4 (which term, as used herein, includes any successor provision thereto) under the Exchange Act at the time of such offer or purchase), the Company shall (i) comply with Rule 13e-4 and Rule 14e-1 (or any successor provision) under the Exchange Act, (ii) file the related Schedule TO (or any successor schedule, form or report) under the

14

Exchange Act, and (iii) otherwise comply with all Federal and state securities laws so as to permit the rights and obligations under Section 3.03 to be exercised in the time and in the manner specified in Section 3.03.

Section 3.08    Repayment to the Company.

The Trustee and the Paying Agent shall return to the Company any cash that remains unclaimed, together with interest, if any, thereon held by them for the payment of the Change of Control Purchase Price; provided, however, that to the extent that the aggregate amount of cash deposited by the Company pursuant to Section 3.05 exceeds the aggregate Change of Control Purchase Price of the Notes or portions thereof which the Company is obligated to purchase as of the Change of Control Purchase Date, then, unless otherwise agreed in writing with the Company, promptly after the Business Day following the Change of Control Purchase Date, the Trustee shall return any such excess to the Company together with interest, if any, thereon. Prior to such return, any such excess funds held by the Paying Agent shall be invested in cash or Permitted Investments as may be directed by the Company from time to time.

## ARTICLE IV

## COVENANTS

Section 4.01    Compliance Certificate.

The following shall apply in lieu of Section 3.5 of the Original Indenture with respect to the Notes:

(a)    The Company shall deliver to the Trustee, within 90 days after the end of each fiscal year, an Officer's Certificate prescribed by the TIA stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto.

(b)    So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, the year-end financial statements delivered pursuant to Section 3.6 of the Original Indenture shall be

15

accompanied by a written statement of the Company's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that the Company has violated any provisions of Article 4 hereof or Article III or IV of the Original Indenture, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation.

(c)    So long as any of the Notes are outstanding, the Company shall deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

Section 4.02    Taxes.

The Company shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency, all stamp taxes and other duties, if any, which may be imposed by the United States or any political subdivision thereof or taxing authority thereof or therein with respect to the issuance of the Notes. The Company shall not be required to make any payment with respect to any other tax, assessment or governmental charge imposed by any government or any political subdivision thereof or taxing authority thereof or therein.

Section 4.03    Stay, Extension and Usury Laws.

The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.04    Corporate Existence.

Subject to Article IV of the Original Indenture and Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)    its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary; and

16

(2)    the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; provided, however, that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.05    Calculations in Respect of Notes.

The Company shall provide a schedule of all calculations called for under the Notes and this Indenture to the Trustee and the Conversion Agent, and each of the Trustee and Conversion Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification. The Trustee and/or the Conversion Agent shall forward the Company's calculations to any Holder of Notes upon request of that Holder.

## ARTICLE V

## MERGER AND CONSOLIDATION OF COMPANY

Section 5.01    Lease of Properties.

Notwithstanding anything in the Original Indenture to the contrary, the Company shall not, directly or indirectly, lease all or substantially all of its properties or assets, in one or more related transactions, to any other Person.

## ARTICLE VI

## DEFAULTS AND REMEDIES

Section 6.01    Events of Default.

In addition to the Events of Default set forth in the Original Indenture, each of the following shall constitute an Event of Default with respect to the Notes:

(1)    default in payment of accrued interest at maturity, when the same becomes due and payable;

(2)    default in payment of the Change of Control Purchase Price or Redemption Price when the same becomes due and payable;

(3)    default in the payment of the Principal Return (and cash in lieu of fraction shares) or failure to deliver the Net Shares, in each case when due, unless the Notes in respect of which such Principal Return (and cash in lieu of fractional shares) and Net Shares

17

were due have been called for redemption in accordance with Section 3.02 hereof;

(4)    default by the Company in the payment of the principal of any bond, debenture, note or other evidence of the Company's Indebtedness, in each case for money borrowed, or in the payment of principal under any mortgage, indenture, agreement or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness of the Company for money borrowed, which default for payment of principal is individually or in an aggregate principal amount exceeding $50,000,000 (or its equivalent in any other currency or currencies) when such indebtedness becomes due and payable (whether at maturity, upon redemption or acceleration or otherwise), if such default shall continue unremedied or unwaived for more than 30 days after the expiration of any grace period or extension of the time for payment applicable thereto.

The Company shall deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which with the giving of notice or the lapse of time or both would become an Event of Default under clause (c) of Section 5.1 of the Original Indenture or clause (4) of this Section 6.01. However, notwithstanding Section 5.1 of the Original Indenture, the Company need not deliver such written notice within 30 days after the occurrence thereof of any event which with the giving of notice or the lapse of time or both would become an Event of Default under clauses (e) or (f) of Section 5.1 of the Original Indenture.

## ARTICLE VII

### TRUSTEE

Section 7.01    Rights of Trustee.

(a)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company shall be sufficient if signed by an Officer of the Company.

(b)    In no event shall the Trustee be required to take notice of any default or breach hereof or any Event of Default hereunder, except for Events of Default specified in Section 6.01 hereof and/or Section 5.1(a) and/or 5.1(b) of the Original Indenture, unless and until the Trustee shall have received from a Holder of a Note or from the Company express written notice of the circumstances constituting the breach, default or Event of Default and stating that said circumstances constitute an Event of Default hereunder.

Section 7.02    Reports by Trustee to Holders of the Notes.

(a)    The Trustee shall transmit by mail all reports as required by TIA Section 313(c).

18

Section 7.03    Eligibility; Disqualification.

Notwithstanding Section 6.10 of the Original Indenture, the Notes shall at all times have a Trustee that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100.0 million as set forth in its most recent published annual report of condition.

In addition to Section 6.10 of the Original Indenture, the Notes shall at all times have a Trustee who satisfies the requirements of TIA Section 310(a)(1), (2) and (5).

## ARTICLE VIII

## DEFEASANCE

Section 8.01    No Defeasance.

Sections 7.2, 7.3 and 7.4 of the Original Indenture shall not apply to the Notes.

## ARTICLE IX

## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders of Notes.

In addition to the purposes set forth in Section 8.1 of the Original Indenture, the Company and the Trustee may amend this Indenture or the Notes or enter into an indenture or indentures supplement hereto (which shall conform to the provisions of the Trust Indenture Act as then in effect) without notice to or the consent of any Holder of a Note:

(1)    to provide for uncertificated Notes in place of certificated Notes or to provide for bearer Notes; or

(2)    to conform the text of the Indenture or the Notes to any provisions of the Description of the Notes section of the Prospectus Supplement to the extent that such provision of the Description of the Notes section of the Prospectus Supplement was intended to be a verbatim recitation of a provision of the Indenture or the Notes.

Section 9.02    With Consent of Holders of Notes.

In addition to clauses (a) through (f) of Section 8.2 of the Original Indenture, without the consent of each Holder affected, an amendment or supplement under Section 8.2 of the Original Indenture may not:

(1)    make any change in any conversion right to the detriment of a Holder; or

(2)    make a change in the percentage of principal amount of the Notes necessary to waive compliance with any provision of the Indenture or to make any change in Section 8.2 of the Original Indenture, as supplemented by this provision, for modification.

## ARTICLE X

## CONVERSION

Section 10.01    Conversion Privilege.

(a)    Subject to the provisions of this Article 10, a Holder of a Note may convert such Note into cash and Common Stock equal to the Conversion Value in accordance with Section 10.15, if any of the following conditions are satisfied and only during the periods set forth in this Section 10.01:

(1)    during any calendar quarter (the "Quarter") commencing after the date of issuance of the Notes, if the Common Stock Price for at least 20 Trading Days in the period of 30 consecutive Trading Days ending on the last Trading Day of the Quarter immediately preceding the Quarter in which the conversion occurs (appropriately adjusted to take into account the occurrence, during such 30 consecutive Trading Day period, of any event requiring adjustment of the Conversion Price under this Indenture) is more than 120% of the Conversion Price on such 30th Trading Day;

(2)    at any time following May 31, 2014;

(3)    (A) during the five Trading Day period immediately after a period of five consecutive Trading Days in which the Trading Price of $1,000 principal amount of Notes for each such Trading Day in such period was less than 95% of the product of (x) the Common Stock Price on such Trading Day multiplied by (y) the Conversion Rate on such Trading Day.

(B)    Notwithstanding the foregoing, if on the date of any conversion pursuant to Section 10.01(a)(3)(A), the Common Stock Price on such date is greater than the Conversion Price on such date but less than 120% of the Conversion Price on such date, then the Conversion Value a Holder of Notes will be entitled to receive will be equal to the principal amount of the Notes held by such Holder as of the Conversion Date plus accrued and unpaid interest to the Conversion Date (such a conversion, a "Principal Value Conversion") and the

20

number of Net Shares (and any cash in lieu of fractional shares) to be delivered upon a Principal Value Conversion will be determined in accordance with Section 10.15; and provided further that, in place of the Five Day Average Closing Stock Price, such number of Net Shares will be calculated using an amount equal to the greater of (i) the Conversion Price on the Conversion Date and (ii) the Common Stock Price on the Conversion Date;

(4)    during the periods set forth in Section 10.01(c) upon (i) a distribution to all or substantially all holders of Common Stock of rights, warrants or options entitling them to subscribe for or purchase, for a period expiring within 60 days of the date of such distribution, shares of Common Stock at a price less than the Common Stock Price on the Trading Day immediately preceding the date of declaration of such distribution or (ii) a distribution to all or substantially all holders of Common Stock evidences of Company indebtedness, rights or warrants to purchase or subscribe for Capital Stock or other securities of the Company, or assets, which distribution has a per share value that exceeds 12.5% of the Common Stock Price on the Trading Day immediately preceding the declaration date of such distribution; provided that, the Holder shall have no right to convert any Note pursuant to Section 10.01(c) hereof if the Holder of a Note otherwise participates in the issuance or distribution described in this Section 10.01(a)(4) without conversion of such Holder's Notes; or

(5)    (A) during the period set forth in clause (B) below, if the Company is party to a consolidation, merger, share exchange, sale of all or substantially all of its assets or other similar transaction pursuant to which the Common Stock is subject to conversion into shares of stock (other than Common Stock), other securities or property (including cash) subject to Section 10.12; provided that if such conversion occurs after the effective date of such transaction, the Holder will receive on conversion the consideration determined in accordance with Section 10.12.

(B)    The Notes shall be convertible pursuant to clause (A) above at any time from and after the date that is 15 days prior to the date of the anticipated effective time (as publicly announced by the Company) of such transaction until and including the date that is 15 days after the actual effective date of such transaction.

(C)    If (i) a Holder elects to convert its Notes pursuant to this Article upon the occurrence of a transaction described clause (5)(A) above,

21

(ii) such transaction also constitutes a Change of Control (regardless of whether a Holder has the right to require the repurchase of Notes pursuant to Section 3.03) and (iii) 10% or more of the consideration for the Common Stock (valued as set forth in Section 10.06 hereof) consists of cash, other property or securities that are not traded or scheduled to be traded or scheduled to be traded immediately following such transaction on a United States national securities exchange or the Nasdaq National Market, then, for purposes of determining the Conversion Value, the Conversion Price in respect of such Notes shall be decreased such that the Conversion Rate shall be increased by an additional number of shares of Common Stock (the "Additional Shares") determined as set forth in Section 10.06.

(b)    In the case of any distribution described in Section 10.01(a)(3), the Bid Solicitation Agent shall have no obligation to determine the Trading Price of the Notes unless the Company has requested such determination in writing, and the Company shall have no obligation to make such request unless a Holder of the Notes provides the Company with reasonable evidence that the Trading Price of the Notes on any date would be less than 95% of the product of (x) the Common Stock Price on such date and (y) the Conversion Rate then in effect. Upon receipt of such reasonable evidence, the Company shall instruct the Bid Solicitation Agent in writing to determine the Trading Price beginning on the next Trading Day and on each successive Trading Day until the Trading Price of the Notes is greater than or equal to 95% of the product of the Common Stock Price and the Conversion Rate. The Company shall make the calculations described in Section 10.01(a)(3) hereof, using the Trading Price of the Notes provided by the Bid Solicitation Agent and will advise the Trustee (or Conversion Agent, as the case may be) within a reasonable time (and, in any event, no later than three Business Days prior to the Conversion Date) of any determination of the Trading Price of the Notes. In the case of the foregoing Section 10.01(a)(4)(i) and Section 10.01(a)(4)(ii), the Company shall cause a notice of such distribution to be filed with the Trustee and the Conversion Agent and to be mailed to each Holder of Notes no later than 20 days prior to the Ex-Dividend Date for such distribution. Once the Company has given such notice, Holders may surrender their Notes for conversion by delivering the Notes to the Conversion Agent at any time thereafter until the earlier of the close of business on the Business Day prior to the Ex-Dividend Date or the Company's announcement that such distribution will not take place; provided that, the Holder shall have no right to convert any Note pursuant to this Section 10.01(c) if the Holder of a Note otherwise participates in the distribution described in either Section 10.01(a)(4)(i) or Section 10.01(a)(4)(ii) without conversion of such Holder's Notes. The "Ex-Dividend Date" for any such distribution means the date immediately prior to the commencement of "ex-dividend" trading for such distribution on The New York Stock Exchange or such other national securities exchange or The Nasdaq Stock Market or similar system of automated dissemination of quotations of securities prices on which the Common Stock is then listed or quoted.

22

(c)    A Holder may convert a portion of a Note equal to $1,000 principal amount or any integral multiple thereof. Provisions of this Indenture that apply to conversion of all of a Note also apply to conversion of a portion of a Note. A Note in respect of which a Holder has delivered a Change of Control Purchase Notice pursuant to Section 3.03 may not be converted unless such Change of Control Purchase Notice is withdrawn pursuant to Section 3.04.

(d)    A Holder of Notes is not entitled to any rights of a holder of Common Stock until, and only to the extent that, such Holder has converted its Notes into Common Stock.

Section 10.02    Conversion Procedure.

(a)    To convert a Note, a Holder must satisfy the requirements of this Article 10 and (i) complete and manually sign the irrevocable conversion notice on the back of the Note and deliver such notice to the Conversion Agent, (ii) if the Notes are in certificated form, deliver the Note to the Conversion Agent, (iii) furnish appropriate endorsements and transfer documents if required by the Registrar or the Conversion Agent, (iv) pay any transfer or other tax, if required by Section 10.03 and/or (v) if the Note is held in book-entry form, complete and deliver to the Depositary appropriate instructions pursuant to the Applicable Procedures. The later of (x) the date on which the Holder satisfies all of the foregoing requirements and (y) the Determination Date is the "Conversion Date." As soon as practicable after the Conversion Date and in any event within four Business Days thereof, the Company shall deliver to the Holder through the Conversion Agent (1) cash in the amount calculated in accordance with Section 10.15 and (2) either (A) a certificate for or (B) a book-entry notation of the number of whole shares of Common Stock issuable upon the conversion and cash in lieu of any fractional shares pursuant to Section 10.15.

(b)    The Person in whose name the Note is registered shall be deemed to be a stockholder of record on the Conversion Date; provided that no surrender of a Note on any date when the stock transfer books of the Company shall be closed shall be effective to constitute the Person or Persons entitled to receive the shares of Common Stock upon such conversion as the record holder or holders of such shares of Common Stock on such date, but such surrender shall be effective to constitute the Person or Persons entitled to receive such shares of Common Stock as the record holder or holders thereof for all purposes at the close of business on the next succeeding day on which such stock transfer books are open (subject to the provisions of the next paragraph of this Section 10.02); provided that such conversion shall be at the Conversion Price in effect on the date that such Note shall have been surrendered for conversion, as if the stock transfer books of the Company had not been closed. Upon conversion of a Note, such Person shall no longer be a Holder of such Note.

(c)    No payment or adjustment will be made for accrued interest, on a converted Note or for dividends or distributions on shares of Common Stock issued upon conversion of a Note, but if any Holder surrenders a Note for conversion between the record date for the payment of an installment of interest and the next interest payment

23

date, then, notwithstanding such conversion, the interest, payable on such interest payment date shall be paid to the Holder of such Note on such interest payment date. In such event, such Note, when surrendered for conversion, must be accompanied by delivery of a check payable to the Conversion Agent in an amount equal to the interest, payable on such interest payment date on the portion so converted. If such payment does not accompany such Note, the Note shall not be converted; provided that no such check shall be required if such Note is surrendered for conversion on the interest payment date. If the Company defaults in the payment of interest, payable on the interest payment date, the Conversion Agent shall repay such funds to the Holder.

(d)    Upon surrender of a Note that is converted in part, the Company shall execute, and the Trustee shall, upon receipt of a written order of the Company signed by two Officers, authenticate and deliver to the Holder, a new Note equal in principal amount to the unconverted portion of the Note surrendered.

Section 10.03    Taxes on Conversion.

If a Holder submits a Note for conversion, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of shares of Common Stock upon the conversion. However, the Holder shall pay any such tax which is due because the Holder requests the shares to be issued in a name other than the Holder's name. The Conversion Agent may refuse to deliver the certificates representing the shares of Common Stock being issued in a name other than the Holder's name until the Conversion Agent receives a sum sufficient to pay any tax which will be due because the shares are to be issued in a name other than the Holder's name. Nothing herein shall preclude any income tax withholding required by law or regulations.

Section 10.04    Company to Provide Stock.

The Company has reserved shares of Common Stock to permit delivery of shares of Common Stock upon conversion of the Notes up to an assumed Five Day Average Closing Stock Price, and from time to time as may be necessary shall reserve out of its authorized but unissued shares of Common Stock a sufficient number of additional shares of Common Stock to permit delivery of shares of Common Stock upon the conversion of the Notes in full.

All shares of Common Stock delivered upon conversion of the Notes shall be newly issued shares or treasury shares, shall be duly and validly issued and fully paid and nonassessable, shall be free from preemptive rights and free of any lien or adverse claim, and shall have the same rights as all of the other outstanding shares of the Company's Common Stock. The Company will endeavor promptly to comply with all federal and state securities laws regulating the offer and delivery of shares of Common Stock upon conversion of Notes, if any, and will list or cause to have quoted such shares of Common Stock on each national securities exchange or in the over-the-counter market or such other market on which the shares of Common Stock are then listed or quoted.

Section 10.05    Adjustment of Conversion Price.

24

The Conversion Price shall be adjusted (without duplication) from time to time by the Company as follows:

(a)    In case the Company shall pay a dividend or make a distribution on the Common Stock payable exclusively in Common Stock, the Conversion Price in effect at the opening of business on the day following the date fixed for the determination of stockholders entitled to receive such dividend or other distribution shall be decreased by dividing such Conversion Price by a fraction of which the denominator shall be the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination and the numerator shall be the sum of (i) such number of shares and (ii) the total number of shares constituting such dividend or other distribution, such decrease to become effective immediately after the opening of business on the day following the date fixed for such determination. For the purposes of this paragraph (a), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such dividend or distribution had not occurred.

(b)    In case the Company shall pay or make a dividend or other distribution on its Common Stock consisting exclusively of, or shall otherwise issue to all holders of its Common Stock, rights, warrants or options, in each case entitling the holders thereof to subscribe for or purchase shares of Common Stock at a price per share less than the Market Price per share of the Common Stock on the date fixed for the determination of stockholders entitled to receive such rights, warrants or options, the Conversion Price in effect at the opening of business on the day following the date fixed for such determination shall be decreased by dividing such Conversion Price by a fraction of which the denominator shall be the sum of (i) the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination plus (ii) the number of shares of Common Stock which the aggregate of the offering price of the total number of shares of Common Stock so offered for subscription or purchase would purchase at such Market Price and the numerator shall be the sum of (i) the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination plus (ii) the number of shares of Common Stock so offered for subscription or purchase, such decrease to become effective immediately after the opening of business on the day following the date fixed for such determination; provided, however, that no adjustment shall be made if Holders of the Notes may participate in the transaction on a basis and with notice that the Company's Board of Directors deems to be fair and appropriate. To the extent that rights are not so issued or shares of Common Stock are not so delivered after the expiration of such rights, warrants or options, the Conversion Price shall be readjusted to the Conversion Price which would then be in effect if such date fixed for the determination of stockholders entitled to receive such rights, warrants or options, had not been fixed. For the purposes of this paragraph (b), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company.

25