(c) In case the Company shall declare a cash dividend or distribution to all or substantially all of the holders of Common Stock, the Conversion Price shall be decreased so that the Conversion Price shall equal the price determined by multiplying the Conversion Price in effect immediately prior to the record date for such dividend or distribution by a fraction,

(i) the numerator of which shall be the average of the Common Stock Prices for the three consecutive Trading Days ending on the date immediately preceding the Ex-Dividend Date for such dividend or distribution (the "Pre-Dividend Sale Price"), minus the full amount of such cash dividend or distribution, to the extent payable in cash, applicable to one share of Common Stock, and

(ii) the denominator of which shall be the Pre-Dividend Sale Price, such adjustment to become effective immediately after the record date for such dividend or distribution; provided, that no adjustment to the Conversion Price or the ability of a Holder of a Note to convert will be made pursuant to this Section 10.05(c) if the Company provides that Holders of Notes will participate in such cash dividend or distribution on an as-converted basis without conversion; provided further, that if the numerator of the foregoing fraction is less than $1.00 (including a negative amount), then in lieu of the foregoing adjustment, adequate provision shall be made so that each Holder shall have the right to receive upon conversion, in addition to the Common Stock issuable upon such conversion (and any cash in lieu of fractional shares), the amount of cash such Holder would have received had such Holder converted its Note on the record date for such dividend or distribution at the Conversion Rate and for the Conversion Value in effect on such record date. If such dividend or distribution is not so paid or made, the Conversion Price shall be adjusted to the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

(d) Subject to the last sentence of this paragraph (d), in case the Company shall, by dividend or otherwise, distribute to all holders of its Common Stock evidences of its indebtedness, shares of any class or series of Capital Stock, cash or assets (including securities, but excluding any rights, warrants or options referred to in paragraph (b) of this Section 10.05 and any cash dividend or distribution referred to in paragraph (c) of this Section 10.05), the Conversion Price shall be decreased so that the same shall equal the price determined by dividing the Conversion Price in effect immediately prior to the effectiveness of the Conversion Price decrease contemplated by this paragraph (d) by a fraction of which the denominator shall be the Market Price per share of the Common Stock on the date fixed for the determination of stockholders entitled to receive such distribution (the "Reference Date") less the Fair Market Value, on the Reference Date, of the portion of the evidences of indebtedness, shares of capital stock, cash and/or assets so distributed applicable to one share of Common Stock and the numerator shall be such Market Price per share of the Common Stock, such decrease to become effective immediately prior to the opening of business on the day following the

26

Reference Date; provided that if the Fair Market Value of the portion of the evidences of indebtedness, shares of capital stock, cash and/or assets so distributed applicable to one share of Common Stock shall be greater than the Market Price per share of Common Stock, then in lieu of the foregoing adjustment, adequate provision shall be made so that each Holder shall have the right to receive upon conversion, in addition to the Common Stock issuable upon such conversion (and any cash in lieu of fractional shares), the amount of evidences of indebtedness, shares of capital stock, cash and/or assets so distributed that such Holder would have received had such Holder converted its Note on the record date for such dividend or distribution at the Conversion Rate and for the Conversion Value in effect on such record date; and provided, further, that no adjustment shall be made if all Holders of Notes are entitled to participate in such transactions. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such dividend or distribution had not occurred. For purposes of this paragraph (d), any dividend or distribution that includes shares of Common Stock or rights, warrants or options to subscribe for or purchase shares of Common Stock shall be deemed instead to be (i) a dividend or distribution of the evidences of indebtedness, shares of Capital Stock, cash and/or assets other than such shares of Common Stock or such rights or warrants (making any Conversion Price decrease required by this paragraph (d)) immediately followed by (ii) a dividend or distribution of such shares of Common Stock or such rights, warrants or options (making any further Conversion Price decrease required by paragraph (a) or (b) of this Section 10.05), except any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the close of business on the date fixed for such determination" within the meaning of paragraph (a) of this Section 10.05.

(e)    In case outstanding shares of Common Stock shall be subdivided into a greater number of shares of Common Stock, the Conversion Price in effect at the opening of business on the Business Day following the day upon which such subdivision becomes effective shall be proportionately decreased and, conversely, in case outstanding shares of Common Stock shall each be combined into a smaller number of shares of Common Stock, the Conversion Price in effect at the opening of business on the day following the day upon which such combination becomes effective shall be proportionately increased, such increase or decrease, as the case may be, to become effective immediately after the opening of business on the Business Day following the day upon which such subdivision or combination becomes effective.

(f)    In case the Company pays to holders of Common Stock in respect of a tender or exchange offer, other than an odd-lot offer, by the Company or any of its Subsidiaries for Common Stock to the extent that the offer involves aggregate consideration that, together with (1) any cash and the Fair Market Value of any other consideration payable in respect of any tender offer by the Company or any of its Subsidiaries for shares of Common Stock consummated within the preceding 12 months not triggering a Conversion Price adjustment and (2) all-cash distributions to all or substantially all holders of the Company's Common Stock made within the preceding 12 months not triggering a Conversion Price adjustment, exceeds an amount equal to 12.5% of the market capitalization of Common Stock on the expiration date of the tender offer,

27

the Conversion Price shall be decreased so that the same shall equal the price determined by dividing the Conversion Price in effect immediately prior to the effectiveness of the Conversion Price decrease contemplated by this Section 10.05(f) by a fraction of which the denominator shall be the number of shares of Common Stock outstanding (including any tendered or exchanged shares) at the last time tenders of exchanges may be made pursuant to such tender or exchange offer (the "Expiration Time") multiplied by the Market Price per share of the Common Stock on the Trading Day next succeeding the Expiration Time and the numerator shall be the sum of (x) the Fair Market Value (determined as aforesaid) of the aggregate consideration payable to stockholders based on the acceptance (up to any maximum specified in the terms of the tender or exchange offer) of all shares validly tendered or exchanged and not withdrawn as of the Expiration Time (the shares deemed so accepted, up to any such maximum, being referred to as the "Purchased Shares") and (y) the product of the number of shares of Common Stock outstanding (less any Purchased Shares) at the Expiration Time and the Market Price per share of the Common Stock on the Trading Day next succeeding the Expiration Time, such decrease to become effective immediately prior to the opening of business on the Business Day following the Expiration Time.

In any case in which this Section 10.05 shall require that an adjustment be made immediately following a record date established for purposes of this Section 10.05, the Company may elect to defer (but only until five Business Days following the filing by the Company with the Trustee of the certificate described in Section 10.10) issuing to the holder of any Note converted after such record date the shares of Common Stock issuable upon such conversion over and above the shares of Common Stock issuable upon such conversion only on the basis of the Conversion Price prior to adjustment; and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

Section 10.06    Adjustment for Certain Changes of Control.

The number of Additional Shares in connection with an adjustment of the Conversion Price as set forth in Section 10.01(a)(5)(C) shall be determined by reference to the table attached as Schedule A hereto, based on the date on which the corporate transaction becomes effective (the "Effective Date") and the stock price paid per share of Common Stock (valued as set forth in the next paragraph) in the corporate transaction (the "Stock Price"); provided that if the Stock Price is between two Stock Price amounts in the table or the Effective Date is between two Effective Dates in the table, the number of Additional Shares will be determined by a straight-line interpolation between the number of Additional Shares set forth for the higher and lower Stock Price amounts and the two dates, as applicable, based on a 365-day year.

The Stock Price per share of Common Stock shall be valued as follows:

(i)    if holders of the Common Stock receive only cash in the corporate transaction, the Stock Price shall be the cash amount paid per share of the Common Stock, and

28

(ii)    in all other cases, the Stock Price shall be the average of the Common Stock Price on the five Trading Days prior to but not including the Effective Date.

Notwithstanding the foregoing, (i) if the Stock Price is equal to or greater than $20 or less than $3.10 (subject in each case to adjustment as described below), the number of Additional Shares shall be zero and (ii) in no event may the total number of shares of Common Stock issuable upon conversion exceed approximately 322.5806 per $1,000 principal amount of Notes, subject to adjustments in the same manner as the Conversion Price as set forth in Section 10.05. The maximum amount of Additional Shares payable shall be 72.5806 per $1,000 principal amount of Notes, subject to adjustments on the same basis.

The Stock Prices set forth in the first row of the table (i.e., column headers) in Schedule A hereto and set forth in the proviso at the first sentence of the first paragraph of this Section will be adjusted as of any date on which the Conversion Price of the Notes is adjusted pursuant to Section 10.05. The adjusted Stock Prices will equal the Stock Prices applicable immediately prior to such adjustment, multiplied by a fraction, the numerator of which is the Conversion Rate immediately prior to the adjustment giving rise to the Stock Price adjustment and the denominator of which is the Conversion Rate as so adjusted. The number of Additional Shares will be adjusted in the same manner as the Conversion Price as set forth in Section 10.05.

Section 10.07    When No Adjustment Required.

No adjustment of the Conversion Price shall be made:

(a)    upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on securities of the Company and the investment of additional optional amounts in shares of Common Stock under any plan,

(b)    upon the issuance of any shares of Common Stock or options or rights to purchase those shares pursuant to any present or future employee, director or consultant benefit plan or program of the Company,

(c)    upon the issuance of any shares of Common Stock pursuant to any option, warrant, right or exercisable, exchangeable or convertible security outstanding as of the date the Notes were first issued,

(d)    upon the issuance of any rights, any distribution of separate certificates representing the rights, any exercise or redemption of any rights or any termination or invalidation of the rights, pursuant to the Company's stockholders rights plan, or

(e)    for a change in the par value or no par value of the shares of Common Stock.

29

There shall also be no adjustment of the Conversion Price in case of the issuance of any Common Stock (or securities convertible into or exchangeable for Common Stock), except as specifically described above.

### Section 10.08    When Adjustment May Be Deferred.

No adjustment in the Conversion Price need be made unless the adjustment would require an increase or decrease of at least 1% in the Conversion Price (other than an adjustment described in Section 10.05(f)). Any adjustments that are not made under this Section 10.08 shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Article 10 shall be made to the nearest cent, with one-half cent rounded up, or to the nearest 1/1,000th of a share, with 1/500th of a share being rounded up, as the case may be.

### Section 10.09    Successive Adjustments.

After an adjustment to the Conversion Price under this Article 10, any subsequent event requiring an adjustment under this Article 10 shall cause an adjustment to the Conversion Price as so adjusted.

### Section 10.10    Notice of Adjustment.

Whenever the Conversion Price is adjusted, the Company shall promptly mail to Holders of Notes a notice of the adjustment and concurrently file with the Trustee and the Conversion Agent such notice and a certificate from the Company's independent public accountants briefly stating the facts requiring the adjustment and the manner of computing such adjustment. The certificate shall be conclusive evidence that such adjustment is correct. Neither the Trustee nor any Conversion Agent shall be under any duty or responsibility with respect to any such notice and certificate (or the receipt of such notice and certificate or with the knowledge of any adjustment absent such notice and certificate) except to exhibit the same to any Holder desiring inspection thereof.

### Section 10.11    Notice of Certain Transactions.

The Company shall mail to Holders of Notes and file with the Trustee and/or the Conversion Agent a notice stating the proposed record date for a dividend or distribution or the proposed effective date of a subdivision, combination, reclassification, consolidation, merger, binding share exchange, transfer, liquidation or dissolution, if any of the following occur:

(a)    the Company takes any action that would require an adjustment in the Conversion Price pursuant to Section 10.05 (unless no adjustment is to occur pursuant to Section 10.06); or

(b)    the Company takes any action that would require a supplemental indenture pursuant to Section 10.12; or

(c)    there is a liquidation or dissolution of the Company.

The Company shall file and mail such notice at least 15 days before the applicable date of any such transaction. Failure to file or mail the notice or any defect in it shall not affect the validity of the transaction.

Section 10.12    Effect of Reclassification, Consolidation, Merger, Share Exchange or Sale on Conversion Privilege.

If any of the following shall occur: (i) any reclassification or change of outstanding shares of Common Stock (other than a change in par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination); (ii) any consolidation, combination, merger or share exchange to which the Company is a party other than a merger in which the Company is the continuing corporation and which does not result in any reclassification of, or change (other than a change in name, or par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination) in, outstanding shares of Common Stock; or (iii) any sale or conveyance of all or substantially all of the assets of the Company; then the Company, or such successor or purchasing corporation, as the case may be, shall, as a condition precedent to such reclassification, change, consolidation, merger, share exchange, sale or conveyance, execute and deliver to the Trustee a supplemental indenture providing that the Holder of each Note then outstanding shall have the right to convert such Note into the kind and amount of shares of Capital Stock and other securities and property (including cash) receivable upon such reclassification, change, consolidation, merger, share exchange, sale or conveyance by a holder of the number of shares of Common Stock deliverable upon conversion of such Note immediately prior to such reclassification, change, consolidation, merger, share exchange, sale or conveyance. Such supplemental indenture shall provide for adjustments of the Conversion Price which shall be as nearly equivalent as may be practicable to the adjustments of the Conversion Price provided for in this Article 10. If, in the case of any such consolidation, merger, share exchange, sale or conveyance, the stock or other securities and property (including cash) receivable thereupon by a holder of Common Stock includes shares of Capital Stock or other securities and property of a corporation other than the successor or purchasing corporation, as the case may be, in such consolidation, merger, share exchange, sale or conveyance, then such supplemental indenture shall also be executed by such other corporation and shall contain such additional provisions to protect the interests of the Holders of the Notes as the Board of Directors of the Company shall reasonably consider necessary by reason of the foregoing. The provision of this Section 10.12 shall similarly apply to successive consolidations, mergers, share exchanges, sales or conveyances. Notwithstanding the foregoing, a distribution by the Company to all or substantially all holders of its Common Stock for which an adjustment to the Conversion Price or provision for conversion of the Notes may be made pursuant to Section 10.05 shall not be deemed to be a sale or conveyance of all or substantially all of the assets of the Company for purposes of this Section 10.12.

In the event the Company shall execute a supplemental indenture pursuant to this Section 10.12, the Company shall promptly file with the Trustee an Opinion of Counsel stating that such supplemental indenture is authorized or permitted by this Indenture and an Officer's Certificate briefly stating (a) the reasons therefor, (b) the kind

31

or amount of shares of stock or securities or property (including cash) receivable by Holders of the Notes upon the conversion of their Notes after any such reclassification, change, consolidation, merger, share exchange, sale or conveyance, (c) any adjustment to be made with respect thereto and (d) that all conditions precedent have been complied with.

### Section 10.13    Trustee's Disclaimer.

The Trustee has no duty to determine when an adjustment under this Article 10 should be made, how it should be made or what such adjustment should be made, but may accept as conclusive evidence of the correctness thereof, and shall be protected in relying upon, the Officer's Certificate with respect thereto, which the Company is obligated to file with the Trustee pursuant to Section 10.10. The Trustee shall not be accountable for and makes no representation as to the validity or value of any securities or assets issued upon conversion of Notes, and the Trustee shall not be responsible for the Company's failure to comply with any provisions of this Article 10. Each Conversion Agent (other than the Company or an Affiliate of the Company) shall have the same protection under this Section 10.13 as the Trustee.

The Trustee shall not be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture executed pursuant to Section 10.12, but may accept as conclusive evidence of the correctness thereof, and shall be protected in relying upon, the Officer's Certificate with respect thereto, which the Company is obligated to file with the Trustee pursuant to Section 10.12 of this Indenture.

### Section 10.14    Voluntary Reduction.

The Company from time to time may decrease the Conversion Price by any amount at any time for at least 20 days, so long as the decrease is irrevocable during such 20-day period. Whenever the Conversion Price is decreased, the Company shall mail to Holders of Notes and file with the Trustee and the Conversion Agent a notice of the decrease. The Company shall mail the notice at least 15 days before the date the decreased Conversion Price takes effect. The notice shall state the decreased Conversion Price and the period during which it will be in effect. A voluntary decrease of the Conversion Price does not change or adjust the Conversion Price otherwise in effect for purposes of Section 10.15.

### Section 10.15    Conversion Value of Notes Tendered.

(a)    Subject to certain exceptions described in Sections 10.01(a)(3) and 10.01(a)(4), Holders tendering the Notes for conversion shall be entitled to receive, upon conversion of such Notes, cash and shares of Common Stock, the value of which (the "Conversion Value") shall be equal to the product of:

(1)    (A) the aggregate principal amount of Notes to be converted divided by 1,000 multiplied by (B) the Conversion Rate (including Additional Shares, if any); and

(2) the average of the Common Stock Price for the five consecutive Trading Days (appropriately adjusted to take into account the occurrence during such period of stock splits and similar events) including and immediately following the second Trading Day following the day the Notes are tendered for conversion (the "Five Day Average Closing Stock Price").

(b) Subject to certain exceptions described below and under Sections 10.01(a)(3) and 10.01(a)(4), the Company shall deliver the Conversion Value to converting holders as follows:

(1) an amount in cash (the "Principal Return") equal to the lesser of (a) the aggregate Conversion Value of the Notes to be converted and (b) the aggregate principal amount of Notes to be converted as of the date tendered for conversion;

(2) subject to the exceptions described below, if the aggregate Conversion Value of the Notes to be converted is greater than the aggregate Principal Return of the Notes to be converted, an amount in shares (the "Net Shares"), determined as set forth below, equal to the difference between such aggregate Conversion Value and such aggregate Principal Return (the "Net Share Amount"); and

(3) an amount paid in cash, determined as set forth below, for any fractional shares of Common Stock.

The number of Net Shares to be paid shall be determined by dividing the Net Share Amount by the Five Day Average Closing Stock Price. Holders of Notes will not receive a fractional share upon conversion of a Note. Instead, the Holder will receive cash for the value of the fractional share. The cash payment for fractional shares shall be based on the Five Day Average Closing Stock Price.

The Conversion Value, Principal Return, number of Net Shares and Net Share Amount shall be determined by the Company at the end of the fifth consecutive Trading Day including and immediately following the second Trading Day after the day the Notes are tendered for conversion (the "Determination Date").

(c) The Company shall pay the Principal Return and cash for fractional shares and deliver the Net Shares, if any, as promptly as practicable after the Conversion Date, but in no event later than four Business Days thereafter, subject to Section 3.02. Delivery of the Principal Return, Net Shares and cash in lieu of fractional shares shall be deemed to satisfy the Company's obligation to pay the principal amount of the Notes, as well as accrued interest payable on the Notes, except as described below. Accrued interest shall be deemed paid in full rather than canceled, extinguished or forfeited. The Company shall not adjust the Conversion Price to account for the accrued interest. Except as described in the following sentence, upon conversion of any Notes on a date that is not an interest payment date, Holders will not be entitled to receive any

33

additional cash payment representing accrued and unpaid interest for the period from the immediately preceding interest payment date to the Conversion Date with respect to the converted Notes and such interest will be deemed paid in full. Nonetheless, if Notes are converted after a regular record date and prior to the opening of business on the next interest payment date, including the date of maturity, Holders of such Notes, at the close of business on the next regular record date shall receive the interest payable on such Notes on the corresponding interest payment date notwithstanding the conversion. Such Notes, upon surrender for conversion, must be accompanied by funds equal to the amount of interest payable on that interest payment date on the Notes so converted.

(d)    If an Event of Default as set forth in Section 5.1(e) or (f) of the Original Indenture has occurred and is continuing, the Company may not pay cash upon conversion of any Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock, provided that Holders shall receive an amount in cash in lieu of any fractional shares. The number of shares of Common Stock to be delivered will be equal to (A) the aggregate principal amount of Notes to be converted divided by 1,000 multiplied by (B) the Conversion Rate.

(e)    Neither the Trustee nor the Conversion Agent has any duty to determine or calculate the Conversion Value, Principal Return, number of Net Shares, the Net Share Amount of any other computation required under this Article 10, all of which shall be determined by the Company (or the Bid Solicitation Agent, as the case may be) in accordance with the provisions of this Indenture and the Trustee and Conversion Agent shall not be under any responsibility to determine the correctness of any such determinations and/or calculations and may conclusively rely on the correctness thereof.

## ARTICLE XI

## SUBORDINATION

Section 11.01    Agreement to Subordinate.

The Company covenants and agrees, and each Holder of Notes by such Holder's acceptance thereof likewise covenants and agrees, that all Notes shall be issued subject to the provisions of this Article 11; and each Holder of a Note, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provisions. The payment by the Company of the principal of, premium, if any, interest and other Obligations with respect to all Notes issued hereunder shall, to the extent and in the manner hereinafter set forth, be subordinated and junior in right of payment to the prior payment in full in cash of principal of (and premium, if any), interest and all other Obligations with respect to all Senior Debt, whether outstanding at the date of this Third Supplemental Indenture or thereafter incurred; provided, however, that no provision of this Article 11 shall prevent the occurrence of any Default or Event of Default hereunder.

Section 11.02    Default On Senior Debt.

34

In the event and during the continuation of any default by the Company in the payment of principal, premium, if any, interest on or any other Obligation relating to, any Senior Debt when the same becomes due and payable (a "Payment Default"), whether at maturity or at a date fixed for prepayment or by declaration of acceleration or otherwise, and such Payment Default continues beyond the period of grace, if any, specified in the instrument evidencing such Senior Debt, then unless and until such Payment Default shall have been cured or waived or shall have ceased to exist or all Senior Debt and all Obligations relating thereto have been paid in full in cash (and in the event that the maturity of any Senior Debt has been accelerated because of a default, the holders of all Senior Debt outstanding have been paid in full in cash), then no direct or indirect payment or distribution (in cash, property, securities, by set-off or otherwise) shall be made or agreed to be made with respect to the principal of (including redemption payments), premium, if any, or interest on, or any other Obligations relating to, the Notes or in respect of any redemption, repayment, retirement, purchase or other acquisition of any of the Notes.

In the event that, notwithstanding the foregoing, any payment shall be received by the Trustee when such payment is prohibited by the preceding paragraph of this Section 11.02, such payment shall be held in trust for the benefit of, and shall be paid over or delivered to the holders of Senior Debt, or their respective representatives, or to the trustee or trustees under any indenture pursuant to which any of such Senior Debt may have been issued, as their respective interests may appear, but only to the extent that the holders of the Senior Debt (or their representative or representatives or a trustee) notify the Trustee in writing within 180 days of such payment of the amounts then due and owing to the holders of such Senior Debt and only the amounts specified in such notice to the Trustee shall be paid to the holders of such Senior Debt.

Section 11.03    Liquidation; Dissolution; Bankruptcy.

Upon any direct or indirect payment by or on behalf of the Company or direct or indirect distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, to creditors upon any dissolution or winding up or liquidation or reorganization of the Company or assignment for the benefit of creditors or marshaling of assets, whether voluntary or involuntary, or in bankruptcy, insolvency, receivership or other proceedings, all amounts (including principal, premium, if any, and interest) due or to become due upon all Senior Debt shall first be paid in full in cash, or such payment thereof provided for in money in accordance with its terms, before any payment or distribution is made on account of the principal (and premium, if any), interest or any other Obligation relating to the Notes; and upon any such dissolution or winding up or liquidation or reorganization, any direct or indirect payment by the Company, or direct or indirect payment or distribution (in cash, property, securities, by set-off or otherwise) to which the Holders of the Notes or the Trustee would be entitled, except for the provisions of this Article 11, shall be paid by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other Person making such payment or distribution, or by the Holders of the Notes or by the Trustee under this Indenture if received by them or it, directly to the holders of Senior Debt (pro rata to such holders on the basis of the respective amounts of Senior Debt held by such holders, as

35

calculated by the Company) or their representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing such Senior Debt may have been issued, as their respective interests may appear, to the extent necessary to pay such Senior Debt in full, in cash, after giving effect to any concurrent payment or distribution to or for the holders of such Senior Debt, before any such payment or distribution is made to the Holders of Notes or to the Trustee.

In the event that, notwithstanding the foregoing, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, prohibited by the foregoing, shall be received by the Trustee or the Holders of the Notes before all Senior Debt is paid in full in cash, or provision is made for such payment in cash in accordance with its terms, such payment or distribution shall be held in trust for the benefit of and shall be paid over or delivered to the holders of Senior Debt or their representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing such Senior Debt may have been issued, and their respective interests may appear, as calculated by the Company, for application to the payment of all Senior Debt remaining unpaid to the extent necessary to pay such Senior Debt in full in cash in accordance with its terms, after giving effect to any concurrent payment or distribution to or for the holders of such Senior Debt.

For purposes of this Article 11, the words, "cash, property or securities" shall not be deemed to include shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinated at least to the extent provided in this Article 11 with respect to the Notes to the payment of all Senior Debt which may at the time be outstanding; provided that (i) such Senior Debt is assumed by the new corporation, if any, resulting from any such reorganization or readjustment, and (ii) the rights of the holders of such Senior Debt are not, without the consent of such holders, altered by such reorganization or readjustment. The consolidation of the Company with, or the merger of the Company with or into, another Person or the liquidation or dissolution of the Company following the conveyance or transfer of its properties and assets substantially as an entirety to another Person upon the terms and conditions provided for in Article IV of the Original Indenture and subject to Section 5.01 shall not be deemed a dissolution, winding up, liquidation or reorganization for the purposes of this Section 11.03 if such other Person shall, as a part of such consolidation, merger, conveyance, or transfer, comply with the conditions stated in Article IV of the Original Indenture. Nothing in Section 11.02 or this Section 11.03 shall apply to claims of, or payments to, the Trustee under or pursuant to Section 6.7 of the Original Indenture.

Section 11.04    Subrogation.

Subject to the payment in full in cash of all Senior Debt, the rights of the Holders of the Notes shall be subrogated to the rights of the holders of such Senior Debt to receive payments or distributions of cash, property or securities of the Company, as the case may be, applicable to such Senior Debt until the principal of (and premium, if any) and interest on the Notes shall be paid in full; and, for the purposes of such subrogation,

36

no payments or distributions to the holders of such Senior Debt of any cash, property or securities to which the Holders of the Notes or the Trustee would be entitled except for the provisions of this Article 11, and no payment over pursuant to the provisions of this Article 11, to or for the benefit of the holders of such Senior Debt by Holders of the Notes or the Trustee, shall, as between the Company, its creditors other than holders of Senior Debt, and the Holders of the Notes, be deemed to be a payment by the Company to or on account of such Senior Debt. It is understood that the provisions of this Article 11 are and are intended solely for the purposes of defining the relative rights of the Holders of the Notes, on the one hand, and the holders of such Senior Debt on the other hand.

Nothing contained in this Article 11 or elsewhere in this Indenture or in the Notes is intended to or shall impair, as between the Company, its creditors other than the holders of Senior Debt, and the Holders of the Notes, the obligation of the Company, which is absolute and unconditional, to pay to the Holders of the Notes the principal of (and premium, if any) and interest on the Notes as and when the same shall become due and payable in accordance with their terms, or is intended to or shall affect the relative rights of the Holders of the Notes and creditors of the Company, as the case may be, other than the holders of Senior Debt, nor shall anything herein or therein prevent the Trustee or the Holder of any Note from exercising all remedies otherwise permitted by applicable law upon default under this Indenture, subject to the rights, if any, under this Article 11 of the holders of such Senior Debt in respect of cash, property or securities of the Company, as the case may be, received upon the exercise of any such remedy.

Upon any payment or distribution of assets of the Company referred to in this Article 11, the Trustee, subject to the provisions of Section 6.2 of the Original Indenture, and the Holders of the Notes, shall be entitled to rely upon any order or decree made by any court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending, or a certificate of the receiver, trustee in bankruptcy, liquidation trustee, agent or other Person making such payment or distribution, delivered to the Trustee or to the Holders of the Notes, for the purposes of ascertaining the Persons entitled to participate in such distribution, the holders of the Senior Debt and other indebtedness of the Company, as the case may be, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article 11; provided that such court, trustee, receiver, agent or other Person has been apprised of, or the order, decree or certificate makes reference to, the provisions of this Article.

Section 11.05     Trustee To Effectuate Subordination.

Each Holder of Notes by such Holder's acceptance thereof authorizes and directs the Trustee on such Holder's behalf to take such action as may be necessary or appropriate to effectuate the subordination provided in this Article 11 and appoints the Trustee as such Holder's attorney-in-fact for any and all such purposes.

Section 11.06     Notice By The Company.

37

The Company shall give prompt written notice to the Trustee of any fact known to the Company which would prohibit the making of any payment of monies to or by the Trustee in respect of the Notes pursuant to the provisions of this Article 11. Notwithstanding the provisions of this Article 11 or any other provision of this Indenture, the Trustee shall not be charged with knowledge of the existence of any facts which would prohibit the making of any payment of monies to or by the Trustee in respect of the Notes pursuant to the provisions of this Article 11, unless and until the Trustee shall have received written notice thereof at the Corporate Trust Office of the Trustee from the Company or a holder or holders of Senior Debt or from any trustee therefor or representative thereof; and before the receipt of any such written notice, the Trustee, subject to the provisions of Section 6.2 of the Original Indenture, shall be entitled in all respects to assume that no such facts exist; provided, however, that if the Trustee shall not have received the notice provided for in this Section 11.06 at least two Business Days prior to the date upon which by the terms hereof any money may become payable for any purpose (including, without limitation, the payment of the principal of (and premium, if any) or interest on any Security), then, anything herein contained to the contrary notwithstanding, the Trustee shall have full power and authority to receive such money and to apply the same to the purposes for which they were received, and shall not be affected by any notice to the contrary which may be received by it within two Business Days prior to such date.

The Trustee shall be entitled to rely on the delivery to it of a written notice by a Person representing himself to be a holder of Senior Debt (or a trustee or representative on behalf of such holder) to establish that such notice has been given by a holder of such Senior Debt or a trustee or representative on behalf of any such holder or holders. In the event that the Trustee determines in good faith that further evidence is required with respect to the right of any Person as a holder of Senior Debt to participate in any payment or distribution pursuant to this Article 11, the Trustee may request such Person to furnish evidence to the reasonable satisfaction of the Trustee as to the amount of Senior Debt held by such Person, the extent to which such Person is entitled to participate in such payment or distribution and any other facts pertinent to the right of such Person under this Article 11, and, if such evidence is not furnished, the Trustee may defer any payment to such Person pending judicial determination as to the right of such Person to receive such payment or distribution.

Section 11.07    Rights Of The Trustee; Holders Of Senior Debt.

The Trustee in its individual capacity shall be entitled to all the rights set forth in this Article 11 in respect of any Senior Debt at any time held by it, to the same extent as any other holder of Senior Debt, and nothing in this Indenture shall deprive the Trustee of any of its rights as such holder. With respect to the holders of Senior Debt of the Company, the Trustee undertakes to perform or to observe only such of its covenants and obligations as are set forth in this Article 11, and no implied covenants or obligations with respect to the holders of such Senior Debt shall be read into this Indenture against the Trustee. The Trustee shall not be deemed to owe any fiduciary duty to the holders of such Senior Debt and, subject to the provisions of Section 6.2 of the Original Indenture, the Trustee shall not be liable to any holder of such Senior Debt if it shall pay over or

38

deliver to Holders of Notes, the Company or any other Person money or assets to which any holder of such Senior Debt shall be entitled by virtue of this Article 11 or otherwise.

Section 11.08    Subordination May Not Be Impaired.

(a)    No right of any present or future holder of any Senior Debt to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company with the terms, provisions and covenants of this Indenture, regardless of any knowledge thereof which any such holder may have or otherwise be charged with.

(b)    Without in any way limiting the generality of the foregoing paragraph, the holders of Senior Debt may, at any time and from time to time, without the consent of or notice to the Trustee or the Holders of the Notes, without incurring responsibility to the Holders of the Notes and without impairing or releasing the subordination provided in this Article 11 or the obligations hereunder of the Holders of the Notes to the holders of Senior Debt, do any one or more of the following: (i) change the manner, place or terms of payment or extend the time of payment of, or renew or alter, such Senior Debt, or otherwise amend or supplement in any manner such Senior Debt or any instrument evidencing the same or any agreement under which such Senior Debt is outstanding; (ii) sell, exchange, release or otherwise deal with any property pledged, mortgaged or otherwise securing such Senior Debt; (iii) release any Person liable in any manner for the collection of such Senior Debt; and (iv) exercise or refrain from exercising any rights against the Company and any other Person.

(c)    The subordination provisions of this Article 11 shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Senior Debt is, pursuant to applicable law, avoided, recovered, or rescinded or must otherwise be restored or returned by any holder of Senior Debt, whether as a "voidable preference," "fraudulent conveyance," "fraudulent transfer," or otherwise, all as though such payment or performance had not been made.

(d)    If, upon any proceeding referred to in Section 11.03, the Trustee does not file a claim in such proceeding prior to fifteen Business Days before the expiration of the time to file such claim, the holders of Senior Debt or their agent may file such claim on behalf of the Holders of the Notes.

(e)    The subordination provisions contained herein are solely for the benefit of the holders from time to time of Senior Debt and their representatives, assignees and beneficiaries and may not be rescinded, canceled, amended or modified in any way other than, as to any holder of Senior Debt, pursuant to an amendment or modification that is permitted by the documentation relating to the Senior Debt applicable to such holder.

39

## ARTICLE XII

### MISCELLANEOUS

Section 12.01    No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 12.02    Severability.

In case any provision in this Third Supplemental Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 12.03    Table of Contents, Headings, etc

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 12.04    Ratification Of Original Indentured

The Original Indenture, as supplemented by this Third Supplemental Indenture, is in all respects ratified and confirmed, and this Third Supplemental Indenture shall be deemed part of the Original Indenture in the manner and to the extent herein and therein provided.

Section 12.05    Trustee Not Responsible for Recitals.

The recitals herein contained are made by the Company and not by the Trustee, and the Trustee assumes no responsibility for the correctness thereof. The Trustee makes no representation as to the validity or sufficiency of this Third Supplemental Indenture.

Section 12.06    Performance by Trustee.

The Trustee, for itself and its successors accepts the trusts under the Original Indenture as amended by this Third Supplemental Indenture, and agrees to perform the same, but only upon the terms and conditions set forth in the Original Indenture, including, without limitation, the terms and provisions defining and limiting the liability and responsibility of the Trustee.

Section 12.07    Governing Law.

40

This Third Supplemental Indenture and each Note shall be governed by and construed in accordance with the laws of the State of New York.

[Signatures on following page]

41

SIGNATURES

Dated as of June 23, 2005

CALPINE CORPORATION

By:  _L. D. Kelly_

Name:
Title:      ROBERT D. KELLY
            EXECUTIVE VICE PRESIDENT

WILMINGTON TRUST COMPANY

By:  _____

Name:
Title:

[SIGNATURE PAGE TO THE THIRD SUPPLEMENTAL INDENTURE]

SIGNATURES

Dated as of June 23, 2005

CALPINE CORPORATION

By: _____
    Name:
    Title:

WILMINGTON TRUST COMPANY

By: _____
    Name:       James J. McGinley
    Title:       Authorized Signer

[SIGNATURE PAGE TO THE THIRD SUPPLEMENTAL INDENTURE]

EXHIBIT A

[Face of Note]

THIS NOTE IS ISSUED IN GLOBAL FORM AND REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC") OR A NOMINEE THEREOF. UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, TO THE COMPANY (AS DEFINED BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO., OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE REGISTERED FORM IN ACCORDANCE WITH THE TERMS HEREOF AND OF THE INDENTURE (AS DEFINED BELOW), THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY DTC TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

A-1

## CALPINE CORPORATION

### $[ ] PRINCIPAL AMOUNT OF
### 7.75% CONTINGENT CONVERTIBLE NOTES DUE 2015

No. ____

principal amount $_____
CUSIP: 131347BN5
ISIN: US131347BN56

Calpine Corporation, a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal amount in Dollars on June 1, 2015.

Interest Payment Dates: June 1 and December 1.

Record Dates: May 15 and November 15.

Additional provisions of this Note are set forth on the reverse hereof.

A-2

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officers.

Date: June 23, 2005

CALPINE CORPORATION

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:


Dated:  June 23, 2005

TRUSTEE'S CERTIFICATE OF AUTHENTICATION:

Wilmington Trust Company, as Trustee, certifies that this is one of the Notes referred to in the Indenture.


By: _____    Dated: _____
        Authorized Officer

A-3

[Back of Note]

$[ ] principal amount of 7.75% Contingent Convertible Notes due 2015

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1) INTEREST.  Calpine Corporation, a Delaware corporation (such corporation and its successors and assigns under the Indenture referred to below, being herein called the "Company"), promises to pay interest on the principal amount of this Note at 7.75% per annum from June 23, 2005 until maturity. The Company shall pay interest semi-annually in arrears on June 1 and December 1 of each year, commencing December 1, 2005, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date"), except as set forth in this paragraph.  Interest on the Notes shall accrue (except as set forth in this paragraph) from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date.  The Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 1% per annum in excess of the rate then in effect; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful.  Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

(2) METHOD OF PAYMENT.  The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders of Notes at the close of business on the May 15 or November 15 next preceding the Interest Payment Date, even if such Notes are cancelled after such record date and on or before such Interest Payment Date, except as provided in Section 2.13 of the Original Indenture with respect to defaulted interest.  Holders must surrender Notes to a Paying Agent to collect principal payments.  The Notes shall be payable as to principal, premium, if any, and interest at the office or agency of the Company maintained for such purpose within or without the City and State of New York, or, at the option of the Company, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds shall be required with respect to principal of and interest, premium on, all Global Notes and all other Notes the Holders of which shall have provided wire transfer instructions to the Company or the Paying Agent.  Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

A-4

(3) PAYING AGENT, CONVERSION AGENT AND REGISTRAR. Initially, Wilmington Trust Company, the Trustee under the Indenture, shall act as Paying Agent, Conversion Agent and Registrar. The Company may change any Paying Agent, Conversion Agent or Registrar without prior notice to any Holder. The Company or any of its Subsidiaries may act in any such capacity.

(4) INDENTURE. The Company issued the Notes under an Indenture dated as of August 10, 2000, as supplemented by the First Supplemental Indenture dated as of September 28, 2000, the Second Supplemental Indenture dated as of September 30, 2004 and the Third Supplemental Indenture dated as of June 23, 2005 (as so supplemented, the "Indenture") between the Company and the Trustee. The Notes are unsecured general obligations of the Company. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (15 U.S. Code Sections 77aaa-77bbbb). The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

(5) MANDATORY REDEMPTION. The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

(6) REPURCHASE AT OPTION OF HOLDER. If a Change of Control occurs, each Holder of Notes shall have the right to require the Company to repurchase all or any part (equal to $1,000 principal amount or an integral multiple of $1,000) of that Holder's Notes pursuant to the terms set forth in the Third Supplemental Indenture. The Company shall deliver to each holder, that has delivered to the Paying Agent an irrevocable written notice of purchase and the Notes to be repurchased, a payment in cash equal the Change of Control Purchase Price as set forth in the Third Supplemental Indenture. Within 30 days following any Change of Control, the Company shall mail a notice to each Holder as required by the Third Supplemental Indenture.

(7) CONVERSION. Upon satisfaction of the conditions set forth in Section 10.01(a) of the Third Supplemental Indenture, a Holder of a Note may convert any portion of the principal amount of any Note that is an integral multiple of $1,000 into cash and fully paid and non-assessable shares (calculated as to each conversion to the nearest 1/1,000th of a share) of Common Stock in accordance with the provisions of Section 10.15 of the Third Supplemental Indenture. Such conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Day immediately preceding the date of Maturity, subject, in the case of conversion of any Global Note, to any Applicable Procedures. The Conversion Price shall, as of the date of the Third Supplemental Indenture, initially be $4.00. The Conversion Rate shall, as of the date of the Third Supplemental Indenture, initially be 250.0000 per

A-5

$1,000 principal amount of Notes. The Conversion Rate will be adjusted under the circumstances specified in the Third Supplemental Indenture.

(8) SUBORDINATION. The Notes shall be subordinated to Senior Debt to the extent and in the manner provided for in the Third Supplemental Indenture.

(9) DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in denominations of $1,000 principal amount and integral multiples of $1,000. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Notes during the period between a record date and the corresponding Interest Payment Date.

(10) DEFEASANCE. The Company may not terminate some or all of its obligations under the Notes and the Indenture as it pertains to the Notes.

(11) PERSONS DEEMED OWNERS. The registered Holder of a Note may be treated as its owner for all purposes, except that interest (other than defaulted interest) will be paid to the person that was the registered Holder on the relevant record date for such payment of interest.

(12) AMENDMENT, SUPPLEMENT AND WAIVER. Subject to certain exceptions, the Indenture or the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the then outstanding Notes voting as a single class, and any existing default or compliance with any provision of the Notes or the Indenture (with respect to the Notes) may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes voting as a single class. Without the consent of any Holder of a Note, the Indenture or the Notes may be amended or supplemented as set forth in the Indenture.

(13) DEFAULTS AND REMEDIES. Events of Default shall be as set forth in the Indenture. If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable. Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all outstanding Notes shall become due and payable without further action or notice. Holders may not enforce the Indenture or the Notes except as provided in the Indenture.

(14) TRUSTEE DEALINGS WITH COMPANY. Subject to the provisions of the Trust Indenture Act, the Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the

Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(15) NO RECOURSE AGAINST OTHERS. A director, officer, employee or stockholder, of the Company as such, shall not have any liability for any obligations of the Company under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

(16) AUTHENTICATION. This Note shall not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(17) ABBREVIATIONS. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(18) CUSIP NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of repurchase as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Company shall furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to:

Calpine Corporation
50 West San Fernando Street
San Jose, California 95113
Attention: Investor Relations

A-7

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____
(Insert assignee's legal name)

_____
(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your Signature: _____
                    (Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

_____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-8

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 3.03 of the Third Supplemental Indenture, state the amount you elect to have purchased:

$_____ principal amount

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

---

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-9

### FORM OF CONVERSION NOTICE

TO:    CALPINE CORPORATION
WILMINGTON TRUST COMPANY

The undersigned registered owner of the attached Note hereby irrevocably exercises the option to convert the attached Note, or the portion thereof below designated, into the Conversion Value in accordance with the terms of the Third Supplemental Indenture referred to in the attached Note. Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Third Supplemental Indenture.

PLEASE NOTE: You may only convert the attached Note upon satisfaction of one of the conditions set forth in Section 10.01 of the Third Supplemental Indenture. If you are converting the attached Note upon satisfaction of the condition set forth in Section 10.01(a)(3), please provide, with this Conversion Notice, reasonable evidence that the Trading Price of the Note is less than 95% of the product of (x) the Common Stock Price and (y) the Conversion Rate in effect.

Upon conversion of your Note, you will receive the Conversion Value in cash and Common Stock of the Company in accordance with Article 10 of the Third Supplemental Indenture.

To convert only part of the attached Note, state the principal amount to be converted (which must be $1,000 or an integral multiple of $1,000):

$_____

If you want the stock certificate (if any) made out in another person's name, fill in the form below:

_____
(Insert other person's social security or tax I.D. no.)

_____

_____
(Print or type other person's name, address and zip code)

Date: _____    Signed: _____

(Sign exactly as your name appears on the other side of this Security. The Signature(s) must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Note registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Note registrar in

A-10

addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended)

Signature Guarantee: _____

A-11

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | principal amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |

---

* This schedule should be included only if the Note is issued in global form.

A-12

Schedule A

Table of Additional Shares

| Effective Date | Stock Price ($) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3.10 | 3.50 | 4.00 | 4.50 | 5.00 | 5.50 | 6.00 | 6.50 | 7.00 | 7.50 | 10.00 | 15.00 | 20.00 |
| June 23, 2005 | 72.58 | 63.00 | 53.82 | 46.74 | 41.12 | 36.57 | 32.80 | 29.64 | 26.96 | 24.64 | 16.71 | 9.15 | 5.63 |
| June 1, 2006 | 72.00 | 62.44 | 53.27 | 46.23 | 40.65 | 36.12 | 32.40 | 29.26 | 26.59 | 24.31 | 16.46 | 9.00 | 5.53 |
| June 1, 2007 | 71.58 | 61.97 | 52.79 | 45.74 | 40.19 | 35.69 | 31.97 | 28.88 | 26.24 | 23.96 | 16.22 | 8.86 | 5.44 |
| June 1, 2008 | 71.11 | 61.35 | 52.15 | 45.10 | 39.55 | 35.08 | 31.41 | 28.32 | 25.73 | 23.50 | 15.86 | 8.66 | 5.32 |
| June 1, 2009 | 70.47 | 60.61 | 51.24 | 44.20 | 38.66 | 34.23 | 30.58 | 27.56 | 24.99 | 22.80 | 15.37 | 8.38 | 5.14 |
| June 1, 2010 | 69.67 | 59.56 | 50.05 | 42.87 | 37.38 | 32.95 | 29.39 | 26.39 | 23.92 | 21.78 | 14.62 | 7.96 | 4.89 |
| June 1, 2011 | 68.78 | 58.10 | 48.28 | 41.01 | 35.40 | 31.09 | 27.56 | 24.70 | 22.27 | 20.26 | 13.51 | 7.35 | 4.52 |
| June 1, 2012 | 67.70 | 56.09 | 45.63 | 38.13 | 32.51 | 28.15 | 24.79 | 22.03 | 19.79 | 17.90 | 11.81 | 6.42 | 3.97 |
| June 1, 2013 | 66.59 | 53.12 | 41.47 | 33.47 | 27.76 | 23.53 | 20.30 | 17.78 | 15.81 | 14.17 | 9.19 | 5.02 | 3.15 |
| June 1, 2014 | 65.05 | 47.84 | 33.91 | 25.03 | 19.24 | 15.38 | 12.68 | 10.74 | 9.30 | 8.20 | 5.24 | 2.96 | 1.90 |
| June 1, 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

A-13