# **EXHIBIT F**

Hearing Date:  August 8, 2007 at 10:00 a.m. (EDT)
Response Deadline:  July 27, 2007 at 12:00 p.m. (EDT)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Calpine Corporation, <u>et</u> <u>al.</u>, | ) | |
| | ) | Case No. 05-60200 (BRL) |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF DEBTORS' LIMITED OBJECTION TO CONVERTIBLE**
**NOTEHOLDER CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300**

PLEASE TAKE NOTICE that at **10:00 a.m. (EDT)** on **August 8, 2007,** the above-captioned debtors and debtors in possession (the "<u>Debtors</u>"), by their counsel, shall appear before the Honorable Burton R. Lifland at the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 623, or as soon thereafter as counsel may be heard (the "<u>Hearing</u>"), and present the Debtors' Limited Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 (the "<u>Objection</u>").

PLEASE TAKE FURTHER NOTICE that the Hearing may be adjourned thereafter from time to time without further notice.

PLEASE TAKE FURTHER NOTICE that responses to the Objection, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (in either case, with a hard copy delivered directly to Chambers) and shall be served upon: (a) counsel to the Debtors, Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022, Attn: Edward O. Sassower, Esq.; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Paul Schwartzberg, Esq., (c) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attn: Michael S. Stamer, Esq., Philip C. Dublin, Esq. and Alexis Freeman, Esq.; (d) counsel to the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn: Gary Kaplan, Esq., (e) counsel to the Ad Hoc Committee of 6% Convertible Noteholders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attn: Kristopher M. Hansen, Esq.; (f) counsel to the Ad Hoc Committee of 7.75% Convertible Noteholders, Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., (g) counsel to Manufacturers & Traders Trust Company, as successor Indenture Trustee for the holders of the 7.75% Contingent Convertible Notes Due 2015, Young Conaway Stargatt & Taylor LLP, The Brandywine Building, 1000 West Street, 17th Floor,

K&E 11928829.13

Wilmington, Delaware 19801, Attn: Ian S. Fredericks, Esq., and (h) counsel to HSBC Bank

USA, N.A., as Indenture Trustee for the holders of the 4.75% Contingent Convertible Notes Due

2023, Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178, Attn: David

E. Retter, Esq.; so as to be received no later than so as to be received no later than **July 27, 2007**

**at 12:00 p.m. (EDT).**

Dated:   July 6, 2007                    Respectfully submitted,
         New York, New York

                                            /s/ Richard M. Cieri
                                            Richard M. Cieri (RC 6062)
                                            Marc Kieselstein (admitted *pro hac vice*)
                                            David R. Seligman (admitted *pro hac vice*)
                                            Edward O. Sassower (ES 5823)
                                            Jeffrey S. Powell (admitted *pro hac vice*)
                                            Stephen E. Hessler (admitted *pro hac vice*)
                                            KIRKLAND & ELLIS LLP
                                            Citigroup Center
                                            153 East 53rd Street
                                            New York, New York  10022-4611
                                            Telephone:  (212) 446-4800
                                            Facsimile:  (212) 446-4900

                                            Counsel for the Debtors

3

Hearing Date:  **August 8, 2007 at 10:00 a.m. (EDT)**
Response Deadline:  **July 27, 2007 at 12:00 p.m. (EDT)**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)

Counsel for the Debtors

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Calpine Corporation, <u>et al.</u>, | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

### DEBTORS' LIMITED OBJECTION TO CONVERTIBLE NOTEHOLDER
### CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300

Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, the "Debtors") file this objection (the "Objection") seeking entry of an order, in substantially the form attached hereto as **Exhibit A**, granting the Debtors' limited objection, pursuant to 11 U.S.C. § 502 and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to claims filed by holders of certain unsecured convertible debt (the "Convertible Noteholders" or the "Noteholders").  In support of this Objection, the Debtors respectfully state as follows.

## INTRODUCTION

Nothing breeds creativity like the potential for a full payout case. As the likelihood has increased that these cases will fall into that rarefied category, a number of parties have been working overtime to conjure up additional claims. Perhaps the most fanciful example of this recent phenomenon is the 11th-hour gambit of the Convertible Noteholders—apparently based on a tortured reading of the Court's CalGen Refinancing Opinion[1]—to obtain a greater recovery than they would possibly have been entitled to had the Debtors never commenced their chapter 11 cases.

As defined and described in greater detail below, between 2000 and 2005, the Debtors issued four series of unsecured debt that allowed the holders a choice—upon the satisfaction of certain conditions precedent—to convert their notes into stock and bet on upside return *or* keep their fixed right to recovery of a sum certain. The Convertible Noteholders elected not to convert their Notes (as hereinafter defined) prepetition and their Notes were not convertible at the time the Debtors commenced their chapter 11 cases. Accordingly—and sensibly—the original proofs of claim filed by the Convertible Noteholders (prior to the August 1, 2006 bar date) properly sought only outstanding principal, accrued interest, and "other unliquidated amounts." But, long after the bar date and close on the heels of the CalGen Refinancing Opinion's holding that the Debtors' repayment of the CalGen Secured Debt (as part of their DIP refinancing) entitled the CalGen Lenders to unsecured breach of contract damages,

---

[1]    Memorandum Decision and Order Granting, in Part, Debtors' Motion for Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims, entered on March 5, 2007 [Docket No. 3875] (the "CalGen Refinancing Opinion"). The terms "CalGen Secured Debt" and "CalGen Lenders," as used herein, shall have the meanings ascribed in the CalGen Refinancing Opinion.

2

the Convertible Noteholders, represented by the same indenture trustees as the CalGen Second and Third Priority Lenders, "supplemented" their proofs of claim to allege the Debtors' likely repayment in full of the Notes pursuant to the Debtors' proposed plan of reorganization (the "Plan") gives rise to damages for a purported "breach" of the Noteholders' conversion rights.

Calling the claims "supplements" does not change the fact that they were late-filed or excuse the Noteholders from failing to seek Court approval to file them. And, most importantly, it does not change the fact that they are entirely new claims that do not relate back to the Noteholders' original claims and, as such, cannot be considered permissible amendments to timely filed proofs of claim.

Moreover, even if the Court were to evaluate the merits of the Convertible Noteholders' unprecedented conversion claims, the Court would find they are unsupported by any governing authority, including, notably, the parties' contracts, the Bankruptcy Code, and controlling case law. As set forth below, these conversion claims fail on many independent levels. As a threshold matter, the claims are fatally flawed because the applicable indentures expressly provide that (i) a chapter 11 filing automatically accelerates the Notes' maturity date, and (ii) *upon maturity, the conversion rights terminate*. The indentures could have—but do not—provide for any damages upon acceleration of the Notes or upon termination of the conversion rights. In other words, the Notes were not convertible at the time the Debtors entered chapter 11 and they will not be convertible at the time the Debtors exit chapter 11—and at neither point in time does accelerating the maturity of the Notes "breach" the conversion rights or give rise to an independent damages claim. Put simply, the Debtors' proposed repayment of the Notes will in no way deprive the Noteholders of any benefit of their bargain.

3

Moreover, the Noteholders' conversion claims fail for the following additional reasons:

- there is no state statute or common law that would support the supplemental conversion claims, or awarding damages therefor, in the absence of supporting provisions in the governing indentures;

- convertible debentures, by their very nature, do not entitle their holders to recover on account of both conversion rights *and* principal and interest;

- even if the Noteholders' conversion rights were somehow breached, the Noteholders have not been damaged because the Debtors project they will repay the Noteholders' principal and interest in full under the Plan;

- convertible noteholders take their conversion rights subject to the same risks as equity holders (i.e., that the equity will decline in value or be wiped out altogether) in which case convertible noteholders are entitled to the same remedies as equity holders (i.e., none);

- claimants' rights are fixed as of the date of the filing of the petition and the Notes were under water at that time;

- holders of the 4% Notes (as hereinafter defined) are not entitled to damages under any circumstances because their Notes expired by their terms postpetition; and

- even if the Court were to award the Noteholders a claim for damages on account of their conversion claims, any such claim would be subject to subordination under 11 U.S.C. § 510(b).

As this Court is aware, on June 20, 2007, the Debtors filed their Plan, which projects (under the most likely scenario with midpoint valuation and midpoint claims)—but does not guarantee—the full repayment of outstanding principal and accrued interest of general unsecured debt, including the convertible Notes. Because allowing the Noteholders' conversion claims necessarily will reduce the recovery of other general unsecured claimants or reduce amounts available to holders of allowed interests, resolution of the issues raised herein will provide valuable clarity to the Plan confirmation process and to those entitled to vote on the Plan. To that end, the Debtors respectfully request that the Court grant this Objection.

## JURISDICTION

This Court has jurisdiction over the Objection pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### 1.    The Convertible Notes

Between 2000 and 2005, Calpine issued four series of unsecured convertible notes (the "Convertible Notes" or "Notes"). As of December 20, 2005, the "Commencement Date" of these chapter 11 cases, the Convertible Notes were outstanding in the aggregate principal amount of approximately $1.8 billion, as set forth below:

- $1,311,000 4.00% Convertible Senior Notes Due December 26, 2006 (the "4% Notes"), issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000 (the "Original Indenture" and, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000, the Second Supplemental Indenture, dated as of September 30, 2004, and the Third Supplemental Indenture, dated as of June 23, 2005, the "Indenture");[2]

- $547,370,000 6.00% Contingent Convertible Senior Notes Due 2014 (the "6% Notes"), issued by Calpine pursuant to the Indenture;

- $650,000,000 7.75% Contingent Convertible Senior Notes Due 2015 (the "7.75% Notes"), issued by Calpine pursuant to the Indenture; and

- $633,775,000 4.75% Contingent Convertible Senior Notes Due 2023 (the "4.75% Notes"), issued by Calpine pursuant to a certain Indenture, dated as of November 14, 2003, which was superseded by that certain Amended and Restated Indenture dated as of March 12, 2004 (the "4.75% Notes Indenture" and, together with the Indenture, the "Indentures").[3]

---

[2]    A true and complete copy of the Indenture is attached hereto as **Exhibit B**.

[3]    A true and complete copy of the 4.75% Notes Indenture is attached hereto as **Exhibit C**.

### 2. The Conversion Rights

#### a. Overview

Described generally, the Indentures provide that, prior to maturity, the holders may convert their Notes into cash and/or common stock—upon the occurrence of one of a number of conditions precedent. Specifically, pursuant to section 10.01(a) of the respective Indentures, the holders of the 4.75%, 6%, and 7.75% Notes may convert their Notes during specified periods in the following circumstances:

(i)   if the trading price of Calpine's common stock is at least 20% higher than the conversion price;

(ii)  in the case of the 6% and 7.75% Notes, after a given date, irrespective of the trading price;

(iii) during a five trading-day period if the trading price of the Notes during the previous five consecutive trading days was less than 95% of an amount roughly equal to what the Noteholders would receive upon conversion;[4]

(iv)  if Calpine distributes rights, warrants, or options to all or substantially all of its common stock holders entitling them to purchase common stock for less than its trading price;

(v)   if Calpine issues debt, rights, or warrants to all or substantially all of its common stock holders with a per share value exceeding 12.5% of the common stock price;

(vi)  if Calpine is party to a consolidation, merger, share exchange, sale of all or substantially all of its assets or other similar transaction; or

(vii) in the case of the 4.75% Notes, Calpine calls the notes for redemption.

The specific conditions precedent for the 4% Notes differ from those for the 4.75%, 6%, and 7.75% Notes, but all of the Notes feature a conversion (or "strike") price.[5]

---

[4]   This amount is the product of (i) the common stock trading price and (ii) the number of shares to which each converting Noteholder was entitled as determined using the conversion rate (See supra, note 5). See Indentures § 10.01(a).

[5]   The unadjusted conversion rate for the 4.75% Notes was approximately 153.8462 shares per $1,000 principal amount of Notes, reflecting a strike price of $6.50. 4.75% Notes Indenture at A-4. The unadjusted conversion (Continued...)

6

### b.    In The Absence Of Default

As long as no event of default has occurred—and provided one of the conversion conditions has transpired—converting holders of the 4.75%, 6%, and 7.75% Notes are entitled to receive (a) repayment of principal, in cash and (b) payment of any "upside" difference between the applicable conversion price and Calpine's stock price, in shares of Calpine common stock. Where, upon conversion, the stock price is lower than the strike price, the holders are not entitled to full repayment of principal and may only receive their conversion value, in cash.

By way of example, if Calpine's common stock is trading at $5.00 per share (i.e., above the strike price) at the time of conversion, a holder of 7.75% Notes with a strike price of $4.00 and a conversion rate of 250 shares per $1,000 in principal of Notes would receive, in return for converting $1,000 in principal amount of 7.75% Notes, $1,000 in cash and $250 worth of common stock. Specifically, the Noteholder is entitled to receive a conversion value equal to the product of the $5.00 stock price and the conversion rate of 250 shares/$1,000 note—which is $1,250. As set forth above, of this $1,250, the Noteholder will receive $1,000 (the principal amount) in cash and the remaining $250 in stock.

Conversely, if Calpine's common stock were trading at $3.00 per share at conversion, the same holder would only receive $750 in cash and no stock (i.e., the product of the $3.00 stock price and the conversion rate of 250 shares/$1,000 note) because the conversion value is less than the principal amount of the Note.

---

rate for the 4% Notes was approximately 55.3403 shares per $1,000 principal amount of Notes, reflecting a strike price of $18.07. 4% Note at 3. The unadjusted conversion rate for the 6% Notes was approximately 259.7403 shares per $1,000 principal amount of Notes, reflecting a strike price of $3.85. 2d Supp. at 3. The unadjusted conversion rate for the 7.75% Notes was 250 shares per $1,000 principal amount of Notes, reflecting a strike price of $4.00. 3d Supp. at A-5.

7

Significantly, holders of 4% Notes are not subject to the same conversion conditions as the other Convertible Noteholders, but they are never entitled to payment in cash. Instead, holders of 4% Notes who convert their Notes may only receive common stock in the amount of 55.3403 shares per $1,000 in principal amount of 4% Notes, which reflects a strike price of $18.07. Thus, if Calpine's common stock were trading at $5.00 per share, holders of 4% Notes would be entitled to convert $1,000 of notes into $276.70 of common stock. If Calpine's common stock price were higher than the strike price, e.g., $20 per share, then the 4% Noteholders would be entitled to convert their Notes into $1,106.81 of common stock.

### c.     Post-Event Of Default

The Indentures provide that commencing a chapter 11 case constitutes an event of default.[6] Upon an event of default, all notes shall be "immediately due and payable" without any further action or notice by the trustee or holders.[7] The Indentures further provide that an event of default significantly alters the Conversion Rights. Most importantly, upon acceleration and the automatic maturity of the Convertible Notes, the Conversion Right terminates altogether. See 4.75% Notes Indenture at A-4; 2d. Supp. at A-5; 3d Supp. at A-5 (The "conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Day immediately preceding the date of Maturity . . .");[8] see also 4% Note at 3

---

[6]   See Indenture § 5.1(e); 4.75% Notes Indenture § 6.01(8).

[7]   See Indenture § 5.2 ("If a Event of Default specified in clause (e) or (f) of Section 5.1 with respect to the Company occurs, the principal of and interest on all the Securities of each Series shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders."); 4.75% Notes Indenture § 6.02(a) ("In the case of Event of Default specified in clauses (8) or (9) of Section 6.01 hereof, the issue price plus accrued and unpaid interest (and Liquidated Damages, if any) on the Notes will become immediately due and payable without any action on the part of the Trustee or any Holder").

[8]   Maturity is, by definition, "reaching the date at which a debt instrument is due and payable." Dictionary of Finance and Investment Terms 413-14 (2003). Here, "Maturity" is not defined in the Indentures, but it is clear
(Continued...)

("Holders may surrender Securities for conversion into shares of Common Stock at any time prior to 5:00 p.m., New York City time, on the date that is two Business Days prior to maturity of the Securities.").

### d.    Repayment Provisions

The Indentures do not (i) provide for any "makewhole" payments of damages or penalties upon acceleration of the Convertible Notes or (ii) provide for any payments of damages or penalties upon termination of the Conversion Rights by virtue of acceleration or otherwise.  In fact, the Indentures expressly provide for payment of postpetition interest "in any proceeding under any Bankruptcy Law[,]"[9] but do not contemplate any damages or any other type of payments in the event of a bankruptcy proceeding.[10]

In sum, Convertible Noteholders who do not convert their notes prior to maturity (either by choice or because none of the conversion conditions have transpired) are entitled only to repayment of principal and interest.

### 3.    Commencement of the Chapter 11 Cases

The Debtors' filing of their chapter 11 cases constituted an event of default, thus rendering the Notes due and payable immediately.  None of the conversion conditions were satisfied at the Commencement Date—i.e., the Notes' accelerated maturity date.

---

that the term does not refer solely to maturity occurring upon expiration of the term of the Notes, because that maturity is defined as "Stated Maturity."  Orig. Indenture at 10.

[9]    See, e.g., 4.75% Notes Indenture § 4.01; 2d. Supp. at A-4.

[10]   The 4.75 Notes Indenture refers to payment of "Liquidated Damages, if any" in certain circumstances, but does not actually provide for any Liquidated Damages.  4.75% Notes Indenture at 7, A-4.

4.      **Convertible Noteholders' Original Proofs of Claim**

By order, dated April 26, 2006, the Court established August 1, 2006 as the bar

date for filing proofs of claim (the "Bar Date"). On or about July 19, 2006, Wilmington Trust

Company ("WTC"), as Indenture Trustee for the 7.75% Notes, filed a proof of claim ("Claim

2404") asserting claims for (a) principal and interest and (b) other unliquidated charges. On or

about July 27, 2006, HSBC Bank USA, National Association ("HSBC"), as successor Indenture

Trustee for the 4% Notes, the 6% Notes, and the 4.75% Notes, filed two proofs of claim

asserting similar claims, including "other unliquidated amounts," in connection with the 4%

Notes and the 6% Notes ("Claim 2821"), and the 4.75% Notes ("Claim 2823"). At the times the

Original Proofs of Claim were filed, the trading prices of the Notes ranged as follows:[11]

| | |
|---|---|
| 4% Notes: | $27.38 (both days) |
| 4.75% Notes: | $44.75 — $46.00 |
| 6% Notes: | $40.00 — $43.50 |
| 7.75% Notes: | $38.00 — $40.00 |

No mention was made in the Original Proofs of Claim of any claim by virtue of any loss of a

conversion right. Clearly, when trading prices were depressed, the Noteholders did not bother to

grasp at straws as they do in their New Claims (as hereinafter defined).

On January 5, 2007, the Debtors and HSBC entered into a stipulation and order,

which the Court approved on January 30, 2007 [Docket No. 3501], pursuant to which the parties

stipulated to allowed claim amounts for the principal and prepetition accrued interest due on

account of, inter alia, each of the 4% Notes, the 6% Notes, and the 4.75% Notes. The parties

reserved for a later date the determination of the appropriate rate of postpetition interest.

---

[11]   Retrieved July 3, 2007 from Bloomberg L.P. database.

5.    **CalGen Refinancing Opinion**

The Court entered the CalGen Refinancing Opinion on March 5, 2007. The CalGen Lenders had objected to the Debtors' proposed refinancing on the grounds that "no-call" clauses barred repayment of the CalGen Secured Debt until specified "lockout" periods had concluded and, assuming otherwise, repayment would entitle the Lenders to secured claims for "makewhole" premiums to compensate for discontinued future interest payments.

The Court disagreed with both of these arguments. First, the Court held that "[g]enerally, no-call provisions that purport to prohibit optional repayment of debt are unenforceable in chapter 11 cases[,]" because "[t]he 'essence of bankruptcy reorganization is to restructure debt . . . and adjust debtor-creditor relationships[,]'" and "[i]t would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it." Id. at 6-7. Second, the Court held that the proposed repayment did not give rise to a secured damages claim by the CalGen Lenders because the governing agreements did not expressly require a prepayment premium upon the repayment of accelerated debt prior to April 1, 2007. More specifically, "each of the CalGen Secured Debt agreements provides that a bankruptcy filing by CalGen is an event of default resulting in an automatic acceleration of debt," and "[a]s such, the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately.'" Id. at 8.

Lastly, the Court also found that, as a result of the Debtors' repayment, the CalGen Lenders' "expectation of an uninterrupted payment stream has been dashed giving rise to damages," and therefore "the CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of the agreements." Id. at 10.

11

**6.    Convertible Noteholders' Supplemental Proofs of Claim**

Very soon after the Court issued the CalGen Refinancing Opinion, the Indenture

Trustees for the Convertible Notes filed "supplemental" proofs of claim to now seek, in addition

to repayment of outstanding principal and accrued interest, damages for any "breach" of the

Conversion Rights (collectively, the "New Claims").[12]    The Noteholders did not seek Court

approval to file the New Claims.

**7.    Debtors' Plan of Reorganization**

On June 20, 2007, the Debtors filed their Plan [Docket No. 5015] and the

disclosure statement thereto [Docket No. 5016] (the "Disclosure Statement").    Under the most

likely scenario, with midpoint valuation and midpoint claims, the Debtors propose to repay the

Noteholders the full amount of their principal and accrued interest, as well as postpetition

interest thereon at a rate to be determined by the Court, together with reasonable prepetition

---

[12]    On or about March 23, 2007, HSBC filed a supplemental proof of claim ("Claim 6247") supplementing Claim 2821.  On or about March 29, 2007, HSBC filed a supplemental proof of claim ("Claim 6249") supplementing Claim 2823.  On or about April 23, 2007, Manufacturers and Traders Trust Company (as successor Indenture Trustee for the holders of the 7.75% Notes) filed a supplemental proof of claim ("Claim 6280") supplementing Claim 2404 on the same basis.  On or about May 22, 2007, HSBC filed proofs of claim amending and replacing Claim 6247 ("Claim 6299") and Claim 6249 ("Claim 6300").  Each of these supplemental proofs of claim states claims for:

> (i) the rights provided to the holders of the [Notes] in Article 10 of the [applicable] Indenture (the "[Conversion Right]"), which [Conversion Right], upon information and belief, was an integral part of the consideration provided in return for the extension of credit to the Debtor evidenced by the [Notes], (ii) all damages, including any accrued prior to the commencement of the Case, arising from any breach of the terms of, and covenants set forth in, the Indenture, including the [Conversion Right], whenever arising, including all damages arising from the loss, whether pursuant to a plan of reorganization for the Debtor or otherwise, of the [Conversion Right], and (iii) all rights to receive postpetition interest, charges and other amounts due or coming due under the terms of the Indenture on or after the commencement of the Case to the fullest extent chargeable or allowable as against the Debtor or its estate under law or equity.

See Claim 6280 ¶ 4; Claim 6299 ¶ 4, Claim 6300 ¶ 4.

indenture trustee fees as provided for under the Indentures (collectively, "Principal and Interest")
pursuant to the Plan.

       The Plan classifies the 4% Notes, the 4.75% Notes, and the 6% Notes in the
General Notes category and provides that the holders of General Notes will receive their pro rata
share of the New Calpine Common Stock Pool for Creditors (as defined in the Plan) and unpaid
postpetition interest at the contract rate determined by the Court. Disclosure Statement Ex. A at
14, 27-28.

       The Plan classifies the 7.75% Notes, which are contractually subordinated to
certain of the Debtors' debt issuances (the "Senior Notes"), as Subordinated Notes. Id. at 21.
The holders of Subordinated Notes also receive their pro rata share of the New Calpine Common
Stock Pool for Creditors together with unpaid postpetition interest, but their recoveries may be
paid over to holders of Senior Notes by virtue of their contractual subordination provisions. Id.
at 28.

       According to the Disclosure Statement, the Debtors' financial advisors value New
Calpine Common Stock (as defined in the Plan) at $16.76 to $19.23 per share. Disclosure
Statement at 150. Holders of General Notes are projected to recover between 91% and 100% of
their claims. Id. at 98. Holders of Subordinated Notes are projected to recover between 80% and
100% of their claims, depending on the extent to which their recoveries must first be paid over to
holders of Senior Notes. Id. at 98-99.

## RELIEF REQUESTED

       The Debtors object to the New Claims on the basis that they were not timely filed.
To the extent the Court allows the Noteholders to pursue their New Claims, the Debtors object to
the New Claims to the extent they seek payment beyond Principal and Interest. Accordingly, the
Debtors respectfully request that the Court, pursuant to section 502 of the Bankruptcy Code and

Bankruptcy Rule 3007, grant the Debtors' Objection and disallow the Convertible Noteholders' claims to the extent they seek amounts beyond Principal and Interest.[13]

**BASIS FOR RELIEF**

The Noteholders' claims for "breach" of their conversion rights should not be allowed. The claims were late-filed and do not satisfy the criteria courts use to determine whether to permit creditors to file late claims. Moreover, the Debtors' proposed repayment of the Convertible Notes will neither breach the conversions rights nor deprive the Noteholders of any benefit of their bargain. Accordingly, neither the Indentures nor governing law entitle the Noteholders to any such damages, even under a "CalGen" dashed expectations construct.

I.      **The New Claims Are Untimely.**

The Noteholders filed their New Claims approximately 10 months after the Bar Date without first seeking necessary Court approval. See Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 125 (2d Cir. 2005) ("[T]he discretion of a bankruptcy court to allow or disallow late-filed claims is well-established."). Presumably, the Noteholders recognized they would be unlikely to obtain Court approval but decided to file the New Claims anyway, hoping no one would object.

In response to the Debtors' Objection, the Noteholders likely will argue the New Claims are not new claims but rather amendments to the Noteholders' original claims. The Noteholders will attempt this argument to take advantage of courts' liberal treatment of belated amendments. Id. at 133-34 ("While belated *amendments* will ordinarily be "freely allowed" where other parties will not be prejudiced, belated *new* claims will ordinarily be denied, even

---

[13]   In accordance with the CalGen Refinancing Opinion, the Debtors will defer seeking a ruling on the rate of interest that should apply to the Convertible Noteholders' proofs of claim. Id. at 13.

absent prejudice, unless the reason for the delay is compelling.") (emphasis in original). But the New Claims cannot be considered amendments because they do not relate back to the original claims. And, as the Noteholders can have no compelling reason for the delay in filing the New Claims, the Court has no basis to overlook the fact that the New Claims are untimely.

### A. The New Claims Are Not Amendments.

"Amendments do not vitiate the role of bar dates: indeed, courts that authorize amendments must ensure that corrections or adjustments *do not set forth wholly new grounds of liability*." United States v. Kolstad (In re Kolstad), 928 F.2d 171, 175 (5th Cir. 1991) (emphasis added). In considering purported amendments to claims, courts first evaluate whether the amendment "relates back" to a timely filed claim. Enron, 419 F.3d at 133. A claim relates back to a timely filed claim if it "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." Id. If a court finds an amendment does relate back to a timely-filed claim, the court will then determine whether allowing the amendment would be equitable. Id.

The Noteholders will not be able to carry their burden to show that the New Claims relate back to their original claims.[14] The New Claims do not correct a form defect in the original claims, they do not describe the original claims with more particularity, and they do not plead a new theory of recovery on the facts set forth in the original claims. Instead, they assert entirely new claims that the Debtors could not reasonably have expected to arise in connection with the original claims.

---

[14] A claimant asserting relation back bears the burden of proof. In re Enron Creditors Recovery Corp., 2007 WL 1705653 at *5 (Bankr. S.D.N.Y. Jun. 13, 2007).

15

In evaluating whether an amended claim relates back to a timely filed claim, courts have moved away from a "cause of action" test to focus instead on whether the amended and original claims arise out of same transaction or occurrence. In re Enron Corp., 298 B.R. 513, 523 (Bankr. S.D.N.Y. 2003), aff'd, 419 F.3d 115 (2d Cir. 2005) (citing In re Miss Glamour Coat Co., Inc., 1980 WL 1668 at *3 (S.D.N.Y. Oct. 8, 1980)). The purpose of this shift is to take into account a debtor's reasonable expectation as to the possibility that "the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question." Miss Glamour Coat, 1980 WL 1668 at *3 (internal quotations omitted). Here, the Debtors could not reasonably have expected that the Noteholders, having filed (and, for certain of the Notes, stipulated to the allowance of) claims for the Principal and Interest on their debt, would turn around and assert additional claims for equity interests they do not possess and that no other convertible debtholder appears ever to have asserted. The Debtors certainly could not reasonably have expected that the Noteholders would seek to recover more than 100% of their due based upon a novel legal theory that is unsupported by the Indentures governing the debt. Accordingly, the New Claims cannot possibly relate back to the original claims and, as such, the Court should not allow them.

**B.    Allowing The Noteholders To File The New Claims Would Not Be Equitable.**

Even if the Court finds that the New Claims relate back to the Noteholders' original claims, it would not be equitable to allow the Noteholders to amend their original claims. In evaluating whether allowing an amendment would be equitable, courts consider the following five equitable factors:

> (1) undue prejudice to the opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and

16

(5) the justification for the inability to file the amended claim at the
time the original claim was filed.

Enron, 2007 WL 1705653 at *3 (internal citations omitted).  Notably, this analysis is essentially

the same as the analysis courts use for late-filed new claims.  Enron, 419 F.3d at 133 (The

"equitable analysis of belated amendments to claims closely resembles Pioneer's "excusable

neglect" analysis of belated new claims.").

### a.    Prejudice

Courts have looked at the following factors to determine whether late-filed claims

will prejudice the debtor or other creditors: "(i) size of claim in relation to estate, (ii) whether the

plan has been filed with knowledge of the existence of the claim, (iii) the disruptive effect of the

claim on a plan close to completion or upon the economic model upon which the plan was

formulated and negotiated."  Enron, 2007 WL 1705653 at *9.  Despite numerous requests from

the Debtors, the Noteholders have not stated a fixed claim for damages, so it is not possible to

evaluate the size of the New Claims in relation to the estate.  Although the Noteholders filed the

New Claims before the Debtors filed the Plan, the New Claims were filed during the formulation

of the Plan, and the Second Circuit has endorsed a finding of prejudice in such circumstances.

Enron, 419 F.3d at 129 (bankruptcy court did not abuse its discretion in finding against claimant

on this factor where late filed amendment was filed while the plan was being formulated).

Moreover, the New Claims will certainly have a disruptive effect on the Plan if the Court awards

the Noteholders more than 100% of their due.

Courts have found that the debtor and other creditors were not prejudiced where

the amended claim did not increase the amount of the original proof of claim.  Ameritrust Co. v.

Integrated Resources, Inc. (In re Integrated Resources, Inc.), 157 B.R. 66, 72 (S.D.N.Y. 1993)

("The record contains evidence that the appellee banks' amended proofs of claim seek no

17

increase in the amount or priority of the bank's original claims.  This factor alone goes to support three of the five factors that need to be considered when balancing the equities.") (internal citations omitted).  Although there is no per se rule that an increase in the claim amount constitutes prejudice, such increase does weigh in favor of a finding of prejudice in this case, where the New Claims increase the amount of the Noteholders' claims beyond 100% of the Principal and Interest on their debt.

### b.    Dilatory Behavior/Bad Faith

Courts have not established a bright line rule regarding acceptable delay.  Enron, 419 F.3d at 128 ("In determining how long is too long, courts generally consider the degree to which, in the context of a particular proceeding, the delay may disrupt the judicial administration of the case.") (internal quotations and citations omitted).  In Enron, the Second Circuit affirmed the bankruptcy court's finding that the claimant had engaged in dilatory behavior by filing its claim six months after the bar date.  Id. at 127-28.  Here, the Noteholders waited *10 months* after the Bar Date to file the New Claims, which, to the extent they are cognizable, existed on the Commencement Date.  Moreover, as discussed above, this delay has disrupted the judicial administration of the case in multiple ways.  First, the Noteholders filed the New Claims during the Debtors' formulation of the Plan, and second—and more importantly—the timing of the New Claims forces the Debtors to deal with them when they should be focusing on the approval of the Disclosure Statement and confirmation of the Plan.  Accordingly, this factor weighs in favor of the Debtors.

### c.    Reason For Delay

Critically, the Noteholders have not offered any reason for the delay in filing the New Claims and the Debtors cannot conceive of a single one.  Significantly, the Second Circuit

18

has noted that the justification for delay is the factor courts should weigh most heavily in the "excusable neglect" analysis (which, as noted above, is essentially the same as the equitable analysis for amended claims). Enron, 419 F.3d at 122 (citing Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 368 (2d Cir. 2003) ("We and other circuits have focused on the third factor: 'the reason for the delay, including whether it was within the reasonable control of the movant.'").

Because the Noteholders' delay in filing the New Claims is inexcusable—and for the reasons set forth above—the Court should deny the New Claims on the basis that they are time-barred. Even if, however, the Court declines to deny the New Claims on the basis that they were late-filed, the New Claims fail on the merits.

## II.    The Debtors' Proposed Repayment Will Not Breach Any Conversion Rights.

Convertible notes offer the following proposition: in exchange for concessions by lenders (typically lower interest rates), borrowers agree that, under certain conditions, lenders may convert the debt into another, potentially more lucrative form of security (typically equity). See Broad v. Rockwell Int'l Corp, 642 F.2d 929, 943 (5th Cir. 1981). According to a well-recognized treatise:

> Convertible debentures exhibit characteristics of both debt and equity securities. The conversion right, although set forth in the debenture and in the indenture, is separate and distinct from the debt evidenced by the debenture and as a separate right, it has its own ascertainable value. The conversion privilege may be stated in terms providing that the debenture can be exchanged for the number of shares of stock that would result from dividing the principal amount of the debenture by a stated figure. The conversion privilege thus attains actual, present value if the market value of the corporation's stock rises above the conversion figure. Since the holder of a debenture has none of the rights of a shareholder, the value of this conversion privilege is subject to "dilution," or obliteration, by acts of the corporation that would keep the market price of the stock below the conversion figure. Accordingly, the indenture may contain an "antidilution" provision

19

> designed to protect debenture holders from corporate attempts to minimize their investments. Generally, absent such a contractual limitation on the corporation's activities, there is no common-law protection for the debenture holders from whatever steps the corporation might take that could result in the diminution in value or practical extinction of the conversion right.

6A Fletcher Cyc. Corp. § 2649.10 (2006). In other words, absent explicit contractual protections, because rights may be "obliterated" without compensating holders for diminished value, it follows that conversion rights have no value until they are exercisable.

### A.    The Indentures Do Not Support The Noteholders' Breach Claims.

The Convertible Note Indentures do not support a finding that the Debtors' proposed repayment would constitute a breach of the Conversion Rights. To the contrary, the Indentures unequivocally establish that the Noteholders are seeking a benefit they failed to bargain for.

As explained above, the Indentures provide that the Debtors' commencement of these chapter 11 cases was an event of default that automatically accelerated the Notes' maturity date, rendering them "due and payable immediately."[15] The Indentures further provide that upon acceleration and maturity of the Notes, the Conversion Rights terminate altogether. It

---

[15] The enforceability of this acceleration clause cannot seriously be disputed. See CalGen Refinancing Opinion at 8 (holding "each of the CalGen Secured Debt agreements provides that a bankruptcy filing by CalGen is an event of default resulting in an automatic acceleration of debt," and "[a]s such, the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately'" and citing In re LHD Realty Corp., 726 F.2d 327, 330-31 (7th Cir. 1984) ("acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity."); In re Ridgewood Apts. of DeKalb County, Ltd., 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) ("Even without specific contractual language, a bankruptcy filing acts as an acceleration of all a debtor's obligations."); In re Manville Forest Prods. Corp., 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984), aff'd in part, rev'd in part on other grounds, 60 B.R. 403 (S.D.N.Y. 1986) (debt is automatically accelerated upon filing bankruptcy); cf., Anchor Resolution Corp. v. State Street Bank and Trust Co. of Connecticut (In re Anchor Resolution Corp.), 221 B.R. 330, 333 (Bankr. D. Del. 1998) (agreement included an express provision that entitled the holders of the notes to a make-whole amount in the event of a prepayment of principal or an event of default; one such specified event of default was the commencement of a voluntary bankruptcy case).

necessarily follows that the Debtors' proposed repayment cannot "breach" a provision that has already terminated under the terms of the Indentures.

On the other hand, the Indentures do not provide for preservation of the Conversion Rights after an event of default, acceleration, and repayment. Nor do the Indentures provide for any payment or penalty upon termination of the Conversion Rights. The Noteholders could have contracted for any of these (or other) protections, but they did not. Accordingly, the Noteholders cannot secure through the claims reconciliation process remedies that they failed to obtain through contractual negotiations.

**B.    Applicable State Law Does Not Support The Noteholders' Breach Claims.**

Not only do the Indentures fail to support the Noteholders' breach claims, the Debtors also have been unable to locate (and the Noteholders have not shared) any New York law that would protect Conversion Rights in the absence of such provisions in the governing indenture.[16]    Moreover, persuasive case law from other jurisdictions undermines the Noteholders' conversion claims. For example, in Broad, the Fifth Circuit ruled that convertible noteholders are not entitled to additional protections at common law beyond the rights set forth in their indentures. In evaluating conversion rights under convertible debentures in the context of a merger, the Fifth Circuit cited to ample precedent holding that conversion rights are limited to those set forth in the governing indentures. Broad, 642 F.2d at 944-45 (collecting cases) ("As Justice Holmes noted ... the law does have machinery through which, if parties so choose, the value of the conversion right may be protected."). Notably, the plaintiff in Broad also was unable to identify any authority under New York or the law of any other jurisdiction that would

---

[16]    The Indentures are governed by New York law. See Orig. Indenture at § 10.11; 4.75% Notes Indenture at § 12.08.

have provided "any additional protection for conversion rights upon merger" beyond the rights provided in the indenture. Id. at 944.

### C.    The CalGen Refinancing Opinion Does Not Support The Noteholders' Breach Claims.

To the extent the Convertible Noteholders intend to rely on the CalGen Refinancing Opinion to argue their conversion claims, that decision is materially distinct. As an initial matter, because the Convertible Notes Indentures provided that the Conversion Rights terminated upon the acceleration and maturity of the Notes, the Debtors' proposed repayment of the Notes in full pursuant to the Plan does not give rise to any conceivable breach of the Indentures.

Moreover, the Convertible Noteholders cannot credibly wrap themselves in the CalGen mantle by claiming they have an "expectation of an uninterrupted payment stream [that will be] dashed giving rise to damages"[17] upon the proposed repayment. The Noteholders' conversion claims are based on a "heads I win, tails you lose" misreading of the Notes. The Convertible Notes, by their very design and nature, do not provide for recovery on account of *both* debt and equity interests. Instead, like all convertible debentures, the Convertible Notes provide the security of a debt instrument but allow the Noteholders to benefit from any future upside by converting their Notes to cash and common stock. Once the Noteholders have converted their Notes, however, they no longer hold debt interests as to the Notes that have been converted; at best, their sole interest is that of equity holders. For this reason, the Convertible Noteholders cannot possibly be entitled to receive repayment of their debt *and* damages on

---

[17]    See CalGen Refinancing Opinion at 10. The Debtors have appealed this aspect of the CalGen Refinancing Opinion's damages award as well.

K&E 11928829.13

account of a conversion right.   By asserting claims for a conversion right in addition to

repayment of the Notes, the Noteholders are impermissibly trying to be both fish and fowl—at

the expense of other parties in interest. Awarding the Noteholders the treatment they are seeking

would render the Plan unconfirmable because it would involve paying them more than 100 cents

on their claims.  <u>See</u> 11 U.S.C. § 1129(b)(1)(B).

## II.    The Debtors' Proposed Repayment Will Not Give Rise To An Allowable Damages Claim.

Even assuming the Debtors' proposed repayment somehow "breaches" the

Conversion Rights, the Noteholders cannot prove they are entitled to an allowable damages

claim.

### A.    The Plan Provides For Repayment Of The Noteholders In Full Pursuant To The Terms Of Their Indentures.

The Debtors' Plan proposes to pay the Noteholders' Principal and Interest in full

and this treatment comports precisely with the terms of the Indentures.   Specifically, the

Indentures clearly provide that only principal and interest shall become due upon a chapter 11-

prompted acceleration to full maturity.   If the Noteholders had desired payment for dashed

expectations upon acceleration, they could have negotiated for and expressly included such a

provision in the Indentures.  <u>See, e.g.</u>, <u>Broad</u>, 642 F.2d at 944-45; <u>In re Einstein/Noah Bagel</u>

<u>Corp.</u>, 257 B.R. 499, 509 (Bankr. D. Ariz. 2000).

<u>Einstein/Noah Bagel</u> involved "put rights" granted under a limited partnership

agreement that entitled the holder to require that its interest in a partnership be purchased at a

price determined by an agreed formula in exchange for the debtor's stock.  The holder of the put

rights argued it was entitled to a claim either because (i) it would not be possible to issue enough

stock to satisfy the obligations under the put rights or (ii) the debtor's stock was worthless.  <u>Id.</u> at

509.   The bankruptcy court declined to award damages to the holder because the put right

agreement was silent on the issue and the parties could have addressed the issue in the agreement. Critical to the court's ruling was the fact that the parties

> could have negotiated an agreement pursuant to which one or both of the Debtors would have a monetary obligation to pay any unexercised portion of the Put Right. This provision is conspicuously absent from the Agreement. This is particularly glaring in light of the fact that the Agreement does address what ENBC's obligations are if there is insufficient stock to pay the Put Price and nowhere is there a suggestion that those obligations include a monetary payment.

Id. at 509-10. Here, the Noteholders' damages claims are not a matter of contract enforcement or a salve for dashed contractual expectations but a grab for more than they are entitled to under the Indentures.

**B.     The Noteholders Are Not Entitled To Damages For Termination Of Their Contract Rights.**

Regardless of their treatment under the Plan, the Noteholders are not entitled to receive damages for termination of a conversion right. Broad, 642 F.2d at 956. In Broad, the Fifth Circuit's decision was based on the fact that purchasers of convertible debentures take on the risk inherent in the "equity feature of the security." At issue in Broad was whether the issuer's merger into another company entitled convertible noteholders to convert their notes into the surviving company's common stock (or receive damages). The convertible noteholders argued that the merger impermissibly cut off their right to share in any upside of the issuer. The Fifth Circuit rejected this contention, noting:

> A purchaser of Debentures, however, takes the risks inherent in the equity feature of the security, risks that are shared with the holders of [the issuer's] Common Stock. One of those risks is that [the issuer] might merge with another company which is effectively the risk that any individual investor's assessment of the value of [the issuer's] Common Stock, based on [the issuer's] prospects for the future, will be replaced by the collective judgment of the marketplace and the other investors in [the issuer] who might vote in favor of the merger. This, like the risk that [the issuer's] future

24

> operations might be lackluster, with the result that conversion
> might never be economically attractive is simply a risk inherent in
> this type of investment.

<u>Id.</u> Here, the Noteholders accepted the upside potential of the Notes along with the risks inherent in equity ownership that the underlying equity will be subject to termination. The fact that the contemplated risks were realized (instead of the possible rewards) does not entitle the Noteholders to additional compensation.

### C.    The Conversion Price Of The Notes Exceeded The Stock Price At The Commencement Date.

The Noteholders will almost certainly liken their conversion right to a stock option and argue that (i) they were damaged because they failed to receive the value of such right and (ii) the Court should award them damages in the amount of the Black-Scholes valuation (or some similar measure) of such conversion right. But courts have already rejected these arguments in analogous circumstances.

For example, in <u>Einstein/Noah Bagel</u>, the put right holder argued that the put right had substantial value because the debtor's stock would be much more valuable after confirmation and the attendant removal of $125 million in debentures from the debtor's balance sheet. <u>Einstein/Noah Bagel</u>, 257 B.R. at 509. The bankruptcy court disagreed, finding it "contrary to fundamental bankruptcy principles" because rights and interests are fixed as of the date of the petition under section 502 of the Bankruptcy Code. <u>Id.</u> At the petition date, the put right was not ripe for exercise. Moreover, it was subject to cancellation under section 1141 of the Bankruptcy Code upon confirmation of a chapter 11 plan. The bankruptcy court noted:

> If [the claimant] were correct, the same argument could be applied
> to unexercised warrants and stock options that, although under
> water at the time of the filing, would have substantial value if they
> 'ride through' the bankruptcy and be exercisable against the
> reorganized debtor with a clean balance sheet. Many cases, among

them In re Am. West Airlines, Inc., 179 B.R. 893 (Bankr. D. Ariz. 1995), teach us that this is not the law.

Id.

The Noteholders' argument likewise is contrary to fundamental bankruptcy principles because their interests were fixed as of the Commencement Date. And to that end, as of the Commencement Date, the Notes were not convertible because they were "under water" (i.e., Calpine's common stock was trading far below the applicable conversion price). See 6A Fletcher Cyc. Corp. § 2649.10 (2006) (conversion rights have no value until they are exercisable). The Noteholders' damage claims are premised upon the same theory advanced by the Einstein/Noah Bagel put right holder: for the Noteholders' purported conversion right to have any value, it, too, would have to "ride through" the bankruptcy and be exercisable against the reorganized debtor. In this context, as in Einstein/Noah Bagel, that is not the law. Under section 502, the Conversion Rights had *no value* as of the Commencement Date and therefore the Noteholders are not entitled to any damages for the cancellation of those worthless Rights.

### D. Holders Of The 4% Notes Cannot Be Entitled To Damages Because The Notes Expired.

The 4% Notes expired by their terms on December 26, 2006 (the "4% Notes Stated Maturity Date"). 4% Note at 1. There is no viable legal theory that could entitle 4% Noteholders to any future upside *after* the 4% Notes expired by their terms. Moreover, the price of Calpine's common stock between the Commencement Date and the 4% Notes Stated Maturity Date ranged from $0.15 to $1.46[18]—well below the 4% Notes' conversion price of $18.07.[19] Thus, it is no surprise that the 4% Noteholders never sought to convert their Notes; if they had,

---

[18]    See http://finance.yahoo.com/q/hp?s=CPNLQ.PK&a=11&b=20&c=2005&d=11&e=26&f=2006&g=d.

26

they would have turned a $1.3 million unsecured fixed debt claim into $105,000 of common stock[20] with highly uncertain prospects.

In any event, convertible noteholders take their notes along with the risk that their conversion feature may never be "in the money." Broad, 642 F.2d at 956. If the Court were to award such damages to the holders of the 4% Notes, it would be no different from awarding common stock holders damages for a decline in the value of their shares, which courts uniformly refuse to do in the absence of fraud. See, e.g., La Grasta v. First Union Secs., Inc., 358 F.3d 840, 847 (11th Cir. 2004) ("[T]he stock market - where risk is inherent - is not a place for those who are faint of heart or weak of stomach. Individuals who put their money in equities in the hope of garnering great returns do not have the peace of mind provided by FDIC insurance, and must be willing to live with fluctuations in the value of their investments.").

III.    **Any Damages Award Must Be Subordinated To Equity.**

Even assuming the Debtors' proposed repayment somehow entitles the Noteholders to an allowable damages claim, any such claim must be subordinated pursuant to section 510(b) of the Bankruptcy Code. Section 510(b) provides that claims

> for damages arising from the purchase or sale of [a security of the debtor] . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). Courts have interpreted the "arising from the purchase" requirement broadly and apply section 510(b) to situations such as these. See, e.g., Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 255 (2d Cir. 2006) ("most prominent decisions of local

---

[19]    4% Note at 3.

[20]    Assumes a $1.46 share price.

27

bankruptcy courts also support the broad interpretation of section 510(b)"); In re Enron Corp., 341 B.R. 141, 161-62 (Bankr. S.D.N.Y. 2006) (claims for breach of contract in connection with under water employee stock options were subject to subordination under section 510(b) because they were recharacterized subordinated securities claims); In re WorldCom, Inc., 2006 WL 3782712, at *6 (Bankr. S.D.N.Y. Dec. 21, 2006) (subordinating claims for damages in connection with unexercised stock for interests under section 510(b)).

Courts presented with the issue of whether to subordinate put rights, call provisions, warrants, and stock options have done so on the basis that these types of instruments enable holders to "participate in the success of the enterprise and the distribution of profits" and that the "form in which the equity interest is held is ultimately irrelevant." WorldCom, 2006 WL 3782712, at *6. Here, similarly, the conversion feature of the Notes enables the Holders to access the upside potential of common stock. See William Bratton, Jr., The Economics and Jurisprudence of Convertible Bonds, 1984 WIS. L. REV. 667, 673 (1984) (Conversion feature "gives convertible bonds the advantage of combining desirable features of straight bonds, such as fixed income payments and principal repayment, with the upside potential of common stock."). Accordingly, the Court should subordinate any damage awards relating to the Noteholders' conversion claims to the same priority as common stock.

Moreover, as a policy matter, it makes logical sense that any damages awards should—at best—be *pari passu* with equity. Specifically, once the Notes are converted, the Noteholders receive common stock (which is the lowest priority interest). But before the Notes are converted or the conversion feature can be exercised, on the other hand, the Noteholders do not even have stock. Giving preconversion noteholders who have, in essence, "less than stock" an unsecured claim would allow them to leapfrog over the (i) existing equity holders,

(ii) converted equity holders, and (iii) the Noteholders' own positions had they exercised their conversion rights. This would not make any sense—and it would violate the absolute priority rule. See, e.g., Med Diversified, 461 F.3d at 259 (ruling section 510(b) required mandatory subordination of claim for breach of termination agreement requiring debtor to issue shares of its stock in exchange for shares of another company's stock). Notably, in Med Diversified, the Second Circuit found that "[i]n this case . . . because of the binding agreement between the parties to turn a debt into an equity interest, it is reasonably clear that Rombro's claim is in line with policy concerns underlying section 510(b)." Id. These same policy considerations support subordination under section 510(b) of any damages award to the Noteholders.

Lastly, the Noteholders will likely argue that the New Claims are not subject to subordination because section 101(16)(C) of the Bankruptcy Code provides that "[t]he term 'equity security' means . . . warrant or right, *other than a right to convert*, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph." 11 U.S.C. § 101(16)(C) (emphasis added). But such an interpretation would pervert the purpose of excluding conversion rights from the definition of "equity security." The legislative history specifies that the convertible debentures are not equity securities. H.R. Rep. No. 95-595, at 310-311 (1977); S. Rep. No. 95-989, at 23-24 (1978). The exclusion of the "right to convert" and convertible debentures from the definition of "equity security" serves to *protect* holders of convertible debentures from underhanded debtors who would try to subordinate to the level of common stock the debenture holders' claims for repayment of the principal of and interest on their debt. It does not mean, and no court has held, that holders of convertible debentures are entitled to unsecured claims for damages associated with their conversion rights.

K&E 11928829.13

Moreover, as discussed above, unexercised conversion rights are "less than stock." As such, it makes sense to carve out the "right to convert" from the definition of "equity security" in order to preserve the rights of holders of convertible debentures to recover exactly that to which they are entitled—principal and interest. This goes hand in hand with the exclusion of convertible debt from section 510(b) of the Bankruptcy Code to prevent convertible noteholders from obtaining a double recovery the likes of which would never be permissible *outside* of bankruptcy, much less in bankruptcy.

## CONCLUSION

The New Claims were filed after the Bar Date and, accordingly, are time-barred. Moreover, even if the Court considers the New Claims, the New Claims seek amounts that the Noteholders are not entitled to under the Bankruptcy Code and the Indentures. Because section 502(b)(1) of the Bankruptcy Code requires courts to disallow claims that are unenforceable against a debtor and its property, the Debtors respectfully request that the Court grant their limited Objection.

## NOTICE

Notice of this Objection has been provided to: (a) the United States Trustee for the Southern District of New York; (b) counsel to the statutory committee of unsecured creditors; (c) counsel to the administrative agents for the Debtors' prepetition secured lenders; (d) counsel to the ad hoc committees; (e) the indenture trustees under the Indentures; (f) counsel to the Debtors' postpetition lenders; (g) the Securities and Exchange Commission; (h) the Internal Revenue Service; (i) the United States Department of Justice; (j) counsel to the statutory committee of equity security holders; and (k) all parties entitled who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required. A copy of the Objection is also

available on the website of the Debtors' notice and claims agent, Kurtzman Carson Consultants,

at http://www.kccllc.net/calpine.

Except as otherwise noted herein, no prior application for the relief requested

herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request an entry of an order, substantially

in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and

further relief as the Court may deem just and proper.


Dated:  July 6, 2007
      New York, New York

Respectfully submitted,

  /s/ Richard M. Cieri
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Counsel for the Debtors

K&E 11928829.13

**<u>EXHIBIT A</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| Calpine Corporation, et al., | ) | |
| | ) | Case No. 05-60200 (BRL) |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER GRANTING DEBTORS' LIMITED OBJECTION TO CONVERTIBLE NOTEHOLDER CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300

Upon the Objection (the "Objection")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") seeking entry of an Order disallowing the New Claims [Docket No. _____], as more fully described in the Objection; it appearing that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties in interest; it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); it appearing that venue of this proceeding and this Objection in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; it appearing that notice of the Objection and the opportunity for a hearing on the Objection were appropriate under the particular circumstances and that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.    The Objection is granted in its entirety.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

2.    Claim numbers 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 are disallowed to the extent that such claims request amounts beyond the Repayment Amounts (as defined below).

3.    Pursuant to section 502(c) of the Federal Rules of Bankruptcy Procedure, the value of the New Claims is determined as the amount of outstanding principal, plus accrued interest at a rate to be determined by the Court at the end of the Chapter 11 Cases and reasonable prepetition indenture trustee fees as provided under the Indentures (collectively, the "Repayment Amounts"). For the purposes of clarity, the Repayment Amounts shall not include any actual or potential claims, premiums or penalties related to any contract defaults or damages.

4.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Objection.

5.    The terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

6.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated: _____, 2007

_____
United States Bankruptcy Judge

K&E 11928829.13