# EXHIBIT J

Kristopher M. Hansen (KH-4679)
Erez E. Gilad (EG-7601)
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Fax: (212) 806-6006

*Attorneys for each of Banc of America Securities,*
*LLC, Brencourt Credit Opportunities Master, Ltd.,*
*Brencourt Multi-Strategy Enhanced Dedicated Fund,*
*LP, Dillon Read U.S. Finance L.P., Dillon Read*
*Financial Products Trading Ltd., Linden Capital*
*L.P., and Ore Hill Hub Fund, Ltd.*

Hearing Date: August 8, 2007 @ 10 a.m. (EST)
Response Deadline: July 27, 2007 @ 12 p.m. (EST)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Cases** |
| | : | |
| **Calpine Corporation, *et al.*,** | : | **Case No. 05-60200 (BRL)** |
| | : | |
| Debtors. | : | **Jointly Administered** |
| | : | |

-------------------------------------------------------------- x

**RESPONSE OF CERTAIN HOLDERS OF THE 7.75% CONTINGENT CONVERTIBLE**
**NOTES DUE 2015 TO THE DEBTORS' LIMITED OBJECTION TO CONVERTIBLE**
**NOTEHOLDER CLAIMS**

S428

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND ...................................................................................... 5

    A.    Brief Description of the 7.75% Convertible Notes .................................. 5

    B.    Chapter 11 Cases ............................................................... 7

ARGUMENT ........................................................................................ 8

I.    THE DEBTORS ARE SOLVENT AND THEREFORE THE
    CONVERTIBLE NOTEHOLDERS ARE ENTITLED TO THE FULL
    BENEFIT OF THEIR BARGAIN AND SHOULD BE MADE WHOLE
    FOR THE LOSS OF THE CONVERSION RIGHT ........................................ 8

II.    THE DEBTORS' PROPOSED REPAYMENT OF THE 7.75%
    CONVERTIBLE NOTES IS A BREACH OF THE CONVERSION
    RIGHT AND OTHER PROTECTIVE MEASURES ...................................... 9

    A.    The Indenture Provides for the Survival of the Conversion Right
        During a Bankruptcy ........................................................ 10

    B.    The Indenture Contains Extensive Protections Designed to Prevent
        Loss of the Value of the Conversion Right ................................. 12

    C.    Damages are Due Despite the Automatic Acceleration of the Debt ............ 14

    D.    Law of the Case and the CalGen Decision Supports the Allowance
        of the Noteholders' Claims ................................................. 15

    E.    The Debtors' Proposed Repayment and Breach of the Indenture
        Gives Rise to a Claim for Damages ........................................ 17

III.    THE CONVERTIBLE NOTEHOLDER CLAIMS ARE VALID DEBT
    CLAIMS ARISING FROM BREACH OF A DEBT INSTRUMENT AND
    THEREFORE ARE NOT SUBJECT TO SUBORDINATION UNDER
    SECTION 510(b) OF THE BANKRUPTCY CODE ...................................... 20

    A.    The Claims Asserted by the Noteholders Arising Under the 7.75%
        Convertible Notes Are Debt Claims ........................................ 21

i

B.     The Convertible Noteholders' Damages Claim Bears No Causal
Nexus to the "Purchase or Sale of a Security" Since the Damages
Relate to the Breach of the Indenture ...................................................................23

C.     Should This Court Find That the Damages Claim Is Subject to
510(b) Subordination, that Statute Requires Only That Such Claim
Be Subordinated to the Claims of Principal and Interest Under the
7.75% Convertible Notes, and Does Not Mandate That Such Claim
Be Deemed *Pari Passu* With, Or Subordinated To, Common Stock ....................24

IV.    THE CONVERTIBLE NOTEHOLDERS' BREACH OF CONTRACT
CLAIMS ARE NOT "NEW CLAIMS" ............................................................................26

A.     The Breach of Contract Claims Are Included in the Proof of Claim......................26

B.     The Supplement Relates Back To, and Merely Clarifies, The Proof
Of Claim.................................................................................................................26

C.     Debtors Fail to Allege Any Prejudice or Equitable Grounds
Sufficient to Disallow the Convertible Noteholders' Damages
Claim......................................................................................................................28

CONCLUSION................................................................................................................................29

# TABLE OF AUTHORITIES

## CASES

Arthur v. Burkich, 520 N.Y.S.2d 638 (3d Dep't 1987) ................................................................13

Broad v. Rockwell Int'l Corp., 642 F.2d 929 (5th Cir. 1981)
    cert. denied 454 U.S. 965 (1981) ....................................................................9, 18, 21

Butner v. United States, 440 U.S. 48 (1979) ................................................................................9

Consol. Rock Prods. Co. v. Du Bois, 312 U.S. 510 (1941) ........................................................8

Friends Realty Assocs., LLC v. Wells Fargo Bank, N.A.P.,
    2007 WL 1322344 (1st Dep't May 8, 2007) ....................................................................13

Harsco Corp. v. Sequi, 91 F.3d 337 (2d Cir. 1996) ..................................................................10

Harff v. Kerkorian, 324 A.2d 215 (Del. Ch. 1974),
    rev'd in part on other grounds, 347 A.2d 133 (Del. 1974) ..............................................21

Hauser v. Western Group Nurseries, Inc., 767 F.Supp. 475 (S.D.N.Y. 1991) ..........................11

Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490 (2d. Cir. 1995)..............................................17

In re 139-141 Owners Corp., 306 B.R. 763 (Bankr. S.D.N.Y. 2004)..........................................8

In re 433 South Beverly Drive, 117 B.R. 563 (Bankr. C.D. Cal. 1990) ....................................15

In re America West Airlines, Inc., 179 B.R. 893 (Bankr. D. Ariz. 1995) ..................................22

In re Calpine Corp., No. 05-60200, 2007 WL 685595
    (Bankr. S.D.N.Y. Mar. 5, 2007)......................................................................... passim

In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co., 791 F.2d 524 (7th Cir. 1986) ..............8

In re Dow Corning, 456 F.3d 668 (6th Cir. 2006) ........................................................................8

In re Einstein/Noah Bagel Corp., 257 B.R. 499 (Bankr. D. Ariz. 2000) ................................18, 19

In re Enron Creditors Recovery Corp., No. 01-16034, 2007 WL 1705653
    (Bankr. S.D.N.Y. June 13, 2007)..................................................................................27

In re Imperial Coronado Partners, Ltd., 96 B.R. 997 (B.A.P. 9th Cir. 1989) ..............................15

In re Migel's Will, 336 N.Y.S.2d 376 (N.Y. Sur. 1972).............................................................21

In re Montgomery Ward Holding Corp., 272 B.R. 836 (Bankr. D. Del. 2001)............................23

In re Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039 (2d Cir. 1982)............15

In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Cal. 1987) ..............................................................14

In re Wyeth Co., 134 B.R. 920 (Bankr. W.D. Mo. 1991)..............................................................23

Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.),
    949 F.2d 585 (2d Cir. 1992)......................................................................................................16

Midland Cogeneration Venture Ltd. P'ship v. Enron Corp.,
    419 F.3d 115 (2d Cir. 2005)......................................................................................................27

Official Comm. of Unsecured Creditors v. American Capital Fin. Servs., Inc. (In re
    Mobile Tool Int'l, Inc.), 306 B.R. 778 (Bankr. D. Del. 2004)...........................................23

Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993)...........................25

Racusin v. American Wagering, Inc. (In re American Wagering, Inc.), No. 05-15969,
    2007 WL 1839681 (9th Cir. June 28, 2007) ........................................................23, 24, 25

R.A. Mackie & Co. v. Wien Securities Corp., 329 F. Supp. 2d 477 (S.D.N.Y. 2004)............19, 20

Russo Enters., Inc. v. Citibank, N.A., 699 N.Y.S.2d 437 (2nd Dep't 1999) .................................13

Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal,
    791 F.Supp. 401 (S.D.N.Y. 1991)............................................................................................17

Trump-Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp., 106 A.D.2d 242
    (1st Dep't 1985), aff'd 66 N.Y.2d 779 (1985) .................................................................10

Wabash Valley Power Ass'n v. United States (In re Wabash Valley Power Ass'n), 72
    F.3d 1305 (7th Cir. 1995) ........................................................................................................18

## STATUTES AND RULES

11 U.S.C. § 101(16) (2007) ............................................................................................................22

11 U.S.C. § 510(b) (2007) .......................................................................................................20, 24

11 U.S.C. § 1129(b) (2007) ..............................................................................................................9

## OTHER

John Creed & Noah Beck, The Demise of CoCos and the Tax Consequences of
    Exchanging Convertible Debt, 734 PLI/Tax 263 (June 27, 2005) ........................................6

**RESPONSE OF THE AD HOC COMMITTEE OF HOLDERS OF THE 7.75%
CONTINGENT CONVERTIBLE NOTES DUE 2015 TO THE DEBTORS' LIMITED
OBJECTION TO CONVERTIBLE NOTEHOLDER CLAIMS**

Banc of America Securities, LLC, Brencourt Advisors, LLC, Dillon Read U.S.

Finance L.P., Dillon Read Financial Products Trading Ltd., Linden Capital L.P. and Ore Hill

Hub Fund, Ltd., the holders and/or investment advisors to certain holders (the "Convertible

Noteholders" or "Noteholders") of certain of the 7.75% Contingent Convertible Notes due 2015

(the "7.75% Convertible Notes" or "Notes") issued by Calpine Corporation ("Calpine", and

together with the above-captioned debtors and debtors-in-possession, the "Debtors") pursuant to

that certain Indenture, dated as of August 10, 2000 (the "Base Indenture"), as supplemented by

the Third Supplemental Indenture, dated as of June 23, 2005 (the "Supplemental Indenture", and

together with the Base Indenture, the "Indenture"),[1] by and through their undersigned counsel,

hereby responds to the Debtors' limited objection dated July 6, 2007 (the "Claim Objection") to

certain of the claims filed by the indenture trustee for the 7.75% Convertible Notes (the

"Indenture Trustee") on behalf of the Convertible Noteholders, and in support hereof,

respectfully states as follows:[2]

### PRELIMINARY STATEMENT

1.    As the Debtors state in their Claim Objection, these chapter 11 cases, one

of the largest in U.S. history, may indeed prove rare. The Debtors, by their own admission, are

likely solvent and pre-petition equityholders are projected by the Debtors to receive a significant

---

[1]    Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the Indenture. A copy of each of the Base Indenture and the Supplemental Indenture are attached hereto as Exhibit A and Exhibit B, respectively.

[2]    The parties have agreed to bifurcate the issues of liability and damages, such that the August 8th hearing will address only the legal issue of whether the Convertible Noteholders are entitled to an allowed claim arising from the asserted breaches of the Indenture, to be followed by a separate evidentiary hearing to determine damages in the event the Court allows such claims.

distribution under the proposed plan of reorganization. However, such a rarity does not abrogate the Debtors' obligation to comply with the Bankruptcy Code, applicable law and the law of this case. The law is clear that creditors of a solvent debtor must receive the full benefit of their bargain, including the full measure of damages arising from any breach of the relevant debt instrument under applicable law.

2.    Contrary to the Debtors' hyperbole, the Noteholders seek to recover nothing more than what they negotiated with the Debtors, based on the contractual protections that are expressly afforded to them under the Indenture, but which the Debtors have profoundly misconstrued. As evidenced by the plain language of the Indenture, the Convertible Noteholders received two separate and distinct forms of consideration that, unlike a traditional convertible instrument, were not mutually exclusive: (i) the right to receive a fixed stream of income, in the form of interest and principal, through the scheduled maturity date (i.e., June 1, 2015), and (ii) the right to convert the Notes and receive stock in addition to cash for the principal amount of the Notes upon conversion. As further evidenced by the Indenture, the Convertible Noteholders also bargained for extensive protections designed to prevent Calpine from eliminating the value of the conversion right through certain corporate transactions, distributions or a bankruptcy filing.

3.    In other words, the Convertible Noteholders received additional incremental "option value" arising from the Noteholders' right, through the year 2015, to receive the full upside potential inherent in the underlying stock without incurring the downside risks typically associated with outright equity ownership. That risk is limited by both Calpine's absolute obligation to pay interest and repay principal at maturity or upon the conversion date and by the contractual protections afforded to the Noteholders in the Indenture. Yet, despite this

2

bargained-for exchange, the Debtors propose to repay the Notes and wipe out the conversion right without compensating the Convertible Noteholders for the loss, resulting in a breach of the Indenture.

4.      In defense, the Debtors argue that no breach of the Indenture will occur because the conversion right terminated immediately upon the automatic acceleration of the debt as a result of Calpine's voluntary bankruptcy filing.  This interpretation contradicts the plain language of the Indenture.  Most notably, Section 10.15(d) of the Supplemental Indenture and the form of Note expressly recognize that the conversion right survives a bankruptcy-related event of default and persists through the scheduled maturity date.  Simply stated, there is nothing in the Indenture to support the Debtors' view that acceleration operates to "obliterate" the conversion right.

5.      Moreover, as this Court has ruled in its CalGen Decision[3] — which is now the law of this case — the automatic acceleration of the debt does not preclude the Noteholders from asserting damages arising from the breach of the Indenture.  In its CalGen Decision, the Court made clear that lenders whose "expectations are dashed" are entitled to damages arising from the breach of their debt instrument, despite the automatic acceleration of payment due to a bankruptcy filing.  That analysis applies with equal force here, and the Debtors' attempts to distinguish the present facts from those at issue in the CalGen Decision are simply unavailing.  The Convertible Noteholders are therefore entitled to damages for breach of the Indenture and the premature termination of their conversion right.

---

[3]   See Memorandum Decision and Order Granting, in Part, Debtors' Motion for Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims, entered on March 5, 2007 [Docket No. 3875] (the "CalGen Decision").  The terms "CalGen" and "CalGen Lenders" shall have the meaning ascribed to such terms in the CalGen Decision.

3

6.    The Debtors also argue, contrary to the language of the statute, that any conversion claims of the Noteholders should be subordinated under Section 510(b) of the Bankruptcy Code "beneath" equity, despite the fact that the claims relate to a valid and enforceable debt instrument. The Debtors do not dispute that the Noteholders' claims for principal and interest arising under the Notes constitute legitimate rights to payment. However, the Debtors make no meaningful distinction between that portion of the Noteholders' claims for principal and interest and the portion relating to damages arising from breach of the Indenture for purposes of Section 510(b) of the Bankruptcy Code. Moreover, as discussed below, the conversion damages arise from the Debtors' breach of various provisions of the Indenture and not from the purchase or sale of the Debtors' securities, since at no time did the Noteholders affirmatively seek to tender their Notes for conversion. Accordingly, the Noteholders' claims arising under the Indenture, including damages for breach of the Indenture, do not fall within the legislative reach of Section 510(b) of the Bankruptcy Code — and even if they did, the Bankruptcy Code is crystal clear that such damage claims would not be subordinate to equity but would be senior thereto.

7.    Finally, the Debtors seek to suppress the Noteholders' claims for damages based on technical grounds, namely that the amendment of the Indenture Trustee's claim (later defined as the Supplement) represents a late-filed proof of claim that should be expunged. These arguments are frivolous and without merit. The timely proof of claim originally filed by the Indenture Trustee expressly asserted claims in unliquidated amounts. The Supplement does nothing more than clarify the nature of the unliquidated amounts that were previously asserted in the Proof of Claim (and expressly says so in the attachment to the Supplement). The Supplement relates to the same Indenture, the same transaction and the same set of facts as the Proof of

4

Claim. Moreover, the allegation that the Debtors or creditors will be prejudiced if the Supplement is allowed is similarly without merit. The Supplement was filed and negotiations took place with the Debtors well before the Debtors finalized the first draft of their plan of reorganization and well before the plan was filed with this Court. The Debtors' suggestion that they could not have conceived the legal theories of recovery stated in the Supplement is disingenuous. Indeed, all they needed to do was read the Indenture that they negotiated.

## BACKGROUND

### A.    Brief Description of the 7.75% Convertible Notes

8.    On June 23, 2005, Calpine issued $650 million principal amount of the 7.75% Convertible Notes pursuant to the Indenture. The scheduled maturity date for the Notes is June 1, 2015.

9.    The Indenture provides that the Notes are convertible, at the option of the holders, into cash and shares of common stock upon the satisfaction of certain conditions precedent. See Supplemental Indenture § 10.01(a). The initial conversion price under the Indenture is $4.00, subject to a variety of adjustments in the event of certain corporate transactions, distributions or occurrences. See Supplemental Indenture §§ 1.01, 10.05, 10.06.

10.    Upon conversion, Calpine is required to satisfy its obligation in cash up to the principal amount of the debt (the "Net Share Settlement"). See Supplemental Indenture § 10.15(a), (b). If the aggregate consideration to be delivered at conversion (the "Conversion Value") is greater than the principal amount of the debt, then the excess of the Conversion Value over the principal amount is paid in shares.[4] Id. Upon an Event of Default, Calpine may elect to

---

[4]    By way of illustration, if Calpine shares trade at $5.00 per share for the prescribed period of time, upon conversion of $1,000 in principal amount of the Notes, the Noteholder will receive $1,250 in total Conversion Value (the conversion rate of 250 shares [i.e., $1000 divided by the conversion price] multiplied by the average
*(cont.)*

5

tender the Conversion Value in the form of shares. See Supplemental Indenture § 10.15(d). In plain English, whenever the Noteholders convert, if the ratios in the Indenture would result in a conversion amount that is grater than the principal amount, the principal is paid in cash and the remainder is paid in stock.

11.    The primary benefit to Calpine for structuring the loan as contingent convertible debt is to prevent dilution of its earnings-per-share for financial reporting purposes.[5] Calpine necessarily received additional benefits as well, including: (1) cheaper financing in the form of a lower coupon rate, (2) the prospect that holders will convert (thereby eliminating liabilities from Calpine's balance sheet but, of course, requiring a large cash payment), and (3) less restrictive covenants as compared with senior, non-convertible bonds.

12.    In exchange, the Indenture contains enhanced protections designed to prevent elimination of the value of the conversion right, including a prohibition against defeasance (Supplemental Indenture § 8.01); protections against a merger, consolidation or sale (Base Indenture § 4.1); restrictions against redemption (Base Indenture § 9.1; Supplemental Indenture § 3.02); adjustments to the conversion price in the event of certain dividends or distributions (Supplemental Indenture § 10.05); adjustments to the conversion price in the event of a Change of Control (Supplemental Indenture § 10.06); protections in the event of a reclassification, merger, consolidation or sale of substantially all of Calpine's assets

---

trading price [*i.e.*, $5.00]). Pursuant to the Net Share Settlement provisions, the Noteholder will receive $1,000 in cash and the remaining $250 in Calpine shares.

[5]    See generally John Creed & Noah Beck, The Demise of CoCos and the Tax Consequences of Exchanging Convertible Debt, 734 PLI/Tax 263 (June 27, 2005). Issuers are generally required to include the shares underlying their outstanding convertible debt in the calculation of earnings per share immediately upon issuance of the debt. Id. To avoid the dilutive effect of these accounting rules (and in response to a change adopted by Financial Accounting Standard Board in late 2004), contingent convertible bonds typically limit a holder's ability to convert until the issuer's stock trades at a value significantly in excess of the conversion price, and provide that the principal return must be paid in cash. Id. Only those shares actually issued upon conversion would be added to the number of shares outstanding for purposes of calculating earnings-per-share. Id.

(Supplemental Indenture § 10.12); and protections in the event of a bankruptcy filing (Supplemental Indenture § 10.06).

**B.     Chapter 11 Cases**

13.     On December 20, 2005 (the "Petition Date") and thereafter, Calpine and various of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.

14.     By order dated April 26, 2006, the Court established August 1, 2006 as the bar date for filing proofs of claim (the "Bar Date").

15.     On July 19, 2006, Wilmington Trust Company, as original Indenture Trustee for the 7.75% Convertible Notes, filed a proof of claim [Number 2404] (the "Proof of Claim") asserting claims for (a) principal and interest and (b) other unliquidated amounts arising under the Indenture.[6]  On or about April 23, 2007, Manufacturers and Traders Trust Company (as successor Indenture Trustee for the 7.75% Convertible Notes) filed a supplement to the Proof of Claim [Number 6280] (the "Supplement").[7]

16.     Between March and July of 2007, the Convertible Noteholders engaged in a number of meetings and negotiations with the Debtors regarding the treatment of the 7.75% Convertible Notes, specifically including the conversion right under the Indenture.

17.     On June 20, 2007, the Debtors filed their plan of reorganization [Docket No. 5015] (the "Plan") and related disclosure statement [Docket No. 5016].  A hearing to consider the adequacy of the Disclosure Statement is currently scheduled to take place on August 8, 2007.

---

[6]     A copy of the Proof of Claim (less exhibits) is attached hereto as Exhibit C.

[7]     A copy of the Supplement (less exhibits) is attached hereto as Exhibit D.

**ARGUMENT**

**I.**

**THE DEBTORS ARE SOLVENT AND THEREFORE THE CONVERTIBLE
NOTEHOLDERS ARE ENTITLED TO THE FULL BENEFIT OF THEIR BARGAIN
AND SHOULD BE MADE WHOLE FOR THE LOSS OF THE CONVERSION RIGHT**

18.    The Debtors, by their own admission, are likely solvent. A solvent debtor

may not produce a windfall for its equityholders by exploiting the provisions of the Bankruptcy

Code to eliminate the lawful rights and claims of its creditors. Consol. Rock Prods. Co. v. Du

Bois, 312 U.S. 510, 527 (1941); In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co., 791

F.2d 524, 528 (7th Cir. 1986). As the Sixth Circuit stated in Dow Corning:

> When a debtor is solvent . . . the presumption is that a bankruptcy
> court's role is merely to enforce the contractual rights of the parties,
> and the role that equitable principles play in the allocation of
> competing interests is significantly reduced...
>
> [A]bsent compelling equitable considerations, when a debtor is
> solvent, it is the role of the bankruptcy court to enforce creditors'
> contractual rights. See Chicago, 791 F.2d at 528 ("[I]f the bankrupt is
> solvent the task for the bankruptcy court is simply to enforce creditor
> rights according to the tenor of the contracts that created those
> rights").

In re Dow Corning, 456 F.3d 668, 679-80 (6th Cir. 2006).

19.    Thus, when a debtor is solvent, the debtor must afford the creditor the full

benefit of his bargain. See In re 139-141 Owners Corp., 306 B.R. 763, 771 (Bankr. S.D.N.Y.

2004) (stating that in bankruptcy cases involving a solvent debtor, "it is the opposite of equity to

allow the debtor to escape the expressly-bargained-for result of its act") (citing Ruskin v.

Griffiths, 269 F.2d 827, 832 (2d Cir. 1959)); In re Dow Corning Corp., 456 F.3d at 679 (stating

that when a debtor is solvent, the bankruptcy court's role is to enforce the contractual rights of

the parties).

20.    Furthermore, under the absolute priority rule, creditors are to receive the full benefit of their bargain prior to equityholders receiving any recovery. See 11 U.S.C. § 1129(b); see also In re Dow Corning Corp. at 678 (citing Bank of Am. Nat'l. Trust & Sav. Ass'n v. 203 North LaSalle Street P'ship, 526 U.S. 434, 441-42 (1999) (describing the absolute priority rule).

21.    Consequently, the Convertible Noteholders, as creditors of a solvent debtor, are entitled to the full benefit of their bargain, and should recover all amounts to which they would be entitled under applicable law, including damages arising from breach of the Indenture and the loss of the value of the conversion right. The Debtors cannot ignore liability by saying that such rights terminate upon acceleration, when they clearly do not, and are required to pay all obligations under the Indenture in full.

**II.**

**THE DEBTORS' PROPOSED REPAYMENT OF THE 7.75% CONVERTIBLE NOTES IS A BREACH OF THE CONVERSION RIGHT AND OTHER PROTECTIVE MEASURES**

22.    In order to determine whether a claim, as defined in Section 101 of the Bankruptcy Code, exists, bankruptcy courts look to state law. See Butner v. United States, 440 U.S. 48, 55 (1979) ("[p]roperty interests are created and defined by state law"). Here, the Indenture is governed by New York Law. See Supplemental Indenture § 12.07. Accordingly, this Court must apply New York law in determining the Convertible Noteholders' claims. "[T]he construction of the Indenture is basically a question of contract law." Broad v. Rockwell Int'l Corp., 642 F.2d 929, 940-41 (5th Cir. 1981), cert denied 454 U.S. 965 (1981).

23.    The Indenture is an enforceable agreement, and the Indenture Trustee has properly fulfilled its duties and responsibilities pursuant thereto. The Debtors' erroneous analysis of the Indenture notwithstanding, the Debtors' proposed repayment of the Notes,

whether under a plan of reorganization or otherwise, does in fact breach a host of Noteholder

protections designed to prevent Calpine from eliminating the value of the conversion right,

resulting in damages. Accordingly, and as further demonstrated below, all of the elements to

establish a breach of contract claim under New York law are met. See Harsco Corp. v. Segui, 91

F.3d 337, 348 (2d Cir. 1996).

## A.    The Indenture Provides for the Survival of the Conversion Right During a Bankruptcy

24.    The fundamental premise of the Debtors' argument is their mistaken belief

that the conversion right terminates upon the automatic acceleration of the Notes as a result of

Calpine's bankruptcy filing since, in their view, the default advances the maturity date of the

Notes to the Petition Date, and therefore a breach of the Indenture cannot occur if that right is

eliminated. Claim Objection at 3. Simply put, the Debtors either ignore the plain language of

the Indenture or just missed the language in the preparation of their argument.

25.    All doubt on this point is put to rest by Section 10.15(d) of the

Supplemental Indenture, which provides as follows:

> If an Event of Default as set forth in Section 5.1(e) or (f) of the Original
> Indenture [i.e., a bankruptcy filing] has occurred and is continuing, the
> Company may not pay cash upon conversion of any Notes (other than cash
> in lieu of fractional shares) and instead will make payment only through
> the delivery of shares of Common Stock, provided that Holders shall
> receive an amount in cash in lieu of any fractional shares.

Supplemental Indenture § 10.15(d) (emphasis added).

26.    Section 10.15(d) clearly permits conversion during a bankruptcy and

expressly provides for the right of Noteholders to convert after a bankruptcy Event of Default.

The Debtors' interpretation, if correct, would render Section 10.15(d) meaningless, thereby

violating a fundamental canon of contract interpretation under New York law. See Trump-

Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp., 106 A.D.2d 242, 244 (1st Dep't 1985), aff'd,

66 N.Y.2d 779 (1985) (stating that a contract must be interpreted "so as to give force and effect to all of its provisions.") (citations omitted); Hauser v. Western Group Nurseries, Inc., 767 F. Supp. 475, 488 (S.D.N.Y. 1991) ("It is a cardinal rule of contractual interpretation that a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual.") (citations omitted).   This Indenture provision completely neuters the Debtors' "loss of conversion upon automatic acceleration in bankruptcy" argument.

27.     The Indenture also provides that the Notes are convertible, at the option of the holders, upon the satisfaction of the conditions precedent listed in Section 10.01(a).  See Supplemental Indenture § 10.01(a).  Significantly, the absence of an Event of Default of any kind, including a bankruptcy filing, is not included in any of the conditions precedent in either Section 10.01(a) of the Supplemental Indenture or elsewhere.  If the parties to the Indenture intended for a voluntary bankruptcy filing or other Event of Default to terminate the conversion right, they would have drafted such a limitation, much as they did in numerous other occasions throughout the Indenture.[8]

28.     Moreover, the form of Note attached to the Supplemental Indenture expressly states: "[s]uch conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Day immediately preceding the date of Maturity, subject, in the case of conversion of any Global Note, to any Applicable Procedures."[9]

---

[8]   See, e.g., Base Indenture §§ 4.1(ii) (Merger and Consolidation), 7.2 (Termination of Company's Obligation) and 7.3(iii) (Defeasance and Discharge of Indenture); Supplemental Indenture §§ 1.1 (definition of "Unrestricted Subsidiary") and 7.3(3) (Purchase Upon Change of Control).

[9]   The form of Note specifically uses the capitalized term "Maturity" but no such defined term appears in the form of Note, the Supplemental Indenture or the Base Indenture.  Given that the form of Note uses a capitalized term, and given the manifest intent of the parties that the conversion right survive a bankruptcy pursuant to Section 10.5(d) of the Supplemental Indenture, it must be presumed that the drafter intended to utilize the defined term "Stated Maturity" as found in the Base Indenture, which is defined as the scheduled maturity date of June 1, 2015.  In any event, the Debtors make no attempt to find support in the Indenture for their argument
                                                                                                         *(cont.)*

Supplemental Indenture at A-5. Once again, the Indenture makes clear that the conversion right lasts until the scheduled maturity date, with no qualification as to the occurrence of any Event of Default or automatic acceleration.

**B.    The Indenture Contains Extensive Protections Designed to Prevent Loss of the Value of the Conversion Right**

29.    The Debtors' attempt to eliminate the conversion right without compensating the Noteholders for the loss of that right would be prohibited outside of bankruptcy. In a leap of logic, the Debtors basically argue that the conversion right has no value until exercisable and can be "obliterated" since the Noteholders did not obtain explicit contractual protections in the Indenture. Claim Objection at 20-21. This is not true. The Indenture clearly provides for anti-dilution protections (see Supplemental Indenture §§ 10.05 and 10.06) and provides that the conversion right rides through certain corporate transactions, and the Convertible Noteholders must be adequately compensated for loss of the value of the conversion right. For example, upon a reclassification, merger or sale of Calpine, the successor or purchaser would be required, as a precondition to the transaction, to enter into a supplemental indenture that included a right to convert into the kind and amount of shares of Capital Stock and other property that are distributed to holders of Calpine common stock as part of the transaction. See Supplemental Indenture § 10.12.

30.    Also, in order to prevent the issuer from eliminating the conversion right prior to maturity, as it is attempting to now do, the Noteholders bargained for no-call protection. Specifically, Section 9.1 of the Base Indenture provides that "Securities of any Series which are redeemable before their Stated Maturity shall be redeemable in accordance with their terms and

---

that "maturity" for purposes of the conversion right is advanced to the Petition Date as a result of the bankruptcy filing.

(except as otherwise specified as contemplated by Section 2.1) in accordance with this Article."
Base Indenture § 9.1. In other words, each subsequent series of securities are redeemable solely
to the extent expressly permitted therein. The Supplemental Indenture provides for only one
limited scenario in which the Company may redeem the 7.75% Convertible Notes, i.e., if the
Company's senior loan documents would preclude the Company from delivering cash to
Noteholders that tender their Notes for conversion, and so long as there is no Event of Default,
then, and only then, may the Company "redeem" the Notes and deliver the same consideration
otherwise deliverable.[10]

        31.    It is therefore presumed that the 7.75% Convertible Notes are non-
callable. See Arthur v. Burkich, 520 N.Y.S.2d 638, 639 (3d Dep't 1987); Friends Realty
Assocs., LLC v. Wells Fargo Bank, N.A.P., 2007 WL 1322344, *1 (1st Dep't May 8, 2007);
Russo Enters., Inc. v. Citibank, N.A., 699 N.Y.S.2d 437, 438 (2nd Dep't 1999). Repayment of
the Notes under the Plan or otherwise clearly breaches the no-call protection contained within the
Indenture, entitling the Noteholders to damages. Indeed, this is precisely what this Court found
when it arrived at the conclusion that the CalGen third lien debt holders were entitled to damages

---

[10]  Specifically, section 3.02 of the Supplemental Indenture, titled "Optional Redemption Upon Conversion",
provides as follows:

    The Company shall have the right to redeem, at its option, any Notes tendered for conversion
    pursuant to Article 10 hereof if, on the date such Notes are tendered for conversion, the Company
    determines, in its sole judgment, that its then outstanding Indebtedness would prevent it from
    paying the Principal Return or delivering the Net Shares when due upon conversion as required by
    Section 10.02 hereof; provided that the Company shall not so redeem any Notes pursuant to this
    Section 3.02 if an Event of Default shall have occurred and be continuing (other than an Event of
    Default that would be cured by such redemption). . . . The redemption price for any Notes so
    redeemed shall be an amount in cash equal to the Principal Return and an amount of shares of
    Common Stock equal to the Net Shares, together with cash in lieu of any fractional shares
    (collectively, the "Redemption Price"), in each case in respect of such Notes tendered for
    conversion as set forth in Section 10.15.

Supplemental Indenture § 3.02; see also Prospectus at S-54 (describing redemption feature and stating "[a]s of
the date hereof, the restricted payment covenants under the instruments or agreements governing certain of our
outstanding indebtedness would prevent us from settling the notes upon conversion without redeeming the notes
and treating such redemption as a refinancing . . ."); see also Id. at 1; S-11-12; S-27; S-54.

for the repayment of the third lien debt which was non-callable for the life of that debt. See In re

Calpine Corp., No. 05-60200, 2007 WL 685595 (Bankr. S.D.N.Y. Mar. 5, 2007).

**C.      Damages are Due Despite the Automatic Acceleration of the Debt**

32.    Consistent with applicable law, the automatic acceleration of the 7.75%

Convertible Notes does not foreclose the assertion of additional damages. Section 5.2 of the

Base Indenture provides that if a bankruptcy event of default with respect to Calpine occurs, then

"the principal of and interest on all the [7.75% Convertible Notes] of each Series shall ipso facto

become and be immediately due and payable without any declaration or other act by the

[Indenture] Trustee or any [Convertible Noteholders]." Base Indenture § 5.2. However, as noted

above, the conversion right explicitly survives automatic acceleration of the debt as a result of

the bankruptcy filing. See Supplemental Indenture §§ 10.01(a), 10.15; A-5.

33.    In addition, acceleration does not foreclose the Indenture Trustee or the

Noteholders from pursuing additional remedies. Section 5.3 of the Base Indenture states that:

> If an Event of Default occurs and is continuing, the [Indenture]
> Trustee may pursue any available remedy to collect the payment of
> principal or interest on the relevant Securities or to enforce the
> performance of any provision of such Securities or this Indenture. . . .
> A delay or omission by the [Indenture] Trustee or any [Convertible
> Noteholder] in exercising any right or remedy accruing upon an Event
> of Default shall not impair the right or remedy or constitute a waiver
> of or acquiescence in the Event of Default. <u>All remedies are
> cumulative to the extent permitted by law</u>.

Base Indenture § 3.5 (emphasis added).

34.    In addition, numerous courts have held, in the prepayment premium

context, that the automatic acceleration of debt as a result of a bankruptcy filing does not

foreclose the possibility that additional amounts beyond principal and interest may be due, since

acceleration is not preclusive of other remedies available to the lender and since the debt may be

decelerated. See In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Cal. 1987) (rejecting debtor's

14

argument that automatic acceleration eliminated any prepayment right, since acceleration is subject to deceleration in a Chapter 11 plan; otherwise a debtor could always avoid the effect of a prepayment clause by filing a bankruptcy case); see also In re Imperial Coronado Partners, Ltd., 96 B.R. 997 (B.A.P. 9th Cir. 1989) (reasoning that since the debtor "had the right" to reinstate the loan, regardless of whether it could practically do so, the lender was still entitled to prepayment even though the lender had itself accelerated the debt prior to the bankruptcy); In re 433 South Beverly Drive, 117 B.R. 563 (Bankr. C.D. Cal. 1990) (same); see also In re Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1053 (2d Cir. 1982) (holding that there is "no bar . . . to the Indenture Trustee seeking specific performance of the redemption provisions where the debtor cause[d] the debentures to become due and payable by its voluntary actions"). Applying the Debtors' argument that the maturity date advances to the Petition Date upon automatic acceleration of the debt as a result of the bankruptcy filing, post-petition interest, for example, would never be payable. Clearly, in the case of a solvent debtor, this is not the correct result, nor the law.

**D.    Law of the Case and the CalGen Decision Supports the Allowance of the Noteholders' Claims**

35.    This Court's CalGen Decision is the law of this case and supports the Convertible Noteholders' view that breach of contract damages are due despite the automatic acceleration of the debt. In its CalGen Decision, this Court held that the CalGen Lenders would be entitled to a prepetition general unsecured claim for damages resulting from the Debtors' breach of the loan agreements. See In re Calpine Corp., No. 05-60200, 2007 WL 685595 (Bankr. S.D.N.Y. Mar. 5, 2007). The Court noted that "damages are always the default remedy for breach of contract." Id. (citing United States v. Winstar, 518 U.S. 839 (1996)).

15

36.    In CalGen, the Debtors raised the same argument presented by the instant Claim Objection, namely that the automatic acceleration of the debt advanced the date of maturity to the petition date and the CalGen Lenders were not entitled to anything more than principal and interest. The Court expressly rejected this argument and held that the CalGen Lenders were indeed entitled to the benefit of their bargain:

> The Debtors' and Creditors' Committee assert that in the absence of any form of liquidated damage in the indentures for the period in question (pre April 1, 2007), the CalGen Secured Lenders' quest for damages is based on an "amorphous" breach of contract theory which leaves them without any remedy especially since they will be paid the full amount of their loans plus accrued interest: "the benefit of their bargain." *This preclusive argument for a total foreclosure of any damage recovery is incorrect.* The CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed giving rise to damages, albeit not measurable as the Lenders would wish. See Harsco Corp v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

In re Calpine Corp., 2007 WL 685595, at * 10-11 (emphasis added).

37.    The CalGen Decision has become law of this case and mandates a similar outcome here. See Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585, 592 (2d Cir. 1992) ("[u]nder the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation"). Like the CalGen Lenders, the Convertible Noteholders are entitled to damages for breach of the Indenture despite the absence of any provision in the Indenture for the payment of a premium or liquidated damages. See In re Calpine Corp., 2007 WL 685595, at * 11. ("Accordingly, while the agreements do not provide a premium or liquidated damages for repayment during the period the Debtors propose, the CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of the agreements").

38.    Unsurprisingly, the Debtors seek to distinguish the present facts by noting that the 7.75% Convertible Notes are being repaid and cancelled under a plan of reorganization

16

that calls for a distribution of equity rather than being repaid in cash during the pendency of the chapter 11 cases. This distinction, however, is form over substance. At its core, the <u>CalGen Decision</u> squarely held that that lenders are entitled to the economic benefit of their bargain. If anything, the Convertible Noteholders present a stronger case for damages since, as described above, the Indenture for the 7.75% Convertible Notes expressly provides for the survival of the conversion right after a bankruptcy Event of Default. In addition, the 7.75% Convertible Notes are non-callable, and, per this Court's CalGen Decision, the Convertible Noteholders are entitled to damages for breach of the no-call protection in the Indenture.

39.    In light of the foregoing, the Noteholders are entitled to allowed claims for damages arising from the Debtors' breach of the Indenture and the loss of the conversion right.

**E.    The Debtors' Proposed Repayment and Breach of the Indenture Gives Rise to a Claim for Damages**

40.    The Convertible Noteholders are entitled to receive a claim for both the principal and interest component of the 7.75% Convertible Notes as well as a separate claim for the loss of the conversion right. It is well established that under New York law, "a party injured by breach of contract should be placed in the same economic position as it would have been in had the contract been performed." <u>Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal</u>, 791 F.Supp 401, 415 (S.D.N.Y. 1991) (finding that lender was entitled to "damages equal to the discounted present value of the incremental interest income expected to be lost as a result of the breach"); <u>see also</u> <u>Indu Craft, Inc. v. Bank of Baroda</u>, 47 F.3d 490 (2d. Cir. 1995) (finding that proper measure of damages is the amount necessary to put the non-breaching party in the same economic position).

41.    As articulated in the "well-recognized" treatise cited by Debtors in their own papers, the conversion right represents a distinct right under the Indenture and possesses its own market value:

> The conversion right, although set forth in the debenture and in the indenture, is <u>separate and distinct from the debt</u> evidenced by the debenture <u>and as a separate right, it has its own ascertainable value.</u>

Debtors' Claim Objection, p. 19 (<u>citing</u> 6A <u>Fletcher Cyc. Corp.</u> § 2649.10 (2006)) (emphasis added); <u>see also</u> <u>Broad v. Rockwell Int'l Corp.</u>, 642 F.2d 929, 943 (5th Cir. 1981) (<u>citing</u> American Bar Foundation, Commentaries on Indentures, 522-23 (1971)).

42.    That separate and distinct right possesses value even if the Calpine shares were trading at a price lower than the conversion price. Indeed, courts have long accepted the fundamental principle that "the equity interest of an insolvent corporation may have some value because the equityholders are entitled to share in the corporation's profits if it becomes profitable in the future." <u>Wabash Valley Power Ass'n v. United States (In re Wabash Valley Power Ass'n)</u>, 72 F.3d 1305, 1318 (7th Cir. 1995) (<u>citing</u> <u>Northwest Bank Worthington v. Ahlers</u>), 485 U.S. 197, 208 (1988)). "[B]ecause the value of a call option is derivative of the value of the underlying stock, the value of a call option on the stock of an insolvent corporation is not worthless as a matter of law." <u>Id</u>. Therefore it is clear, as a matter of law, that the conversion right currently retains independent and significant value.

43.    The facts present here are in stark contrast to those in <u>In re Einstein/Noah Bagel Corp.</u>, 257 B.R. 499 (Bankr. D. Ariz. 2000) ("<u>ENBC</u>"). As a threshold matter, unlike Calpine, the ENBC debtors were insolvent and, under the plan, offered pre-petition equity holders out-of-the-money warrants. In addition, ENBC addresses the terms of a "put right" under a partnership agreement that requires the partnership or its parent to repurchase the limited partner's existing equity interests, whereas the Convertible Noteholders are not existing

18

equityholders and have asserted claims arising under a debt security governed by an indenture. Also, the ENBC court reached the conclusion that the put right is basically illusory, since the Court held that the partnership agreement contained a provision that absolved the partnership from liability in the event it was unable to satisfy the put obligations (i.e., if it was unable to pay cash or stock for the put right, or unable to obtain shareholder approval to register the equity interests, then the claimant's existing equity interests would remain in place, as would ENBC's remaining obligations, though no damages would result). Id. at 504-06. Calpine, on the other hand, is under a contractual obligation to honor the conversion right through the year 2015, and that contractual right is being prematurely terminated — which, under federal, state and the law of the case, gives rise to a claim for damages. In any event, the language cited by the Debtors is dicta (see id. at 509), and the ENBC court ultimately refused to value the put interests. Id. at 510.

44.    As noted above, the 7.75% Convertible Notes provide the Noteholders with two separate and distinct forms of consideration that are not mutually exclusive: (1) the right to receive payments of interest and principal through maturity, and (2) upon conversion, the right to receive the principal amount in cash and the excess value in stock, and thereby benefit from potential upside through maturity. Contrary to the Debtors' assertions, the conversion right retains value because the right is exercisable until June 1, 2015 and during that time there is the potential for future increases in the stock price.

45.    The Debtors' suggestion that the conversion right lacks present value simply because the trading price of Calpine shares was lower than the conversion price as of the Petition Date (as opposed to the effective date of the Plan, the actual date of breach) fails to take into account several critical factors typically considered in valuing options or derivatives, including duration, volatility, future gains (or losses) in value, and strike price. See R.A. Mackie

19

& Co. v. Wien Securities Corp., 329 F. Supp. 2d 477, 512-14 (S.D.N.Y. 2004).  Indeed, the

Convertible Noteholders are prepared to demonstrate at the second phase of this contested matter

the quantum of damages that will be suffered by the Convertible Noteholders as a result of the

loss of the conversion right.

      46.     Accordingly, the Convertible Noteholders are entitled to a separate claim

for damages arising from the elimination of their conversion right, in addition to their claims for

principal and interest.

III.

**THE CONVERTIBLE NOTEHOLDER CLAIMS ARE VALID DEBT CLAIMS
ARISING FROM BREACH OF A DEBT INSTRUMENT AND THEREFORE ARE NOT
SUBJECT TO SUBORDINATION UNDER SECTION 510(b) OF THE BANKRUPTCY
CODE**

      47.     As demonstrated below, the damages arising from breach of the Indenture

are not subject to mandatory subordination pursuant to section 510(b) of the Bankruptcy Code.[11]

The Bankruptcy Code, together with the legislative history to Section 510(b), clearly

demonstrates that Congress did not intend for the claims asserted by the Noteholders arising

under the 7.75% Convertible Notes to fall under the ambit of Section 510(b) of the Bankruptcy

Code.[12]

---

[11]  Section 510(b) of the Bankruptcy Code provides that:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, *for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security,* except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).

[12]  To the extent the Debtors seek mandatory subordination of a portion of the Convertible Noteholders' claims, the Claim Objection is procedurally defective, and the Debtors are required to commence an adversary proceeding pursuant to Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

20

A.     The Claims Asserted by the Noteholders Arising Under the 7.75%
       Convertible Notes Are Debt Claims

48.    As a general matter, convertible bonds have long been characterized as

creatures of debt, and not equity, and therefore any claims arising under the 7.75% Convertible

Notes for payment of principal, interest or damages are not subject to subordination under

Section 510(b) of the Bankruptcy Code.  As the Court stated in In re Migel's Will, 336 N.Y.S.2d

376, 379 (N.Y. Sur. 1972):

> That a bond is convertible at the sole option of its holder into stock
> should no more affect its essential quality of being a bond than should
> the fact that cash is convertible into stock affect the nature of cash.
> Any bond, or any property, for that matter, is convertible into stock
> through the intermediate step of converting it to cash. . . . [C]ase law
> indicates that a convertible debenture is a bond and not an equity
> security until conversion occurs.

Id. at 374;  see also Harff v. Kerkorian, 324 A.2d 215 (Del. Ch. 1974), rev'd in part on other

grounds, 347 A.2d 133 (Del. 1974) (same).

49.    In fact, Broad v. Rockwell, cited heavily by the Debtors, stands for the

very proposition that conversion rights are incidents of debt that represent wholly contractual

interests in the issuer, as opposed to equity interests.  See Broad v. Rockwell Int'l Corp., 642

F.2d 929, 940, n. 10 (5th Cir. 1981) ("[T]he rights of the holders of the debt securities are largely

a matter of contract.").  Accordingly, the Debtors' argument that Convertible Noteholders "bear

the same risks and are entitled to the same remedies as equityholders (i.e., none)" is mistaken

since the Convertible Noteholders possess valuable and enforceable rights and remedies under

the Indenture.[13]  Claim Objection at 4.

---

[13]    The Debtors appear to ignore the economic realities underlying the Convertible Notes, and treat the Convertible
Notes as holding stand-alone warrants to purchase stock of Calpine.  This is not the case.

21

50.     Indeed, Congress recognized the fact that convertible bonds, though a hybrid security, should be treated as debt. Specifically, Section 101(16) of the Bankruptcy Code, in pertinent part, defines the term "equity security" as including shares of stock of a corporation, warrants or other rights to purchase stock, but expressly excludes "a right to convert." 11 U.S.C. § 101(16). The legislative history reveals that Congress did not intend the definition of "equity security" to include "a security, such as a convertible debenture, that is convertible into equity security, but has not been converted." S. REP. No. 989, 95th Cong. (2d Sess. 1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810; H.R.REP. No. 95-595, at 311, 95th Cong. (1st Sess. 1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6268. Unless and until the Convertible Noteholders tender their Notes for conversion, all claims arising under the Indenture represent debt claims akin to claims for principal and interest. Moreover, courts have clearly distinguished between a conversion right and the right to purchase typically associated with stock options. See In re America West Airlines, Inc., 179 B.R. 893 (Bankr. D. Ariz. 1995) ("The legislative history reveals that only a right to convert is not included in the definition of "equity security"...[a] right to purchase however, is within the definition provided in the Bankruptcy Code."). Thus, the cases cited by the Debtors, which involve stock options, are distinguishable from the instant dispute, which involves claims arising under convertible bonds.

51.     Furthermore, in analyzing whether a claim is subject to statutory subordination, courts have analyzed whether the claimant undertook the risks of an equityholder. Here, by virtue of the hybrid nature of the 7.75% Convertible Notes, the Noteholders did not incur the risks associated with equity. As described above, in the event the trading price of Calpine's stock price dropped, the Noteholders retained the right to enforce Calpine's absolute obligation to pay interest and repay principal. Simply stated, the policies of Section 510(b)

22

would not be served by subordinating any of the Noteholders' claims arising under the Indenture, and Section 510(b) is simply inapplicable to the current situation.

**B.    The Convertible Noteholders' Damages Claim Bears No Causal Nexus to the "Purchase or Sale of a Security" Since the Damages Relate to the Breach of the Indenture**

52.    As demonstrated above, the damages asserted by the Noteholders are not a result of the failure of the Company to deliver shares of stock upon conversion of the Notes; the Noteholders have made no election to convert the notes. Rather, the claim represents damages arising from the Debtors' breach of a debt instrument resulting from the premature termination of the conversion right, and therefore is not within the contours of Section 510(b) of the Bankruptcy Code. See e.g., Official Comm. of Unsecured Creditors. v. Am. Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.), 306 B.R. 778 (Bankr. D. Del. 2004); In re Montgomery Ward Holding Corp., 272 B.R. 836, 843 (Bankr. D. Del. 2001) (absent an allegation of fraud in the purchase, sale, or issuance of a debt instrument, Section 510(b) does not apply to a claim seeking simple recovery of an unpaid debt due upon a promissory note, even if the note was given in exchange for stock); In re Wyeth Co., 134 B.R. 920, 921 (Bankr. W.D. Mo. 1991) (claims based on notes issued by debtor to redeem stock neither fall under the plain language of Section 510(b) nor 'bear any relationship whatever' to its underlying policy concerns).

53.    The sole cause of the Noteholders' damages is the breach of the Indenture, not the non-delivery of stock. There is no transactional nexus between the Noteholders' damages claim for breach of the Indenture with a purchase or sale of stock. See e.g., Racusin v. American Wagering, Inc. (In re American Wagering, Inc.), No. 05-15969, 2007 WL 1839681 (9th Cir. June 28, 2007). In the American Wagering case, Racusin was hired as a financial advisor in connection with the initial public offering of the debtor's stock, and the parties entered into an agreement pursuant to which he was to be compensated in cash and stock. Id. at * 1.

23

Racusin later obtained a money judgment against the debtor arising from his claims for breach of contract. Id. After the debtor filed for bankruptcy, the debtor sought to subordinate his claim. Id. at * 2. Though the court acknowledged that section 510(b) does encompass certain breach of contract claims, it only encompasses those claims that bear "some nexus or casual relationship between the claim and the purchase of the securities." Id. at * 3. Specifically, the Ninth Circuit held as follows:

> We agree that his claim is not one that is properly subordinated because it is not one "for damages arising from the purchase or sale of a security." The original...contract, which promised him "4% of the final evaluation" of the IPO, only gave him the monetary value of the shares of stock, not the stock itself. [The debtor] never upheld its end of the contract, resulting in a lawsuit for breach seeking damages based on the value of the stock. Racusin received that money judgment and initiated legal action to receive it long before the bankruptcy proceeding at issue here commenced. Racusin thus sought all along what was promised by the contract-the monetary value of the stock, rather than the stock itself-and the district court, after some direction from this Court, effectuated the contractual remedy as well.

In re American Wagering, Inc., 2007 WL 1839681, at * 2 (emphasis added).

54.     Accordingly, the claim for damages arising from the breach of the Indenture for the 7.75% Convertible Notes does not arise as a result of the sale or purchase of a security, and, therefore, is not subject to mandatory subordination.

**C.     Should This Court Find That the Damages Claim Is Subject to 510(b) Subordination, that Statute Requires Only That Such Claim Be Subordinated to the Claims of Principal and Interest Under the 7.75% Convertible Notes, and Does Not Mandate That Such Claim Be Deemed *Pari Passu* With, Or Subordinated To, Common Stock**

55.     Section 510(b) subordinates a claim "to all claims or interests represented by such security, except that if such security is common stock, such claim has the same priority as common stock." 11 U.S.C. § 510(b) (emphasis added). The statute, on its face, only requires that the Noteholders' claims arising from the loss of the conversion right be subordinated (if at

24

all) to the class of allowed claims relating to <u>such</u> security, <u>i.e.</u>, the 7.75% Convertible Notes, and certainly does not mandate that the claim be subordinated "beneath" common equity, as the Debtors suggest. It is well-settled that statutory provisions should be interpreted in accordance with their plain meaning. <u>Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380 (1993) ("Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'") (construing Fed. R. Bankr. P. 9006) (<u>quoting</u> <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979)).

56.    Subordinating the Noteholders' damages claim "beneath" equity would <u>not</u> be consistent with the policy considerations underlying the enactment of Section 510(b) of the Bankruptcy Code. As the <u>American Wagering</u> court stated:

> Section 510(b) serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets. The principles behind corporate and bankruptcy laws generally do not favor shifting the risk of loss from shareholders to creditors, even if the shareholders are blameless. One of the primary purposes of section 510(b), therefore, is to prevent disappointed shareholders, sometimes the victims of corporate fraud, from recouping their investment in parity with unsecured creditors.

<u>In re American Wagering, Inc.</u>, 2007 WL 1839681, at * 3.

57.    The Convertible Noteholders have not sued the Debtors as equity investors seeking monetary damages for fraud or breach of contract related to their mishandling of shareholders' economic investment in the company. Rather, they have asserted a claim for breach of their debt instrument. The Noteholders are creditors of the Debtors and the total amount of their claims should be treated accordingly.

## IV.

## THE CONVERTIBLE NOTEHOLDERS' BREACH OF CONTRACT CLAIMS ARE NOT "NEW CLAIMS"

58.    The Debtors devote nearly half of their pleading to a baseless argument in an attempt to disallow the Convertible Noteholders' damages claim on technical, albeit unfounded, grounds. They argue that the original Proof of Claim does not cover the damages claim, and that the Supplement somehow represents an untimely proof of claim, does not relate back to the original Proof of Claim, and allowance of the breach of contract claim would prejudice the Debtors or other parties-in-interest. These arguments are wholly without merit.

### A.    The Breach of Contract Claims Are Included in the Proof of Claim

59.    As a threshold matter, the Debtors have failed to demonstrate that the original Proof of Claim is insufficient in any material way in respect of any and all of the Noteholders' claims to the extent they relate to the Indenture and the 7.75% Convertible Notes, including damages for breach of the Indenture. The Proof of Claim was timely filed, asserted both liquidated and unliquidated claims, and attached the actual Indenture. As discussed above, the terms of the Indenture plainly provide for a conversion right and related protections, and the Debtors are charged with being familiar with its contents, particularly since they drafted the document. Accordingly, the Proof of Claim includes all claims related to the breach of the Indenture.

### B.    The Supplement Relates Back To, and Merely Clarifies, The Proof Of Claim

60.    With respect to the Supplement, the Indenture Trustee took extra measures to make clear that the Supplement was intended to simply clarify the nature of the unliquidated amounts previously asserted in the original Proof of Claim. On the form cover page for the Supplement, the Indenture Trustee indicated that it supplements a previously filed claim dated

7/18/06 (Claim No. 2404). Also, the notice of the filing of the Supplement states: "Please note that this Supplement to Proof of Claim <u>merely supplements</u> proof of claim number 2404, and <u>is not intended to, and does not, replace</u> proof of claim number 2404." Supp. to Claim No. 2404 (emphasis in original). In addition, a footnote to the attachment to the Supplement states:

> The purpose of the Supplement is to <u>provide more detail regarding the claims asserted in Paragraph II with respect to the 7.75% Notes.</u> All of the claims described herein arise from and relate to the 7.75% Notes, and arise under the Indenture or from a breach thereof, <u>and were subsumed and included within the Original Proof of Claim.</u>

<u>See</u> Exhibit D (emphasis added).

61. In any event, the Supplement arises out of the same "conduct, transaction, or occurrence" set forth in the Proof of Claim and therefore relates back to the Proof of Claim. <u>See</u> <u>In re Enron Creditors Recovery Corp.</u>, No. 01-16034, 2007 WL 1705653 (Bankr. S.D.N.Y. June 13, 2007) (applying Rule 15(c)(2) of the Federal Rules of Civil Procedure to determine whether an amendment relates back to a proof of claim). The Proof of Claim was timely filed. The Supplement makes no reference to new documents, facts, or indentures. Rather, the Supplement refers to exactly the same facts and documents as in the original claim, and amplifies the nature of the claims asserted in the original claim. The cases cited by the Debtors bear no resemblance at all to the present dispute. Unlike the cases cited by the Debtors, the Supplement does not change the parties or assert a new claim against a separate debtor-entity. <u>Cf.</u> <u>Midland Cogeneration Venture Ltd. P'ship v. Enron Corp.</u>, 419 F.3d 115 (2d Cir. 2005) (court rejected late-filed claim to add Enron under the guaranty six months after the court-determined bar date). Thus, it strains credulity to suggest that the Supplement, in fact, does anything more than merely clarify the nature of the unliquidated amounts previously asserted. The Debtors' arguments lack merit, especially when one considers that the Debtors negotiated the Indenture just two years ago.

C.    Debtors Fail to Allege Any Prejudice or Equitable Grounds Sufficient
      to Disallow the Convertible Noteholders' Damages Claim

62.    As a matter of last resort, the Debtors request the Court to invoke its

equitable powers to eliminate certain of the Noteholders' unliquidated claims by asserting a host

of disingenuous and self-serving statements.  Once more, the Debtors misapply the very legal

standard they cite and fail to offer any meaningful explanation to support their assertions that the

Debtors or any party-in-interest will be prejudiced if the Supplement is allowed.  As noted

above, the Supplement was filed in good faith and merely clarifies the unliquidated claims

originally asserted in the Proof of Claim and addresses certain legal arguments being proffered

by other parties-in-interest both prior and subsequent to the issuance of the CalGen Decision,

nothing more.  The Supplement does not change the parties involved or offer any surprises.[14]

63.    Furthermore, the Noteholders engaged in good faith negotiations with the

Debtors regarding the claim well before the Debtors even filed the first draft of the

reorganization plan.  In fact, the Debtors acknowledged their discussions with the Convertible

Noteholders in a status conference before this Court as early as May 30, 2007.  The Debtors later

stated in open court that the first draft of the plan of reorganization had not even been

disseminated to the official committees until mid-June 2007, which was over a month after the

---

[14]    The Debtors fail to conceive the notion that the Supplement was filed out of an abundance of caution to avoid
litigation and pre-empt attempts to subvert the Convertible Noteholders' rights.  The Convertible Noteholders'
concerns were borne out, as evident from the presence of a highly irregular provision in the current version of
Plan on file with this Court, which purports to eliminate the right of any party-in-interest to make any argument
unless reflected in an agreement with the Debtors or filed with this Court:

> Waiver or Estoppel:  Each Holder of a Claim or an Interest shall be deemed to have waived any
> right to assert any argument, including the right to argue that its Claim or Interests should be
> Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an
> agreement made with the Debtors or their counsel, the Creditors' Committee or its counsel, the
> Equity Committee or its counsel, or any other Entity if such agreement was not disclosed in the
> Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the
> Confirmation Date.

See Plan Article VIII (emphasis added).

Supplement was filed and several weeks after a meeting was had among counsel to the Debtors and the Convertible Noteholders. Thus, the Debtors were aware of the Convertible Noteholders' claim for damages while plan formulation was still in process, and any assertion of prejudice is disingenuous.

64.    In addition, allowance of the claims asserted by the Proof of Claim and Supplement would not disrupt the judicial administration of the Debtors' case. The Plan represents a classic waterfall plan, which contemplates a distribution to equity to the extent all creditors are paid in full. The Debtors are currently engaged in the claims reconciliation process, as is customary in Chapter 11 cases. The Debtors have not demonstrated how the allowance of the Supplement or the Convertible Noteholder claims would disrupt the waterfall Plan or disrupt judicial administration of the case. If anything, the record suggests that the Debtors, as part of the claims reconciliation process are currently in the process of objecting to various claims asserted by various noteholders that include claims beyond just principal and interest. Other parties are not prejudiced if a claimant asserts its lawful rights. The fact that the Debtors dispute the claim is not a basis for determining the sufficiency or timeliness of a proof of claim. It is for this Court to decide if the claim is valid or not.

## CONCLUSION

65.    The conversion right contained in the Indenture represents a separate and distinct form of consideration under the 7.75% Convertible Notes. That right, in accordance with the plain terms of the Indenture, survives through bankruptcy and remains contractually valid through June 1, 2015. To the extent the Debtors seek to prematurely terminate that conversion right, whether pursuant to a confirmed plan of reorganization or otherwise, the Noteholders are entitled to damages for the loss of that value.

29

WHEREFORE, based on the foregoing, the Convertible Noteholders respectfully request that this Court deny the Claim Objection and grant the Convertible Noteholders the relief requested herein, and grant such other and further relief as the Court may deem appropriate.

Dated: New York, New York
       July 27, 2007

                              Respectfully submitted,

                              STROOCK & STROOCK & LAVAN LLP

                              By: /s/ Kristopher M. Hansen
                                  Kristopher M. Hansen (KH-4679)
                                  Erez E. Gilad (EG-7601)

                              180 Maiden Lane
                              New York, New York 10038
                              Tel: (212) 806-5400
                              Fax: (212) 806-6006

                              *Attorneys for each of Banc of America Securities, LLC,
                              Brencourt Credit Opportunities Master, Ltd., Brencourt
                              Multi-Strategy Enhanced Dedicated Fund, LP, Dillon
                              Read U.S. Finance L.P., Dillon Read Financial Products
                              Trading Ltd., Linden Capital L.P., and Ore Hill Hub
                              Fund, Ltd.*

30