# EXHIBIT L

**Hearing Date: August 8, 2007 at 10:00 a.m. (EDT)**
**Response Deadline: July 27, 2007 at 12:00 p.m. (EDT)**

MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Dennis F. Dunne (DD 7543)
Matthew S. Barr (MB 9170)
Andrew M. Leblanc (*pro hac vice*)

Attorneys for each of Aristeia Capital,
L.L.C., Aurelius Capital Management,
L.P., Drawbridge Special Opportunities
Advisors LLC, Ore Hill Hub Fund Ltd.,
Nisswa Master Fund Ltd., Pines Edge Value
Investors Ltd., Pines Edge Value Investors
L.P., Silver Sands Fund LLC, Stark Master
Fund Ltd. and 3V Capital Management, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 05-60200 (BRL) |
| Calpine Corporation., et al., | : | |
| | : | Jointly Administered |
| Debtors. | : | |

-------------------------------------------------------x

## RESPONSE TO DEBTORS' OBJECTION
## TO CONVERTIBLE NOTEHOLDER CLAIM
## NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Aristeia Capital, L.L.C., Aurelius Capital Management, L.P., Drawbridge Special

Opportunities Advisors LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines

Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC ,

Stark Master Fund Ltd. and 3V Capital Management, LLC (the "6% Convertible

Noteholders"), as beneficial owners, or managers of entities or accounts that are beneficial owners, of the 6% Convertible Notes Due 2014 (the "6% Convertible Notes") issued under the Indenture, dated as of August 10, 2000 (the "Original Indenture"), between Calpine Corporation (together with its affiliated debtors and debtors-in-possession, "Debtors"), as issuer, and Wilmington Trust Company, as predecessor indenture trustee (together with HSBC Bank USA, National Association, as successor indenture trustee ("HSBC"), collectively, the "Indenture Trustee"), as supplemented by the Second Supplemental Indenture, dated as of September 30, 2004 (the "Supplemental Indenture", together with the Original Indenture, the "Indenture", a copy of which is attached as Exhibit A hereto), jointly submit, by and through their undersigned counsel, this response to the Debtors' Limited Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 [Docket No. 5206] (the "Objection"), and respectfully represent as follows:

### PRELIMINARY STATEMENT

*"Nothing breeds creativity like the potential for a full payout case."*

1.    Creativity, indeed. The Objection starts with a sentence that, unless dismissed as overblown rhetoric, underscores the Debtors' creative use of the phrase "full payout case." There is nothing creative in creditors, such as the Holders, demanding that a debtor compensate them for all of the contractual rights that a debtor abrogates in bankruptcy. What is creative is the Debtors' Plan. It seeks to satisfy only certain of their contractual obligations to a creditor, while ignoring others, and then attaches the label, "a full payout case", to it. They then use that label as a shibboleth, which when magically uttered, allows them to run roughshod over the absolute priority rule and provide a

distribution to junior stakeholders without full payment to the Holders. What the Debtors describe as a "rarefied category" of full payout cases would not be rare at all if "full payout" meant paying only those portions of creditor claims that the Debtors wanted to pay and providing no compensation at all for other contractual rights that are eliminated in a reorganization.

2.      To borrow from the fervid collection of hyperbole contained in just the opening paragraph of the Objection, the Debtors have "been working overtime" to "conjure up" a series of "fanciful" arguments, based on a "tortured reading" of the Indenture as well as this and other courts' decisions, to cause the Court to disregard fundamental principles of bankruptcy law. Fustian rhetoric aside, what little effort at legal analysis the Debtors make in the Objection is easily refuted. At its core, the Objection rests on the premise that the conversion right by its terms ended on the petition date. In the Debtor's world, the filing of a case magically eliminated the extremely valuable conversion right through automatic acceleration and a tortured reading of the definition of maturity in the Convertible Notes. The Debtors' contentions are factually and legally erroneous; both the form of the note, which the Debtors cite in the Objection, and the controlling language of the Indenture itself that the Debtors chose not to mention demonstrate irrefutably that the conversion right survived the commencement of these cases. Stripped of this misconstruction of the operative documents, the conversion right is like any other contractual right abrogated in a Chapter 11 case – it is entitled to an allowed claim for the resulting damages.

3.      The Debtors provided purchasers of the 6% Convertible Notes two interdependent components of valuable economic consideration: (1) a promise to return

the principal plus interest accrued over time at the agreed interest rate; and (2) the conversion right, which was a promise to permit the 6% Convertible Noteholders to convert until maturity in 2014 into a combination of cash and common stock of the Debtors at an exchange rate agreed upon in the Indenture (the "Conversion Right"). The Conversion Right was a fundamental element of the economic consideration promised and provided by the Debtors; and one that permitted the Debtors to issue the 6% Convertible Notes at a lower interest rate as compared to notes without a conversion feature. A critical feature of the Conversion Right, as with any option, is its duration. The longer the contract gives a holder to wait and see what the future holds before deciding whether to exercise an option, the more opportunity will exist for the option to be in the money. Thus, forcing holders of 6% Convertible Notes to decide today (let alone on the petition date) whether to convert is itself fundamentally at odds with the bargain reflected in the Conversion Right.

4.    It would be inequitable and patently unfair – let alone impermissible under the Bankruptcy Code – to allow the Debtors to strip the 6% Convertible Noteholders of one of their bargained-for rights while at the same time compensating similarly situated creditors for all of their bargained-for rights. To illustrate, suppose a debtor issues pre-petition two *pari passu* unsecured series of bonds. One is a non-convertible bond with an interest rate of 18%,[1] and the other is a convertible bond with an interest rate of 6%. Now assume that under a plan of reorganization (as with the plan the Debtors have filed in this case) the debtor pays the holders of both series of notes principal plus pre- and

---

[1]    Although the above hypothetical is provided for illustrative purposes only, at the time the 6% Convertible Notes were issued, Calpine Corporation's unsecured non-convertible bonds of comparable maturities had a yield-to-maturity of approximately 18%.

post-petition interest in full, but cancels the conversion right without allowing any compensatory claim for that loss. The policy of treating similarly situated creditors equally is surely violated by awarding the nonconvertible noteholders an allowed claim for their entire economic bargain but not the convertible noteholders.

5.      To avoid the clear breach of contract they seek to visit on the 6% Convertible Noteholders, the Debtors contend that the bankruptcy filing was an acceleration event that vitiated the Conversion Right by unilaterally advancing the "Maturity" date. Courts have routinely refused to permit debtors to avoid their contractual obligations by relying on the constructive acceleration of debt that comes with bankruptcy. Bankruptcy acceleration is simply not an election of remedies by the affected creditors. The risk of abuse from a contrary reading is heightened here when the Debtors are solvent. Elimination of the Conversion Right without compensating the 6% Convertible Noteholders would create a windfall to old equity (the very parties' whose designated agent – the issuer's Board of Directors – decided to access the public market and issue the 6% Convertible Notes). Bankruptcy jurisprudence abhors a windfall. Moreover, it is not a vehicle for common stockholders to escape the consequences of the lawful bargains struck by their directors.

6.      As this Court has already made clear in these cases, when a debtor abrogates bargained-for economic consideration owing to a creditor, it must compensate the creditor through damages to the creditor whose expectations have "been dashed." In re Calpine Corp., No. 05-60200, 2007 WL 685595, *5 (Bankr. S.D.N.Y. Mar. 5, 2007) (hereinafter, "CalGen") (finding that damages are owed to bondholders who are pre-paid

contrary to the terms of their indenture).[2] Stripping the 6% Convertible Noteholders of the Conversion Right gives rise to an unsecured claim for damages against the Debtors for breach of the Indenture.

7.    The Debtors further contend that the breach of the Conversion Right results in no damage to the 6% Convertible Noteholders; or, alternatively, that any such damages would be subordinate to equity (in a reading that flies in the face of the language of the statue they contend applicable).  Even without delineating the obvious failings in these arguments, the Debtors have not sought a determination of the value or priority of any allowed claim.  Rather, they contest any liability for breach of the Conversion Right. While the Holders submit there can be no result other than that the breach of the Conversion Right creates an unsecured damage claim, the 6% Convertible Noteholders will establish the amount of such claim at an appropriate evidentiary hearing after resolution of the Debtors' objection as to liability.

## BACKGROUND

8.    ***Chapter 11 Petitions.***  On December 20, 2005 (the "Petition Date"), Calpine Corporation and certain of its affiliates filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§

---

[2]    The Conversion Right presents a stronger case for an allowed claim than the make-whole claims at issue in Calgen because a make-whole premium is an ancillary covenant designed to "protect" bargained for consideration (i.e., interest payments) against early voluntary prepayments of the debt.  First, the Conversion Right is not a covenant designed to protect the payment of interest over time, but is a distinct contractual right independent of the 6% Convertible Noteholders' claim for principal and interest.  Second, the Conversion Right is not a form of interest, either pre- or post-petition, and is thus not subject to any limitations on account of post-petition interest.  Elimination of the Conversion Right is not a breach of a non-economic term of the contract, but an elimination of directly bargained-for consideration.

101-1532 (as amended, the "Bankruptcy Code").[3]  The Debtors are operating their

businesses and managing their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

9.      ***Plan and Disclosure Statement.***  On June 20, 2007, the Debtors filed their

Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of

the United States Bankruptcy Code (the "Disclosure Statement") and the Debtors' Joint

Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the

"Plan").  On July 2, 2007, the Debtors filed the Debtors' Motion for Entry of an Order

(A) Approving the Adequacy of the Debtors' Disclosure Statement; (B) Approving

Solicitation and Notice Procedures with Respect to Confirmation of the Debtors'

Proposed Plan of Reorganization; (C) Approving the Form of Various Ballots and

Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect

Thereto (the "Disclosure Statement Motion").  The Disclosure Statement Motion is set to

be heard before this court on September 11, 2007.

## FACTUAL BACKGROUND TO MOTION

10.     ***Issuance of 6% Convertible Notes.***   Pursuant to the Indenture, debtor

Calpine Corporation (the "Issuer") issued the 6% Convertible Notes in the principal

amount of $725,000,000 due at maturity in 2014.

11.     ***Conversion Right and Other Indenture Provisions.***  The Indenture

provides for, among other things, the right to convert the 6% Convertible Notes into cash

and common stock of the Issuer up to maturity in 2014 (Indenture, Article 10).  The

Indenture prohibits defeasance of the 6% Convertible Notes (Supplemental Indenture,

Exhibit A) and restricts voluntary redemption by the Issuer (Supplemental Indenture,

---

[3]      Certain of the affiliates filed petitions for relief subsequent to the Petition Date.

Section 3.02). The Issuer cannot voluntarily redeem any of the 6% Convertible Notes; provided however, the Issuer may, under certain circumstances, redeem those of the 6% Convertible Notes held by a holder who has affirmatively elected to exercise its right of conversion. Id. In such instance, the redemption price includes not only the principal amount of the 6% Convertible Notes redeemed but also requires delivery of the Issuer's common stock in an amount calculated on the same basis as the Conversion Right. Id.

12.     *Postpetition Accruals*. The 6% Convertible Notes were issued at $839 per $1,000 principal amount at maturity and bear regular cash interest at a rate of 6% per annum on $1,000 per note. Regular cash interest on the 6% Convertible Notes is payable semiannually on March 30 and September 30 of each year, beginning on March 30, 2005. However, no interest is to be paid on or accrue for the interest periods corresponding to the March 30 and September 30, 2007, 2008 and 2009 interest payment dates. Instead, beginning on September 30, 2006, the original principal amount of $839 per note increases daily until September 30, 2009 to reach $1,000 in principal amount per note (the "Postpetition Accruals"). (Supplemental Indenture, Exhibit A.)

13.     *Bankruptcy Proof of Claim.* On April 26, 2006, this Court entered an Order Establishing A Deadline For Filing Proofs Of Claim And Approving The Form And Manner Of Notice Thereof [Docket No. 1348] (the "Bar Date Order"). The Bar Date Order established August 1, 2006, as the deadline to file proofs of claim in these Chapter 11 Cases on account of claims arising prior to the Petition Date (the "Bar Date"). The Debtors agreed to a 30-day extension of the Bar Date for HSBC, as successor indenture trustee under the Indenture.

14.    HSBC submitted proof of claim number 2821 on July 26, 2006, asserting claims on account of the 6% Convertible Notes for (a) principal outstanding as of the Petition Date in the amount of $547,370,000.00, (b) accrued unpaid interest to the Petition Date in the amount of $9,813,333.33, and (c) certain other unliquidated amounts (the "6% Convertible Notes Proof Of Claim").

15.    On March 27, 2007, HSBC filed a notice of the filing of the Supplement To Proof Of Claim [Docket No. 4127] (the "Original Supplement"), clarifying that the 6% Convertible Notes Proof Of Claim subsumed any and all claims on account of the Conversion Right. On May 23, 2007, at the Debtors' explicit request to clean up their claims register, HSBC filed an Amended Supplement To Proof Of Claim [Docket No. 4679] (the "Amended Supplement"). The Amended Supplement replaced the Original Supplement in its entirety. On June 8, 2007, the Debtors filed the Debtors' Sixteenth Omnibus Objection to Proofs of Claim (Claims to be Adjusted, Wrong Debtor Claims to be Adjusted, Duplicative Claims, Anticipatory Claims, No Liability Claims, Amended/Replaced Claims, Unliquidated Claims and Assumed Contract Claims) [Docket No. 4871] expunging the Original Supplement.

16.    *Prior Stipulation.* On January 30, 2007, the Debtors and HSBC entered into that certain Stipulation and Order Resolving Claim Numbers 2820, 2821, 2822, 2823, 2824, and 2825 [Docket No. 3501] (the "Prior Stipulation"). The Prior Stipulation specifically acknowledged that the 6% Convertible Notes Proof of Claim included amounts in addition to principal and interest, and provided that the 6% Convertible Notes Proof of Claim is deemed an allowed claim in the following amounts: (a)

9

$538,373,715.00 on account of principal outstanding as of the Petition Date and (b)

$8,662,747.50 on account of accrued unpaid interest to the Petition Date.

## ARGUMENT

### I.    6% Convertible Noteholders Are Entitled to Compensation If Conversion Right is Breached

17.    The Debtors cannot contest that the Indenture includes the Conversion

Right. By the Objection, the Debtors seek the Court's permission to pay off the 6%

Convertible Notes without compensating the 6% Convertible Noteholders for elimination

of the Conversion Right. As with breach of any contractual right, the 6% Convertible

Noteholders are entitled to damages for a breach of the Conversion Right. See Schonfeld

v. Hilliard, 218 F.3d 164, 175-76, 183 (2d Cir. 2000) (holding that, in a breach of

contract case, non-breaching party is entitled to general and special damages); see

also Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495-96 (2d Cir. 1995) (reversing

district court and reinstating damages award to non-breaching party for breach of

contract). The Debtors' request for an order absolving them for any such damages is

inappropriate.

18.    Contrary to the Debtors' contentions, the unique promise of the

Conversion Right makes the need to compensate the 6% Convertible Noteholders for

breach of that contract more acute, not less. The right to convert the debt was an integral

and valuable part of the consideration. Convertible debt instruments have "the advantage

of combining" two buckets of bargained-for consideration: the "desirable features of

straight bonds, such as fixed income payments and principal repayment, with the upside

potential of common stock." William W. Bratton, Jr., The Economics and Jurisprudence

of Convertible Bonds, 1984 Wis. L. Rev. 667, 673 (1984) (hereinafter, referred to as

"Bratton"). Investors in convertible notes bargain for "two imperfectly correlated elements of value – debt value and conversion value – combined in the same security." Bratton at 677. In exchange for a conversion right, "bondholders customarily accept a coupon rate lower than that of an equivalent straight bond" and "less restrictive business covenants." Id. This bedrock principle of corporate finance is evidenced here by (a) the 1,200 basis point difference between the interest rate on the 6% Convertible Notes and the yield to maturity of the equal priority ranking unsecured non-convertible bonds at the time[4] and (b) the limited business-related covenants in the Indenture when compared to non-convertible debt instruments issued by the Debtors.

19.     For the Debtors to reap the benefits of lower interest rates and less restrictive covenants, the Conversion Right had to be protected from elimination by the Issuer. Accordingly, the Indenture, among other things, prohibits voluntary redemption of the 6% Convertible Notes at the option of the Issuer (Indenture, Section 3.02), defeasance (Indenture, Exhibit A), and dilution of the Conversion Right (Indenture, Section 10.05).[5] Any act by the Debtors in these cases through a plan of reorganization, or otherwise, that would deny the 6% Convertible Noteholders the benefit of the

---

[4]     At the time the 6% Convertible Notes were issued, based on the coupon rate and the trading prices of the Issuer's unsecured bonds, the yields to maturity for the Issuer's non-convertible unsecured bonds were approximately 18%. Therefore, for the Issuer to issue unsecured bonds, if they could have marketed these type of bonds at all, they would have had to issue them with coupons of at least 18% as the market demanded.

[5]     Quixotically, the Debtors cite to a treatise that discusses the fact that convertible notes *without an antidilution provision* can be "obliterated" through dilution as support for the argument that the Conversion Right "may be obliterated without compensating holders for diminished value, it follows that conversion rights have no value until they are exercisable." (Objection at 20.) This argument is so ridiculous that a response is almost difficult to fashion. Suffice it to say that the 6% Convertible Noteholders disagree with the argument that a borrowers' ability to dilute a convertible instrument that does not have an antidilution provision (which provision the Indenture in fact has) leads to the conclusion that a promised for conversion option has no value.

Conversion Right would perforce deny the 6% Convertible Noteholders the benefit of

their bargain and create a breach of contract claim enforceable in these Chapter 11 Cases.

See Butner v. United States, 440 U.S. 48, 56 (1979) ("the federal bankruptcy court should

take whatever steps are necessary to ensure that the [creditor] is afforded in federal

bankruptcy court the same protection he would have under state law if no bankruptcy had

ensued").

      20.     Furthermore, it appears that the Debtors are solvent and old equity is

projected to receive a meaningful distribution. The Second Circuit has stated that in

cases of a solvent debtor, equity must be held to the terms of the contracts that the debtor

negotiated with its creditors even if doing so burdens them, holding as follows:

> No benefit will be given to the holders at the expense of
> any other class of creditors. The burden of this payment
> will fall entirely on the interest of the stockholders. They
> cannot complain that they are treated inequitably when
> their interest is cut down by the payment of a sum to which
> the debenture holders are clearly entitled by the express
> provisions of the trust indenture.

Ruskin v. Griffiths, 269 F. 2d 827, 832 (2d Cir. 1959) (holding that it is "the opposite of

equity to allow the debtor to escape the expressly-bargained-for result of its act." (citing

In re International Hydro-Electric System, 101 F. Supp. 222, 224 (D. C.D.Mass. 1951)),

cert. denied, 361 U.S. 947 (1960). A bankrupt's right to alter its pre-petition contractual

obligations are not applicable when the debtor is solvent and its desire to avoid damages

creates a benefit that "would not inure to the creditors but instead would be a windfall to

the debtor." In re Consolidated Operating Partners L.P., 91 B.R. 113, 117 (Bankr. D.

Colo. 1988). The 6% Convertible Noteholders have lived up to their end of the bargain.

The Debtors must now do the same. The Debtors raise a variety of arguments that they

contend compel a conclusion that they should not be liable for breach of the Conversion
Right; but these arguments are unavailing.

> **A.    Breach Of Conversion Right**
> **Gives Rise To A Breach Of**
> **Contract Claim Against Debtors**

21.    A creditor's right to assert a claim for damages is governed by state law.
See Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 24 (2000) (although allowance of
a claim is subject to federal bankruptcy law, validity of a claim is determined by
applicable state law). A valid claim under state law is an enforceable claim in bankruptcy
under section 502(b)(1) of the Bankruptcy Code, subject only to the express exceptions in
the federal bankruptcy law. Butner, 440 U.S. at 55. It is well-settled that a contract party
has a damage claim for breach of contract by a counter-party; and the 6% Convertible
Noteholders have a claim against the Debtors here. See Indu Craft, Inc., 47 F.3d at 495-
96 (awarding damages to plaintiff where defendant breached contract).

22.    The Indenture is, by its terms, governed by New York law. Under New
York law, in order to make out a breach of contract claim, an aggrieved party must
demonstrate: (i) an enforceable agreement; (ii) performance of the agreement by the
aggrieved party; (iii) the defendant's failure to perform in accordance with the terms of
the agreement; and (iv) damages arising from the defendant's failure to perform. Harsco
Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

23.    All of the elements required to establish a breach of contract claim under
New York law are present here. First, there is no dispute that the Indenture is an
enforceable agreement and that the Indenture contains the Conversion Right, which is
likewise an enforceable agreement. Second, it is equally undisputed that the Indenture

Trustee has always performed and fulfilled its duties under the Indenture and that the money raised by the issuance of the 6% Convertible Notes was delivered to the Debtors. Third, the Objection indicates the Debtors' plan to eliminate the Conversion Right under the Plan, which will constitute a failure by the Debtor to perform in accordance with the terms of the agreement.  Finally, the 6% Convertible Noteholders will sustain damages from the loss of their Conversion Right and the benefit of their bargain represented therein.

**B.    Acceleration Resulting From
Voluntary Bankruptcy Filing
Does Not Terminate Conversion Right**

24.    As they did without success in the CalGen dispute and, more recently, in connection with the makewhole litigation, the Debtors argue that the acceleration of principal and interest provided for in section 5.2 of the Indenture,[6] which was triggered by the Debtor's voluntary filing of these chapter 11 cases, advanced the date of maturity under the Indenture. In their view, therefore, the Conversion Right ceased to exist as of the day prior to the Petition Date. (Objection at 20-21, 23.)  The conclusion that the Debtors can avoid the Conversion Right by precipitating an event of default is flatly contradicted by both the terms of the Indenture and applicable law.

---

[6]    Section 5.2 of the Indenture provides, in relevant part, that:

> If an Event of Default specified in clause (e) or (f) of Section 5.1 with respect to the Company occurs, the principal of and interest on all the Securities of each Series shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders.

1.    Indenture Provides For
Survival Of Conversion Right

25.    Undeterred by the relevant facts and hewing closely to their shopworn playbook, the Debtors argue that the default occasioned by their bankruptcy filing accelerates not only the date upon which principal and interest becomes due and payable but also the "date of Maturity" as such term is used in the provision of the form note that states that the Conversion Right shall "expire at the close of business on the Business Day immediately preceding the date of Maturity." (Supplemental Indenture at A-5.) Nowhere in the Indenture or the form note is the term "date of Maturity" defined. Relying on a dictionary definition of "maturity" and ignoring all other terms of the Indenture and form note, the Debtors make the unsupported leap that "Maturity" must be advanced by the bankruptcy default. The Court must read the Indenture so as to give effect to all of its terms. See 11 Williston on Contracts § 32:5 (4th ed. 2007) ("interpretation which gives effect to all provisions of the contract is preferred to one which renders a portion of the writing superfluous, useless or inexplicable"); see also Galli v. Metz 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'") (citing Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988)). Any such reading compels the conclusion that "Maturity" as used with regard to the termination of the Conversion Right means the maturity date stated on the face of the Note, which is September 30, 2014, not an earlier date affected by acceleration.

26.    Several terms of the Indenture would be rendered meaningless by the Debtors' argument. First, the 6% Convertible Notes were issued with an original issue

discount. Accordingly, the "Principal Amount" due and owing on a particular day is calculated as principal plus accreted and unpaid interest calculated pursuant to a formula.[7] "Principal Amount at Maturity," by contrast, is defined as "the principal amount at maturity set forth on the face of such Note." (Supplemental Indenture at 4.) If, as the Debtors' suggest, the date of *maturity* is advanced by their default, rather than just acceleration of principal and interest, then the Debtors would be liable for the full face amount of the 6% Convertible Notes, rather than the "Principal Amount" reflecting the original issue discount, even if default occurred the day after the 6% Convertible Notes were issued. This conclusion is plainly incorrect.

27.    Second, the Indenture states that the Conversion Right may be exercised "at any time following September 30, 2013," without any qualification for default or an earlier maturity (because no such earlier maturity date is contemplated by the documents). The Debtors, in effect, seek to have this Court insert such a qualification into the indenture when (i) there is no evidence in the form note that this qualification was ever intended, let alone agreed upon, and (ii) at best, it would have created an inconsistency between the indenture and the form note, in which case the indenture would control, as the form note itself states.  (Supplemental Indenture, § 10.01(a)(2).)  If the Conversion Right were eliminated by a bankruptcy default as the Debtors suggest, then this provision would be rendered meaningless.

---

[7]    Defined as "with respect to each $1,000 *Principal Amount at Maturity of 6% Convertible Notes*, (i) prior to September 30, 2006, the Original Principal Amount, (ii) on and following September 30, 2009, the *Principal Amount at Maturity*, and (iii) on any date from and including September 30, 2006 to but excluding September 30, 2009, the Original Principal Amount, plus $0.1469 per calendar day from and including September 30, 2006 to but excluding such date.  All references to principal of the Securities in the Original Indenture shall be to the Principal Amount as defined above." (Supplemental Indenture at 4)  (emphasis added)

28.    Finally, the Indenture expressly contemplates conversion of the 6% Convertible Notes after default, contrary to the Debtors' argument. (Objection at 21 ("the Indentures do not provide for preservation of the Conversion Right after an event of default, acceleration, and repayment").) The Supplemental Indenture states clearly that:

> If an Event of Default has occurred and is continuing (other than a Default in a cash payment upon conversion of the 6% Convertible Notes), the Company may not pay cash upon conversion of any 6% Convertible Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock.

(Supplemental Indenture, § 10.15(d).) For the 6% Convertible Noteholders to have an opportunity to convert after a bankruptcy default such that section 10.15(d) has meaning, the Conversion Right must survive such a default.[8]

### 2.    Applicable Law Requires Survival Of Conversion Right

29.    In addition to being inconsistent with the terms of the Indenture, the Debtors' argument ignores the fact that the acceleration automatically triggered by the voluntary bankruptcy filing is nothing more than a remedy on default, the true purpose of which is to protect the contractual rights of the 6% Convertible Noteholders under the Indenture. Under the Indenture, the 6% Convertible Noteholders are vested with multiple rights, including their right to payment and the Conversion Right. Concomitantly with

---

[8]    As this Court is well aware, the Debtors have made substantially similar acceleration arguments in their CalGen refinancing and makewhole objection pleadings. In both cases, and distinguishable from the instant case, the Debtors had textual arguments that the "Model-T" indenture provisions therein did not provide for a voluntary prepayment penalty during the period in question and that the documents failed to specify that any prepayment premium survives default. However, in the Calgen context, this Court nonetheless held that the lenders' expectations had been "dashed" and awarded them an unsecured claim. CalGen, 2007 WL 685595 at *5. Here, where the Indenture clearly provides for the Conversion Right to survive default, the 6% Convertible Noteholders' right to a claim on account of damages suffered by breach of the Conversion Right should receive greater, not lesser, judicial protection.

these rights, the 6% Convertible Noteholders are also vested with various remedies, including, among others, acceleration, which they have not elected. It strains logic and reason to believe that the Debtors could excuse themselves from their obligations under the Indenture by committing a voluntary default and then shielding themselves behind one of the remedies that attempts to cure that default. If this were the case, the Conversion Right would be worthless because, at any time, the Debtors could simply commit a default that automatically accelerates the debt, unilaterally eviscerate the benefits of such right and provide a windfall to equity. Cf. In re Skyler Ridge, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987) ("If automatic acceleration of a debt defeats a prepayment premium clause, such a clause could never be enforced in a bankruptcy case. A debtor, under such a rule, could always avoid the effect of a prepayment premium clause by filing a bankruptcy case."); Tymon v. Wolitzer, 240 N.Y.S.2d 888, 895 (N.Y. Sup. Ct. 1963) (holding that provision pursuant to which debt becomes due and payable without notice as a result of certain defaults "could be brought into being only by an election to accelerate **affirmatively exercised by the plaintiff-obligee** . . . [and that **a]ny other holding would take the option of accelerating or not accelerating away from the pledgee for whose benefit the clause is placed in the contract and give it to the pledgor**. Adopting the rule of automatic acceleration would enable a debtor, who is obligated to pay a high rate of interest over a long period of time, by deliberately defaulting, to compel an obligee to accept immediate payment of the debt contrary to the intention of the parties and to the detriment of the obligee.") (emphasis added).

30.     The significance of a creditor's election of remedies is illustrated by the Seventh Circuit's decision in In re LHD Realty Corp., 726 F.2d 327 (7th Cir. 1984), a

case cited by the Debtors, in which the court denied a prepayment premium to a lender who sought relief from the automatic stay in order to foreclose on its collateral. The basis for the court's decision to deny the prepayment penalty was not the automatic acceleration of debt upon filing of chapter 11, as the Debtors contend. Instead, it was the fact that the lender there had acted with an "unmistakable intention to exercise the option" to accelerate the debt by seeking to lift the automatic stay and foreclose under state law, and thus should be considered to have elected its remedy of acceleration. See id. at 331. Here, unlike the lender in LHD Realty Corp., the 6% Convertible Noteholders have not taken any actions to suggest that they prefer acceleration over any of their other remedies under the Indenture.

31.     In addition to straining logic and reason, the Debtors' argument is also inconsistent with analogous law. Numerous courts, including this Court, have recognized that the acceleration resulting from a bankruptcy is simply a conditional right of a lender, which should not be interpreted to deny such lender the benefit of its bargain. See, e.g., CalGen, 2007 WL 685595 at * 4, 5 (concluding that lenders were entitled to an unsecured claim for damages resulting from prepayment notwithstanding fact that debts at issue had become "due and payable immediately" under applicable debt agreements as a result of Calpine's bankruptcy filings); In re Imperial Coronado Partners, Ltd., 96 B.R. 997, 1000 (B.A.P. 9th Cir. 1989) ("Under the Bankruptcy Code, [the borrower] had the right to deaccelerate the due date of the loan as part of a plan of reorganization."); In re Skyler Ridge, 80 B.R. at 507 (explaining that "[t]he acceleration of a debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium"); In re Manville Forest Prods. Corp., 43 B.R. 293, 297, 298 (Bankr. S.D.N.Y.

1984), aff'd in part, rev'd in part on other grounds, 60 B.R. 403 (S.D.N.Y. 1986)

("Section 1124 allows the debtor to return the accelerated claim to its original maturity

date and recreate the pre-default setting for all purposes under the contract"

notwithstanding "basic tenet of the Bankruptcy Code that '[b]ankruptcy operates as the

acceleration of the principal amount of all claims against the debtor.'").

32.   As explained by the Seventh Circuit in LHD Realty Corp.,

> acceleration appears to be a conditional right of the lender subject
> to being undone by the cure provisions of sections 1123(a)(5)(G)
> and 1124.  Section 1124(2) of the Bankruptcy Code expressly
> recognizes that a debtor pursuant to a Chapter 11 plan may reverse
> the acceleration of an obligation caused by his default . . .

726 F.2d at 332.  Indeed, the Debtors tellingly omit from their Objection discussion of the

sort of de-acceleration contemplated by the Indenture and discussed in LHD Realty Corp.

and the cases cited above.  (See Indenture, § 5.2.) ("An acceleration and its consequences

in respect of a Series of Securities shall be automatically annulled and rescinded;

provided, however, that such annulment and rescission would not conflict with any

judgment or decree and if all existing Events of Default with respect to such Series have

been cured or waived except nonpayment of principal or interest that has become due

solely because of the acceleration.").  Accepting the Debtors' self-serving argument that

their voluntary bankruptcy filing extinguishes the Conversion Right they agreed to

provide, when it was the Debtors' default that caused the acceleration in the first place,

would produce an inequitable result inconsistent with analogous law.

### C.   6% Convertible Noteholders Are Entitled to Damages For Breach of Conversion Right

33.   The 6% Convertible Noteholders are entitled to compensation for both the

principal, interest, and related items (which has been conceded in the Prior Stipulation)

and for the Conversion Right (which is at issue in the Objection). The goal of contract damages is to put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract. See Indu Craft, Inc., 47 F.3d at 498; see also Adams v. Lindblad Travel, Inc., 730 F.2d 89, 92 (2d Cir. 1984). Damages are calculated at the time of the breach. See Sharma v. Skaarup Ship Mgmt Corp., 916 F.2d 820, 825 (2d Cir. 1990) ("where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages"). In this case, the Debtors could perform the contractual option by providing the 6% Convertible Noteholders with a continued right to convert, at the same economic level, into the common stock of the reorganized Issuer (or its successor) through the year 2014. If the Debtors do not honor their commitment, the 6% Convertible Noteholders are entitled to an allowed claim for the damages caused by the Debtors' breach from the time of the breach, which will be the effective date of a confirmed plan of reorganization in these Chapter 11 Cases.[9]

---

[9]    The Debtors contend that because the Indenture does not contain a liquidated damages provision for the elimination of the Conversion Right that the claim must fail. (See Objection at 9.) This argument is absurd. Applicable law does not require that a party's state law damage claim fails in the absence of such a clause providing for liquidated damages or some other remedy; rather that is exactly the purpose of the extensive body of common law on breach of contract. Even where "the agreements do not provide a premium or liquidated damages for repayment . . . the [creditors] still have an unsecured claim for damages for the Debtors' breach of the agreements." See CalGen, 2007 WL 685595 at *5; see also Lake River Corp. v. Carborundum Co., 769 F.2d 1284, 1292 (7th Cir. 1985) (determining where a liquidated damages or penalty provision in a loan agreement is disallowed as unreasonable estimate of damages, claiming party nonetheless entitled to common law damages under state law). Under New York law, contractual remedies are nonexclusive. See, e.g., In re Hale Desk Co., 97 F.2d 372, 373 (2d Cir. 1938) ("[W]hether [a] provision for damages in a contract should be treated as an exclusive remedy is to be determined by the intent of the parties as revealed in all the facts of the particular case."); Palazzetti Import/Export, Inc. v. Morson, No. 98 CIV. 722 (FM), 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6 2001) ("[U]nder New York law, contractual remedies are deemed to be nonexclusive absent some indication of contrary intent.").

34.     The Conversion Right is a valuable right that is "equivalent to a call option . . . with a strike price equal to the outcome" of the applicable conversion formula. Peltz v. Welsh (In re Bridge Info. Sys.), 311 B.R. 781, 788 (Bankr. E.D. Mo. 2004); see also, Broad v. Rockwell Int'l Corp., 642 F.2d 929, 942 (5th Cir. 1981), cert denied, 454 U.S. 965 (1981) (noting "[a] convertible debenture is one which gives the holder the right to exchange his debenture for other securities of the (issuing) Company . . . . The conversion right, although set forth in the debenture and in the indenture, is separate and distinct from the debt evidenced by the debenture. As a separate right it has its own ascertainable value."); 6A Fletcher Cyc. Corp. § 2649.10 (2006) (same). The 6% Convertible Notes are unlike typical convertible securities that only give a holder "the privilege of electing between two alternative modes of satisfaction" – payment of the debt or conversion into stock. P.W. Brooks & Co. v. North Caroline Public Serv. Co., 32 F.2d 800, 803 (M.D.N.C. 1929). The Indenture grants the 6% Convertible Noteholders, upon exercise of the Conversion Right, entitlement to both: (i) cash, calculated in part on the principal amount of their notes, and (ii) common stock, calculated based on the difference between the strike price of the Conversion Right and the Issuer's stock price. (Indenture, Article 10). Contrary to the Debtors' contention that "the Convertible Noteholders cannot possibly be entitled to receive repayment of their debt *and* damages on account of a conversion right," (Objection at 22 (emphasis in original)), that is exactly what the Debtors agreed to in the Indenture. Accordingly, the 6% Convertible Noteholders have a separate damage claim on account of the Conversion Right, in addition to their claim for principal, interest and other costs under the Indenture, that must be compensated for in these Chapter 11 Cases if it is impaired.[10]

---

[10]     Additionally, to the extent the 6% Convertible Noteholders are divested of any and all

22

35.    The Debtors contend that because the conversion price under the Notes exceeded the price of Calpine stock at the petition date, no damages have been suffered. The Debtors' suggestion of a damages calculation is a fundamentally flawed method for calculating the value of a contract such as the Conversion Right.[11] Such a damages calculation would not determine the value of the bargained-for right because it fails to account for the critical aspects of the Conversion Right's value such as volatility, the duration of the potential exercise period and the expectation of exercising such right in the event the issuer's equity appreciates. See R.A. Mackie & Co., L.P. v. PetroCorp. Inc., 329 F. Supp. 2d 477, 513 (S.D.N.Y. 2004) (where issuer wrongfully extinguished warrants, court held that difference between market value of stock on date options were tendered for redemption in merger and strike price of warrants was not applicable and inquiry was properly directed towards valuing unexercised warrants using Black-Scholes method).

36.    Indeed, measuring the value of an option by considering only whether the strike price exceeds the market price of the underlying security at a particular day years before the option expires completely ignores the active market that exists for trading in options and convertible bonds. Options and convertible bonds are routinely issued "out of the money," where the strike price is higher than the underlying securities' current

---

Postpetition Accruals from the effective date of the Issuer's plan of reorganization through 2014, the Holders have an unsecured claim for damages because their "expectation of an uninterrupted payment stream has been dashed". CalGen, 2007 WL 685595 at *5.

[11]    In addition to being flawed methodologically, this argument is legally infirm because it presumes that the Court should use the petition date to calculate the damages. The Debtors have not breached the Conversion Right today, but they have indicated an intention to do so in the future. As such, the price of the Issuer's stock as of the Petition Date is not relevant to the quantum of damages owing the 6% Convertible Noteholders.

market value. Such options are actively traded at values substantially greater than zero; and including a conversion feature in a bond issue reduces the interest rates paid by the borrower, making clear that the option has value. These facts manifestly demonstrate that even out of the money options have value. To contend that such options have no value is to ignore economic reality.

37.     To overrule the Objection, the Court does not need to determine a quantum of damages. The Debtors are seeking a determination that they are not liable for breach of the Conversion Right, not a determination as to the value of the 6% Convertible Noteholders' claim if they are liable. Accordingly, the Court need only consider whether breach of the Conversion Right is a contract breach that gives rise to damages, which it clearly does. The 6% Convertible Noteholders intend to demonstrate at an appropriate time that such damages are significant, given the nature of the Conversion Right.

### D.     Breach Of Conversion Right Damages Are Not Subordinated

38.     The Debtors close the Objection with a contention that any damages award that the Court may issue should be subordinated pursuant to Section 510(b) of the Bankruptcy Code to the Debtors' old equity. (Objection 27-30.) Any suggestion that a claim for breach of an indenture governing a debt security should be subordinated to equity is patently absurd. Moreover, this argument is irrelevant to the Objection, which seeks a determination that the Debtors are not liable for damages. In fact, the subordination argument is so off the mark that the Debtors fail even to request any relief relating to this argument, even in the alternative.[12] (Objection at 30.) The 6%

---

[12]     To the extent that the Debtors contend that they are seeking a determination that damages for breach of the Conversion Right should be subordinated pursuant to section 510(b) of the Bankruptcy Code or otherwise, the Objection is procedurally defective. The Debtors

Convertible Noteholders will be prepared to establish that their damages claim for breach

of the Conversion Right is an unsecured claim if that issue is before the Court at some

time in the future.

## II. Claim For Breach Of Conversion Right Is Appropriately Before Court

39.    The Debtors first argument is that the 6% Convertible Noteholders should

not be permitted to proceed on their claim because, although the 6% Convertible Notes

Proof of Claim claimed for breach of the Indenture and even attached the Indenture, the

Debtors contend that it did not sufficiently identify the claim for breach of the

Conversion Right.  The 6% Convertible Notes Proof of Claim included claims not only

for principal and interest but also "for any and all other amounts due or to become due

under the Indenture and the Notes, whether now due or hereafter arising," including

without limitation unliquidated or contingent amounts or for compensatory damages.

(6% Convertible Notes Proof of Claim, Para. 2(f) (emphasis added).) On March 27, 2007,

the Indenture Trustee filed the Original Supplement (as defined below), which

supplemented the 6% Convertible Notes Proof of Claim.  On May 23, 2007, at the

Debtors' explicit request, the Indenture Trustee filed the Amended Supplement which

was substantively identical to the Original Supplement (together with the Original

Supplement, the "Supplements").[13]  The Supplements stated with more specificity and

---

cannot seek such subordination by an objection to a proof of claim.  Rather, such an
argument would have to be raised in an adversary proceeding conducted pursuant to
Bankruptcy Rules 3007 and 7001.  See 9 Collier on Bankruptcy § 3007.01[1], n.6 (15th
ed. 2007).

[13]    The absurdity of the Debtors' position is highlighted best by the blatant misuse of the
defined term "New Claim" to suggest that the series of supplemental claims filed by the
Indenture Trustee were new claims and were not supplemental claims.  (Objection at 12.)
The Debtors define the term in a section entitled "Convertible Noteholders'
*Supplemental* Proofs of Claims;" and each of the claims, including the Original

clarity the already existing demand for compensation to the extent that the Debtors

intended to abrogate the Conversion Right, which they now have indicated an intention to

do. There is no basis to disallow the claim for breach of the Conversion Right as

untimely.

### A.    Claim For Breach Of Conversion Right Was Included In 6% Convertible Notes Proof of Claim

40.    The Conversion Right is a contractual right created by the Indenture.

Accordingly, any claim for breach of the Conversion Right plainly arises under the

Indenture and therefore falls within the clear language of the unliquidated claim in the

6% Convertible Notes Proof of Claim. The 6% Convertible Noteholders are hard pressed

to comprehend the Debtors' contention that the 6% Convertible Notes Proof of Claim,

which specifically includes all claims on account of the Indenture, somehow excludes the

claims for breach of the Conversion Right. The Debtors' argument to the contrary is

unavailing.

### B.    Even If Claim for Breach of Conversion Right Not Contained in 6% Convertible Notes Proof Of Claim, Supplements Properly Amended 6% Convertible Notes Proof Of Claim

41.    Even if the 6% Convertible Notes Proof of Claim did not specifically

include a claim for breach of the Conversion Right (which the 6% Convertible

Noteholders dispute), the Supplements should be accepted as amendments to the 6%

Noteholders Proof of Claim. It is well-settled Second Circuit precedent that an

---

Supplement, is defined as a "*supplemental* proof of claim [] *supplementing* [the prior filed claim]." (Id. (emphasis added).) Apparently recognizing that defining the supplemental claims as what they were, "Supplemental Claims," would be devastating to their argument, the Debtors simply called them something different to better serve their disingenuous argument. Whatever defined name the Debtors ascribe to the series of supplemental claims filed by the Indenture Trustee, they cannot avoid that they are what the Debtors stated them to be – supplements to the original timely filed claims.

"[a]mendment to a claim is freely allowed." Midland Cogeneration Venture Ltd. P'ship

v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 133 (2d Cir. 2005) (citing In re

Integrated Res., Inc., 157 B.R. 66, 70 (S.D.N.Y. 1993)).  In considering whether to permit

an amendment to a claim, courts conduct a two-prong inquiry:  (1) whether there was a

timely assertion of a similar claim such that the amendment relates back to the original

proof of claim; and (2) whether it would be equitable to allow the amendment.  Id.  Under

this test, the claim for breach of the Conversion Right in the Supplements should be

allowed as an amendment to the 6% Convertible Notes Proof of Claim.

> 1.    Supplements Relate Back
>        To Original Proof of Claim

42.    The Court first must consider whether the Supplements relate back to the

6% Convertible Notes Proof of Claim by examining "whether there was a timely

assertion of a similar claim or demand evidencing an intention to hold the estate liable."

In re Spiegel, Inc., 337 B.R. 816, 820 (Bankr. S.D.N.Y. 2006) (internal citations omitted).

As Judge Gonzalez has recently explained, in determining whether this prong is satisfied,

courts have applied rule 15(c) of the Federal Rules of Civil Procedure (the "FRCP")

pursuant to Bankruptcy Rules 7015 and 9014(c).  In re Enron Creditors Recovery Corp.,

2007 WL 1705653, *4 (Bankr. S.D.N.Y. June 13, 2007).  FRCP 15(c)(2) is "used for

amending an original pleading (here, the 6% Convertible Notes Proof of Claim) to add a

claim or defense" and the test is whether "the claim or defense asserted in the amended

pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be

set forth in the original pleading."  Id.

43.    The Supplements' express claim for breach of the Conversion Right is a

creature of the same contract, between the same parties, on account of the same

transaction as the other claims contained in the 6% Convertible Notes Proof of Claim.

Indeed, the Supplements (one of which was provided at the Debtors' request) merely

provided more specificity and clarity with regard to what claims were asserted in the 6%

Notes Proof of Claim. Accordingly, pursuant to the FRCP 15(c)(2), the Supplements

relate back to the 6% Notes Proof of Claim and, thus, the claim for breach of the

Conversion Right was timely filed.

> 2.    Equity Demands That Breach of
>        Conversion Right Claim Be Heard

44.    The next inquiry for the court is whether it would be equitable to allow the

amendment. This Court has explained the analysis as follows:

> Multiple factors play a role in this analysis, including
> whether the debtor, or other creditors, would be unduly
> prejudiced by the amendment, or whether, instead, other
> creditors would receive a windfall from the disallowance of
> the amendment, and whether the late claimant acted in
> good faith and the delay was justified.

Spiegel, 337 B.R. at 820. Despite the Debtors' insinuations to the contrary, the

Supplements clearly were filed in good faith and with no delay. As the Debtors had not

indicated potential treatment of the Conversion Right under a plan of reorganization, the

Original Supplement was intended to create an atmosphere of negotiation well before the

filing of any plan was anticipated.[14] At the time of filing of the Original Supplement, the

Debtors' financial condition, including the significant possibility that they were solvent,

had been clarified with the work conducted regarding their business plan. There was no

---

[14]    The Objection disingenuously obfuscates the timeline of the filing of the Supplements to
argue, erroneously, that the alleged "new claims" were filed ten months following the Bar
Date. In fact, the Original Supplement was filed seven months after the bar date on
March 27, 2007. The Amended Supplement, which replaced the Original Supplement,
was filed on May 23, 2007 at the Debtors' explicit request to aid them in cleaning up
their claims register. The Debtors' use of the later filing date is, at best, misleading.

unjustifiable delay or bad faith in filing the Original Supplement when the motivation

was to clarify the 6% Convertible Notes Proof of Claim and not to amend it or to assert

new claims in addition to it.

45.    Most importantly, any prejudice alleged by the Debtors is flatly

contradicted by their own actions and statements in open court. Prior to the filing of the

Supplements, the Debtors voluntarily entered into the Prior Stipulation, which expressly

provides that additional unliquidated claims asserted in the 6% Notes Proof of Claim

would be resolved in the plan process. (Prior Stipulation, Para. 9.) Furthermore, at a

hearing held on May 30, 2007, months after the filing of the Original Supplement, the

Debtors indicated no prejudice to the plan process and stated that "it is our current

intention to file a plan of reorganization by June 20th" and that they were "please[d] to

inform the court that we remain on track to hit that date." (Transcript 9:9-15, May 30,

2007.)    At this same hearing, the Debtors addressed the Conversion Right claims,

stating:

> I should note for the court that we have also been in
> discussions with some newly formed ad hoc groups of
> convertible notes. These are holders of our convertible
> notes, and these convertible notes, your Honor, essentially
> allow the holder of those notes to convert a portion of their
> debt claim to equity. These ad hoc groups, your Honor,
> have asserted claims for loss of the future ability to convert
> a portion of their debt to stock, even if the Calpine debtors
> were to distribute enough reorganized Calpine equity to the
> holders of such claims to pay principal and accrued interest
> in full. So, your Honor, in the absence of some sort of
> settlement with these holders of these convertible note
> claims, we expect we are going to have to come in front of
> the court and litigate those claims, hopeful, again, during
> the summer.

29

(Transcript 12: 7-22, May 30, 2007.) It is entirely disingenuous for the Debtors to now argue that claims that they were fully aware of and in the process of negotiating were somehow prejudicial to a plan process that they themselves describe as "on track."

46.    Moreover, before the Supplements were filed, the Debtors voluntarily entered into the Prior Stipulation, which expressly provides that additional unliquidated claims asserted in the 6% Convertible Notes Proof of Claim would be resolved in the plan process. (Prior Stipulation, Para. 9.) Accordingly, the Debtors were fully aware during the process of formulating a plan that the principal and interest payments were not the only claims of the 6% Convertible Noteholders.

47.    There is no prejudice to the Debtors from the filing of the Supplements because the Debtors were months away from filing their plan of reorganization at the time of the filing. See Spiegel, 337 B.R. at 820 (stating "the critical consideration is whether the opposing party will be unduly prejudiced by the amendment"). Id. The Debtors nevertheless contend that "the New Claims were filed during the formulation of the Plan, and the Second Circuit has endorsed a finding of prejudice in such circumstances". (Objection at 17 (citing In re Enron Corp., 419 F.3d at 133-134).) The Debtors' arguments mischaracterize the *dicta* in Enron and, more significantly, fail to allege any actual prejudice to the plan formulation process.

48.    The Second Circuit in Enron explained that their concern was with regard to the "advanced stage" of negotiations underlying the plan of reorganization at the time the amended claim was filed. This is a far cry from where the Debtors were in March of

this year. Accordingly, Enron is entirely distinguishable and the facts here do not

evidence the same type of prejudice that occurred in Enron.[15]

49.     Nor can the Debtors contend that there would be prejudice to the plan that

they eventually filed by the allowance of the claim for breach of the Conversion Right.

The proposed plan is a waterfall plan designed to encompass resolution of a wide range

of disputes, which the Debtors are now trying to resolve,[16] and would not be defeated by

the allowance or disallowance of a claim for breach of the Conversion Right.  Although

such allowance may affect the distributions to certain creditors, it would not affect the

viability of the proposed plan itself, or the ability of the Debtors to reorganize.

50.     The Debtors further argue that the size of the claim for breach of the

Conversion Right alone is prejudicial.  (Objection at 17-18.)  This argument is a red

herring that asks the Court to use the damages for breach of contract to determine the

admissibility of the Supplements.  The 6% Convertible Noteholders agree that the

Debtors' breach of the Conversion Right would give rise to substantial damages (a fact

that the Debtors interestingly dispute in other places in the Objection), but that alone

cannot be the basis for denying the amendment.  It is axiomatic that "while bar dates

establish the universe of participants in the debtor's case, they have little correlation to the

---

[15]     By the Debtors' logic, no amended claims could be allowed at any time after the bar date
because one would expect that a debtor is formulating a plan at all times before the plan
is filed.  Accordingly, any proffered amendment would be untimely as either during the
formulation of a plan or after the formulation of a plan.  It cannot be sufficient, as the
Debtors have done here, simply to state they were formulating a plan without any
recitation of actual prejudice.

[16]     For example, after filing the Objection, the Debtors recently entered into the Stipulation
Regarding Certain Calculations Under the Indentures and Related Documents to the
Unsecured Debt [Docket No. 5240] and filed the Debtors' Motion for Authorization to
Enter Into Stipulation With Second Lien Committee and Wilmington Trust Company, as
Indenture Trustee [Docket No. 5344] with certain bondholders regarding a "make whole"
payment.

final relative amounts in which creditors will share any distribution." In re Kolstad, 928 F.2d 171, 175 -176 (5th Cir. 1991). Although the computation of damages for breach of the Conversion Right must take into account a variety of factors, many of which change on a daily basis, it is a task that the Debtors' stable of estate-funded financial and legal advisors is capable of estimating such that the consequences of the Debtors' breach of the Conversion Right cannot be a surprise.

51.    Finally, as noted in Spiegel, the court should consider whether "other creditors would receive a windfall from the disallowance of the amendment." Spiegel, 337 B.R. at 820. By the Objection, the Debtors seek to have the Court conclude that one group of creditors, those who hold the 6% Convertible Notes, will not be compensated for a blatant breach of contract to which they otherwise would be entitled to damages. Where, as here, the Debtors are solvent, disallowance of the claim for breach of the Conversion Right would create a windfall to old equity, the very parties who stood to gain when the purchasers of the 6% Convertible Notes infused cash into the Debtors. Because old equity, through its agent, the Issuer's Board of Directors, agreed through their promise to provide the Conversion Right, shielding them from liability through procedural dismissal for breaching such promise would be inequitable.[17]

---

[17]    The Debtors suggest, without argument, that the Court should disallow the Supplements because the Indenture Trustee did not move for their admission as new claims. As discussed above, the Debtors requested that the Indenture Trustee file the Amended Supplement in order to clean up their claims register, which the Indenture Trustee did as a courtesy. The Debtors' Sixteenth Omnibus Objection initially sought to expunge the Original Supplement in favor of the Amended Supplement, which objection has been withdrawn without prejudice, presumably as a strategic matter for the Debtors. (See Status Report on Debtors' Third, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth and Sixteenth Omnibus Objections to Claims at 24 [Docket No. 5234] (the "Claims Matrix").)  The Debtors' own Claims Matrix, filed after the Objection, refers to the Amended Supplement as an "Amended/Replaced" claim. Id. In any event, because the Debtors requested that the Indenture Trustee file the Amended Supplement, they

## CONCLUSION

52.    The Indenture's Conversion Right is an integral component of the bargained-for rights and consideration of the 6% Convertible Notes.  In the event the Debtors and the final confirmed plan of reorganization fail to provide the 6% Convertible Noteholders with a continued right to convert into the common equity of the reorganized Debtors (or its successor) through the year 2014, the 6% Convertible Noteholders are entitled to a damage claim separate and distinct from the claim for principal, interest and other costs under the Indenture.  If necessary at an appropriate time, the 6% Convertible Noteholders shall be prepared to put forth expert testimony as to the valuation and ranking of their allowed claim for the damages caused by the Debtors' breach of the Conversion Right.

---

should be estopped from contending that the Indenture Trustee had to move for leave to file such supplement.

WHEREFORE, the 6% Convertible Noteholders respectfully request that this Court (i) overrule the Objection, (ii) hold that the 6% Convertible Noteholders have a right to an allowed claim for damages, in an amount to be determined at a subsequent evidentiary hearing, on account of the Debtors' abrogation of the Conversion Right under the Plan, and (iii) grant the 6% Convertible Noteholders such other relief as is just and proper.

Dated: New York, New York
      July 27, 2007

                MILBANK, TWEED, HADLEY & McCLOY LLP

                By:   /s/   Dennis F. Dunne
                      Dennis F. Dunne (DD 7543)
                      Matthew S. Barr (MB 9170)
                      Andrew M. Leblanc (*pro hac vice*)
                      One Chase Manhattan Plaza
                      New York, New York  10005
                      Telephone:  (212) 530-5000
                      Facsimile:  (212) 530-5219

                      Attorneys for each of Aristeia Capital,
                      L.L.C., Aurelius Capital Management,
                      L.P., Drawbridge Special Opportunities
                      Advisors LLC, Ore Hill Hub Fund Ltd.,
                      Nisswa Master Fund Ltd., Pines Edge Value
                      Investors Ltd., Pines Edge Value Investors
                      L.P., Silver Sands Fund LLC, Stark Master
                      Fund Ltd. and 3V Capital Management, LLC,
                      solely in their individual capacities