# **EXHIBIT N**

Michael S. Stamer (MS-4900)
Lisa G. Beckerman (LB-9655)
Philip C. Dublin (PD-4919)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Counsel to the Official Committee of Unsecured
Creditors of Calpine Corporation, et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------x
            :
In re:      :   Chapter 11
            :
CALPINE CORPORATION, et al.,   :   Case No. 05-60200 (BRL)
            :
            Debtors.   :   (Jointly Administered)
---------------------------------------------------------x

**STATEMENT OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS OF CALPINE
CORPORATION, ET AL. IN SUPPORT OF THE DEBTORS'
LIMITED OBJECTION TO CONVERTIBLE NOTEHOLDER
CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300**

TO THE HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, with Calpine, the "Debtors"), by and through its undersigned counsel, hereby files this statement (the "Statement") in support of the Debtors' Limited Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 (the "Objection").[1] In support of this Statement, the Creditors' Committee respectfully submits as follows:

---
[1] All terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

5431

**STATEMENT**

1. In the Objection, the Debtors request the entry of an order determining that the holders of four series of unsecured convertible notes (collectively, the "Noteholders") are not entitled to allowed claims for damages for purported breaches of the Noteholders' conversion rights (collectively, the "Convertible Claims") arising from the Debtors' anticipated satisfaction of the Notes and cancellation of the Notes pursuant to the Debtors' recently filed proposed plan of reorganization (the "Plan"). The Creditors' Committee supports the relief sought by the Debtors in the Objection because (a) the Convertible Claims are entirely new claims that were filed in contravention of the Bar Date and are time-barred and (b) there is no basis for the Convertible Claims under the applicable indentures, notes and other agreements (the "Governing Documents") or under the Bankruptcy Code and controlling case law.

**I.    The Convertible Claims Should Be Disallowed Because They Are Time-Barred.**

**A.    The Convertible Claims Are Entirely New Claims.**

2. The original proofs of claim filed in July 2006 by the indenture trustees for the Notes did not mention or even hint at the Convertible Claims. Moreover, a subsequently filed stipulation and consent order dated January 5, 2007 (the "Claims Stipulation") between the Debtors and the indenture trustee for three of the four series of Notes likewise did not make <u>any</u> reference to the Convertible Claims, even though, pursuant to the Claims Stipulation, the parties agreed to the allowed amount of principal and pre-petition accrued interest on account of the 4% Notes, the 6% Notes and the 4.75% Notes. Indeed, there was no reference to the Convertible Claims until March 2007 soon after the Court issued its decision concerning the claims asserted by holders of CalGen's secured debt (the "CalGen Decision")[2] – or, nearly eight months after the Bar Date had passed.[3]

---

[2] In re Calpine Corp., 2007 WL 685595 (Bankr. S.D.N.Y. March 5, 2007) (appeal pending).

The failure of the indenture trustees or the Noteholders to make a single reference to the Convertible Claims in the original proofs of claim or the Claims Stipulation verifies that the Convertible Claims were filed as entirely <u>new</u> claims of which no party had notice.

3.	Notwithstanding that the indenture trustees styled the Convertible Claims as "supplemental claims," the Convertible Claims do not constitute amendments to the original proofs of claim. The Convertible Claims, which are based on a novel, unsupported legal theory, plainly assert new grounds of liability that are separate and distinct from the plain vanilla grounds of liability on which the original proofs of claims for principal and interest were based. Cases in this jurisdiction and in other jurisdictions have routinely held that courts "must subject post bar date amendments to careful scrutiny to assure that there [is] no attempt to file a new claim under the guise of an amendment." <u>In re Integrated Resources, Inc.</u>, 157 B.R. 66, 70 (S.D.N.Y. 1993); <u>see also</u> <u>In the Matter of Commonwealth Corp.</u>, 617 F.2d 415, 420 (5th Cir. 1980) (same); <u>In re Asia Global Crossing, Ltd.</u>, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005) (same); <u>In re Drexel Burnham Lambert Group, Inc.</u>, 151 B.R. 684, 694 (Bankr. S.D.N.Y. 1993) (same); <u>In re Robert Stone Cut Off Equipment, Inc.</u>, 98 B.R. 158, 160 (Bankr. N.D.N.Y. 1989) (same). Thus, while the Convertible Claims are dressed up as "supplemental claims," in reality, they are entirely new claims that were filed in violation of the Court's order setting the Bar Date (the "<u>Bar Date Order</u>").

  **B.** **The Failure to File the Convertible Claims Before the Bar Date Was Not the Result of "Excusable Neglect."**

4.	Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") provides that a bankruptcy court may, in its discretion, allow a late filing of a claim where the movant establishes that its failure to comply with an earlier deadline "was the result of

---

[3] Indeed, two of the Convertible Claims (i.e., Claim 6299 and Claim 6300) were filed nearly <u>ten</u> months after the Bar Date.

3

excusable neglect." Fed. R. Bankr. Proc. 9006(b)(1). The burden is on the claimant to prove that its failure to file a timely claim was the result of excusable neglect. In re Enron Creditors Recovery Corp., 2007 WL 1705653 at *5 (Bankr. S.D.N.Y. June 13, 2007); In re Andover Togs, Inc., 231 B.R. 521, 549 (Bankr. S.D.N.Y. 1999) (same).

5. The seminal case interpreting the "excusable neglect" requirement of Bankruptcy Rule 9006(b)(1) is the Supreme Court's decision in Pioneer Inv. Servc's Co. v. Brunswick Assoc's L.P., 507 U.S. 380 (1993). In Pioneer, the Supreme Court explained that whether a claimant's neglect of a deadline is excusable is an equitable determination, "taking account of all the relevant circumstances surrounding the [claimant's] omission," including "[(i)] the danger of prejudice to the debtor, [(ii)] the length of the delay and its potential impact on judicial proceedings, [iii] the reason for the delay, including whether it was within the reasonable control of the movant, and [iv] whether the movant acted in good faith." Id. at 395 (citations omitted).

6. Following Pioneer, courts within the Second Circuit have "taken a hard line" in applying the Pioneer test, including the Second Circuit's most recent decision on late-filed claims in Midland Cogeneration Venture Ltd. P'Ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 121 (2d Cir. 2005). Second Circuit courts have "focused on the third factor: 'the reason for the delay, including whether it was in the reasonable control of the movant.'" Enron, 419 F.3d at 122 (quoting Pioneer, 507 U.S. at 395). Under this approach, "the equities will rarely if ever favor a party who fail[s] to follow the clear dictates of a court rule." Enron, 419 F.3d at 122 (quoting Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 366-67 (2d. Cir. 2003)) (internal quotations omitted) (emphasis added).

7. As set forth below, under the Pioneer factors, including, in particular, the critical third factor regarding the reason for the delay, the indenture trustees and the Noteholders cannot establish that the late filing of the Convertible Claims was the result of excusable neglect.

### (i) The Danger of Prejudice to the Debtors

8. Courts within the Second Circuit consider a number of factors to determine what constitutes prejudice under the Pioneer test, including, among other things, (a) whether the debtor had advance knowledge of the claim, see, e.g., Enron, 419 F.3d at 130 (citing In re O'Brien Envt'l Energy, Inc., 188 F.3d 116, 128 (3d Cir. 1999)); In re Keene Corp., 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995); (b) the size of the late claim in relation to the estate, see, e.g., In re Enron Creditors Recovery Corp., 2007 WL 1705653 at *9 (Bankr. S.D.N.Y. June 13, 2007) (citing Keene, 188 B.R. at 910); and (c) whether allowing a claim would be likely to precipitate a flood of similar claims, see, e.g., Enron, 419 F.3d at 130 (citing In re Kmart Corp., 381 F.3d 709, 714 (7th Cir. 2004)). Indeed, in cases of this size with tens of thousands of filed claims, "it can be presumed . . . there are other similarly-situated potential claimants" and that "[a]ny deluge of motions seeking similar relief would prejudice the Debtors' reorganization process." In re Enron Creditors Recovery Corp., 2007 WL 1705653 at *11 (citation and internal quotations omitted).

9. Here, the Debtors had no advance knowledge of the Convertible Claims because, as noted above, there was no mention of the Convertible Claims until March 2007 – nearly eight months after the Bar Date had passed. Additionally, despite the numerous requests of the Debtors and the Creditors' Committee, the Noteholders have consistently refused to disclose publicly their estimate of the amount of the Convertible Claims. Thus, it is not possible to determine with certainty the size of the Convertible Claims in relation to the estates, although the Creditors' Committee and its professionals believe that the Noteholders will assert very substantial Convertible Claims.

10.  Allowing the Convertible Claims would prejudice the other unsecured creditors and, potentially, equity security holders[4] who timely filed their proofs of claim and proofs of interest and would likely precipitate a flood of unjustifiable claims for any purported violation of an indenture or other contract that gave rise to alleged "dashed expectations." For example, other debt holders (either secured or unsecured) may argue that, in addition to satisfaction of principal and interest due, they should also be awarded damages for their "dashed expectations" of future interest income and other fees payable over the life of their debt facility since their debt will be satisfied prior to the stated maturity notwithstanding the acceleration and maturity of such debt under the express terms of their governing documents and applicable law. Creditors of the Debtors' estates might also attempt unjustifiably to seek "dashed expectation" damages in situations relating to executory contracts, employment agreements, intellectual property licenses, option agreements, and numerous other breached contracts, none of which should give rise to such types of claims. Accordingly, this factor weighs heavily in favor of the Debtors and supports disallowance of the Convertible Claims.

### (ii)   The Length of the Delay and its Potential Impact on Judicial Proceedings

11.  Second Circuit courts have routinely acknowledged that bar date orders serve an "essential function" in the administration of bankruptcy proceedings. <u>Enron</u>, 419 F.3d at 127; <u>In re Hooker Invs., Inc.</u> 937, F.2d 833, 840 (2d Cir. 1991) ("[A] bar order does not function merely as a procedural gauntlet, but as an integral part of the reorganization process. If individual creditors were permitted to postpone indefinitely the effect of a bar order . . . the institutional means of

---

[4] As the Court is aware and as set forth in the Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, the Creditors' Committee believes that (a) the Debtors' assumed New Calpine Total Enterprise Value (as defined in the Plan) may be greater than the actual enterprise value of the Reorganized Debtors (as defined in the Plan) as may be determined by this Court and (b) the Debtors' claims estimates may be lower than the actual amount of allowed claims upon completion of the claims reconciliation process, each of which may have a material impact on the recoveries to holders of allowed unsecured claims and, if applicable, prepetition equity interests.

ensuring the sound administration of the bankruptcy estate would be undermined.") (citation and internal quotations omitted); see also In re Drexel Burnham Lambert Group, 129 B.R. 22, 26 (Bankr. S.D.N.Y. 1991) (same). Here, in complete disregard of the Bar Date Order, the Convertible Claims were filed nearly eight months (and with respect to two of the Convertible Claims, ten months) after the Bar Date had passed and, in each instance, without seeking approval of the Court. The indenture trustees' disregard for the Bar Date Order clearly contravenes the essential function it was intended to serve.

12. While courts have not "established a bright-line rule governing when the lateness of a claim will be considered substantial," Enron, 419 F.3d at 128, numerous courts have disallowed claims that were filed much closer to the applicable bar date than the eight (or ten) months after the Bar Date in which the Convertible Claims were filed here. See, e.g., Enron, 419 F.3d at 120 (six month delay); In re JSJF Corp., 344 B.R. 94, 101-102 (9th Cir. B.A.P. 2006) (approximately 4 month delay); In re Nalle, 125 B.R. 164, 167 (Bankr. W.D.Tex. 1991) (6 day delay); In re Norris Grain Co., 81 B.R. 103, 107-108 (Bankr. M.D. Fla. 1987) (approximately 5 month delay). Moreover, in each of the foregoing cases, the court disallowed the claim as late-filed, even though the claimant had sought court approval to file the claim after the bar date. Here, in stark contrast, the indenture trustees and the Noteholders did not follow proper procedure and did not seek this Court's approval for the late filing of the Convertible Claims.

13. Courts "generally consider the degree to which, in the context of a particular proceeding, the delay [in filing a claim] 'may disrupt the judicial administration of the case.'" Enron, 419 F. 115 (quoting In re Infiltrator Sys., Inc. 241 B.R. 278, 281 (Bankr. D. Conn. 1999) (emphasis added); see also In re O'Brien Envt'l Energy Inc., 188 F.3d at 130 (same). Here, the late filing of the Convertible Notes has disrupted the judicial administration of these cases in a number of respects. First, the Convertible Claims were filed in the midst of a critical period in which the

7

Debtors were formulating the Plan. Second, the late filing has forced the Debtors to deal with the Convertible Claims now when the Debtors should be focusing on other matters. Indeed, at this stage of these cases, the Debtors' focus should be on negotiating consensual resolutions to disputed provisions in their proposed Plan, obtaining approval of an appropriate disclosure statement in order to move toward confirmation of a confirmable plan of reorganization and resolving legitimate disputed claims. Third, to the extent that the Convertible Claims remain unresolved and unliquidated as of confirmation, the reorganized Debtors may have to maintain large reserves for an unknown period of time, which could delay for years distributions to other stakeholders in these cases.

### (iii)    Reason for the Delay

14.    As noted above, according to the Second Circuit, the most important factor under the "excusable neglect analysis" is whether there was a justification for the delay, including whether it was in the reasonable control of the movant. See supra ¶ 6. Notwithstanding this well-established rule, the indenture trustees and the Noteholders have failed to provide any excuse for their delay in filing the Convertible Claims. Remarkably, they decided to forego Court approval for the late filing of the Convertible Claims, even though the filing occurred long after the Bar Date had passed. The provisions of the applicable indentures on which the indenture trustees and Noteholders rely have not changed since they were drafted. Accordingly, the indenture trustees and Noteholders were aware or should have been aware of the purported Conversion Claims far in advance of the Bar Date, if not on the Petition Date or even earlier. The filing of the Convertible Claims certainly "was in the reasonable control" of the indenture trustees and the Noteholders and, therefore, the indenture trustees and the Noteholders could have, and most definitely should have, filed the Convertible

Claims prior to the Bar Date. They did not, however and, thus, the Convertible Claims should be disallowed as time-barred.[5]

## II. There is No Basis for the Convertible Claims Under the Governing Documents or the Bankruptcy Code and Controlling Case Law.

15. Even if the Court were to consider the merits of the Convertible Claims, such claims should be denied because (a) as a threshold matter, the conversion rights were terminated upon the commencement of these chapter 11 cases and, thus, cannot by definition be breached now; (b) the Convertible Claims are barred pursuant to the express terms of the Bankruptcy Code and applicable case law; and (c) satisfaction of the Notes under a plan of reorganization cannot give rise to allowable damage claims, even under the rationale of the CalGen Decision.

### A. The Noteholders' Conversion Rights Terminated Upon the Commencement of These Cases and, Thus, Are Incapable of Being Breached.

16. The Governing Documents expressly provide that the commencement of a chapter 11 bankruptcy case constitutes an event of default,[6] which accelerates the Notes to the date of the bankruptcy filing and renders "the principal of and interest" on the Notes "immediately due and payable without any declaration or other act on the part of the Trustee or any [Noteholders]."[7] In addition, as this Court held in the CalGen Decision, the commencement of a bankruptcy case, even in the absence of a contractual acceleration provision, automatically operates to accelerate and mature all of a debtor's debt obligations. In re Calpine Corp., 2007 WL 685595 at *4 (Bankr.

---

[5] Few courts within the Second Circuit have interpreted the final "good faith" factor in the context of adjudicating whether late-filed claims were the result of excusable neglect. The Creditors' Committee, at this time, has not formed a position on whether the indenture trustees and the Noteholders acted in good faith, but expressly reserves all of its rights to make this argument at a subsequent stage of this litigation, including, in particular, after the indenture trustees and the Noteholders have filed their response to the Objection.

[6] See Indenture § 5.1(e); 4.75% Notes Indenture § 6.01(8).

[7] See Indenture § 5.2(e). The 4.75% Notes are similarly accelerated upon a bankruptcy default. See 4.75% Notes Indenture § 6.02(a) ("In the case of [a bankruptcy default] the issue price plus accrued and unpaid interest (and Liquidated Damages, if any) on the Notes will become immediately due and payable without any action on the part of the Trustee or any Holder.").

S.D.N.Y. March 5, 2007) ("It should be noted that the Secured Debt is now matured by the occurrence of an Event of Default, i.e., the filing of the chapter 11 petitions."); see also In re LHD Realty Corp., 726 F.2d 327, 330-31 (7th Cir. 1984) ("[A]cceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity"); In re Homesteads Community at Newtown, LLC, 339 B.R. 532, 541 (Bankr. D. Conn. 2006) ("Even assuming the debt was not mature prior to the petition, the filing of a petition accelerates the principal amounts due on all claims against the debtor."); In re First Connecticut Small Business Inv. Co., 118 B.R. 179, 184 (Bankr. D. Conn. 1990) (same). Thus, both pursuant to the plain language of the Governing Documents and by operation of law, the filing of the Debtors' bankruptcy cases accelerated the maturity of the Notes to the Petition Date.

17. The acceleration and maturity of the Notes are fatal for the Convertible Claims because the Governing Documents uniformly provide that the Noteholders' conversion rights terminate upon the acceleration and maturity of the Notes. See Second Supplemental Indenture at A-5 (The "conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Date immediately preceding the date of Maturity . . . ."); Third Supplemental Indenture at A-5 (same); 4.75% Notes Indenture at A-4 (same); see also 4% Note at 3 ("Holders may surrender Securities for conversion into shares of Common Stock at any time prior to 5:00 p.m., New York City time, on the date that is two Business Days prior to the maturity of the Securities."). Thus, the Debtors' proposed satisfaction and cancellation of the Notes pursuant to a plan of reorganization cannot possibly constitute a breach of the Noteholders' conversion rights because the conversion rights were terminated at the Petition Date pursuant to both the plain language of the Governing Documents and by operation of law.

18. Moreover, the interests of the Noteholders were represented, at the time of preparation of the Governing Documents, by sophisticated parties who failed to bargain for the

10

inclusion of a provision that would grant the Noteholders claims on account of conversion rights that would no longer be exercisable upon acceleration and maturity of the Notes by virtue of a document provision or by operation of law. To the extent the Noteholders desired to preserve claims for loss of their conversion rights upon a bankruptcy-caused acceleration and maturity, such benefit could have been, and should have been, negotiated for and expressly included in the Governing Documents.

19.   Thus, since (a) the Notes matured upon the Petition Date, (b) conversion rights cannot be exercised post-maturity and (c) there are no provisions in the Governing Documents providing for claims to be asserted on account of lost conversion rights, there can be no argument that the anticipated satisfaction and cancellation of the Notes under a plan gives rise to claims in addition to principal and accrued interest.

> **B.   The Convertible Claims are Barred under the Bankruptcy Code and Applicable Case Law.**

20.   Even if the Noteholders' conversion rights somehow did not terminate by virtue of the acceleration and maturity of the Notes caused by the Debtors' bankruptcy filing, the Convertible Claims are nonetheless expressly prohibited under the Bankruptcy Code. Specifically, Bankruptcy Code section 502(b) explicitly provides that a claim filed in a bankruptcy case must be determined "as of the date of the filing of the petition." 11 U.S.C. § 502(b). Here, it is undisputable that, as of the Petition Date, the Noteholders' conversion rights were not ripe since the conditions precedent for exercising the conversion rights had not occurred.[8] While the conversion rights might have had

---

[8] Specifically, pursuant to section 10.01 of the respective indentures, the holders of the 4.75%, 6%, and 7.75% Notes may convert their Notes during specified periods in the following circumstances, as applicable, and upon the satisfaction of certain other additional conditions: (i) if the trading price of Calpine's common stock is at least 20% higher than the conversion price; (ii) in the case of the 6% and 7.75% Notes, after a given date that has yet to occur, irrespective of the trading price; (iii) during a five trading-day period if the trading price of the Notes during the previous five consecutive trading days was less than 95% of an amount roughly equal to what the Noteholders would receive upon conversion; (iv) if Calpine distributes rights, warrants, or options to all or substantially all of its common stock holders entitling them to purchase common stock for less than its trading price; (v) if Calpine issues debt, rights,

some value at an indeterminate point in the future, had such conversion rights not been terminated by the Debtors' bankruptcy filing, any such speculative future value is irrelevant insofar as the Noteholders' claims were fixed as of the Petition Date under Bankruptcy Code section 502(b).

21.  On facts similar to these, courts have refused to allow analogous claims based on warrants, put rights and other forms of options that were not ripe as of the bankruptcy filing. See, e.g., Einstein/Noah Bagel Corp., 257 B.R. 499, 507 (Bankr. D. Ariz. 2000) (disallowing claim based on a put right which was not exercisable as of the petition date); In re Search Fin. Servc's Acceptances Corp., 2000 WL 256889 at *3 (N.D. Tex. March 7, 2000) (holding that claim based on warrants which were not redeemable for cash as of the petition date should be treated as an equity interest rather than a claim); cf. In re First Amer. Healthcare of Georgia, Inc., No. 96-20188, 1997 WL 33477665 (Bankr. S.D. Ga., Apr. 28, 1997) (disallowing claim based on stock option that was unenforceable as of the petition date).

22.  Thus, the Convertible Claims are barred under the Bankruptcy Code and applicable case law and, therefore, should be disallowed in their entirety.

### C. Satisfaction of the Notes Will Not Give Rise to Allowable Damage Claims.

23.  Notwithstanding the CalGen Decision, the Noteholders are not entitled to damage claims for "dashed expectations" pursuant to any purported loss of the Noteholders' conversion rights or otherwise. The expectation of the Debtors and the Noteholders upon maturity of the Notes is set forth explicitly in the Governing Documents. As set forth above, the Noteholders specifically agreed that their conversion rights would terminate at or prior to maturity, which occurred upon the

---

or warrants to all or substantially all of its common stock holders with a per share value exceeding 12.5% of the common stock price; (vi) if Calpine is party to a consolidation, merger, share exchange, sale of all or substantially all of its assets or other similar transaction; or (vii) in the case of the 4.75% Notes, Calpine calls the notes for redemption.

commencement of these chapter 11 cases and, therefore, the Noteholders could not possibly have had any legitimate expectation of converting the Notes post-bankruptcy.

24.  Moreover, even if the conversion rights somehow did not terminate upon the Petition Date and, therefore, are capable of being breached, the Noteholders are still not entitled to "dashed expectation" damages. As set forth above, the Governing Documents expressly provide that, upon a bankruptcy-caused acceleration and maturity, Noteholders are entitled only to "principal of and interest" on the Notes and not any additional premiums, penalties and/or damages. See supra at ¶ 16. Accordingly, the Noteholders cannot assert a legitimate claim for "dashed expectations" because the Plan proposes to pay them exactly what they are entitled to under the Governing Documents. See In re Adelphia Commc'ns Corp., 342 B.R. 142, 154 (Bankr. S.D.N.Y. 2006) ("[N]o party can make a contractual claim that goes beyond its contractual rights"); In re Vest Assocs., 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998) (holding that a bankruptcy court may not "read into a contract damage provisions which the parties themselves have failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan or note"); see also Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999) ("If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself"); but see In re Calpine Corp., 2007 WL 685595 (Bankr. S.D.N.Y. March 5, 2007) (appeal pending). Therefore, the Convertible Claims should be disallowed in their entirety.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Creditors' Committee respectfully requests that the Court: (a) grant the relief requested in the Objection and (b) grant the Creditors' Committee such other and further relief as the Court deems just, proper and equitable.

Dated: July 27, 2007

> AKIN GUMP STRAUSS HAUER & FELD LLP
>
> By: /s/ Michael S. Stamer
> Michael S. Stamer (MS 4900)
> Lisa G. Beckerman (LB-9655)
> Philip C. Dublin (PD-4919)
> Akin Gump Strauss Hauer & Feld LLP
> 590 Madison Avenue
> New York, New York 10022-2524
> (212) 872-1000 (Telephone)
> (212) 872-1002 (Facsimile)
> mstamer@akingump.com
> lbeckerman@akingump.com
> pdublin@akingump.com
>
> Counsel to the Official Committee of Unsecured Creditors of Calpine Corporation, et al.