# **EXHIBIT O**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted pro hac vice)
Stephen E. Hessler (admitted pro hac vice)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Calpine Corporation, et al., | Case No. 05-60200 (BRL) |
| Debtors. | Jointly Administered |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF**
**LIMITED OBJECTION TO CONVERTIBLE NOTEHOLDER**
**CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300**

Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, the "Debtors") as and for their Omnibus Reply in support of the Limited Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299, and 6300, filed on July 6, 2007 [Docket No. 5206] (the "Objection"), respectfully represent as follows.[1]  Certain holders of the 6% Notes (the "6% Noteholders") and 7.75% Notes (the "7.75% Noteholders"), HSBC, as the Indenture Trustee for the 4% Notes, the 4.75% Notes, and the 6%

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

5540

Notes, and Manufacturers & Traders Trust Company ("MT&T"), as successor Indenture Trustee

for the 7.75% Notes, filed responses to the Objection (collectively, the "Responses").[2]

## PRELIMINARY STATEMENT

In the Responses, the Noteholders characterize their Convertible Notes as

nontraditional convertible notes that, unlike traditional convertible notes that allow holders the

*alternative* of repayment or conversion, feature *concurrent* rights to repayment *and* "conversion

rights" lasting through Stated Maturity.  Essentially, the Noteholders are arguing they have

convertible supernotes and that these supernotes entitle the Noteholders to "substantial," but as

yet unspecified, breach of contract damages for breach of their purported conversion rights.  But

despite the Noteholders' attempts to complicate this matter by mischaracterizing their Notes, the

Notes are no different from ordinary convertible notes and do not entitle the Noteholders to the

hundreds of millions of dollars in damages they will likely seek if the Court grants their claims.

If, however, the Court determines to award the Noteholders damages on account of their

"conversion rights," then such damages must be subordinated to the level of equity; indeed, the

conversion rights are nothing other than the right to buy equity with outstanding principal.

The Noteholders' ill-founded Responses only further reinforce the correctness of

the Debtors' legal arguments.  That said, because the Noteholders' impermissibly late-filed

claims are not even properly before this Court—and thus need not (and should not) even be

adjudicated—the Debtors are compelled to explain briefly at the outset that the Responses do not

remotely justify their tardiness.

---

[2]    The response filed by the 6% Noteholders is referred to herein as the "6% Response" and the response filed by
the 7.75% Noteholders is referred to as the "7.75% Response."  HSBC filed a substantive response and a
joinder to the 6% Response (the "HSBC Joinder") and MT&T joined the 7.75% Response.

I.    **The Court Should Expunge the New Claims Because They Were Untimely**

The Noteholders acknowledge, as they must, that their New Claims were filed nearly eight months (for the 4.75% and 6% Notes) and nearly nine months (for the 7.75% Notes) after the Bar Date.   Nonetheless, assert the Noteholders, the Court should excuse the New Claims' untimeliness for the following reasons, none of which is correct.[3]

A.    **The New Claims Do Not Relate Back to the Original Claims**

The Noteholders conclusorily argue that the New Claims are permissible supplements because the Noteholders designated them as "Supplemental Claims" and because the New Claims merely clarify the Original Claims.[4]   But, as an initial, obvious matter, unilaterally deeming a claim "Supplemental" does not automatically make it so.   Moreover, the Noteholders have done the exact opposite of clarifying an existing claim with greater specificity; instead, they have filed a catchall claim for "other unliquidated amounts" and attempted to bootstrap within this language an entirely new claim.   Because of the potential for precisely this type of mischief, courts vigilantly apply the relation back doctrine to guard against new claims being nominally disguised as supplements.

The Noteholders argue the New Claims relate back to the Original Claims because the New Claims are a "creature of the same contract, between the same parties, on

---

[3]   The 6% Noteholders argue the Debtors should be estopped from arguing the Indenture Trustee was required to move for leave to file the "Amended Supplement," 6% Response at 32-33 n.17, but this misapprehends the Debtors' point.   To be clear, the Debtors do not argue the Indenture Trustee had to move for leave to file the "Amended Supplement"; rather, the Debtors argue that the "Amended Supplement," which amends the Original Supplement," must be denied for the same procedural and substantive reasons as the Original Supplement.   Put simply, if the Original Supplement was untimely (and it was), the Amended Supplement must have been as well.

[4]   7.75% Response ¶ 60; 6% Response ¶ 39.

account of the same transaction" as the Original Claims.[5]  But this argument ignores the very

purpose of the "arising out of the same transaction" test for relation back: to serve as a proxy for

determining whether the debtor could have expected the claim to be amended in the way that it

was.[6]  It is not enough for the Noteholders to argue the New Claims involve the same contract

and the same parties when, as here, the Original Claims' boilerplate demand for "other

unliquidated amounts" could not possibly have alerted the Debtors that the Noteholders would

subsequently devise and file the novel legal theories that they did.

> ### B.    Equity Does Not Warrant Consideration of the New Claims

Even if the Court were to determine that the New Claims do relate back to the

Original Claims, the Noteholders have not satisfied their burden of proving it would be equitable

to consider the New Claims.

> #### 1.    The New Claims Prejudice the Debtors

Despite the Noteholders' assertions to the contrary, proceeding to consider the

New Claims would indeed prejudice the Debtors (and their constituents) in multiple respects.

First, the New Claims were filed a mere two and three months (respectively) before the Debtors

filed their Plan, by which time the Debtors were actively formulating and negotiating the Plan.[7]

---

5    See, e.g., 6% Response ¶ 43.

6    See, e.g., In re Miss Glamour Coat Co., 1980 WL 1668 at *3 (S.D.N.Y. Oct. 8, 1980) (courts adopted "same
     transaction" test to take into account a debtor's reasonable expectation as to the possibility that "the character of
     the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set
     forth in the original pleading might be called into question."); In re Oxford Health Investors, LLC, 2004 WL
     2830694, at *8 (Bankr. M.D.N.C. 2004) ("Application of this test involves two concerns: that the amendment
     arose out of the same transaction or occurrence, and that other parties could have reasonably expected or
     anticipated that the original claim would be altered in the manner of the later amendment.").

7    Although the 6% Noteholders argue otherwise, neither the Debtors' court statements nor the stipulation with
     HSBC regarding allowed claim amounts supports the notion that the New Claims do not prejudice the Debtors.
     6% Response at ¶ 45.  At the May 30th hearing, the Debtors represented to the Court that the New Claims
     would have to be litigated if the Debtors were unable to settle them.  That statement in no way narrowed the
     (Continued...)

To that end, the Second Circuit's ruling in Enron that the bankruptcy court did not abuse its discretion where it denied a claim that would have adversely impacted plan negotiations is not, as the Noteholders argue, distinguishable from the instant case.  To the contrary, the Second Circuit's express concern that "negotiations were at a sufficiently advanced stage *that the belated introduction of a multimillion-dollar claim would have a disruptive effect*" is especially apt here.  Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 129 (2d Cir. 2005) (emphasis added).  Second, the claims resolution process is particularly burdened—and thus the Bar Date even more critical—in these Chapter 11 Cases, given the circumscribed exclusivity periods mandated by the BAPCPA and the complexity of the Debtors' restructuring challenges.  Finally, and most importantly, the Debtors have recently determined to investigate an alternative plan transaction,[8] and protracted litigation of the untimely New Claims will be a prejudicial distraction to the Debtors' ongoing efforts to finalize the negotiation of their reorganization Plan before their favorable exit financing commitment expires.

---

universe of potential arguments and defenses available to the Debtors.  Moreover, saying the Debtors were on track to file the Plan by June 20th did not mean the New Claims were not disruptive and, more importantly, did not waive the Debtors' right to object to the timeliness of late-filed claims.  Indeed, the Debtors' statement on May 30th that they intended to file the Plan by June 20th only confirms that they were formulating the Plan in March and April.  Contrary to the Noteholders' insinuations, the fact that the Plan filed on June 20, 2007 contemplated a waterfall distribution scheme does not mean it was not in negotiations or subject to disruption more than a few days prior to filing.

The stipulation similarly does not evidence a lack of prejudice.  The stipulation was entered *before* the New Claims were filed, and the fact that it did not address any specific unliquidated amounts cemented the Debtors' expectations that the "unliquidated amounts" it referenced were customary unliquidated amounts, such as default interest, rather than a tenuous justification for filing brand new claims.  Indeed, the timing of the stipulation supports the Debtors' contention of prejudice.

[8] See Statement Relating to Notice of Adjournment of Hearing on the Debtors' Disclosure Statement and Solicitation Procedures, dated as of July 27, 2007 [Docket No. 5421].

K&E 12005808.7

5

2.    Claim Size Is Relevant to the Analysis

Remarkably, notwithstanding the Debtors' repeated requests, both before and after filing the Objection, the Noteholders still refuse to provide any estimate of the potential size of the New Claims—beyond hinting obliquely (and ominously) that damages would be "substantial."[9]    The Debtors understand that the Noteholders may be seeking claims in the hundreds of millions, which would have a significant impact on the Plan process.[10]  Claim size is an explicit element of the test most courts (including this Court) use to analyze whether a debtor is prejudiced by an untimely amendment:[11]

> [E]ven were this Court to recognize G.S.'s complaint as an informal motion to amend, *or even an amended claim*, in order to be within the scope of a permissible amendment, the second claim should not only be *of the same nature as the first but also reasonably within the amount to which the first claim provided notice. The $14,000,000 increase above the amount asserted in the proof of claim clearly brings this informal amendment outside the bounds of this standard.*

---

[9]  6% Response ¶ 50.  The Debtors presume the Noteholders have not yet specified their damages for strategic reasons, i.e., their claims are likely so "substantial" (especially in relation to the total amount of the Noteholders' principal and interest claims) that the Court would be inclined to deny them on the basis of their untimeliness and prejudice to the Debtors.  Moreover, the Noteholders presumably would prefer to have the Court commit to the idea of liability in a vacuum, so that the Noteholders can later spring on it an astronomical damages claim that the Court will be forced to allow to be consistent with its damages theory.  Id. ¶ 37 ("Accordingly, the Court need only consider whether a breach of the Conversion Right is a contract breach that gives rise to damages, which it clearly does. The 6% Convertible Noteholders intend to demonstrate at an appropriate time that such damages are significant, given the nature of the Conversion Right.").

[10]  The 7.75% Noteholders assert that they and the Debtors "agreed" to bifurcate damages and liability.  This is an overstatement.  The Debtors merely indicated that they believed the Court would be able to deny the New Claims without the need for an evidentiary hearing.  Although the Debtors subsequently have stipulated with the Noteholders that none of the Parties would seek to put on evidence at the hearing to consider the Objection, the Debtors emphasize that (a) the issue before the Court does not have to be resolved in a bifurcated fashion; and (b) the very fact that the Noteholders are asserting "substantial" (although still unspecified) damages is relevant to the Court's determination of the Objection.

[11]  See, e.g., Enron, 419 F.3d at 130, 133; In re Enron Creditors Recovery Corp., Case No. 01-16034, 2007 WL 1705653, at * 10-11 (Bankr. S.D.N.Y. June 13, 2007).

Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Products Corp.), 89 B.R. 358, 375 (Bankr. S.D.N.Y. 1988) (Lifland, C.J.) (internal quotations and citations omitted) (emphasis added).

>3.    The Noteholders Do Not Satisfy the Good Faith Element

Possibly the most objectionable contention in the Responses is the 6% Noteholders' claim they acted in good faith when they filed the New Claims because (a) the Debtors had not yet indicated their proposed treatment of the so-called Conversion Right under a plan and (b) the Debtors' "financial condition, including the significant possibility that they were solvent, had been clarified" at the time of filing the New Claims.[12]  Neither of these contentions is indicative of good faith—and neither supports the Court's exercise of its equitable powers to consider the New Claims.

Notably, if a creditor could amend its claim without court approval simply because the debtor had not indicated its proposed treatment of claims, then there would no point in setting a bar date before the debtor filed its plan.  Indeed, allowing the Noteholders to amend the Original Claims would eviscerate the Bar Date.  Any claimant could end run a claims bar date merely by filing a timely claim for "any claims" or "unliquidated amounts" and subjecting the debtor to unlimited "supplements."  That is why including a catchall reservation of rights to amend or supplement a proof of claim does not excuse a creditor from complying with a bar date.  See, e.g., In re Stavriotis, 977 F.2d 1202, 1206 (7th Cir. 1992) ("If the [creditor] had an unqualified right after the bar date to amend proofs of claim dramatically for any reason or for no reason at all, the bar date in bankruptcy proceedings would be meaningless.  Under that view,

---

[12]    6% Response ¶ 44.

every creditor could file grossly misleading proofs of claim and later amend those claims as of

right at their leisure, whenever they decided to calculate the extent of actual debt claimed to be

owed."); In re Dynamic Tours & Transp., Inc., 349 B.R. 307, 312 (Bankr. M.D. Fla. 2006)

("reservation of rights language [in proof of claim] does not create a perpetual opportunity for

[claimant] to revise its claims").

Even more egregious is the 6% Noteholders' argument that their belated

discovery of the Debtors' likely solvency justifies their late-filed claim. This rationale actually

concedes that the New Claims existed as of the bar date but the 6% Noteholders did not bother to

assert them until *they heard the pot might be bigger*. But (with certain exceptions not relevant

here) solvency has no bearing on the amount of an allowed claim.[13] Moreover, solvency is not

an acceptable reason to file an untimely claim. See In re Chicago, Milwaukee, St. Paul & Pac. R.

Co., 830 F.2d 758, 766 (7th Cir. 1987) ("The government attempts to justify its failure to file a

claim at the appropriate time by arguing that 'it was not known at the time the proofs of claim

were due to be filed that the debtor would prove to be solvent.' ... But uncertainty as to

fluctuations or changes in the value of a debtor's estate does not excuse a failure to file a timely

claim."). Accordingly, the 6% Noteholders' admission shows that their justification for tardily

filing their New Claim was far from excusable neglect.

### 4. The Court Also Must Disallow the Noteholders' Latest Untimely Claims

Consistent with their self-proclaimed bar date immunity, the Noteholders have

raised even more new claims in their Responses. Both groups of Noteholders now argue *for the*

---

[13] A claimant has the same claim regardless of the debtor's financial condition—if the debtor turns out to be solvent, the claimant receives payment in full on account of its allowed claim, and if the debtor is not solvent, the claimant receives a percentage recovery on its allowed claim.

*first time* that, in addition to principal *and* interest *and* postpetition interest *and* damages for breach of the so-called "Conversion Right," they are *also* entitled to damages for breach of the Indenture's purported no-call provision (*and*, presumably, any other "unliquidated amounts" the Noteholders can invent before confirmation).[14]  Not only are these most recent new claims untimely, they are not even filed.  Notably, courts, including this one, have found asserting a new claim without bothering to file an amended proof of claim results in, at best, a limitation in recovery to the amount asserted in the original claim.  See Manville Forest Prods., 89 B.R. at 374 (creditor " never even amended its proof of claim, nor did it seek an extension of time to do so. This factor is influential in this Court's determination that even were [creditor] entitled to recover on its timely filed claim, that recovery would be limited to the sum listed on the face of that claim.").  Accordingly, even if the Court decides to consider the New Claims in spite of their untimeliness, there is no basis to consider any additional claims, including the no-call claims.

## II.    The Noteholders Do Not Have a Breach Claim Under State Law

The Noteholders assert claims under state law for breach of their so-called conversion rights.  In support of this assertion they cite numerous cases that stand for the uncontroversial proposition that bankruptcy courts look to state law to determine whether a claim exists.  They also cite New York cases setting forth the elements of a breach of contract claim. Strikingly, however, the Noteholders *do not cite any authority (because there is none)* to support their contention that repayment of principal and accrued interest, in full, without compensation for the value of a "conversion right," would constitute a breach of contract under New York law.

---

[14]  6% Response at 22-23 n.10; 7.75% Response ¶ 38.

Indeed, the Noteholders read into their Indentures an independent right to convert their Notes through Stated Maturity, which ranges from 2014 through 2023. By mischaracterizing the nature of their Notes,[15] the Noteholders apparently desire to present the issues before the Court as much more complicated than they really are. The simple fact is the Noteholders have nothing other than traditional convertible notes that give them the right, under certain circumstances, to select the form of their repayment. When the Notes have been accelerated in bankruptcy and are repaid under the Plan, the Noteholders will not be entitled to damages arising from the loss of their conversion right because upon repayment they will have no longer have any principal to convert to old equity (and, in any event, there will be no old equity to which to convert).

## A.    The Notes Are Traditional Convertible Debentures

Convertible notes allow their holders to elect repayment in the form of principal and interest or in the form of another security of the issuer—typically stock. The Notes provide that, upon conversion (except upon the occurrence of an event of default), the Noteholders receive payment of their principal amount in cash and any upside associated with an increased equity value (the "Equity Kicker") in shares of common stock.[16] Even though the Notes provide for a hybrid cash and stock repayment, the Notes are no different from, and do not entitle the holders to any more value than, traditional convertible notes. To illustrate this point, consider

---

[15] The Noteholders also mischaracterize the Notes in other material respects. For example, the Noteholders argue that the [cash] value of their conversion right is the downside protection feature of the Notes. 7.75% Response ¶ 2. But the downside protection comes not from the *value of the conversion right*, but rather from the Noteholders' ability to elect to receive repayment of their principal and accrued interest in cash rather than converting their Notes (and receiving even less than principal and accrued interest) when their conversion rights are out of the money.

[16] Indenture § 10.15(a); 4.75% Notes Indenture § 10.14(a).

two sets of convertible notes with the same terms (i.e., stock price, conversion rate, etc.): one, a hypothetical "traditional" convertible note which allows holders to convert their principal amount into equity of the issuer; and the other, one of the 7.75% Notes at issue here. If Calpine's common stock were trading at $5.00 per share, the holder of the traditional note could convert its note into $1,250 of stock and the holder of the 7.75% Note would receive the same return—$1,250—of which the $1,000 principal amount would be payable in cash and the additional $250 Equity Kicker in shares. Accordingly, the only difference between the Notes and traditional convertible notes is the *form* of the value the holders receive upon conversion.[17]

### B.    The Notes Do Not Feature Independent Conversion Rights

According to the Noteholders, the hybrid cash and stock form of repayment indicates the Notes feature "two separate and distinct forms of consideration that are <u>not</u> mutually exclusive: (1) the right to receive payments of interest and principal through maturity, and (2) upon conversion, the right to receive the principal amount in cash and the excess value in stock, and thereby benefit from the upside."[18]

Both logic and the terms of the Indentures dictate it would be impossible for the Noteholders to retain a conversion right after their principal (which is the currency of conversion) is repaid—there simply would be nothing left to convert. Moreover, and more importantly, the Second Circuit (and other courts) have ruled otherwise. According to the Second Circuit, convertible

---

[17]    And even the form is irrelevant because holders of either type of notes could convert their respective payments into the form of the other holders' payments, i.e., the "traditional" noteholder could sell $1,000 worth of its shares for cash upon conversion or the 7.75% Noteholder could buy $1,000 of stock with the cash it received. As the 7.75% Noteholders acknowledge, the purpose of the cash repayment is not to benefit the Noteholders, but rather to enable the issuer to take advantage of favorable accounting treatment. 7.75% Response ¶ 11.

[18]    7.75% Response ¶ 44. <u>See also</u> 6% Response ¶ 3.

debentures provide for two *mutually exclusive* modes of satisfaction. Under one the holder may exercise his right to convert the debenture into common stock, in which event he will surrender his debenture and it will not be redeemed or paid at maturity … The alternative to conversion is that the taxpayer will redeem the debenture or pay it at maturity, in which event the conversion privilege will be terminated and it will pay out no more than it received at the time of issuance, thus precluding the existence of any original issue discount. In no event will the taxpayer be required both to honor the conversion privilege *and* to redeem the debenture. By the terms of the debenture, no conversion may take place until the bond is surrendered, and the option to convert expires as the bond becomes due. The holder of an obligation convertible into stock has the privilege of electing between two alternative modes of satisfaction, but he cannot resort to both.

See Chock Full O' Nuts Corp. v. United States, 453 F.2d 300, 304-305 (2d Cir. 1971) (first emphasis added).[19]

Notably, the Second Circuit has recognized that there is one type of instrument that offers its holder the non-mutually exclusive rights the Noteholders assert—bond-warrant investment units. Id. at 305 ("With the bond-warrant investment unit … the holder receives and the issuer incurs two separate and independent obligations, and both may have to be fulfilled. Indeed, while the warrant and debt obligations are often issued as a package, since they are far more attractive to investors in unison than they would be separately, they are totally independent and separable obligations, and the warrant, *unlike the conversion privilege*, should be independently valued. Further evidence of this independence is the fact that the conversion feature of a bond is not assignable apart from the bond itself.") (internal citations omitted) (emphasis added). Thus, if a lender advances $1 million in return for a bond-warrant investment

---

[19] See also Husky Oil Co. v. Comm'r, 83 T.C. 717, 735 (T.C. 1984) ("The holder of a convertible debenture has alternative contractual rights - he may demand payment of the debenture, or he may demand shares of stock in accordance with the conversion privilege. When performance of one of the issuer's obligations to a holder of a convertible debenture is demanded and completed, the alternative obligation is discharged."); National Can Corp. v. United States, 520 F.Supp. 567, 574 (N.D. Ill. 1981) ("The convertible debenture is an indivisible unit; the issuer has but one obligation to meet, either redemption or conversion. It can never be required to do both.").

unit, depending on its specific bargain, the bond-warrant investment will include a bond for part

of that amount and warrants or options for the rest (e.g., a bond for $800,000 and $200,000 of

options).  In contrast, a convertible debenture issued at par for $1 million is treated as $1 million

of debt.

Not even the Noteholders would argue that the Convertible Notes are bond-

warrant investment units or that the conversion feature of the Notes is separately assignable.

Consequently, the Noteholders' characterization of their Notes is incorrect and, contrary to their

assertions, their conversion privilege has no independent value.[20]

### C.    Any Ability to Convert the Notes Has Terminated

#### 1.    Conversion Rights Terminate Upon Maturity

Even if the Noteholders have an independent conversion right, it has long since

been terminated.  As the Debtors argued in the Objection, any conversion right the Noteholders

may have had terminated upon maturity and the Notes matured upon acceleration.    The

Noteholders dispute that the conversion right terminates upon any maturity other than Stated

Maturity.  According to the Noteholders, the Debtors "make no attempt to find support in the

Indenture for their argument that 'maturity' for purposes of the conversion right is advanced to

the Petition Date."[21]    Notably, however, the Noteholders do not respond to the Debtors'

---

[20]  The 7.75% Noteholders argue that a treatise the Debtors cited supports the notion that the conversion right is a
distinct right with its own value, citing an excerpt from treatise providing "the conversion right ... is separate
and distinct from the debt evidenced by the debtenture and as a separate right, it has its own ascertainable
value."  But this citation is incomplete.  7.75% Response ¶ 41 (emphasis omitted).  The Debtors' complete
citation clarified that, "The conversion privilege thus attains actual, present value if the market value of the
corporation's stock rises above the conversion figure."  Objection at 19-20 (citing 6A Fletcher Cyc. Corp.
§ 2649.10 (2006)).

[21]  7.75% Response at 11-12 n.9.

argument that the "maturity" reflecting expiration of the Conversion Right cannot be the "Stated Maturity" because the Indenture explicitly defines "Stated Maturity."

### 2.    Maturity Occurred Upon Acceleration

Recognizing they may fail to convince the Court that "maturity" does not mean maturity, the Noteholders next try to convince the Court that "acceleration" does not mean acceleration. Although all of the Notes explicitly provide that principal and accrued interest immediately become due and payable in the event of a bankruptcy filing, the Noteholders argue that such automatic acceleration provisions did not operate to mature the Notes for the purpose of terminating conversion rights because automatic acceleration can never be used against a lender[22] This reasoning is contrary to blackletter law and this Court's holding in the CalGen matter. In the CalGen Refinancing Opinion, the Court explicitly found—without limitation— that the CalGen Secured Debt was accelerated "by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately'" and, on that basis, declined to award the CalGen Secured Lenders a secured makewhole claim.[23]

The Noteholders also make oblique references about their purported right to decelerate, but the Debtors do not concede that the Noteholders even remain able to decelerate,

---

[22]  The 7.75% Noteholders argue that, if maturity occurs upon automatic acceleration, postpetition interest would never be payable. 7.75% Response ¶ 34. But postpetition interest is not payable on a non-executory unsecured loan agreement. The only way lenders in such situations receive postpetition interest is as interest on their prepetition claims as fixed on the petition date.

[23]  CalGen Refinancing Opinion at 8. The 6% Noteholders also argue that the CalGen Refinancing Opinion supports their claim for breach of their so-called conversion rights even more than it supports the makewhole claims. 6% Response at 6 n.2. But the reasoning of the CalGen Refinancing Opinion does not apply to this situation; a makewhole premium is designed to ensure that creditors receive the same return regardless of when the Notes are repaid, but a conversion right is an *alternative* to principal and interest. CalGen does not support awarding simultaneous claims for two alternative remedies.

and in any event, the Noteholders cannot use their purported right to decelerate to attain the benefits of deceleration without actually decelerating.

### D. Even If the Noteholders Possess Conversion Rights, The Debtors Have Not Breached Them

According to the Noteholders, the Debtors propose to "eliminate the Conversion Right under the Plan, which will constitute a failure by the Debtor to perform in the accordance with the terms of the agreement."[24]  Significantly, the Noteholders fail to cite any law in support of their novel proposition that a debtor can effect a post-confirmation breach of a nonassumable, non-pass through agreement.[25]  Elimination of the conversion right under the Plan is not a failure to perform under the Indentures—by repaying the Noteholders' principal and accrued interest in full, the Debtors are rendering alternative performance as provided in the Indentures.  See Chock Full O'Nuts, 453 F.2d at 304-305 ("The alternative to conversion is that the taxpayer will redeem the debenture or pay it at maturity, in which event the conversion privilege will be terminated and it will pay out no more than it received at the time of issuance...").

Furthermore, the 7.75% Noteholders' attempt to distinguish In re Einstein/Noah Bagel Corp., 257 B.R. 499 (Bankr. D. Ariz. 2000), which is discussed at length in the Objection, falls flat.[26]  For the reasons set forth in the Objection, the facts of Einstein/Noah Bagel, in which the Arizona bankruptcy court noted that prepetition option holders are not entitled to the benefit

---

[24]  6% Response ¶ 23.  See also 7.75% Response ¶ 45.

[25]  Undoubtedly, the Noteholders argue the Debtors breached their obligations under the Notes (by repaying in full the Noteholders under the Plan) to shift the Court's focus away from the risks inherent in the Notes (and assumed by the Noteholders) that the conversion feature would never pay off.  See Broad v. Rockwell Int'l Corp., 642 F.2d 929, 956 (5th Cir. 1981) ("A purchaser of [convertible] Debentures ... takes the risks inherent in the equity feature of the security, risks that are shared with the holders of [the issuer's] Common Stock ... [T]he result that conversion might never be economically attractive is simply a risk inherent in this type of investment.").

[26]  7.75% Response ¶ 43.

or value of post-emergence stock, are indeed similar to this matter.[27]  In addition, the court's comment was not fact-dependent.[28]

Finally, the fact that the Noteholders bargained for certain non-bankruptcy anti-elimination protections provides no justifiable reason for this Court to infer that repayment pursuant to a bankruptcy-induced acceleration constitutes a breach of the agreements. Significantly, the Noteholders also bargained for certain provisions indicating that payment in full of principal and interest satisfies the Debtors' obligations in the event of a change of control. Specifically, the Indentures contemplate that, if a change of control occurs, the Noteholders may force Calpine to repurchase their Notes, but only in the amount of principal and accrued interest.[29]  Nothing in the change of control provision states or implies that the Noteholders would be entitled to enforce their "separate" conversion right under such circumstances.  Indeed, the change of control provision conclusively indicates that repayment of outstanding principal and interest satisfies the Noteholders in full.   Thus, repayment of outstanding principal and accrued interest under the Plan cannot prejudice the Noteholders, notwithstanding that the Noteholders could not possibly be entitled to the claims they assert for *post-confirmation* breaches (as discussed supra).

---

[27]  Objection at 23-26.

[28]  Notably, Einstein/Noah Bagel is also relevant to the matter at hand because, although the bankruptcy court reserved valuation of the put right for confirmation, it noted that certain provisions similar to the ones in the Indentures suggested that the put right had no incremental value: "Certainly, some of the provisions of the Agreement suggest that there is no incremental value-e.g., the lack of either additional consideration or a preference upon liquidation arising from the Put Right (section 9.3), the non-transferability of the Put Right (section 4.7(a)) and the Units themselves (section 7.3), and the lack of a monetary remedy upon failure to satisfy the Put Price (section 4.7(e))." Id. at 510.  Accordingly, the Einstein/Noah Bagel dicta supports the notion that the Noteholders are not entitled to damages on account of their purported conversion rights.

[29]  See, e.g., 2d Supp. § 3.03(a); 4.75% Notes Indenture § 3.10.

E.     **The Noteholders Are Not Entitled to Damages**

Even if the "conversion rights" are subject to breach, as the Noteholders claim, the Noteholders have not been damaged.  The Noteholders argue that repayment of their principal and interest in full upon the Effective Date "strips" them of the benefit of their bargain and alters their contractual rights.[30]  But the only thing they bargained for upon a bankruptcy event of default—and an attendant automatic acceleration (even regardless of whether that constituted "maturity")—was principal and interest *or* the value of their principal (and no interest) in stock.  This is necessarily so because, by virtue of the nature of the conversion right, upon repayment of the principal, nothing is left to convert.  Tellingly, the Notes do not contain a guaranteed conversion right or a "fill-up" provision (although even if they did, the Debtors would dispute the effectiveness of such provisions in bankruptcy).  Moreover, although the Noteholders argue that even out-of-the-money options have value, they cite no law in support of the proposition that holders of options that are out of the money as of the petition date are entitled to recover anything.

F.     **If the Conversion Right Has Value, It Must Be Disallowed as Unmatured Interest**

To the extent the 6% Noteholders argue that they are entitled to conversion right damages because they accepted a lower interest rate on account of the conversion feature[31]—and

---

[30]  The Noteholders also assert they are entitled to the New Claims because the Debtors are likely solvent and creditors of a solvent debtor must receive the full benefit of their bargain.  But it is a fundamental tenet of bankruptcy law that a debtor's solvency alone is not grounds for allowing claims against it.  See Bank of Montreal v. American Homepatient, Inc., 309 B.R. 738, 742 (M.D. Tenn. 2004) ("accepting the Agent's argument that the Lenders should be paid in excess of $6 million in damages because the Debtor has the means to do so would place the Lenders' interests of being compensated for a breach ahead of the Debtor's interests in rehabilitating itself.").

[31]  6% Response ¶ 3.

to the extent the 6% Notes actually were issued with actual original issue discount—the Noteholders' arguments fail as a matter of bankruptcy law. Specifically, the value of any conversion right would be equivalent to the original issue discount ("OID") and, therefore, any claim for such value would be treated as unmatured interest which must be disallowed pursuant to section 502(b)(2) of the Bankruptcy Code.[32]

## III.    Even If the New Claims Are Allowed, They Must Be Subordinated[33]

In an attempt to convince the Court that their New Claims should not be subordinated to the level of equity under section 510(b) of the Bankruptcy Code, the 7.75% Noteholders completely mischaracterize their claims as breach of contract claims in respect of debt interests. They also argue, in spite of binding contrary authority, that their claims do not satisfy the "arising from the purchase or sale" of a security requirement set forth in section

---

[32]    See, e.g., Peltz v. Welsh, Carson, Anderson & Stowe, LP (In re Bridge Info. Sys., Inc.), 311 B.R. 781, 792 (Bankr. E.D. Mo. 2004) (to the extent "the value of the options contained in the convertible debt instrument is separate consideration apart from the debtor's unsecured obligation to repay the principal amount of the loan," such value constitutes OID); Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.), 962 F.2d 543 (5th Cir. 1992) (unamortized claims for an OID are claims for unmatured interest); LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.), 961 F.2d 378 (2d Cir. 1992) (same).

[33]    The 6% Noteholders (and by virtue of the HSBC Joinder, the 4.75% Noteholders) have unilaterally determined not to brief the subordination issue at this time because: (i) the Debtors' subordination argument is "patently absurd"; and (ii) the Objection is procedurally defective because the Debtors did not commence an adversary proceeding. 6% Response at 24-25 n.12. But the Debtors did not have to commence an adversary proceeding to seek subordination—Bankruptcy Rule 3007 provides that an adversary proceeding is automatically commenced upon a request for subordination in a claim objection. GNK Enters., Inc. v. Conagra, Inc. (In re GNK Enters., Inc.), 197 B.R. 444, 449 (Bankr. S.D.N.Y. 1996) (Lifland, J.) ("Although the Defendant notes that objections to claims are to be filed as a simple contested matter under Federal Rule of Bankruptcy Procedure 3007, that Rule provides that if an objection to claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding. Here, the objection to ConAgra's claim ... was joined with demands for relief under 7001(1) and 7001(8) [subordination of any allowed claim or interest], and is accordingly assertable in this adversary proceeding."); In re Danbury Square Assocs., Ltd. P'ship, 153 B.R. 657, 661 (Bankr. S.D.N.Y. 1993) (same). Moreover, the Debtors are seeking mandatory subordination of the New Claims, so the Court need not engage in a factual inquiry regarding the Noteholders' conduct as it might in connection with a request for equitable subordination. Accordingly, if the Court determines the New Claims are allowable, the Debtors request that the Court render a contemporaneous decision that they are subject to mandatory subordination prior to any damages inquiry. The Debtors should not be penalized for the 4.75% and 6% Noteholders' decision to play Russian roulette with a loaded gun.

510(b) and that section 510(b) only applies to fraud claims.[34]  And, as a last ditch effort, they argue that policy considerations weigh against subordinating the New Claims.  But no amount of smoke and mirrors will change the fact that the New Claims, if allowed in any amount, are subject to mandatory subordination.

A.   **The New Claims Are Not Breach of Contract Claims and Are Not Immune from Subordination**

As the 7.75% Noteholders would have it, the New Claims seek nothing more than damages for breach of contract (rather than non-delivery of stock) and thus are unsecured claims not subject to subordination.[35]  The 7.75% Noteholders also argue that the New Claims should not be subordinated because, until exercised, their conversion right gives rise to "debt claims akin to claims for principal and interest"[36]   But these superficial—and incorrect—characterizations of the New Claims do not change the fact that the Noteholders are seeking damages on account of their right to "buy" the Debtors' existing common stock with the principal of their notes.  Indeed, creative wordplay aside, the New Claims are indeed based on the non-delivery of stock and are directly related to the value of the Debtors' existing equity.  The Noteholders are seeking to recover at the level of debt on account of interests that are, at best, in the nature of equity.[37]

---

[34]  To be clear, the Debtors do not concede the New Claims are "claims" within the meaning of section 101(5) of the Bankruptcy Code.  See, e.g., In re Baldwin-United Corp., 52 BR 549, 552 (Bankr. S.D. Ohio 1985) (stock conversion claim of employees that held options that could be converted into cash or stock was not a claim).  Thus, the Debtors' subordination argument only applies if the Court finds the New Claims are claims and determines they are allowable.

[35]  7.75% Response ¶ 53.

[36]  7.75% Response ¶ 50.

[37]  The 7.75% Noteholders assert that they did not take on the risks of equity holders because "by virtue of the hybrid nature of the 7.75 Convertible Notes," they could enforce Calpine's obligation to repay interest and principal.  7.75% Response ¶ 51.  This statement belies the Noteholders' assertion that the conversion right is a
(Continued...)

Courts applying section 510(b) do not allow claimants to recast their claims for the value of equity interests or non-delivery of stock as claims for breach of the contract governing the claimants' relationship with the debtor. See, e.g., Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 255 (2d Cir. 2006); American Broadcasting Sys., Inc. v. Betacom of Phoenix, Inc. (In re Betacom of Phoenix, Inc.), 240 F.3d 823, 829 (9th Cir. 2002) (subordinating claim for breach of merger agreement for failing to convey shares); Kaiser v. Pippin (In re Kaiser Group Int'l, Inc.), 326 B.R. 265, 268 (D. Del. 2005) (subordinating claim for breach of "fill-up" provision in merger agreement requiring debtor to provide cash and/or stock up to intended amount of merger consideration upon certain decreases in the value of shares conveyed as merger consideration).

Notably, in Med Diversified, the claimant entered into an employment termination agreement with the debtor pursuant to which the debtor agreed to issue by a certain date, 905,500 shares of its common stock to the claimant in exchange for claimants 905,500 shares of the stock of another company. The debtor failed to comply with the termination agreement and subsequently filed for bankruptcy. The claimant filed a breach of contract claim for debtor's failure to satisfy its obligation to deliver its stock. When the debtor sought to subordinate the claim, the claimant argued that the claim could not be subordinated because it was not for stock, but rather for breach of the termination agreement.

---

supplement, not an alternative, to the repayment of principal and interest and shows precisely why the Noteholders are not entitled to recover a cent on account of the New Claims. Either, as the Noteholders argue, they have a convertible supernote that allows them both to recover principal and interest *and* enjoy a conversion right, in which case the fact that the Noteholders can seek repayment of principal and interest does *not* insulate them from the risks of equity holders in connection with additional conversion right. Or, as convertible notes actually operate, the Noteholders may either recover principal and interest or convert their notes to stock, in which case the fact that the Debtors are satisfying their principal and interest claim means the claim is satisfied in full, the Noteholders no longer have anything to convert, and are not entitled to damages.

The Second Circuit declined to adopt the claimant's position, ruling that, by bargaining to exchange his securities for stock instead of taking the cash owed him, the claimant "had the potential benefit of the proceeds of the enterprise deriving from the ownership of the securities." Med Diversified, 461 F.3d at 256-57. Here, the Noteholders' right to convert similarly gives them the option to exchange their notes for stock instead of accepting repayment of principal and interest. Accordingly, as in Med Diversified, the Noteholders have the "potential benefit of the proceeds of the enterprise deriving from the ownership of the securities" and the New Claims are subject to subordination.

Moreover, the 7.75% Noteholders' argument that the New Claims are not subject to subordination because the "right to convert" was excluded from the Bankruptcy Code definition of "equity security"[38] ignores the fact that such exclusion was designed to *protect* convertible debenture holders from having their debt claims subordinated. In any event, the 7.75% Noteholders conveniently overlook the fact that the exclusion of conversion rights from subordination provisions confirms the notion that convertible debentures do not feature separate conversion rights and, therefore, that the Noteholders are not entitled to breach on account of such "rights." To the extent, however, the Noteholders do have a separate "conversion right" on account of which they are owed damages, such damages *must* be subordinated to equity because any conversion rights are inextricably tied to the Debtors' equity.

**B.    The New Claims Satisfy the "Arising from the Purchase or Sale" Requirement**

The 7.75% Noteholders also try to avoid subordination by proposing an extraordinarily narrow interpretation of section 510(b). According to the 7.75% Noteholders,

---

[38]    7.75% Response ¶ 50.

section 510(b) does not mandate subordination of a damages claim unless the damages arose from an actual purchase or sale transaction.[39] But that is not the law in the Second Circuit. See Med Diversified, 461 F.3d at 258 ("We agree with the Ninth Circuit's reasoning that the first policy rationale for mandatory subordination applies *even if there is no 'actual' sale or purchase*" because even "[b]efore they receive any stock or extend a line of credit, investors and creditors have different expectations."") (emphasis added).[40]    Moreover, the nonbinding authority the 7.75% Noteholders cite in support of their position is easily distinguishable and, with respect to one case, no longer good law.[41]

---

[39] 7.75% Response ¶ 53.

[40] Notably, although the Debtors cited Med Diversified at length in the Objection, the 7.75% Noteholders do not mention Med Diversified at all, much less attempt to distinguish it. Instead, the 7.75% Noteholders cite nonbinding authority that is not completely consistent with Med Diversified. See Racusin v. American Wagering, Inc. (In re American Wagering, Inc.), Case No. 05-15969, 2007 WL 1839681, at *3 (9th Cir. June 28, 2007). Like Med Diversified, American Wagering supports a broad interpretation of the "arising from the purchase or sale" requirement. Id. ("Although many subordination cases sound in fraud, the scope of section 510(b) has been broadened over the years to include claims based on contract law and other actions. The majority of courts in recent years that have confronted the scope of § 510(b), including this one, have concluded that the phrase "arising from" should be read broadly to encompass claims other than fraud claims, such as claims for breach of contract.") (internal citations omitted). Furthermore, the facts of American Wagering are different from the facts of this case. In American Wagering, the claimant was to be compensated in cash in an amount determined by reference to the value of the debtor's stock. The claimant received a judgment in that amount and the debtor sought to subordinate the judgment claim. The Ninth Circuit ruled, inter alia, that the claimant had a debt claim rather than an equity claim because it had previously reversed an award of stock to the claimant.

[41] Specifically, the Noteholders cite three cases which deal with claimants that had exchanged their equity interests for unsecured notes *prior to* the bankruptcy. Official Comm. of Unsecured Creditors v. American Capital Fin. Servs., Inc. (In re Mobile Tool, Int'l, Inc.), 306 B.R. 778 (Bankr. D. Del. 2004); Montgomery Ward v. Schoeberl (In re Montgomery Ward Holding Corp.), 272 B.R. 836, 843 (Bankr. D. Del. 2001); In re Wyeth Co., 134 B.R. 920 (Bankr. W.D. Mo. 1991). In all of these cases, the claimants no longer had equity interests or even potential equity interests at the time of the bankruptcy. Thus, subordination of the claims for repayment on the notes was inappropriate because there was no longer any connection of the claims to the debtors' equity. See Digital Americas, Inc. v. Int'l Wireless Comm'ns Holdings, Inc. (In re Int'l Wireless Comm'ns Holdings, Inc.), Case No. 02-2733, 2003 WL 21466898, at *3 n.2 (3d Cir. Apr. 16, 2003) ("Once a shareholder sells his or her stock, he or she has decided not to continue assuming the downside risks or upside benefits of equity ownership."). Moreover, to the extent Montgomery Ward held that section 510(b) does not apply "absent an allegation of fraud in the purchase, sale, or issuance of a debt instrument," the Third Circuit has explicitly declined to adopt such a narrow interpretation and, as such, Montgomery Ward is no longer good law in that respect. See Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133, 143-44 (3d Cir. (Continued...)

Indeed, as the Second Circuit indicated in <u>Med Diversified</u>, the relevant test for mandatory subordination is whether the claimant "(1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor." <u>Med Diversified</u> at 256. Indeed, the Second Circuit noted that the claims at issue in <u>Med Diversified</u> were subject to subordination because the claimant "took on the risk and return expectations of a shareholder *when he agreed to exchange securities in PrimeRx and employment claims for the shares of the debtor*." <u>Id.</u> (emphasis added). Here, any claim the Noteholders could conceivably have beyond principal and interest would be for their right to convert to stock. As such, the Noteholders clearly take on the risks of equity holders that the stock price (or a related Conversion Condition) will never permit conversion.

The Second Circuit also adopted the reasoning of the <u>Enron</u> bankruptcy court regarding subordination of claims arising from a loss in value of employee stock options (which would be analogous to an independent conversion right) due to the debtors' fraud. <u>Id.</u> at 257. In <u>Enron</u>, the claimants argued that their claims should be treated as unsecured claims because their stock options represented cash compensation rather than equity. <u>See</u> In re Enron Corp., 341 B.R. 141 (Bankr. S.D.N.Y. 2006). The bankruptcy court disagreed and subordinated the claims to the level of equity because "the cash value of the options varied with the value of the debtor's stock, and to that extent resembled a typical equity interest--and moreover, any damages claimants sought would be the type of damages flowing from changes in the debtor's share price, implicitly referred to by section 510(b)." <u>Med Diversified</u>, 461 F.3d at 257 (citing <u>Enron</u> at 157, 167-68,

---

2002) (declining to interpret section 510(b) to apply only to claims alleging fraud or actionable conduct in the issuance of the security).

internal quotations omitted).[42]   Applying the correct test, it is clear that the New Claims, if allowed, would be subject to subordination regardless of how the 7.75% Noteholders choose to characterize them.

### C.    The New Claims Should Be Subordinated to Equity

Recognizing that the New Claims would properly be subject to subordination, the 7.75% Noteholders argue that, even if their New Claims are subordinated, they should not be subordinated to the level of equity; rather, they should be subordinated to other claims of the same priority as the Convertible Notes.  Section 510(b) requires that claims "for damages arising from the purchase or sale of *such a security* .... be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such *security*."   11 U.S.C.  § 510(b) (emphasis added).  The Noteholders argue, somewhat desperately, that the "security" at issue here is the Convertible Notes.  But, as established above, the New Claims are related to the purchase or sale of Calpine common stock.  Thus, the New Claims should be subordinated to the level of Calpine common stock, not the Convertible Notes.

### D.    Policy Considerations Support Subordination[43]

Finally, the 7.75% Noteholders argue that the policies underlying section 510(b) do not support subordination of the New Claims.  But they have it exactly wrong—indeed,

---

[42]    Accordingly, to the extent the Noteholders assert that they would calculate their damages using the Black-Scholes method, 6% Response ¶ 35; 7.75% Response ¶ 45, they essentially concede that their New Claims are subject to subordination, because Black-Scholes is used to value equity option and warrants.  The Noteholders may be hesitating to provide a calculation of their purported damages—in part because such a calculation would show the Court exactly why the New Claims, if allowed, would have to be subordinated to the level of equity.

[43]    Although the Debtors believe the "conversion right" is, in effect, "less than equity," the Debtors did not argue that the New Claims must be subordinated beneath equity.  The Debtors argued that the New Claims should be subordinated to the level of equity in accordance with section 510(b), which provides that where, as here, common stock is the underlying security, subordinated claims should have "the same priority as common stock."  11 U.S.C. § 510(b).

policy considerations mandate subordination of claims like the New Claims.  In fact, the Second Circuit has noted that, where a claim involves the exchange of debt for an equity interest, policy concerns warrant subordination.  <u>Med Diversified,</u> 461 F.3d at 259 ("In this case, however, because of the binding agreement between the parties to turn a debt into an equity interest, it is reasonably clear that Rombro's claim is in line with policy concerns underlying section 510(b).").

Moreover, as the Debtors argued in the Objection, equitable principles call for subordination.  How could it be fair to existing equity holders to give Convertible Noteholders an unsecured claim for damages relating to a right to acquire stock, when those Noteholders are being repaid their principal and interest in full and, if they had converted (or were to convert) their Notes, they would have been in the same boat as existing equity?

## IV.    The Court May Disallow the New Claims Relating to the 4% Notes

The Debtors also objected to the New Claims relating to the 4% Notes on the basis that the Notes have already expired by their terms, so the 4% Noteholders could not be entitled to conversion right damages under any theory.  HSBC, as Indenture Trustee for the 4% Notes, did not respond to this argument (because they could not).  Accordingly, the Debtors request that, at the very least, the Court disallow Claim Nos. 2821 and 6247 to the extent they assert New Claims on account of the 4% Notes.

## CONCLUSION

For the reasons set forth herein and the Objection, the Debtors respectfully request that the Court find the New Claims are time-barred.

WHEREFORE the Debtors request that the Court grant the Objection (including in the alternative, subordinating New Claims to the extent they are allowed) and grant the Debtors such other and further relief as is just.

Dated: August 6, 2007          Respectfully submitted,
     New York, New York

                          /s/ Richard M. Cieri
                       Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Counsel for the Debtors

K&E 12005808.7