# **EXHIBIT P**

Michael S. Stamer (MS-4900)
Lisa G. Beckerman (LB-9655)
Philip C. Dublin (PD-4919)
Shaya Rochester (SR-5559)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Counsel to the Official Committee of Unsecured
Creditors of Calpine Corporation, et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                  :

In re:                              :        Chapter 11

                                  :

CALPINE CORPORATION, et al.,        :        Case No. 05-60200 (BRL)

                                  :

                     Debtors.    :        (Jointly Administered)

-----------------------------------------------------------------x

<div align="center">

**OMNIBUS REPLY OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS OF CALPINE**
**CORPORATION, ET AL. TO THE RESPONSES TO THE DEBTORS'**
**LIMITED OBJECTION TO CONVERTIBLE NOTEHOLDER**
**CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300**

</div>

TO THE HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE:

      The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Calpine

Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, with

Calpine, the "Debtors"), by and through its undersigned counsel, hereby submits this omnibus

reply (the "Reply") to the responses to the Debtors' Limited Objection to Convertible Noteholder

Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 [Docket #5206] (the

"Objection").[1]  In support of this Reply, the Creditors' Committee respectfully represents as follows:

**REPLY**

1.      The respondents – the indenture trustees and ad hoc committees (collectively, the "Respondents") – assert that the holders of the Notes (the "Noteholders") are entitled to allowed claims for damages for purported breaches of the Noteholders' rights to convert their Notes into common stock of Calpine (collectively, the "Convertible Claims") arising from the Debtors' anticipated satisfaction and cancellation of the Notes pursuant to the Debtors' recently filed proposed plan of reorganization (the "Plan").  As set forth below and in the Creditors' Committee's Statement in Support of the Objection (the "Statement in Support"), the Convertible Claims are without merit and should be disallowed in their entirety because (a) they are based on a misreading of the Governing Documents that has no support in the plain terms of the Governing Documents, basic principles of contract interpretation or applicable bankruptcy law and (b) are time barred.

**I.**      **There is No Basis Under the Governing Documents, New York Contract Law, the Bankruptcy Code or Applicable Bankruptcy Law for Allowance of the Convertible Claims.**

2.      Outside of a Calpine chapter 11 filing, pursuant to the Governing Documents, the Noteholders are to be treated as holders of debt, receiving regular interest payments, until the conversion rights set forth in the applicable indentures ripen (i.e., when one or more of the conditions precedent required to be able to exercise the conversion rights actually occurs and such rights are exercised).  If such conditions precedent occur, a Noteholder can choose between exercising its conversion right and receiving cash and/or equity or continuing to remain as a creditor and be paid principal and interest when they come due.  If a Noteholder elects to

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection and the Statement in Support (defined herein).

convert, it exchanges its Notes for cash and/or shares of common stock and is no longer a creditor.

3.      As discussed in more detail below, after the occurrence of a bankruptcy event of default, the Noteholders are entitled only to principal and interest, which is what a holder of debt is typically entitled to in a bankruptcy.  Upon a bankruptcy filing, the indentures expressly treat the Noteholders as creditors who have claims for principal and interest, rather than forcing the Noteholders to convert the Notes into equity and being treated as holders of interests.  This treatment is appropriate since, pursuant to the terms of the Governing Documents and applicable law, the bankruptcy filing accelerates and matures the Notes and terminates, by the express terms of the Notes, any right of the Noteholders to exchange their Notes for Calpine common stock.  Indeed, there are no provisions in any of the Governing Documents that entitle the Noteholders to principal, interest and a monetary payment to compensate them for their unripe conversion rights.

> **A.     The Governing Documents Do Not Provide that the Noteholders'
> Conversion Rights Survived the Debtors' Bankruptcy Filing.**

4.      The central argument asserted by the Respondents is that the Governing Documents – including, in particular, section 10.15(d) of the Indenture[2] – provide for the survival of the Noteholders' conversion rights, even after the Notes have been accelerated and matured as a result of a bankruptcy filing.  See, e.g., Response of Certain Holders of the 7.75% Contingent Convertible Notes Due 2015 to the Debtors' Limited Objection to Convertible Noteholder Claims (the "7.75% Response") ¶ 25 ("All doubt on this point is put to rest by Section 10.15(d)").  Section 10.15(d) does not, however, grant a Noteholder an affirmative right to convert, let alone a right to convert post-bankruptcy.  Similarly, section 10.15(d) does not

---

[2] The applicable provision in the 4.75% Notes Indenture is section 10.14(d).  Unless otherwise stated, all references hereinafter to section 10.15(d) of the Indenture shall include section 10.14(d) of the 4.75% Notes Indenture.

preserve conversion rights that were not exercisable as of the date of the bankruptcy filing. To the contrary, and as the Respondents acknowledge, the Noteholders' rights to convert are governed by a completely different section of the Indenture – section 10.01, which is aptly titled "Conversion Privilege." <u>See</u> Response to Debtors' Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 (the "<u>6% Response</u>") ¶ 27; 7.75% Response ¶ 27; HSBC Bank USA, N.A.'s (1) Response to Debtors' Limited Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 and (2) Joinder to Response of the 6% Convertible Noteholders to the Debtors' Limited Objection (the "<u>HSBC Response</u>") ¶ 5.

     5.     Section 10.15(d) governs only the <u>form and value of consideration</u> to which a Noteholder may be entitled to receive after an event of default. Section 10.15(d) provides:

> If an Event of Default has occurred and is continuing (other than a Default in a cash payment upon conversion of the Notes), the Company may not pay cash upon conversion of any Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock. The number of shares of Common Stock to be delivered will be equal to (A) the aggregate Principal Amount at Maturity of the Notes to be converted divided by 1,000 multiplied by (B) the Conversion Rate.

Second Supplemental Indenture § 10.15(d); 4.75% Notes Indenture § 10.14(d). This provision neither addresses what happens in a bankruptcy nor provides the Noteholders with <u>any</u> right to convert.

     6.     Upon an event of default, other than a bankruptcy-related event of default, there is no automatic acceleration and maturity of the Notes. <u>See, e.g.,</u> Indenture § 5.2 (stating that if a non-bankruptcy-related event of default occurs and is continuing, then "the Trustee by notice to the Company, or the Holders of at least 25% in principal amount of the Securities of such Series by notice to the Company and the Trustee, may declare the principal of and accrued interest on

all the Securities of such Series to be due and payable. Upon such declaration, the principal and interest shall be due and payable immediately."). Thus, it is logical that the indentures would contain a provision which addresses the form and value of consideration that a Noteholder would be entitled to receive if such Noteholder were permitted to and did convert its Notes after the occurrence of an event of default unrelated to a bankruptcy filing and prior to the acceleration of the Notes in accordance with the terms of the Indenture.

7.     Even section 10.15(d) of the Third Supplemental Indenture, which specifically mentions a bankruptcy-related event of default, governs only the <u>form and value of consideration</u> to which a Noteholder is entitled to receive. It does not, however, provide the Noteholder with <u>any</u> right to convert:

> If an Event of Default set forth in Section 5.1(e) or (f) of the Original Indenture [<u>i.e.</u>, a bankruptcy-related event of default] has occurred and is continuing, the Company may not pay cash upon conversion of any Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock, provided that Holders shall receive an amount in cash in lieu of any fractional shares. The number of shares of Common Stock to be delivered will be equal to (A) the aggregate principal amount of Notes to be converted divided by 1,000 multiplied by (B) the Conversion Rate.

Third Supplemental Indenture § 10.15(d).

8.     The Respondents have thus confused two distinct concepts in their reading of the indentures: (a) the right to convert, which is governed by section 10.01, not section 10.15(d); and (b) the form and value of consideration a Noteholder may be entitled to receive after a bankruptcy-related event of default has occurred, assuming that such Noteholder had the right to convert its Notes as of the Petition Date. Since the Noteholders' conversion rights under section 10.01 of the indentures were not exercisable as of the Petition Date – a fact which has not been

disputed in <u>any</u> of the pleadings filed by the Respondents – section 10.15(d) by its plain terms

does not apply.[3]

      **B.**      **The Respondents' Interpretation of the Governing Documents
Contravenes Basic Principles of Contract Interpretation under New
York Law.**

9.     The law is well-settled that "[i]t is a cardinal rule of contractual interpretation that

a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual."

<u>Hauser v. Western Group, Inc.</u>, 767 F.Supp. 475, 488 (S.D.N.Y. 1991); <u>Galli v. Metz</u>, 973 F.2d

145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect

of rendering at least one clause superfluous or meaningless . . . is not preferred and will be

avoided if possible."). Indeed, the Respondents expressly acknowledge the foregoing legal

principles in their respective pleadings. <u>See</u>, <u>e.g.</u>, 6% Response ¶ 25; 7.75 Response ¶ 26.

10.     Despite their recognition of applicable law, the Respondents' interpretation of the

Governing Documents does not follow it. For example, the Respondents' analysis of the

Governing Documents disregards the existence and effect of the defined term "Stated Maturity",

which is used throughout the Governing Documents, <u>see</u>, <u>e.g.</u>, Original Indenture at 10,

§§ 5.1(d), 8.2(c), 9.1.

11.     Specifically, pursuant to the Respondents' reading of the Governing Documents,

the Noteholders' conversion rights did not terminate upon the acceleration and maturity of the

Notes caused by the Debtors' bankruptcy filing, even though the Governing Documents

expressly provide that the conversion rights terminate upon "the date of Maturity" – not upon the

---

[3] Under the interpretation of the Governing Documents most favorable to the Noteholders, if one or more of the conditions precedent set forth in section 10.01 had occurred prior to the Petition Date, this Court might interpret section 10.15(d) as permitting the Noteholders to exchange their Notes for shares of the Debtors' Common Stock, but not cash (other than cash in lieu of fractional shares), in lieu of retaining the Notes and receiving principal and interest as set forth in the indentures. In order to reach such an interpretation, this Court would have to determine that section 10.15(d) is applicable, notwithstanding the express language in the Notes providing that the conversion rights cannot be exercised after maturity. There would also be potential legal impediments to effectuating such an exchange post-petition, such as the need to obtain Bankruptcy Court approval to modify the automatic stay and to allow Calpine to issue such Common Stock in exchange for the Notes.

"Stated Maturity." See Second Supplemental Indenture at A-5 (The "conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Date immediately preceding the date of Maturity . . . ."); Third Supplemental Indenture at A-5 (same); 4.75% Notes Indenture at A-4 (same). The Respondents attempt to extricate themselves from the Governing Documents' plain language by asserting that the phrase "date of Maturity" refers only to the stated maturity of the Notes and not maturity brought on by any other event. See 6% Response ¶ 25; 7.75% Response ¶ 28; HSBC Response ¶ 25. Under this reading, however, the term "Stated Maturity" becomes entirely superfluous.

12.     The Respondents' strained interpretation of "Maturity" should also be rejected because it does not fit with the corresponding language found in the Governing Documents for the 4% Notes. The 4% Notes provide, in pertinent part, that "Holders may surrender Securities for conversion into shares of Common Stock at any time prior to 5:00 p.m., New York City time, on the date that is two Business Days prior to the maturity of the Securities." See Objection, Ex. B-2 at 3 (emphasis added). The use of the undefined term "maturity" in the 4% Notes strongly suggests that the use of the term "Maturity" in the subsequent Notes was not intended to have a narrow meaning to refer only to the stated maturity of the Notes (for which there is already a defined term) but rather to have a more generic, dictionary meaning – i.e., "the date at which a debt instrument is due and payable." Dictionary of Finance and Investment Terms 413-14 (2003).

13.     Similarly, the Respondents' position that the conversion rights survived the Debtors' bankruptcy filing does not comport with section 5.2(e) of the Indenture (or its counterpart in the 4.75% Notes Indenture, section 6.02(a)), which expressly provides that, upon a bankruptcy-related event of default, "the principal and interest" on the Notes "shall ipso facto become and be immediately due and payable without any declaration or other act on the part of

7

the Trustee or any [Noteholders]." See Indenture § 5.2(e); 4.75% Notes Indenture § 6.02(a).

Indeed, no provision of the indentures provides that unripe conversion rights survive a

bankruptcy-related automatic acceleration, or that the Noteholders are entitled to claims on

account of conversion rights eliminated by such acceleration. Nonetheless, the Respondents read

these rights and claims into the Governing Documents, thereby rendering the plain meaning of

section 5.2(e) of the Indenture and section 6.02(a) of the 4.75% Notes Indenture ineffective.

### C.     The Respondents' Arguments Ignore the Bankruptcy Code.

14.     Section 502(b) of the Bankruptcy Code expressly provides that a claim filed in a

bankruptcy case must be determined "as of the date of the filing of the petition." 11 U.S.C.

§ 502(b); Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 250 (2d. Cir. 1999).

15.     The Respondents have asserted in a number of different ways that the Convertible

Claims had value on the Petition Date, based upon the theory that the Noteholders' conversion

rights may have been exercisable at some indeterminate point in the future, had such rights not

been terminated by the Debtors' bankruptcy filing. See 6% Response ¶¶ 34-37; 7.75% Response

¶¶ 40-46; HSBC Response ¶ 29. These arguments should be rejected because any such

speculative future value is irrelevant under section 502(b) of the Bankruptcy Code since the

conversion rights were not exercisable as of the Petition Date. See, e.g., Einstein/Noah Bagel

Corp., 257 B.R. 499, 507 (Bankr. D. Ariz. 2000) (disallowing claim based on a put right which

was not exercisable as of the petition date); In re Search Fin. Serve's Acceptances Corp., No.

39832129RCM11, 2000 WL 256889 at *3 (N.D. Tex. March 7, 2000) (holding that claim based

on warrants which were not redeemable for cash as of the petition date should be treated as an

equity interest rather than a claim); cf. In re Jobs.com, Inc., 283 B.R. 209, 212-14 (Bankr. N.D.

Tex. 2002) (disallowing contingent, unmatured claim for breach of a stock redemption provision

because such claim was not enforceable as of the petition date); In re First Amer. Healthcare of

Georgia, Inc., No. 96-20188, 1997 WL 33477665 (Bankr. S.D. Ga., Apr. 28, 1997) (disallowing

claim based on stock option that was unenforceable as of the petition date).

16.     As (a) the Noteholders' conversion rights were not exercisable as of the Petition

Date (a fact the Respondents concede), (b) the Noteholders' conversion rights terminated as of

the Petition Date because the Notes were accelerated and matured, and (c) as discussed above, no

provision in the Governing Documents preserves the Noteholders' unripe conversion rights after

the Petition Date or provides the Noteholders with claims for the termination of conversion rights

caused by the Debtors' bankruptcy filing, the Noteholders do not have any allowable claims in

respect of the Conversion Claims. See supra ¶¶ 2-8; see also Statement in Support ¶¶ 17-20.

**D.     The Respondents Misapply the Law in Support of their Positions.**

17.     The Respondents improperly rely upon a number of cases to argue that, under

applicable law, the Noteholders' conversion rights survived the Debtors' bankruptcy filing. See

6% Response ¶¶ 29-30; 7.75% Response ¶ 34; HSBC Response ¶ 25. As a threshold matter, all

of the cases relied on by the Respondents involved requests for prepayment premiums as

opposed to conversion rights. Moreover, as set forth below, these cases do not hold that a party

is entitled to a premium and/or penalty – let alone a damage claim for lost conversion rights upon

a bankruptcy-caused acceleration and maturity – where the party fails to bargain specifically for

the inclusion of such provisions, as the Noteholders failed to do here.

18.     For example, the Respondents improperly rely upon Skyler Ridge for the

proposition that that the automatic acceleration of debt as a result of a bankruptcy filing does not

foreclose the possibility that additional amounts beyond principal and interest may be due. See

6% Response ¶ 29; 7.75% Response ¶ 34. While the Skyler Ridge court noted in dicta that if

"automatic acceleration of a debt defeats a prepayment premium clause, such a clause could

never be enforced in a bankruptcy case," the court nonetheless held that the secured lender's

purported entitlement to a premium was not enforceable on the grounds that the provision in the

lender's contract was "not a reasonable estimate of the damages that would result from

premature prepayment." In re Skyler Ridge Corp., 80 B.R. 500, 507, 511-12 (Bankr. C.D. Cal.

1987). Thus, the Respondents' reliance on the court's observation regarding the enforceability of

prepayment premiums is misplaced as it was mere dicta. Moreover, the court's observation

regarding the enforceability of prepayment premiums has been disproven over time. Skyler

Ridge was decided in 1987. The court's reasoning provided a roadmap to investors on how to

draft a premium or penalty provision properly. Specifically, indentures containing prepayment

premium provisions that were intended to be enforceable notwithstanding a bankruptcy induced

automatic acceleration incorporate express language in the indenture's remedies provisions to

say exactly that. See, e.g., In re Anchor Resolution Corp., 221 B.R. 330, 333 (Bankr. D. Del.

1998) (agreement included an express provision that entitled the holders of the notes to a make-

whole amount in the event of a prepayment of principal or an event of default; one such specified

event of default was the commencement of a voluntary bankruptcy case). Thus, parties to

indentures and credit agreements came to understand that, if a bankruptcy occurred, the

entitlement to a premium would depend in the first instance on whether explicit language was

included in the governing document to reflect the parties' intent that the premium would remain

viable following the commencement of a bankruptcy case. As set forth above, the Governing

Documents do not include any such provisions – explicit or implicit.

19.    The Respondents' reliance upon the LHD Realty and Sharon Steel cases is also

misplaced. See 6% Response ¶¶ 29-30, 32; 7.75% Response ¶ 34. In LHD Realty, the court

held that the case fell within the "acceleration exception" to prepayment premium assessment,

under which a lender that elects to accelerate a debt loses its right to a prepayment premium, not

because it was the lender who caused the acceleration, but because the acceleration itself

10

rendered any prepayment premium inapplicable. In re LHD Realty Corp., 726 F.2d 327, 331

(7th Cir. 1984). In the court's words: "acceleration, by definition, advances the maturity date of

the debt so that payment thereafter is not prepayment but instead is payment made after

maturity." Id. at 330-31. Just as the acceleration of the debt in question led the court in LHD

Realty to reject the lender's claim to a prepayment premium, this Court should similarly deny the

Respondents' attempts here to recover on account of the termination of conversion rights after an

acceleration which advanced the maturity date of the Notes.

20.    In Sharon Steel, the acceleration provisions in the indentures at issue were

permissive, as opposed to automatic as is the case here. See Sharon Steel v. Chase Manhattan

Bank, 691 F.2d 1039, 1053 (2d Cir. 1982), cert denied, 460 U.S. 1012 (1983) (noting that the

acceleration provisions in the underlying agreements were "explicitly permissive"). Under those

specific circumstances, the Sharon Steel court determined that the indenture trustees were not

precluded from seeking specific performance of the redemption provisions upon the debtor's

default as opposed to accelerating the underlying debt. Id. A distinction of even greater

significance, however, is the fact that Sharon Steel *did not involve a bankruptcy case*. Id. at

1045. Consequently, the issue of whether the automatic acceleration arising as a result of a

bankruptcy filing renders ineffective a prepayment premium – let alone a conversion right – was

not before the court.[4]

21.    The holders of the 6% Notes improperly rely upon the Imperial Coronado and

Manville Forest Products cases to argue that the acceleration resulting from a bankruptcy is a

conditional right of a lender. See 6% Response ¶ 31. To the contrary, those cases held that de-

acceleration is the right of the debtor, not creditors. See Imperial Coronado Partners, Ltd., 96

B.R. 997, 1000 (B.A.P. 9th Cir. 1989) ("Under the Bankruptcy Code, ICP [i.e., the debtor] had

---

[4] Similarly, the holders of the 6% Notes cite Tymon v. Wolitzer, 240 N.Y.S.2d 888 (N.Y. Sup. Ct. 1963), which did not involve a bankruptcy case.

the right to deaccelerate the due date of the loan as part of the plan of reorganization."); In re Manville Forest Products, Corp., 43 B.R. 293, 298-99 (Bankr. S.D.N.Y. 1984) ("Section 1124 allows the debtor to return the accelerated claim to its original maturity date and recreate the pre-default setting for all purposes under the contract.") (emphasis added).

22.    Ultimately, Skyler Ridge, LHD Realty, Sharon Steel, Imperial Coronado, Manville Forest Products and all of the other numerous cases touching on the issue of a debtholder's entitlement to a premium upon payment have one unifying element: if the bargained for language between the parties is explicit and reasonable, it will be enforced. As set forth above, however, the Governing Documents do not contain any language which preserves the Noteholders' conversion rights after the Debtors commenced their bankruptcy cases or provides the Noteholders with claims on account of the termination of such rights.

>          **E.    The CalGen Decision Neither Supports the Noteholders' Damage
>                  Claims Nor Constitutes the Law of the Case.**

23.    The Respondents attempt to rely upon the CalGen Decision to argue that the Noteholders are entitled to damage claims for "dashed expectations" arising from the purported loss of their conversion rights. Two of the Respondents go so far as to argue that the CalGen Decision is the law of the case and, therefore, bars any further litigation of the issues raised by the Objection. See 7.75% Response ¶¶ 35-39; HSBC Response ¶¶ 21-23, 25. These arguments, however, are not supported by the facts or the well-established law in the Second Circuit.

24.    Courts within the Second Circuit, including cases cited in the Respondents' pleadings, consistently hold that the law of the case doctrine is a discretionary doctrine that applies only where litigants seek to reopen issues that have already been decided. See, e.g., U.S. v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (holding that the doctrine is "at best, a discretionary doctrine which does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided.") (emphasis added); U.S. v.

Martinez, 987 F.2d 920, 923 (2d Cir. 1993) (same); U.S. v. Birney, 686 F.2d 102, 107 (2d Cir. 1982) (same); see also In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991) (same and cited in the 7.75% Response).The CalGen Decision did not decide, and could not have decided, the issues raised by the Objection because the CalGen Decision concerned an entirely different set of claims arising under totally different agreements with completely different terms.

25.    The facts giving rise to the holding in the CalGen Decision were, in summary, the following: holders of pre-petition oversecured debt were repaid in full, in cash, outside of a plan of reorganization, the principal and accrued interest on their claims.  The debt was repaid during what would have been a "no-call" period but for the acceleration and deemed maturity of such debt.  Based on the foregoing facts, this Court awarded the holders of the CalGen Secured Debt breach of contract damages stating that "[t]he CalGen Secured Lenders' expectation of an uninterrupted payment stream has been dashed giving rise to damages, albeit not as the Lenders' would wish." In re Calpine Corp., No. 05-60200, 2007 WL 685595 at *5 (Bankr. S.D.N.Y. Mar. 5, 2007) (appeal pending).

26.    The facts at hand are entirely different than those related to the CalGen Decision.  Under the Respondents' interpretation of the Governing Documents, the Noteholders must prove to this Court that they reasonably expected that the right to convert would continue until the Stated Maturity regardless of whether Calpine filed for bankruptcy prior thereto, notwithstanding that (a) under section 502(b) of the Bankruptcy Code, claims are fixed as of the petition date, (b) the conditions precedent in section 10.01 of the Indenture had not occurred as of the Petition Date and may never occur prior to substantial consummation of a plan of reorganization for the Debtors,[5] (c) the Indenture provides for the automatic acceleration of the Notes upon a

---

[5] In the CalGen Decision, the Court held that the holders of the CalGen Secured Debt were entitled to damages because they had an expectation of an "uninterrupted payment stream [that] ha[d] been dashed." Calpine, 2007 WL 685595 at *5 (emphasis added). Here, by contrast, the Noteholders' loss involves, at most, a right to

bankruptcy filing, (d) in such circumstances, the Indenture provides only for the Noteholders' entitlement to principal and interest and not for any other monetary payment to the Noteholders, (e) applicable case law provides that, upon a bankruptcy filing, the Notes automatically accelerate and mature, (f) the Notes provide that the conversion rights cannot be exercised after maturity, and (g) section 1141 of the Bankruptcy Code provides that confirmation of a plan of reorganization discharges a debtor from any debt that arose before the date of such confirmation. The Noteholders cannot assert a legitimate claim for damages due to "dashed expectations" because the Plan proposes to pay them exactly what they are entitled to under the Governing Documents.

27.    In latching onto the CalGen Decision, notwithstanding that the facts underlying the CalGen Decision are not remotely similar to those present here, the Respondents have provided support for the concerns that the Creditors' Committee has expressed in other pleadings filed with the Court – namely, that the CalGen Decision could very well lead in the future to creditors asserting a wide array of unsupportable claims for any purported violation of an indenture or loan agreement that arguably could give rise to alleged "dashed expectations." The law of the case argument advanced by the Respondents demonstrates precisely why these concerns were justified. If the Court accepts the Respondents' law of the case argument, creditors in these and other cases will undoubtedly seek to push the door open even further by using the CalGen Decision as a basis for seeking "dashed expectation" claims that have little or no similarity to the claims that were in fact adjudicated in the CalGen Decision.

28.    In the unlikely event that this Court concludes that the law of the case doctrine is applicable to the facts and circumstances present here, the Court can and should exercise its discretionary power to not invoke the doctrine so as to prevent creditors from continuing further

---

convert to equity that, in any event, was entirely contingent and which may never have materialized. Indeed, the Notes are explicitly labeled "Contingent Convertible Notes."

along the slippery slope described above.  See Williams, 205 F.3d at 34 (2d Cir. 2000) (holding

that the law of the case doctrine is "at best, a discretionary doctrine"); Martinez, 987 F.2d at 923

(2d Cir. 1993) (same).

**II.     The Convertible Claims Should Be Disallowed Because They Are Time-Barred.**

29.     As noted in the Objection and the Creditors' Committee's Statement in Support,

the Convertible Claims are time-barred and seek to assert entirely new claims that are not

justified by the facts of these cases and are unrelated to initial timely filed claims for principal,

interest and other specified obligations.  Unable to defend their violation of the Bar Date Order

with effective legal argument, the Respondents call the Debtors and Creditors' Committee's

positions "an absurdity," "frivolous," and even "disingenuous."  One must presume that the

Respondents resort to this level of argumentation to obscure the not so trivial "technicality"

(another choice word used by the Respondents) that the Convertible Claims were filed nearly

eight or, in some instances, ten months after the Bar Date without leave of the Court or providing

any explanation whatsoever for the late-filing.  See, e.g., 6% Response ¶¶ 39, 45; 7.75%

Response ¶ 58.  Indeed, the eighty-plus pages of pleadings filed by the Respondents in response

to the Objection fail to provide a single reason for why it took so long to file the Convertible

Claims.

**A.     The Convertible Claims Are Entirely New Claims that Were Not
Asserted in the Initial Proofs of Claim.**

30.     The Respondents argue that the initial proofs of claim filed in July 2006 by the

indenture trustees for the Notes (collectively, the "Initial Claims") included the Convertible

Claims because (a) the Initial Claims asserted "unliquidated" claims, "other amounts,"

"reservations of rights," and numerous other generic placeholders, (b) the Initial Claims attached

copies of the respective indentures and/or included language stating that "all provisions of [the

Governing Documents] are expressly incorporated herein by reference" and (c) the Debtors

should have been aware of the Convertible Claims because the Debtors drafted and are parties to the Governing Documents. See, e.g., 6% Response ¶ 39-40; 7.75% Response ¶ 59; HSBC Response ¶¶ 7, 10-14.

31.    The Respondents' arguments are without merit. The Initial Claims simply did not make any meaningful references to the Convertible Claims. The Convertible Claims, which assert entitlements never before requested, let alone adjudicated, in any reported U.S. bankruptcy case of which the Creditors' Committee is aware, clearly are separate and distinct from the grounds of liability on which the Initial Claims for principal, interest and other amounts were based.

32.    Furthermore, if the Respondents' arguments were correct, then bar date orders would be meaningless and could always be circumvented by claimants who simply asserted generic amounts in their proofs of claim and attached copies of the applicable documents, as did the Respondents here. See In re Hooker Invs., Inc. 937, F.2d 833, 840 (2d Cir. 1991) ("[A] bar order does not function merely as a procedural gauntlet, but as an integral part of the reorganization process. If individual creditors were permitted to postpone indefinitely the effect of a bar order . . . the institutional means of ensuring the sound administration of the bankruptcy estate would be undermined.") (citation and internal quotations omitted); In re Drexel Burnham Lambert Group, 129 B.R. 22, 24 (Bankr. S.D.N.Y. 1991) (stating that that a bar date order is "essential to the orderly administration and successful reorganization in a Chapter 11 case"). To the extent claims were objected to because they were lacking sufficient particularity, then claimants could simply file "supplemental" claims – at any point in the bankruptcy proceeding – and argue that the debtor should have been aware of the claims insofar as the debtor drafted and/or signed the applicable agreement.

### B.    The Convertible Claims Are Not Supplements to the Initial Claims.

33.    The Respondents argue "in the alternative" that the Convertible Claims supplement the Initial Claims. See 6% Response ¶¶ 41-43; 7.75% Response ¶¶ 60-61; HSBC Response ¶¶ 7, 15-18. These arguments are likewise without merit and should be rejected.

34.    As a threshold matter, the Respondents have applied the wrong legal standard in their efforts to "supplement" the Initial Claims. As the Second Circuit observed in its most recent decision on untimely claims, courts should analyze a claim as a late-amended claim only where "there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." Midland Cogeneration Venture Ltd. P'Ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 133 (2d Cir. 2005) (internal quotations and citations omitted) (emphasis added); see also In re Asia Global Crossing, Ltd., 324 B.R. 503, 508-09 (Bankr. S.D.N.Y. 2005) (disallowing late-amended claim because, among other things, the initial claim asserted only a general damage claim and did not provide adequate notice of the amended claim); In re Norris Grain Co., 81 B.R. 103, 107 (Bankr. M.D. Fla. 1987) (same).[6] As set forth above and in the Statement in Support, the Initial Claims and the Convertible Claims do not assert similar claims or demands but, rather, entirely new claims. See Statement in Support ¶¶ 2-3, 9. Nonetheless, the Respondents mistakenly rely on the legal standards used for adjudicating late-amended claims, rather than belated new claims. See 6% Response ¶¶ 41-43; 7.75% Response ¶¶ 60-61; HSBC Response ¶¶ 7, 15-18.

35.    While the standards for adjudicating late-amended claims and belated new claims are similar, see Enron, 419 F.3d at 133, they are not identical. According to the Second Circuit,

---

[6] While the Respondents cite In re Enron Creditors Recovery Corp., No. 01-16034, 2007 WL 1705653 at *4 (Bankr. S.D.N.Y. June 13, 2007) to argue that the proper standard for analyzing whether a claim constitutes a late-amended claim is set forth by Rule 15(c)(2) of the Federal Rules of Federal Procedure, which tests whether the two claims arise out of the same "conduct, transaction or occurrence," see 6% Response ¶ 42; 7.75% Response ¶ 61, this test was not used by the Second Circuit in Enron, which, as noted is the Second Circuit's most recent decision on untimely claims and, therefore, the governing law in this District.

the main difference between the two standards is the following: "[w]hile belated <u>amendments</u> will ordinarily be freely allowed where other parties will not be prejudiced, belated <u>new</u> claims will ordinarily be denied, even absent prejudice, unless the reason for the delay is compelling." <u>Id.</u> at 133-34 (emphasis in original). In the present case, this distinction is important. The Respondents cannot and do not provide a single reason, let alone a compelling reason, for the delay in filing the Convertible Claims. This omission is consistent with the fact that the Respondents decided to forego seeking Court approval for the late filing of the Convertible Claims, even though the filing occurred long after the Bar Date had passed. Indeed, the Respondents have declined to provide any valid excuse for their delay in filing the Convertible Claims. Thus, under the proper standard for adjudicating belated new claims, the Convertible Claims must be disallowed.[7]

36.    Even under the lower standard for adjudicating belated amended claims, which is not applicable in the instant case, the Convertible Claims should be disallowed. As noted, this standard focuses on the potential prejudice that would be caused to other parties by allowing the late filing of the claim. <u>Enron</u>, 419 F.3d at 133-43; <u>In re Robert Stone Cut Off Equipment Inc.</u>, 98 B.R. 158, 162-63 (Bankr. N.D.N.Y. 1989) (disallowing late-amended claim because, among other things, allowing the "State's late claim for withholding taxes to attach to any remaining surplus in the estate at this late juncture would prejudice the other creditors, who were diligent in filing their claims in a timely fashion, perhaps wreak havoc in a case already closed . . . [and] abuse the Code's statutory scheme of expeditious and equitable distributions") (citing cases).

37.    Here, the prejudice would be significant. First, despite requests by the Debtors and the Creditors' Committee, the Noteholders have refused to disclose publicly their estimate of

---

[7] The other factors used by courts to determine whether a belated new claim should be time-barred also weigh heavily in favor of the Objection and support the disallowance of the Convertible Claims. <u>See</u> Statement in Support ¶¶ 4-13.

the amount of the Convertible Claims.  While it is not possible to determine with certainty the size of the Convertible Claims in relation to the estates, the Creditors' Committee and its professionals believe that the Noteholders will assert very substantial Convertible Claims, which could materially dilute recoveries of other stakeholders.  Second, as set forth in the Statement in Support, allowing the Convertible Claims would prejudice other unsecured creditors and, potentially, equity security holders[8] who timely filed their proofs of claim and interest and would likely precipitate a flood of unjustifiable claims for any purported violation of an indenture or other contract that gave rise to alleged "dashed expectations."  See Statement in Support ¶ 10; see also supra at ¶ 27.  Third, to the extent that the Convertible Claims remain unresolved and unliquidated as of confirmation, the reorganized Debtors may have to maintain large reserves for an unknown period of time, which could delay distributions to other stakeholders in these cases for years.

38.    Accordingly, even under the standard for adjudicating belated amendments, allowance of the Convertible Claims would be prejudicial to the Debtors, their estates and their shareholders.  Thus, the Convertible Claims must be disallowed as time-barred.

---

[8] As the Court is aware and as set forth in the Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, the Creditors' Committee believes that (a) the Debtors' assumed New Calpine Total Enterprise Value (as defined in the Plan) may be greater than the actual enterprise value of the Reorganized Debtors (as defined in the Plan) as may be determined by this Court and (b) the Debtors' claims estimates may be lower than the actual amount of allowed claims upon completion of the claims reconciliation process, each of which may have a material impact on the recoveries to holders of allowed unsecured claims and, if applicable, prepetition equity interests.

**WHEREFORE**, for the foregoing reasons and for the reasons set forth in the Statement in Support, the Committee respectfully requests that this Court (a) disallow the Convertible Claims and (b) grant the Creditors' Committee such other and further relief as the Court deems just, proper and equitable.

Dated: August 6, 2007

<div style="margin-left:3em">

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:  /s/  Michael S. Stamer
     Michael S. Stamer (MS-4900)
     Lisa G. Beckerman (LB-9655)
     Philip C. Dublin (PD-4919)
     Shaya Rochester (SR-5559)
     Akin Gump Strauss Hauer & Feld LLP
     590 Madison Avenue
     New York, New York 10022-2524
     (212) 872-1000 (Telephone)
     (212) 872-1002 (Facsimile)
     mstamer@akingump.com
     lbeckerman@akingump.com
     pdublin@akingump.com


     Counsel to the Official Committee of Unsecured
     Creditors of Calpine Corporation, et al.

</div>