# EXHIBIT Q

Hearing Date: August 8, 2007 at 10:00 a.m. (EDT)

Brad Eric Scheler (BS-8019)
Gary Kaplan (GK-4542)
Michael de Leeuw (MD-8479)
Adrian Feldman (AF-2478)
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
One New York Plaza
New York, New York 10004
(212) 859-8000 (Telephone)
(212) 859-4000 (Facsimile)

*Attorneys for the Official Committee of Equity Security Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :
In re:                                                    :      Chapter 11
                                                          :
    CALPINE CORPORATION, et al.,                          :      Case No.  05-60200 (BRL)
                                                          :      (Jointly Administered)
                                  Debtors.                :
                                                          :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**RESPONSE OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS IN**
**SUPPORT OF THE DEBTORS' LIMITED OBJECTION TO CONVERTIBLE**
**NOTEHOLDER CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300**

The Official Committee of Equity Security Holders (the "Equity Committee") of Calpine

Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, the

"Debtors"), for its response in support of the Debtors' Limited Objection to Convertible

Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 (the "Objection"),

by and through its undersigned attorneys, respectfully states as follows[1]:

### INTRODUCTION

Not satisfied with receiving par plus accrued interest, the Convertible Noteholders have

---

[1]    The Equity Committee joins in the arguments made by the Debtors in the Objection and in their reply to the
responses thereto.

5541

invented a damage theory seeking to recover damages for the alleged loss of the right to convert their notes into stock (the "Conversion Rights"). While the Convertible Noteholders' theory is certainly creative, it is wholly without merit. The untimely claims filed by the Convertible Noteholders must be seen for what they are – an attempt to capitalize on the Debtors' solvency and to grab value above and beyond that to which they are entitled under their indentures.

The Equity Committee recognizes that before equity holders are entitled to receive a recovery on account of their interests, all creditors must receive payment in full on account of their claims. The Equity Committee is working to ensure that all creditors receive just that. However, payment in full means that the creditors receive their contractual entitlements, not additional amounts based on creative theories having no basis in the underlying indentures. While the fact of the Debtors' solvency has already spawned numerous baseless claims for various premiums and damages, the Convertible Noteholders' claims are the most overreaching of the claims asserted to date.

As a preliminary matter, this Court does not need to reach the merits of the Convertible Noteholders' claims, as the claims were filed long after the bar date had passed. The late filed proofs of claim cannot be construed as simply supplementing the original claims for par plus accrued interest because they assert entirely new claims based upon an entirely new set of facts. Moreover, there can be no suggestion that the claims were untimely filed due to excusable neglect.

In addition to being time barred, the claims are wholly without merit. First, the Convertible Noteholders cannot succeed on a breach of contract claim because, pursuant to the terms of the indentures, the Debtors' bankruptcy filing accelerated the maturity date of the Notes, which triggered expiration of the Conversion Rights. Thus, under the terms of the indentures,

the Convertible Noteholders are not entitled to the damages they now seek. The Debtors' solvency cannot be used as a tool to provide a greater recovery than they are entitled to receive under their indentures.

Further, even if there could be a cognizable claim for breach of the Conversion Rights, under the circumstances of this case, this claim should be allowed at zero. The Convertible Noteholders' claims, like all other claims, were fixed as of the date of the Debtors' bankruptcy filing (the "Petition Date"). At that time, the Conversion Rights were substantially under water, and since none of the conditions precedent to conversion had been met, the Convertible Noteholders could not exercise the Conversion Rights.[2] In fact, even if the Conversion Rights could have been exercised on the Petition Date, the Convertible Noteholders would have received a conversion value less than the principal amount of the Notes. As such, as of the Petition Date, the Conversion Rights were worthless and therefore the Convertible Noteholders are not entitled to any additional amounts for the loss of the Conversion Rights. Permitting the Convertible Noteholders to recover par plus accrued interest plus additional amounts would violate the absolute priority rule, as the indentures entitle the Convertible Noteholders to recover on their debt security *or* their equity security upon conversion – not both.

Finally, to the extent the Convertible Noteholders receive an award of Conversion Damages, pursuant to section 510(b) of the Bankruptcy Code, that claim must be subordinated to Calpine's common stock. The claims asserted by the Convertible Noteholders are claims arising from the purchase or sale of a security, inasmuch as the essence of the claim is that they were not permitted to acquire the stock to which they claim they are entitled. Under section 510(b), this

---

[2]    The value of the Debtors' common stock has risen significantly over the duration of these chapter 11 cases, and it is certainly possible that on the effective date, the price per share of common stock will have exceeded the conversion price of the Notes. However, this is irrelevant for the purposes of calculating a damage claim, as all claims are fixed as of the Petition Date.

3

claim is subordinated to other interests that are *pari passu* with their security (i.e., the conversion right). Because conversion rights are *pari passu* with common stock, a claim for Conversion Damages must be subordinated to common stock.

## BACKGROUND

Prior to the commencement of these cases, Calpine issued four series of unsecured convertible notes (the "Notes"). As of December 20, 2005, the Notes were outstanding in the aggregate principal amount of approximately $1.8 billion.[3]

By Order dated April 26, 2006, the Bankruptcy Court set the date of August 1, 2006 as the last date to file claims in the Debtors' bankruptcy case (the "Bar Date").

Prior to the Bar Date, Wilmington Trust Co. ("Wilmington Trust"), as Indenture Trustee for the holders of the 7.75% Notes, filed Claim 2404 asserting claims for (a) principal and interest and (b) other unliquidated charges on account of the 7.75% Notes. In addition, prior to the Bar Date, HSBC Bank USA, National Association ("HSBC"), as successor Indenture Trustee for the 4% Notes, the 6% Notes and the 4.75% Notes, filed Claims 2821 and 2832 (together with Claim 2404, the "Original Claims") asserting similar claims.

On January 30, 2007, the Court approved a stipulation (the "Stipulation"), pursuant to which the Debtors and HSBC stipulated to the allowed claims for the principal and accrued

---

[3]     The Notes include: (a) the $1,311,000 4.00% Convertible Senior Notes Due December 26, 2006 (the "4% Notes"), issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000 (the "Original Indenture" and, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000, the Second Supplemental Indenture, dated as of September 30, 2004 (the "6% Notes Indenture"), and the Third Supplemental Indenture, dated as of June 23, 2005 (the "7.75% Notes Indenture"), the "Indenture"); (b) the $547,370,000 6.00% Contingent Convertible Senior Notes Due 2014 (the "6% Notes"), issued by Calpine pursuant to the Indenture; (c) the $650,000,000 7.75% Contingent Convertible Senior Notes Due 2015 (the "7.75% Notes"), issued by Calpine pursuant to the Indenture; and (d) the $633,775,000 4.75% Contingent Convertible Senior Notes Due 2023 (the "4.75% Notes"), issued by Calpine pursuant to a certain indenture, dated as of November 14, 2003, which was superseded by that certain Amended and Restated Indenture dated as of March 12, 2004 (the "4.75% Notes Indenture" and, together with the Indenture, the "Indentures").

4

prepetition due on account of the 4% Notes, the 6% Notes and the 4.75% Notes.

Between seven and ten months after the Bar Date, Manufacturers and Traders Trust Company ("Manufacturers Trust"), as successor to Wilmington Trust, and HSBC filed Claims 6280, 6299 and 6300 (the "New Claims"). Although the New Claims purport to supplement the Original Claims by further describing certain unliquidated amounts sought in the Original Claims, the New Claims assert a wholly new claim for damages based on the termination or loss of the Conversion Rights.[4]

On June 20, 2007, the Debtors filed their plan of reorganization (the "Debtors' Plan"). The Debtors' Plan provides that the Notes will be paid in full (principal and accrued interest) with common stock of reorganized Calpine (the "New Common Stock"), on the effective date.

On July 6, 2007, the Debtors filed the Objection seeking disallowance of the New Claims.

Between July 27 and July 30, 2007, (i) an ad hoc group of holders of the 6% Notes (the 6% "Notes Committee"), (ii) an ad hoc group of holders of the 7.75% Notes (the "7.75% Notes Committee"), (iii) Manufacturers Trust, as indenture trustee for the 7.75% Notes, and (iv) HSBC, as indenture trustee for the 6.0% Notes and the 4.75% Notes, filed responses (the "Responses") to the Objection asserting entitlement to unsecured damage claims based on an alleged breach of the Conversion Rights.

---

[4] Specifically, each of the New Claims assert claims for: "(i) the rights provided to the holders of the [Notes] in Article 10 of the [applicable] Indenture (the "[Conversion Right]"), which [Conversion Right], upon information and belief, was an integral part of the consideration provided in return for the extension of credit to the Debtor evidenced by the [Notes], (ii) all damages, including any accrued prior to the commencement of the Case, arising from any breach of the terms of, and covenants set forth in, the Indenture, including the [Conversion Right], whenever arising, including all damages arising from the loss, whether pursuant to a plan of reorganization for the Debtor or otherwise, of the [Conversion Right], and (iii) all rights to receive postpetition interest, charges and other amounts due or coming due under the terms of the Indenture on or after the commencement of the Case to the fullest extent chargeable or allowable as against the Debtor or its estate under law or equity." See New Claims ¶4.

5

Also on July 27, 2007, the Debtors filed their Statement Relating to Notice of

Adjournment of Hearing on the Debtors' Disclosure Statement and Solicitation Procedures (the

"Statement"). As noted in the Statement, the Debtors have been contacted by third party

investors interested in sponsoring an alternative plan of reorganization and have therefore

embarked on a process to solicit proposals that would provide a guaranteed distribution to equity

holders superior to that provided in the Debtors' Plan. Statement at 2.

## ARGUMENT

### I.    The New Claims Are Time Barred

The Convertible Noteholders filed the New Claims long after the passage of the Bar Date

and without seeking Court approval to file an untimely claim. Courts will only permit an

untimely claim if (i) the claim relates back to a timely claim so that it is considered an

amendment of that claim or (ii) the reason for the late filing is due to excusable neglect. Here,

neither exception applies.

### A.    The New Claims are Not Permissible Amendments to the Original Claims

While claims filed after the bar date are ordinarily time barred, a court will allow a late

filed claim to the extent it amends a previously filed, timely claim and is not a new claim.

Specifically, courts only allow late filed "amendments" where (i) the amendments relate back to

the original claims they amend, and (ii) allowing a late filed amendment would be equitable. See

In re Enron Creditors Recovery Corp., 2007 WL 1705653, at *10 (Bankr. S.D.N.Y. June 13,

2007) (noting that the "'second prong is to be applied only if the first prong is satisfied and the

claim qualifies as an amendment and not simply a new claim'"). The decision whether to allow

an untimely claim as an amendment "rests within the sound discretion of the bankruptcy judge."

Integrated Resources, Inc. v. Ameritrust Co. National Association, et al. (In re Integrated

Resources, Inc.), 157 B.R. 66, 69 (S.D.N.Y. 1993). As discussed below, the New Claims cannot

be permitted as amendments because they do not relate back to the Original Claims and

permitting the filing of the New Claims would be inequitable.

           1.      The New Claims Do Not Relate Back to the Original Claims

       Where a proof of claim is filed to "cure a defect in the claim as originally filed, to

describe the claim with greater particularity, or to plead a new theory of recovery on the facts set

forth in the original claim," courts generally permit an amendment that, effectively, "relates

back" to the original claim. Integrated Resources, Inc., 157 B.R. at 70; see also In re Enron

Creditors Recovery Corp., 2007 WL 1705653, at *13 (noting that the party asserting an

amendment relates back bears the burden of proof). A claim relates back only if it arose out of

the conduct, transaction, or occurrence set forth in the original claim. In re Enron Creditors

Recovery Corp., 2007 WL 1705653, at *4. However, "[a]mendments do not vitiate the role of

bar dates: indeed, courts that authorize amendments must ensure that corrections or adjustments

do not set forth wholly new grounds of liability." U.S. v. Kolstad (In re Kolstad), 928 F.2d 171,

175 (5th Cir. 1991).

       The New Claims do not relate back to the Original Claims but instead assert "wholly new

grounds of liability." The Original Claims include claims for principal and interest and any other

amounts due or to become due under the Indentures. Nothing in the New Claims (i) cures a

defect in the Original Claims, as no defect is alleged, (ii) describes the Original Claim with

greater particularity, as the New Claims raise for the first time claims for Conversion Damages,

or (iii) pleads a new theory of recovery on the facts set forth in the Original Claims, as the facts

needed to support a claim for Conversion Damages were not alleged in the Original Claims.

Furthermore, the New Claims do not arise out of the same transaction or occurrence set forth in

the Original Claims.  Although the Original Claims assert amounts due under the Indentures, nothing in the Indentures provides for the recovery of Conversion Damages.  Furthermore, per the Stipulation, on January 5, 2007, the indenture trustee for the 4% Notes, the 6% Notes and the 4.75% Notes stipulated the allowed amounts of the claims at principal plus accrued interest.  The Stipulation was based on the facts as set forth in the Original Claims.  Any claim for Conversion Damages is outside the scope of the Stipulation, and thus based on a new set of facts not set forth in the Original Claims.

The Convertible Noteholders bear the burden to prove that the New Claims relate back to the Original Claims.  See Integrated Resources, Inc., 157 B.R. at 70; see also In re Enron Creditors Recovery Corp., 2007 WL 1705653, at *13.  The Convertible Noteholders go to great lengths to try to characterize the New Claims as pleading a new theory of recovery on the facts set forth in the Original Claims.  To support this contention, the Convertible Noteholders rely upon language in the New Claims for the proposition that the claims "supplement previously filed claims."  7.75% Notes Committee Response at 26.  Specifically, the New Claims state, "Please note that this Supplement to Proof of Claim merely supplements proof of claim 2404" and "the purpose of the Supplement is to provide more detail regarding the claims."  Claim 6280.  However, simply stating that the New Claims are supplements does not make them so.  The extra language in the proof of claim is superfluous – it is the substance that is of import to this Court.  Because the Original Claims did not assert any claims for loss of the Conversion Rights or any other claim even tangentially related to the Conversion Rights, the Convertible Noteholders cannot show that the New Claims relate back to the Original Claims.

2.    Permitting the New Claims Would Not be Equitable

Even if the New Claims related back to the Original Claims, this Court must still

8

conclude that permitting the New Claims to be filed would be equitable before permitting the

Convertible Noteholders to pursue them.  In making this determination regarding equitability,

courts consider five factors:

> (1) undue prejudice to the opposing party; (2) bad faith or dilatory behavior on the
> part of the claimant; (3) whether other creditors would receive a windfall were the
> amendment not allowed; (4) whether other claimants might be harmed or
> prejudiced; and (5) the justification for the inability to file the amended claim at
> the time the original claim was filed.

In re Enron Creditors Recovery Corp., 2007 WL 1705653, at *3.  Based on these factors,

allowing the New Claims as amendments would be inequitable.

(i)      <i>Prejudice to Opposing Party</i>

If this Court allows the Convertible Noteholders to pursue the New Claims, the Debtors

as well as their equity holders will suffer undue prejudice.  As an initial matter, parties in interest

are unable to gauge the size of the New Claims because the Convertible Noteholders have not

revealed their estimation of damages.  As this Court is aware, the Debtors have filed a plan of

reorganization and are engaged in a process to test the market for potential investors to fund a

chapter 11 plan.  The Debtors, the two official Committees and other parties in interest are

currently focused on efforts to develop a chapter 11 plan to conclude these cases.  Not

surprisingly, the discussions regarding the chapter 11 plan focus on, among other things, the

Debtors' estimate of the claims pool based upon many months of due diligence, objections,

negotiations and settlements.  Substantially increasing the claims pool during the height of the

plan process and on the eve of the Debtors' expiration of exclusivity is the ultimate form of

prejudice.  Indeed, it would subvert the very purpose of a bar date – "enabling the parties in

interest to ascertain with reasonable promptness the identity of those making claims against the

estate and the general amount of the claims, a necessary step in achieving the goal of successful

reorganization." In re Best Products, Inc., 140 B.R. 353, 357 (Bankr. S.D.N.Y. 1992) (citing First Fidelity Bank, N.A. v. Hooker Investments, Inc. (In re Hooker Investments, Inc.), 937 F.2d 833, 840 (2d Cir. 1991)).

In addition, allowing the New Claims would undoubtedly result in a flood of similar unjustifiable claims by creditors seeking to take advantage of the Debtors' solvency. Given the number of claims and theories that have arisen from the CalGen Decision, there is no question that allowing the Convertible Noteholders to pursue Conversion Damages will prompt a host of other creative claims that parties will assert relate back to and supplement previously filed claims. Accounting for and defending against such claims will be prejudicial to these cases and threaten the Debtors' ability to timely emerge from chapter 11. The Convertible Noteholders should not be permitted to completely disrupt these cases with their late filed claims.

(ii)    <em>Bad Faith or Dilatory Behavior on the Part of the Claimant</em>

The New Claims are the product of the Convertible Noteholders' dilatory behavior. There is no other explanation for the Convertible Noteholders' (i) delay in filing the New Claims, (ii) failure to assert Conversion Damages in the Original Claims, and (iii) failure to seek leave from this Court to amend the Original Claims. Truth be told, the reason the claims were so late is that the Convertible Noteholders did not concoct the theory of Conversion Damages until this Court's CalGen Decision. Indeed, as noted above, in January 2007 the Debtors and the Convertible Noteholders stipulated to the allowed amount of the Convertible Noteholders' claims for principal plus accrued interest. If the Convertible Noteholders had developed their theory of Conversion Damages at the time of the Original Claims, they were obligated to assert such claims in connection with negotiations regarding the size of their claims. This Court should not reward the Convertible Noteholders' dilatory tactics.

10

    *(iii)*    *Whether Other Creditors Would Receive a Windfall/Whether Other Claimants Would Be Harmed*

As noted above, the Equity Committee recognizes that equity interest holders are not entitled to recovery until all creditors are paid in full. Payment in full, however, does not include damages based on outlandish theories. Permitting the New Claims as amendments would create the potential for the Convertible Noteholders to recover substantially more than what they would receive outside of chapter 11. Thus, if the New Claims are allowed, the only parties receiving a windfall are the Convertible Noteholders. If the New Claims are disallowed, it will simply ensure that equity holders receive their rightful recovery from a solvent estate.

    *(iv)*    *Justification for the Inability to File the Amended Claim at the Time the Original Claim Was Filed*

The Convertible Noteholders' ten-month delay in filing the New Claims is inexcusable. See In re Enron, 419 F.3d 115, 127-128 (2nd Cir. 2005) (disallowing claim filed six months after bar date); In re JSJF Corp., 344 B.R. 94, 101-102 (9th Cir. B.A.P. 2006) (disallowing claim filed four months after bar date); In re Norris Grain Co., 81 B.R. 103, 107-108 (Bankr. M.D. Fla. 1987) (disallowing claim filed five months after bar date). Although the Convertible Noteholders contend that their claims for Conversion Damages arose out of the same facts set forth in the Original Claims, they give no reason why they did not specifically allege such claims in the Original Claims nor why they waited ten months to file the New Claims.

"In determining how long is too long, courts generally consider the degree to which, in the context of a particular proceeding, the delay 'may disrupt the judicial administration of the case.'" In re Enron, 419 F.3d at 127 (quoting In re Infiltrator Sys. Inc., 241 B.R. 278, 281 (Bankr. D. Conn. 1999)). As discussed above, the filing of the New Claims has already

11

disrupted the judicial administration of the Debtors' cases, and allowing the New Claims will further threaten the reorganization process. The New Claims were filed during a critical stage of the plan formulation process and allowing the Convertible Noteholders to pursue such claims when they have not even placed a numeric value on alleged damages poses the risk of delayed emergence from chapter 11. Simply stated, the New Claims are too late.

        B.      <u>The Delay in Filing the New Claims is Not Due to Excusable Neglect</u>

A bankruptcy court may allow a tardily filed claim if the reason for the late filing was due to "excusable neglect" under Bankruptcy Rule 9006(b)(1). <u>Pioneer Inv. Serv. Co. v. Brunswick Assocs. P'ship</u>, 507 U.S. 380, 382 (1993); <u>In re Enron Creditors Recovery Corp.</u>, 2007 WL 1705653, at *26 (noting that the burden of proving excusable neglect is on the claimant). In determining whether to allow a late filed claim due to excusable neglect, courts will look to the circumstances and make an equitable determination of whether the failure to timely file was due to "inadvertence, mistake or carelessness, as well as by intervening circumstances beyond the party's control." <u>Pioneer</u>, 507 U.S. at 388. In making such a determination, courts will look to "the danger of prejudice to the debtor, the length of delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." <u>Id.</u> at 395.

These factors mirror those for determining whether it would be equitable to permit a late filed proof of claim as an amendment. For the reasons discussed above, allowing the New Claims as late filed claims would prejudice the Debtors and disrupt the reorganization process. Such a result should not be tolerated where the Convertible Noteholders had every opportunity to

file a timely claim but did not do so because they invented their entire new damage claim long

after the Bar Date and as a product of bad faith.

## II.     The Convertible Noteholders Do Not Have a Cognizable Damages Claim for Breach of the Indentures

### A.     The Conversion Rights Expired by the Terms of the Indentures upon the Debtors' Bankruptcy Filing

Even if the New Claims are not time barred, they must be disallowed because repayment

of the Notes cannot constitute a breach.  The Indentures expressly provide that the

commencement of a chapter 11 case by Calpine is an event of default that automatically

accelerates the Notes, causing the principal and interest on the Notes to "ipso facto become and

be immediately due and payable."  Indenture § 5.2(e); 4.75% Notes Indenture § 6.02(a).  It is

also a well-established matter of bankruptcy law that upon the filing of a bankruptcy petition, all

prepetition debt automatically accelerates to maturity.  See In re Calpine Corp., 365 B.R. 392,

398 (Bankr. S.D.N.Y. 2007); In re Manville Forest Products Corp., 43 B.R. 293, 297 (Bankr.

S.D.N.Y. 1984); In re LHD Realty Corp., 726 F.2d 327, 330-31 (7th Cir. 1984).  As such, both

under the plain terms of the Indentures and as a matter of bankruptcy law, there is no question

that the Debtors' bankruptcy filing accelerated the maturity of the Notes to the Petition Date.

The Indentures further provide that the Conversion Rights expire upon maturity of the

Notes.  See 6% Notes Indenture and 7.75% Notes Indentures at A-5 (The "conversion right shall

commence on the initial date of the Notes and expire at the close of business on the Business

Date immediately preceding the date of Maturity."); 4.75% Notes Indentures at A-4 (same).

Thus, the Conversion Rights terminated when the Notes matured to the Petition Date.

Although the Convertible Noteholders concede that the Indentures provide for (i)

automatic acceleration of the Notes upon commencement of bankruptcy case and (ii) termination

of the Conversion Rights upon maturity of the Notes, they put forth a number of creative yet ill-founded arguments that the Conversion Rights survived the Debtors' bankruptcy filing. First, they claim that, because "maturity" is not defined in the Indentures, this Court should find that automatic acceleration of the Notes advanced the maturity date for the purposes of causing the Notes to become immediately due and payable but did not advance the maturity date for the purposes of causing the Conversion Rights to terminate. 6% Notes Committee Response at 15. This attempt to ascribe two different meanings to the word "maturity," is nothing but an impermissible request that this Court graft into the Indentures a benefit the Convertible Noteholders failed to obtain through contractual negotiations. See Jackson Heights Care Center v. Rehabilitation and Health Care Center, No. 2006-02874, slip op. at 2, 39 A.D.3d 477 (2d Dept. April 3, 2007) ("When interpreting a contract, a court determines the intent of the parties from within the four corners of the contract ..."); see also In re Adelphia Commc'ns. Corp., 342 B.R. 142, 153 (Bankr. S.D.N.Y. 2006) ("if the bank lenders wished to contract for additional remedies (which likewise was their right, if their contract counterparty was agreeable to providing such), the bank lenders could have done so"). The Convertible Noteholders obviously bargained for the protection of automatic acceleration but did not bargain for Conversion Rights to survive automatic acceleration. They cannot have it both ways now by advancing divergent definitions of "maturity." Cf. Palmieri v Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006) ("In determining ... the construction of contractual language, a court should accord that language its plain meaning.").

Likewise, the Convertible Noteholders cannot avoid the consequences of automatic acceleration simply because that provision is a lender protection. 6% Notes Committee Response at 18 (stating that acceleration is a remedy "which they have not elected"). The

14

Convertible Noteholders argue that it defies logic to think that the Debtors could avoid their

obligations under an indenture by committing an event of default that automatically accelerates

the debt. As the Convertible Noteholders are undoubtedly aware, however, this is precisely why

lenders frequently craft protections to prevent such a result. For example, the indentures

governing the Debtors' second lien debt include a provision requiring payment of a premium

upon a bankruptcy filing commenced to avoid a bar on prepayment. See Debtors' Motion for

Entry of an Order Allowing Limited Objection to Claims and Determining Value of Claims

[Docket No. 4880], Exhibit B at 1-3. Similarly, the Debtors' Aries Facility required payment of

a premium upon repayment of debt accelerated by an event of default. See In re Calpine Corp.,

365 B.R. at 398 n.6. The Convertible Noteholders could have just as easily included a similar

provision that protected their Conversion Rights upon acceleration but chose not to.

    This intentional drafting omission is even more apparent in light of certain other

provisions in the Indentures that are intended to protect the Conversion Rights (e.g., anti-dilution

protections, protections for the Conversion Rights in the case of a merger or similar transaction,

and the termination of Calpine's right to redeem the Notes upon an event of default). While the

Convertible Noteholders claim that inclusion of these protections evidences the Debtors'

inability to eliminate the Conversion Rights, such protections only highlight the fact that the

Convertible Noteholders recognized the potential for elimination and did not take steps to (i)

preserve the Conversion Rights during bankruptcy or (ii) provide for damages upon termination

of the Conversion Rights. The Convertible Noteholders' failure to include such protections is

fatal to their claim for Conversion Damages, as convertible noteholders are only entitled to the

rights set forth in their indentures. See Broad v. Rockwell Intern. Corp., 642 F.2d 929, 955 (5th

Cir. 1981) (convertible noteholders "have a legitimate interest only in those rights that are accorded them under their [i]ndenture").

The Convertible Noteholders also claim that the Indentures contemplate survival of the Conversion Rights after acceleration because section 10.15(d) provides that during a continuing event of default, upon conversion, the Convertible Noteholders receive payment solely in the form of stock. 7.75% Notes Indenture § 10.15(d); 6.0% Notes Indenture § 10.15(d); 4.75% Notes Indenture § 10.14(d).[5] Section 10.15(d) provides that if there is a conversion, Calpine cannot use its cash to pay the Convertible Noteholders. This provision is intended to limit the rights of the Convertible Noteholders – by limiting the currency in which they can get paid – and is not intended to expand their rights. The Convertible Noteholders cannot use a provision intended to limit their recovery as a means to create a post-default right to convert, when the Indentures plainly provide that the Conversion Rights have terminated by virtue of automatic acceleration of the maturity date.

Further, because the Conversion Rights terminate one day prior to maturity, section 10.15(d) only has meaning in the event the Conversion Rights are ripe on the day before the Notes mature. Section 10.01(a) of the indentures governs the conditions precedent to conversion. 6% Notes Indenture § 10.01(a); 7.75% Notes Indenture § 10.01(a); 4.75% Notes Indenture § 10.01(a). To the extent any of these conditions are met one day prior to a bankruptcy filing and automatic acceleration of the maturity date, then section 10.15(d) would allow a Convertible Noteholder to swap its claim for principal and accrued interest for common stock in bankruptcy. Here, since the conditions precedent to conversion had not been met on the day

---

[5]      Section 10.15(d) of the 6% Notes Indenture, section 10.15(d) of the 7.75% Notes Indenture, and section 10.14(d) of the 4.75% Notes Indenture are substantially similar. For ease of reference, the Equity Committee refers to each of these sections as "section 10.15(d)."

prior to the Petition Date the Conversion Rights were not ripe. Thus section 10.15(d) is not applicable in this case.

Finally, the Convertible Noteholders argue that the Conversion Rights were preserved because the Notes are non-callable. 7.75% Notes Committee Response at 13. This argument is nothing more than an attempt to recast their claim for breach of Conversion Rights as a claim for breach of no-call provisions. Such a claim is clearly impermissible as it was not raised in the New Claims, much less the Original Claims.

Accordingly, there can be no breach of the Indentures because (i) the Notes matured on the Petition Date pursuant to the terms of the Indentures and by operation of bankruptcy law, (ii) maturity of the Notes caused the Conversion Rights to terminate under the terms of the Indentures, and (iii) the Indentures did not include any provision for preservation of Conversion Rights in the event of bankruptcy or compensation upon termination of such rights.

B.    Even if the Conversion Rights Survived the Debtors' Bankruptcy Filing, Termination of the Conversion Rights upon Satisfaction of the Notes Does Not Give Rise to Damages

In the event this Court determines that the Conversion Rights were preserved despite automatic acceleration of the maturity date of the Notes, the Convertible Noteholders are still not entitled to damages for breach. As an initial matter, elimination of a conversion right is not compensable, especially where, as here, the conversion rights were "under water" and unexercisable at the time of the bankruptcy filing. First, section 502(b) of the Bankruptcy Code provides that claims are determined "as of the filing of the petition." There is no question that as of the Petition Date, not only was Calpine's stock trading far below the conversion price of the Notes, but the Conversion Rights were not even exercisable because none of the conditions precedent for conversion had been met. See 6% Notes Indenture § 10.01(a); 7.75% Notes

17

Indenture § 10.01(a); 4.75% Notes Indenture § 10.01(a).  Completely ignoring the fact that the

Conversion Rights were not exercisable on the Petition Date, the Convertible Noteholders claim

that they are entitled to damages because the Conversion Rights have an independent value

recognized by the marketplace.

However, while an unexercisable conversion right may have value on the open market,

that does not translate to a claim.  Many investments have a market value yet do not give rise to a

claim in bankruptcy.  For example, courts have determined that options, such as put rights, stock

options and warrants, carry no value for claims purposes unless either exercisable or enforceable

against the debtor.  See In re Einstein/Noah Bagel Corp., 257 B.R. 499, 509 (Bankr. D. Ariz.

2000) (noting that the "rights of holders of claims and interests are fixed as of the date of the

petition" and denying claimant damages on account of put right that was unexercisable and

unenforceable at the time of the debtor's bankruptcy filing); In re Search Fin. Servc's

Acceptances Corp., 2000 WL 256889 at *3 (N.D. Tex. March 7, 2000) (holding that claim based

on warrants with unripe redemption feature as of the petition date should be treated as an equity

interest); In re Baldwin-United Corp., 52 B.R. 549, 550 (Bankr. S. D. Ohio 1985) (stating that

holders of stock options did not have a claim unless their right to receive a cash payment had

matured).

These decisions are consistent with the common understanding of a conversion right and

the risk assumed by a convertible noteholder that it may never be able to execute such right.  See

Broad, 642 F.2d at 956 (noting that a purchaser of convertible notes "takes the risks inherent in

the equity feature of the security").  In the same vein, convertible noteholders assume the risk

that the issuer of the notes will engage in activities that preclude exercise of conversion rights.

As noted above, convertible noteholders "have a legitimate interest only in those rights that are

18

accorded them under their [i]ndenture." Id. at 955. Thus, to the extent noteholders bargain for

protections, such as an anti-dilution provision or preservation of conversion rights in the event of

a merger, the economic position of the right to convert may be maintained. However, "absent

such a contractual limitation on the corporation's activities, there is no common law protection

for the debenture holders from whatever steps the corporation might take that could result in the

diminution in value or practical extinction of the conversion right." 6A Fletcher Cyc. Corp. §

2649.10 (2006). As such, a debtor need not compensate a convertible noteholder for diminution

in value or termination of a conversion right in the absence of a specific contractual protection

barring such a result. Accordingly, any claim by the Convertible Noteholders for "dashed

expectation" damages must fail. The Convertible Noteholders had no expectation of conversion

on the Petition Date because the Conversion Rights were not ripe at that time and were not

protected in the event of termination.

  Finally, Conversion Damages cannot be awarded because any recovery by the

Convertible Noteholders beyond par plus accrued interest would violate the absolute priority rule

under Bankruptcy Code section 1129(b)(2)(B), which prohibits creditors from receiving in

excess of 100% of their allowed claims absent the consent of many junior constituents.[6] See In

re Granite Broad. Corp., et al., 2007 Bankr. S.D.N.Y LEXIS 1700, at *58 (Bankr. S.D.N.Y. May

18, 2007) (citing In re Exide Tech., 303 B.R. 48, 61 (Bankr. D. Del. 2003)) (A "corollary of the

---

[6] Section 1129(b)(2)(B) of the Bankruptcy Code states, in relevant part, that a plan is "fair and equitable" with respect to a class of unsecured claims if:

  (i) the plan provides that each holder of a claims of such class receive or retain an account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

  (ii) the holder of any claims or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

absolute priority rule is that a senior class cannot receive more than full compensation for its claims."). Contrary to the Convertible Noteholders' contention, the Indentures do not contemplate any circumstance under which the Convertible Noteholders could ever be paid principal plus accrued interest plus an additional premium based on the Conversion Rights.

The Indentures provide that in the absence of an event of default, a Convertible Noteholder that exercises its Conversion Rights is entitled to receive either (i) principal, paid in cash, plus the upside difference between the conversion price and the Debtors' stock price, paid in common stock, or, (ii) where the stock price is lower than the conversion price, the conversion value (which will be less than the full repayment of the principal), paid in cash. See 6% Notes Indenture § 10.15(b); 7.75% Notes Indenture § 10.15(b); 4.75% Notes Indenture § 10.14(b). However, during a continuing event of default, the Convertible Noteholders may only receive these amounts in the form of stock. See 6% Notes Indenture § 10.15(d); 7.75% Notes Indenture § 10.15(d); 4.75% Notes Indenture § 10.14(d). Thus, the Convertible Noteholders cannot claim a right to both cash and stock under the terms of the Indenture.

Further, the Indentures do not include any provisions that permit the Convertible Noteholders to seek damages upon the loss or termination of the Conversion Rights. Thus, by receiving par plus accrued interest under the Debtors' Plan, the Convertible Noteholders will receive the entire benefit of their bargain under the Indentures. To permit the Convertible Noteholders any additional value in the form of Conversion Damages or otherwise would violate both the terms of the Indentures and section 1129(b) of the Bankruptcy Code.

Accordingly, assuming the Conversion Rights survived the Debtors' bankruptcy filing, the Convertible Noteholders' only recourse is to exercise the conversion rights in bankruptcy to the extent the conditions for conversion are met, or lose the rights upon satisfaction of their claim

20

for principal plus interest. Since the Conversion Rights do not entitle the Convertible

Noteholders to receive stock in reorganized Calpine, the Convertible Noteholders cannot use the

fact that the rights are not "riding through" as a basis for damages. See In re Einstein/Noah

Bagel Corp., 257 B.R. at 509 (rejecting argument that value could be ascribed to "unexercised

warrants or stock options that, although under water at the time of the filing, would have

substantial value if they could 'ride through' the bankruptcy and be exercisable against the

reorganized debtor with a clean balance sheet.").

### III.    Section 510(b) of the Bankruptcy Code Requires Any Award of Conversion Damages to Be Subordinated to Equity

If this Court determines that the Convertible Noteholders are entitled to damages for

breach of the Conversion Rights, the claim must be subordinated to common stock pursuant to

section 510(b) of the Bankruptcy Code. Section 510(b) provides in pertinent part:

> For the purpose of distribution under this title, a claim ... for damages arising
> from the purchase or sale of such a security ... shall be subordinated to all claims
> or interests that are senior to or equal the claim or interest represented by such
> security, except that if such security is common stock, such claim has the same
> priority as common stock.

11. U.S.C. § 510(b). Damages are deemed to "arise from" a security transaction where "'the

transaction is part of the causal link leading to the injury.'" Rombro v. Dufrayne (In re Med

Diversified, Inc.), 461 F.3d 251, 254 (2d Cir. 2006) (quoting In re PT-1 Commc'ns., Inc., 304

B.R. 601, 608 (Bankr. E.D.N.Y. 2004)).

The Convertible Noteholders assert that subordination is improper because there is no

"causal link" between Conversion Damages and the purchase or sale of a security. Specifically,

the Convertible Noteholders state that section 510(b) is inapplicable because the Conversion

Damages arise from the Debtors' elimination of the Conversion Rights, as opposed to the failure

to deliver stock upon conversion of the Notes. 7.75% Notes Committee Response at 23. This is

a distinction without a difference. By conceding that the non-delivery of common stock amounts to a "purchase or sale" of a security within the meaning of section 510(b), the Convertible Noteholders necessarily admit that breach of the right to receive stock also amounts to a purchase or a sale. This outcome is only logical, as courts have broadly interpreted section 510(b) to apply to subordination of claims based on breach of a right to receive stock. See In re WorldCom, Inc., 2006 WL 3782712, at * 6 (Bankr. S.D.N.Y. Dec. 21, 2006) (holding that a claimant's "claims for damages related to his unexercised stock options and the common stock held in his [accounts] should be subordinated pursuant to section 510(b) of the Bankruptcy Code"); In re Worldwide Direct, Inc., 268 B.R. 69, 73 (Bankr. D. Del. 2001) (subordinating a claim for breach of contract due to the debtor's failure to issue stock to the creditor pursuant to a severance agreement); In re Med Diversified, 461 F.3d at 259 (subordinating a claim for damages based upon the debtor's failure to issue its common stock to an employee executive as provided by prepetition agreement). Thus, because the claim for breach of the Conversion Rights is a claim relating to a purchase or sale of security, that claim must be subordinated "to all claims or interests that are senior or equal to the claim or interest represented by such security." 11 U.S.C. § 510(b).

Lastly, the Convertible Noteholders argue that any claim for Conversion Damages may not be subordinated because the definition of "equity security" in Bankruptcy Code section 101(16)(C) expressly excludes "a right to convert." However, the definition of "equity security" is irrelevant because section 510(b) refers to the purchase or sale of a *security*, the definition of which does *not* exclude a right to convert. 11 U.S.C. § 101(49). Since the security at issue is the

22

conversion right, and that security would ordinarily be *pari passu* with common stock, under section 510(b), the damage claim must be subordinated to common stock.[7]

Accordingly, to the extent this Court awards the Convertible Noteholders an unsecured claim for Conversion Damages, it should subordinate such claim below common stock pursuant to section 510(b).

## CONCLUSION

For all these reasons, the Equity Committee supports the relief requested in the Objection.

Dated:  New York, New York            Respectfully submitted,
       August 6, 2007


                     **FRIED, FRANK, HARRIS, SHRIVER &**
                        **JACOBSON LLP**

                     _/s/ Gary Kaplan_
                     Brad Eric Scheler (BS-8019)
                     Gary Kaplan (GK-4542)
                     Michael de Leeuw (MD-8479)
                     Adrian Feldman (AF-2478)
                     One New York Plaza
                     New York, NY 10004
                     Telephone:  (212) 859-8000
                     Facsimile:   (212) 859-4000

                     *Attorneys for the Official Committee of Equity*
                     *Security Holders*

593557

---

[7] The Convertible Noteholders may argue that section 510(b) would subordinate the claim to the same priority as common stock. Section 510(b), however, is clear that a damage claim is subordinate to all claims or interests equal to the underlying security "except that if **such security is common stock**, such claim has the same priority as common stock." 11 U.S.C. § 510(b) (emphasis added). Here, the security at issue is not common stock, and therefore the exception is inapplicable.

23