# **EXHIBIT S**

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-60200-brl

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  CALPINE CORPORATION,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                August 8, 2007

19                10:55 AM

20

21  B E F O R E:

22  HON. BURTON E. LIFLAND

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2  HEARING re Debtors' Motion for an Order, Pursuant to 11 U.S.C.

3  Section 363(b) and Rule 9019 of the Federal Rules of Bankruptcy

4  Procedures Approving Settlement Agreement Among Pacific Gas and

5  Electric Company, Delta Energy Center, LLC and Los Medanos

6  Energy Center, LLC

7

8  HEARING re Motion (a) to Authorize the Debtors to Assume

9  Certain Leases and Executory Contracts Relating to the Debtors'

10  Gilroy Facility; (b) Approving Certain Amendments Thereto; and

11  (c) Granting Related Relief

12

13  HEARING re Motion to Approve Settlement Agreement Between the

14  Debtors and Turlock Irrigation District

15

16  HEARING re Debtors' Motion for Authorization to Enter into

17  Stipulation with Second Lien Committee and Wilmington Trust

18  Company, as Indenture Trustee

19

20  HEARING re Debtors' Third Omnibus Objection to Proofs of Claim

21  (Beneficial Certificate Holder Claims Related to

22  Rumford/Tiverton Financing, Beneficial Noteholder Claims,

23  Equity Interest Claims, Hybrid Equity Interest/Beneficial

24  Noteholder Claims and Unspecified Equity Interest/Beneficial

25  Noteholder Claims)

3

1

2   HEARING re Debtors' Twelfth Omnibus Objection to Proofs of

3   Claim (Amended/Replaced Claims, No Liability Claims,

4   Duplicative Claims, Claims to be Adjusted, Wrong Debtor Claims

5   to be Adjusted, Claims Filed by the Fireman's Fund Insurance

6   Company and PSM Management Claims)

7

8   HEARING re Debtors' Thirteenth Omnibus Objection to Proofs of

9   Claim (No Liability Claims, Anticipatory Claims, Assumed

10  Contract Claims, Amended/Replaced Claims, Unliquidated Claims,

11  Claims to be Adjusted and Wrong Debtor Claims to be Adjusted)

12

13  HEARING re Debtors' Sixteenth Omnibus Objection to Proofs of

14  Claim (Claims to be Adjusted, Wrong Debtor Claims to be

15  Adjusted, Duplicative Claims, Anticipatory Claims, No Liability

16  Claims, Amended/Replaced Claims, Unliquidated Claims and

17  Assumed Contract Claims)

18

19  HEARING re Debtors' Seventeenth Omnibus Objection to Proofs of

20  Claim (Claims to be Adjusted, Wrong Debtor Claims to be

21  Adjusted, Amended/Replaced Claims and No Liability Claims)

22

23  HEARING re Debtors' Limited Objection to Convertible Noteholder

24  Claims

25

4

1

2    HEARING re Adversary Proceeding 1-07-01760, Calpine Corporation

3    v. Rosetta Resources, Pre-Trial Conference

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

5

1

2  A P P E A R A N C E S :

3  KIRKLAND & ELLIS LLP

4        Attorneys for Calpine Corporation

5        153 East 53rd Street

6        New York, NY 10022

7

8  BY:   RICHARD M. CIERI, ESQ.

9        HELEN HUANG, ESQ.

10

11  KIRKLAND & ELLIS LLP

12        Attorneys for Calpine Corporation

13        200 East Randolph Drive

14        Chicago, IL 60601

15

16  BY:   DAVID R. SELIGMAN, ESQ.

17        MARK KIESELSTEIN, ESQ.

18        ANDREW R. MCGAAN, ESQ.

19

20

21

22

23

24

25

6

1

2  AKIN GUMP STRAUSS HAUER & FELD LLP

3        Attorneys for Creditors' Committee

4        590 Madison Avenue

5        New York, NY 10022

6

7  BY:   MICHAEL S. STAMER, ESQ.

8        LISA G. BECKERMAN, ESQ.

9

10  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

11        Attorneys for Official Committee of Equity

12         Security Holders

13        One New York Plaza

14        New York, NY 10004

15

16  BY:   GARY KAPLAN, ESQ.

17        ADRIAN E. FELDMAN, ESQ.

18

19  MILBANK, TWEED, HADLEY & MCCLOY LLP

20        Attorneys for Individual 6% Noteholders

21        One Chase Manhattan Plaza

22        New York, NY 10005

23

24  BY:   DENNIS F. DUNNE, ESQ.

25        MATTHEW S. BARR, ESQ.

7

1

2    STROCK & STROCK & LAVAN LLP

3          Attorneys for 7.75% Convertible Noteholders

4          180 Maiden Lane

5          New York, NY 10038

6

7    BY:    KRIS HANSEN, ESQ.

8          EREZ GILAD, ESQ.

9

10   YOUNG CONAWAY STARGATT & TAYLOR, LLP

11         Attorneys for M&T, as Indenture Trustee

12         The Brandywine Building

13         1000 West Street

14         17th Floor

15         Wilmington, DE 19801

16

17   BY:    IAN S. FREDERICKS, ESQ.

18

19   KELLEY DRYE & WARREN LLP

20         Attorneys for HSBC Bank USA, N.A.

21         101 Park Avenue

22         New York, NY 10178

23

24   BY:    SARAH L. REID, ESQ.

25         JENNIFER A. CHRISTIAN, ESQ.

8

1

2   NIXON PEABODY LLP

3         100 Summer Street

4         Boston, MA 02110

5

6   BY:   JOHN V. SNELLINGS, ESQ.

7

8   CADWALADER, WICKERSHAM & TAFT LLP

9         Attorneys for Rosetta Resources

10        One World Financial Center

11        New York, NY 10281

12

13  BY:   JOHN H. BAE, ESQ.

14

15  MAYER, BROWN, ROWE & MAW LLP

16        Attorneys for Rosetta Resources

17        700 Louisiana Street

18        Suite 3400

19        Houston, TX 77002

20

21  BY:   CHARLES S. KELLEY, ESQ.

22

23

24

25

9

1

2    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3         Attorneys for Unofficial Committee of Second Lien

4         1285 Avenue of the Americas

5         New York, NY 10019

6

7    BY:    ELIZABETH R. MCCOLM, ESQ.

8           ANDREW N. ROSENBERG, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



45

1

2

3

4

5          MR. KIESELSTEIN:  Your Honor, good morning again.

6    Mark Kieselstein on behalf of the debtors.  Your Honor, this

7    takes us to item 11 on the agenda, the debtors' limited

8    objection to certain of the convertible noteholder claims.

9    Your Honor, before we launch into the hearing, there are a

10   couple of speeded issues, if you will, about the appropriate

11   scope of the hearing today, which was the subject of a call

12   among the parties yesterday and unfortunately we were unable to

13   resolve the two issues.  We did resolve one of three.

14          Your Honor, the issues are these.  The debtors are of

15   the belief that now is an appropriate time to take up the

16   question of mandatory subordination under Section 510(b) of the

17   Bankruptcy Code.  That is to say, although we are not getting

18   into the quantum of damages in today's hearing, we do believe

19   it's appropriate and helpful to our process to understand the

20   Court's view on whether or not any claim that might be

21   cognizable would be at the level of one's secured claim or

22   would be subordinated pursuant to 510(b) to the level of

23   equity.  We did brief that issue in our opening brief, several

24   pages worth, and we further expanded on that in our reply.  We

25   understand the position of the convertible noteholders that it

46

1    seemed procedurally inappropriate at this time to go forth with

2    the subordination in question because that purportedly requires

3    a formal adversary proceeding.  Your Honor, in our reply we

4    cited -- actually, a case of Your Honor's where a request for

5    subordination joined a claim objection and was treated as a de

6    facto adversary proceeding.  We think that is appropriate here

7    as well.

8         You know, we would also note, Your Honor, that given

9    the belated nature of the filing of the claims to sort of stand

10   on procedural niceties -- and , again, we don't think they

11   apply here but to stand on procedural niceties to further

12   attenuate these proceedings only augments the prejudice to the

13   debtor and we ought to get to this question right away.

14        Your Honor, the other issue in dispute is -- the

15   scope of the hearing is the question of the size of the claim.

16   We again are not going to quant the damages for purposes of

17   today's hearing; however, the issue of prejudice in terms of

18   the belated nature of the amendment or the new claim depending

19   on how one characterizes it turns -- and we believe it's

20   impacted by the potential size of the claim.  We made a

21   reference in our brief, our reply brief, to the fact that these

22   claims could amount to hundreds of millions of dollars.

23   Candidly, the noteholders have said in their papers that they

24   believe the claims are material and substantial despite

25   repeated requests not shared with us the range of claims they

47

1    actually think exist under their theories.  Again, we think

2    it's an important and relevant issue on the question of

3    prejudice.  For lack of a better term, size matters when it

4    comes to prejudice and related claims.  So we think these

5    ref -- we think talking about this is appropriate albeit we're

6    not getting into any formal evidentiary wave of quantum

7    damages.  We're really only repeating things we've heard from

8    noteholders in non-408 segments.  So again, we think it's

9    relevant for discussion today preliminarily.

10          MS. BECKERMAN:  Good morning, Your Honor, Lisa

11    Beckerman on behalf of the creditors' committee.  We obviously

12    concur with Mr. Kieselstein edition here.  In our papers, we

13    have also raised the issue of the late filed nature of the

14    claims as well as whether they are untimely amendments.  And as

15    Your Honor knows, under the second circuit test that would be

16    applicable to those, one of the issues that does have to be

17    considered by the Court in determining those issues is the

18    prejudice which does look at the size of the claims.  I think

19    in our papers we have also said that the claims could be as

20    much as up to a billion dollars from our understanding, Your

21    Honor, and that therefore they're very sizable as well.

22          Our concern is that the -- what the respondents here

23    are trying to do, the convertible claim holders, is to take a

24    position that Your Honor could not rule at this point on the

25    issue that we both raised in our papers and the debtors raised

48

1    in their papers that the claim should be denied on the basis

2    that they were untimely filed, either as untimely filed new

3    claims or untimely filed amendments.  And the reason that the

4    convertible debt holders have argued that we can't refer to

5    even things as there being in a very large size range that

6    we've been told would obviously mean that they would be in a

7    position of trying to tell Your Honor that that matter would

8    have to await an evidentiary hearing or something till we show

9    you the actual amount of it.  And we find that to be a delay

10   tactic, very distressing, and we think that the burden is on

11   them under the second circuit test to come forward and

12   demonstrate that there isn't prejudice to the estate and we've

13   obviously been told that these claims are very substantial.

14        I don't think that if they thought these claims were

15   one dollar, Your Honor, we would have been filing all these

16   papers and litigating about them today.  So I confer with Mr.

17   Kieselstein's point that I think we at least have to be able to

18   represent that it's our understanding that they could very

19   large and therefore quite prejudicial to the estate in the

20   argument.  And to be barred from doing that, having to await an

21   evidentiary hearing, I think they would be trying to use their

22   decision to file a claim without an amount is a shield for us

23   being able to, you know, oppose the claims on a very legitimate

24   basis that they're late filed.

25        And so we'd obviously ask that we be able to be heard

49

```
 1    at least to the extent of just saying that we believe the
 2    claims are very substantial and could be in these ranges that
 3    we're talking about.
 4              MR. DUNNE:  Your Honor, may I stream on this because
 5    I think we're arguing over something that's not in dispute
 6    instead of hearing the same point again from Mr. Kaplan.  It's
 7    really -- Your Honor, if I may, it's Mr. Dunne from Milbank
 8    Tweed Hadley & McCloy on behalf of clients who hold the 6%
 9    convertible notes.  We are not disputing that they can make a
10    representation that we believe at an evidentiary hearing we
11    will ultimately be able to prove damages in the hundreds of
12    millions of dollars.  We've also agreed that we're not having
13    that evidentiary hearing today.  The facts are not actually
14    before you.  They believe it's much less than a hundred million
15    dollars.  Our only point was --
16              THE COURT:  You're describing the elephant in the
17    room?
18              MR. DUNNE:  Right.
19              THE COURT:  Okay.  We've got an elephant in the room.
20              MR. DUNNE:  Exactly.  That --
21              THE COURT:  It's got a hundred million plus on its
22    hide.  Okay.
23              MR. DUNNE:  Exactly.
24              THE COURT:  That's what everybody wanted to know.
25    How about a billion?
```

50

1          MR. DUNNE:  Well, for the sixes -- it's not a billion

2     for the sixes, but hundreds of millions.

3          THE COURT:  Half a billion?

4          MR. DUNNE:  Could be.

5          THE COURT:  Could be?  Okay.

6          MR. KAPLAN:  Your Honor, the only thing I just wanted

7     to note was that in the Enron decision the second circuit

8     actually specifically addressed this and specifically said the

9     size -- at the same time, however, the size of the claim cannot

10    be irrelevant to the analysis.  And some parts are taken into

11    account whether allowance of a late claim would jeopardize the

12    success.  So the second circuit itself has looked at it and

13    said you cannot say that the size of the claim is simply

14    relevant for these purposes.

15         MR. HANSEN:  Your Honor, it's Kris Hansen at Stroock

16    on behalf of the certain seven and three-quarter percent

17    noteholders.  I think we're all in agreement here that

18    references can be made to the size of the claim.  The point

19    that we had yesterday in our conference call was that for Your

20    Honor to make a decision --

21         THE COURT:  You know, folks, I'm not interested in

22    your conference call.  I'm only interested in what you before

23    me.  You didn't include me in your conference call, number one.

24    Number two, you filed a ton of papers before me and I've gone

25    through them and I'm prepared to react as any judge would do

51

1    with respect to papers that have been submitted before him.

2    The gamesmanship that goes on here.  To find out just the size

3    of the elephant in the room, you should have come to that

4    conclusion on your telephone call and not burden everybody with

5    it now.  I now know I'm dealing with a very, very large sum of

6    money in the view of some of the claimants.  Eleventh hour

7    filed claims, as a matter of fact.

8            MR. DUNNE:  Your Honor, may I address the other

9    aspects of Mr. Kieselstein's remarks which went to

10   subordination and the appropriateness of getting into that

11   today?

12           THE COURT:  Well, that's been put in with all the

13   papers so I'll deal with it.

14           MR. DUNNE:  That's right.  I'm prepared to address it

15   in the order that --

16           THE COURT:  Fine.  If you put it in your papers, you

17   intend for -- to react to it.

18           MR. KIESELSTEIN:  Your Honor, with that, I'll launch

19   into my remarks which will be brief, Your Honor.  Your Honor,

20   with their other worldly convertible valued claims, these

21   creditors, Your Honor, boldly but belatedly go where no other

22   creditor has ever gone before, Your Honor.  But these claims

23   are riddled with procedural and substantive defects and you

24   received exhaustive and I'm sure exhausting briefing, Your

25   Honor, so I only intend to briefly review --

52

1          THE COURT:  Again, the court reporter is not here.

2    So I'm going to ask you to speak up.

3          MR. KIESELSTEIN:  Sure.  I apologize.

4          THE COURT:  It's a microphone that's picking you up

5    and I'm not sure it's doing its job.  Can you tell?

6          MR. KIESELSTEIN:  Well, the levels --

7          THE COURT:  The levels are all right?

8          MR. KIESELSTEIN:  Yeah.

9          THE COURT:  Okay, good.  They've gone down?

10         MR. KIESELSTEIN:  Well, they're going up and down but

11   other than that --

12         THE COURT:  Will you point to who's quiet so they can

13   raise their voice?

14         MR. KIESELSTEIN:  Your Honor, I'm going to move

15   physically closer to the microphone.  Hopefully, that will

16   assist.  I apologize for the sidelong glance, Your Honor.

17         Your Honor, as I was saying, you've received

18   exhaustive and probably exhausting briefing so I only want to

19   briefly review a few of the key issues.  First, Your Honor, on

20   the timeliness question, we've set out in our papers that there

21   obviously is an issue about whether these amendments which no

22   one disputes were filed many months after the bar date relate

23   back to the original proofs of claim that were filed or whether

24   they are entirely new claims, Your Honor.  For purposes of

25   figuring out whether or not they relate back, Your Honor, the

53

1    Courts have talked about whether the amendment is a

2    clarification of the original proof of claim.  Whether it was a

3    correction of an error in the original proof of claim or

4    whether it laid out an alternative theory seeking the same

5    recovery as the original claim.  Clearly, this proof of claim

6    on this novel theory or this amendment doesn't fit any of those

7    categories.  Now there's been some talk in the papers about

8    this transaction test, i.e., does the claim arise out of the

9    same transaction?  But that issue is really a proxy for whether

10    or not the debtors were put on notice that this claim was

11    coming.  And in fact, we were blind sighted by this claim

12    because such a claim has never been previously asserted, Your

13    Honor.

14            On the question of prejudice, that is, even if one

15    were to say, yes, it relates back, there's still a

16    determination of whether it's equitable to considerable the

17    claim or not.  Here, Your Honor, there is obvious prejudice.

18    We've just heard that the claim may amount to the hundreds of

19    millions of dollars.  This, while we are frantically attempting

20    to put together a guaranteed distribution plan, hit our January

21    31, 2008 exit date all with the shadow of the expiration of

22    exclusivity looming over us, Your Honor.  And as we've talked

23    about the prejudice which already exists is burgeoning on a

24    daily basis because we repeatedly asked how much is the claim

25    and we can't get a straight answer to that question.  So as we

54

1    go further into these negotiations, we're further handicapped

2    by not knowing the scope of what we're dealing with or the size

3    of the elephant.

4            In terms of the other factor is what was the

5    justification for delay, here there was no justification for

6    delay.  Some of the creditors say, well, we didn't know how we

7    were going to be treated under our plan.  But it doesn't work

8    that way, Your Honor.  Creditors don't file claims based on a

9    plan.  Debtors file a plan based on claims.  And the bar date

10   matters.  It's not just a day on a bureaucrat's calendar, Your

11   Honor.  It's critically important and numerous cases have

12   recognized that.

13           Certainly, the other creditors candidly concede that

14   the increased value of the estate made it worth their while to

15   log in these claims when they did.  But the bar date is not

16   resurrected and no safe harbor is created on the other side of

17   the bar date simply because the debtors' estate is perceived to

18   having increased in value.  Under their theory, they had the

19   claim the day we filed for Chapter 11.  They had it the day the

20   original bar date became due.  They chose not to file it until

21   much, much later.

22           Your Honor, turning to the merits, I think we have to

23   return to first principles of convertible debentures.  The

24   convertible notes permit alternative forms of recovery that are

25   mutually exclusive.  Two ways of obtaining a return on one's

55

1    investment.  Either principal and interest or conversion to

2    stock, not both.  One or the other, whether in bankruptcy or

3    out.  Now, the holders argue that the inden -- there are

4    independent rights to both in this situation.  That is, an

5    independent right to the P&I and an independent right to the

6    conversion privilege.  But here, those rights are wholly

7    interdependent, not independent and conjoined.  Once a bond is

8    converted, it obviously no longer exists.  And the only way to

9    get stock is to convert a bond.  So these are mutually

10   exclusive.  Notwithstanding the fact that they've asserted a

11   claim for both P&I and for the conversion privilege.  That's a

12   metaphysical impossibility inside bankruptcy or out, Your

13   Honor.

14           The fact that the pre-default -- they're pre-default.

15   The bonds could be converted for a combination of cash and

16   stock -- doesn't change this basic truth.  Those rights are

17   interlinked; they don't operate independently and they don't

18   create dual claims, Your Honor.  For that reason alone, the

19   conversion privilege claims are subsumed and consumed by the

20   P&I claims previously filed by the holders and purported to be

21   allowed under our waterfall plan.  We don't dispute basic P&I.

22   Those claims are well established.

23           Your Honor, it would be different if the lender,

24   let's say, loaned a thousand dollars to a borrower, got back

25   800 dollars in bond and 200 dollars in warrants.  And we talk

56

1    about it in A Choc Full O'Nuts case, there was -- the second

2    circuit recognized, there was such a beast.  You could have an

3    instrument that had those two separate independent features.

4    But that's not our facts.  That's not what we have here, Your

5    Honor.

6              Further, even if we looked away from the timeliness

7    issue, even if we ignored the fundamental nature of convertible

8    indentures, here the conversion privilege expired by its terms

9    before it was ever exercised and that was because under the

10   terms of the indentures, when the debtor filed for bankruptcy

11   the maturity by contract was accelerated.  There was

12   acceleration.  All P&I was due immediately and the indentures

13   also provide that one day prior to maturity conversion

14   privilege goes away.

15             So, Your Honor, here we have automatic acceleration

16   under the agreement.  We have maturity lower case and that

17   terminates the conversion privilege.  Now the holders argue

18   that maturity doesn't mean maturity.  They argue that lower

19   case maturity should be read to mean stated maturity which is a

20   defined term in the indentures and basically means the original

21   stated maturity on the cover of the indentures, 2014, 2023,

22   whatever it is.  But if that were the case, it would have been

23   simple enough to say "stated maturity" rather than have lower

24   case maturity and we all know the common sense in the

25   dictionary definition of maturity for these purposes is when

57

1   all the principal and interest comes due and payable. And

2   that's how these indentures operated. So that's on December

3   20th, 2005, Your Honor. Under the documents, the conversion

4   privilege had vaporized.

5          And what then of Section 1015(d) which the holders

6   purport to make much of, Your Honor? That provision purports

7   to allow the conversion privilege to survive post-bankruptcy.

8   Well, in the first instance, Your Honor, the way the holders

9   interpret 10.15(d) would be to obliterate the other provisions

10  that I just discussed, the maturity provision, the acceleration

11  provision and we all know it's a basic rule of contract

12  instruction that when two provisions may appear to be at odds

13  with each other, it's the duty of the Court to attempt to

14  harmonize them in a way that does violence to neither, Your

15  Honor. Here, there are -- it's not difficult at all to

16  harmonize these two provisions. There are two ways that jump

17  to mind. First, if but only if the pre-conditions to

18  conversion had occurred pre-bankruptcy, one could read 1015(d)

19  to say that the conversion privilege survived, albeit modified

20  to provide for conversion only to stock and not to cash and

21  stock. Similarly, one can read 1015(d) to say that if the

22  conversion privilege was in the process of being exercised and

23  there was an intervening bankruptcy, then the conversion

24  privilege again would be honored albeit by converting to stock

25  not to cash and stock. And I would note that the process for

58

1    actually converting the bonds is quite complicated under the

2    documents.   10.02 talks about to convert a hol -- a note, the

3    holder must complete and manually sign the irrevocable

4    conversion notes, deliver them to the conversion agent, deliver

5    the note to the conversion agent, furnish appropriate

6    endorsement and transfer documents, pay any transfer or other

7    taxes, if the note is held in book entry form, complete and

8    deliver the depositary, appropriate instructions pursuant to

9    the applicable procedures.   When all of those things are

10   satisfied, you then have the conversion date thereafter.   The

11   debtor would have four business days or not less than four

12   business days to actually go ahead and process the conversion,

13   deliver the cash, deliver the stock.

14           So one could imagine that there could be quite a

15   lengthy process and if a bankruptcy were to enter midstream,

16   one could certainly read 1015(d) to say fine, we're going to go

17   ahead and allow that process to be finished up, again, albeit

18   the currency of stock only.

19           So, Your Honor, we think it's rather easy to

20   harmonize those provisions without a disarray in the maturity

21   provision of the documents or the acceleration provision of the

22   documents.

23           I would also note that the holders here did not

24   bargain for any compensation if the conversion privilege were

25   to be terminated by the terms of the documents.   In essence,

59

1    the equivalent of a pre-payment premium for early payment.  No

2    such provision was put in the documents here; however, the

3    convertible holders would like the Court to create one for

4    their benefit.  That is to say, treat (d) like a bondholder,

5    you know, without a pre-payment premium but that got paid early

6    and therefore didn't have its expectations met.  And I think,

7    Your Honor, this goes to the phenomena we talked about a little

8    bit ago which is the noteholders want to be in the band guard

9    of the CalGen revolution, Your Honor.  They want to be at the

10   front of the dashed expectations parade and the way they're

11   doing it is to latch on to these documents and create a right

12   that does not exist anywhere within the four corners, Your

13   Honor.

14          But even if one, Your Honor, were to ignore the

15   untimeliness issue, the nature of convertible debt holders --

16   debt instruments, the fact that the documents provided that the

17   conversion privilege expired by its terms, the lack of any

18   contractual provision granting such a right post-conversion,

19   there still would be no basis for a claim for damages here

20   because it's undisputed that the pre-conditions for conversion

21   never transpired.  These conversion rights were always under

22   water.  They were always out the money and pursuant to 502 of

23   the Code, when claims are fixed as of the petition date, if

24   you've got an out of the money option put/warrant thing of that

25   nature, then you have basically got a cognizable claim in

60

1    bankruptcy.  Now that is not to say that there might be some

2    third party out there that says underwater warrants with a ten-

3    year term, underwater conversion privileges with a ten-year

4    term, I'll pay money for that, that's worth something.  It may

5    even be worth more than par depending on what other comparable

6    investments are out there.

7            But that's a distinction that's critical.  What you

8    can get from the secondary market is not something you can

9    necessarily assert against the debtor.  The debtor is not a

10   backstop for the secondary market and convertible debt

11   instruments.  And the fact that the privilege has gone away or

12   is terminated and you can't go pedal that to some third party,

13   again, that gives rise to no claim against the debtor.  502

14   tells us that.  And the Einstein/Noah case, the other cases

15   we've cited stand for the proposition that an underwater equity

16   type instrument whether it's embedded in a contract or anywhere

17   else does not give rise to a claim when it's out of the water

18   on day 1.

19           Finally, Your Honor -- trying to edit my comments

20   down -- the subordination issue, Your Honor.  Even if one

21   ignores tardiness, the only other things I've talked about,

22   it's clear that any claim arising from this loss of the

23   conversion privilege which is, after all, is nothing more than

24   the right to buy stock with bonds.  Any damages that would

25   arise from that would clearly be subject to mandatory

61

1    subordination under Section 510(b) of the Code.  It's clear

2    from the case law that 510(b) is broadly construed.  There does

3    not have to be an actual sale or purchase of a security.  If

4    there's a contract that provides for the prospect of a purchase

5    of a security and the actions of a debtor or the intervention

6    of bankruptcy take away that right even though never exercised,

7    the damages that would arise from that clearly fall within the

8    ambit of Section 510.  As Judge Gonzales noted in WorldCom, all

9    of these instruments, puts/warrants options, conversion

10   privileges are really just the ability to participate in the

11   success of the enterprise.  And it should go without saying

12   that the converse is equally true.  One looking to have a right

13   to invest in the success of the enterprise takes a risk of the

14   failure of the enterprise as well.  That's what's transpired

15   here and it does not give rise to a cognizable claim.

16          Now you'll hear the noteholders say, wait a minute,

17   510(d) expressly excludes from its workings convertible debt

18   instruments.  But clearly, what that provision is meant is to

19   prevent, you know, aggressive, sneaky debtors from trying to

20   subordinate the entire P&I claim simply because it happens to

21   be under the umbrella of a convertible debt instrument.  It

22   does not immunize the conversion privilege from being treated

23   as it is, as an equity claim or at the level of equity.

24          And, Your Honor, I suspect you won't hear much from

25   noteholders' counsel about independent rights, about the right

62

1    to P&I, right to conversion privilege when you get to the

2    subject of subordination because that puts them in a box.  If

3    it's a separate right to purchase equity with bonds, then the

4    implication is clear.  It's within the ambit, again, of Section

5    510(b).

6          Your Honor, I apologize for racing through that but

7    I'm happy to answer any questions the Court might have.

8          MS. BECKERMAN:  Your Honor, on behalf of -- Lisa

9    Beckerman from Akin Gump on behalf of the creditors' committee.

10   Your Honor, we basically think that there are three reasons why

11   these claims should be denied.  And one is that contractually,

12   we don't think that they're entitled to the claims and I think

13   our papers have dealt with that and I'll just touch on a couple

14   points that are hopefully slightly different from Mr.

15   Kieselstein's.

16         Second, we don't think that even within the ambit of

17   your CalGen decision that we have before the Court and the

18   context of expectation damages that there would be such

19   expectation damages that would be awarded here or due here or

20   should be claimed here because the contract doesn't provide

21   them with the expectation that would be necessary to allow them

22   to have such a claim.

23         And last, of course, we'll touch on the timeliness

24   issue that we've already spoken about a little bit earlier in

25   the hearing.

63

1          Your Honor, the indenture is very clear that when

2    there's a bankruptcy filing there is an automatic acceleration

3    and the principal and interest becomes due.  I think in a

4    circumstance like this where you have a convertible debenture

5    that that was intentional.  That the document itself limits

6    itself to the principal and interest becoming due.  It doesn't

7    suggest that there's anything else that comes due.  And it's

8    because these securities, as Mr. Kieselstein, I think, has

9    mentioned, you having a unique feature in the sense that you

10   are a debt holder and you get principal and interest and you're

11   treated like a creditor until such time as your conversion

12   privileges become great, if they ever do under your document,

13   and then if you, yourself, voluntarily elect to actually

14   convert at that point, then you exchange your note to become an

15   equity holder or, outside of bankruptcy, perhaps for cash.

16          Here, we have a situation where the indenture treats

17   them in a situation where there's a bankruptcy filing like

18   every other creditor would be.  You get principal, you get

19   interest, that's what you get.  As Mr. Kieselstein pointed out,

20   obviously the language of the indenture itself doesn't seem to

21   imply in any way that there would have been some other claim

22   that would have been available based on unripe conversion

23   rights.  And that's what we had here, Your Honor.  We had,

24   under Section 10.01, which is the actual section of the

25   indenture, that does actually deal with the right to convert or

64

1    not, not 10.5 or 10.4, as the case may be (d).  That section of

2    the indenture does say to you that you have to satisfy these

3    certain provisions, certain factual things, either relating to

4    the value of the stock, passage of dates, mergers and

5    consolidations, things that weren't in existence and hadn't

6    happened at the time of the bankruptcy filing.

7            So we have a situation where the contract itself is

8    very clear what happens to you if there's a bankruptcy filing,

9    there's the acceleration and principal and interest, and we

10   didn't have a situation we had any ripe conversion rights.

11   Well, that's important because pursuant to 502(b), obviously

12   everyone's claims that are involved in this proceeding are

13   fixed as the filing date and the language of the document

14   doesn't provide them with a claim for unripe conversion rights.

15   The language of the document provides them with principal and

16   interest.  The language of the document says that the

17   conversion right couldn't be exercised after maturity and you

18   had a maturity.  And the languages of the document say, along

19   with the Bankruptcy Code, that, you know, you're stuck at what

20   you had on the date of the filing.  And what they had on the

21   date of the filing were unripe conversion rights that were not

22   exercisable at that point.

23           So then, you have to look at, well, how do we

24   reconcile the fact that we have this provision that the

25   respondents, that the convertible debenture holders have

65

1    focused on, which is this 10.14(d) and 10.15(d) depending on

2    the indenture.  You know, I think that, as our papers indicate,

3    our reading of that is that if in the two indentures where it

4    discusses a situation where there is any type of default, the

5    language of that provision is limited to saying what kind of

6    form or value you would get if you did convert.  And obviously,

7    outside of bankruptcy, there's no automatic acceleration, no

8    automatic situation where the notes reach maturity outside of

9    bankruptcy and, therefore, it might obviously be possible that

10    somebody would wish to exchange in a situation -- if the

11    conversion was available to them.  And that's what that

12    provision allows for.

13          With respect to the 7.75 indenture, which obviously

14    does speak specifically in a 10.15(d)(2)(b) bankruptcy default

15    situation, our view is that we think that the only way to

16    reconcile that with the rest of the reading of the indenture

17    and make it make sense is in a hypothetical situation where

18    those conversion rights have been ripe at the time of the

19    filing.  And that wasn't our case here.

20          The way that the convertible debenture holders want

21    to read this indenture, it would mean that you're going the

22    provision saying you get -- principal and interest become due

23    and payable.  You're ignoring the situation where there's the

24    acceleration in the document.  You're ignoring the fact that

25    you don't have a ripe conversion right at the time of the

66

```
 1    filing under 10.01 of the document.  You're ignoring the fact

 2    that the document uses a term "stated maturity" to mean stated

 3    maturity and therefore "maturity" must mean something else in

 4    the notes, the more general (b) that we read.  And it's very

 5    hard to read the indenture in a way that makes sense, in a way

 6    that's being argued by the convertible debenture holders.  And

 7    whereas we think that the reading that we've advanced or the

 8    companies advanced does read the indenture the way that makes

 9    sense -- yes, as you know under the case law what we all need

10    to be trying to do here.

11              In addition, because the conversion rights were not

12    ripe at the time under the cases that we've cited and Mr.

13    Kieselstein previously referred to, in Einstein and the other

14    cases, it's argued that there wouldn't be a claim that was ripe

15    at the time of the filing because it's not under -- there

16    wouldn't be a claim under the indenture and the conversion

17    rights were not ripe.  This is a situation where I think you

18    see the convertible debenture holders trying to have it both

19    ways.  On one hand, outside of bankruptcy, basically, they have

20    a choice where they get principal and interest, they can stay

21    as a noteholder for the entire term of the indenture if they'd

22    like to.  Or, at some point, if the conversion rights are ripe

23    and they then exercise their right to choose to, they could

24    exchange their position and leave being a creditor and becoming

25    either cashed out or an equity holder outside of bankruptcy.
```

67

1    Here they're arguing that they get something in addition to

2    their rights as a creditor.  That they get their rights as a

3    creditor, the principal and interest and what they're entitled

4    to just like every creditor is and they also get some kind of

5    claim for the lost conversion rate even though that's not set

6    forth in the indenture and it wasn't ripe and therefore it

7    wouldn't be a permissible claim under 502(b).  In essence,

8    they're trying to get better rights in a bankruptcy than they

9    would be entitled to contractually outside of a bankruptcy.

10   And I don't think the indenture can be read that way that makes

11   sense.

12           The second point is that I don't believe that the

13   CalGen decision supports their entitlement to a claim under

14   expectation damages.  First of all, this is not the situation

15   that we had in CalGen where you had somebody who had a

16   provision in their documents that provided for a payment stream

17   over time that got interrupted solely because of the bankruptcy

18   filing and the acceleration.  Here, at best, you have a reading

19   where under certain circumstances, if they ever happen and then

20   if the person actually chooses to elect at that point to

21   convert, they have a right to switch over from debt to cash and

22   equity outside of bankruptcy and equity at best inside of

23   bankruptcy.

24           As of the filing date, none of the conditions pressed

25   in any indenture were met for doing that.  And the indenture is

68

1    very clear, that you get principal and interest and you don't

2    get a claim.  Based on the language of the agreement, it's hard

3    to see how the convertible debenture will just -- could have

4    had an expectation of anything but principal and interest.  The

5    document itself just says that's what you're going to get.

6    There's an acceleration; that's what you're entitled to.  It

7    doesn't say that you always get a conversion rate.  It says

8    that you get a conversion rate if certain things happen, if

9    there isn't a maturity, if you actually choose to exercise it

10   and obviously there is no situation at the time of the filing

11   where those rights were exercisable.

12          The convertible debenture holders are sophisticated

13   parties.  Section 502(b) of the Bankruptcy Code has been in

14   existence for a lot longer than the indentures.  The case law

15   about automatic acceleration with respect to a bankruptcy has

16   been out there.  And it's clear that if the parties had wanted

17   to preserve some kind of liquidated damages claim or other

18   right or some argument that they had an expectation to get

19   something after a bankruptcy filing other than in principal and

20   interest, the document would have to support that.  And unless

21   the document supports it, I don't think your CalGen decision

22   supports the argument for that because there can't have been a

23   reasonable expectation.

24          And in addition to the contract not supporting their

25   reasonable expectation, we have a unique situation here where

69

1    unlike the CalGen creditors who had a contractual provision

2    that said you're going to get the stream of payments over time,

3    here you have a situation where the person under certain

4    circumstances might have a right to convert and every

5    individual noteholder has the right to decide if those

6    circumstances are even ripe if you would actually exercise

7    them.  And at the time of a bankruptcy filing there is the

8    maturity and obviously the situation where the principal and

9    interest comes due.  It's very hard for someone to look at the

10   reading of this contract and think that they would have had an

11   expectation of any kind of damages but furthermore to then

12   award expectation of damages assuming that every single -- that

13   these conversion rights sometime in the future would have

14   become ripe, even though there's a lot of conditions to it, and

15   then to say that every person would have exercised them.  I

16   don't think that -- I think that's quite a stretch from Your

17   Honor's CalGen decision and I don't think that's supported by

18   the case law or even by the CalGen rationale.  I just think

19   that they're very distinguishable.

20          The last point that I wanted to make to Your Honor is

21   the supplemental claims, as they're so-called.  From our

22   perspective, these are clearly your late filed claims.  These

23   are not amendments clarifying claims that were stated before.

24   What you have here is claims that have never been asserted in

25   any reported decision that we could find ourselves in the