70

1    country in a bankruptcy scenario.  So they're novel claims.

2    They are claims that were known at the time of the bankruptcy

3    filing.  The conversion right, even under the arguments that

4    the convertible debenture holders are going to be making is

5    known all those facts, all those provisions of the indenture

6    that they're relying on.  That was all known at the time of the

7    bankruptcy filing.  So any claims that they wanted to put this

8    Court on notice and the debtors' estate on notice of should

9    have been in the initial claims.  Basically , when the second

10   circuit, under the Midland Cogeneration Venture Limited

11   Partnership versus Enron case looked at this and tried to

12   figure out if this is a relation back situation, the Court

13   focused on there must have been a timely assertion of a similar

14   claim or demand evidencing an intention to hold the estate

15   liable.  Well, back when there was a bar date, that didn't

16   happen.  That was not in the vague language of, you know,

17   "other potentially liquidated amounts."  We're talking about a

18   very sizeable claim here, Your Honor.  Obviously, none of us

19   know if it's allowed as a claim, what it would be allowed in,

20   exact dollar amount and obviously that's not to be determined

21   today, as we discussed earlier, but we know that it's a very

22   large elephant as we've all said.

23            It is also an elephant that was in existence and

24   known about at the time of the plan.  And there is no

25   discussion whatsoever in any of the respondents' papers about

71

1    why they didn't -- they had this delay.  And furthermore they

2    didn't even follow the proper procedure, Your Honor, for filing

3    a late filed claim which would obviously be coming to this

4    Court and explaining why they met the standards for excusable

5    neglect under Pioneer and why they should be permitted to file

6    a late filed claim or for that matter a subsequent amended, you

7    know, on a late filed basis.  And I think given that these

8    claims should have been asserted back at the time of the filing

9    there's really no question that these are belated claims that

10   were knowable and should have been there.  And the second

11   circuit says when you're looking at the Pioneer test and the

12   circumstance that you have to focus on the delay factors being

13   the most important.  Why was there a delay, was there a real

14   reason for the delay.  The second circuit in its cases,

15   including in Midland, comments it takes a hard line on this

16   point.  And that it adopts the hard line approach.  And here

17   there just isn't any reason at all advanced -- not a single

18   reason whatsoever advanced for the delay.  I suggest to Your

19   Honor that since the burden on the other side is to explain why

20   they met the standards for being able to file these claims late

21   filed, while they met the excusable delayed standards and why

22   there's a reason for the delay and they haven't put in one

23   piece of statement, one evidence about why.  Your Honor, under

24   that circumstances the claims have to be denied.

25            Even if Your Honor thought that these were just

72

1    amendments and that they really do relate back this still does

2    not meet the standards the second circuit applied for

3    amendments in these types of circumstances.  The second circuit

4    does look at things like the equities and the prejudice of

5    parties.  Mr. Kieselstein I think has done a very good job of

6    explaining the prejudice that would be to the estate where we

7    are now in this process of having all of a sudden these

8    extremely large claims coming to the forefront and being

9    allowed.  The Court has to look at under those circumstances

10   and consider certain things including the dilatory behavior on

11   the part of the claimant which I think we clearly know here,

12   whether other creditors would receive some kind of windfall if

13   the amendment was not allowed.  I don't think that this is that

14   type of situation.  Here none of the other creditors or the

15   debtor assumed in their plan we were going to have to be

16   dealing with these types of additionally large claims.  They

17   weren't knowable; they're not cognizable under the documents.

18   There is obviously potential prejudice that would be to the

19   entire estate and other creditors whose recoveries would be

20   diminished by this and prejudice to claimants.  And there's

21   really no justification for them not being able to file this at

22   the time of the filing of the plan.

23        Again, even under the test for amendments I think

24   that they failed to justify why these claims shouldn't be

25   disallowed even if the Court determined that they related back.

73

1   I think that they fail that test as well and therefore based on

2   that we think that the claim should be disallowed because

3   they're not supported by case law or the terms of the contract.

4   They're not supportable expectation damages claims under the

5   CalGen decision.  And they are claims that should be denied on

6   the basis that they were late filed claims or untimely claims.

7            MR. KAPLAN:  Your Honor, Gary Kaplan from Fried

8   Frank.  We join in the arguments of the statement of Ms.

9   Beckerman not to belabor the record.  We just fully join in

10  everything that they stated.

11           THE COURT:  Anyone else want to be heard?

12           MR. DUNNE:  Your Honor, Dennis Dunne from Milbank

13  Tweed on behalf of the six percent convertible noteholders

14  which we represent.  Let me just frame the issue a bit as I see

15  it and then I'll address Mr. Kieselstein's statement and Ms.

16  Beckerman's arguments.  But before I do I wanted to address

17  some of the back and forth about CalGen.

18           I don't view us as some spawn of CalGen as Mr.

19  Kieselstein tries to characterize us.  We, in fact, were

20  working with these noteholders prior to Your Honor's CalGen

21  decision which I do think supports our position but this was an

22  argument that we were going to raise regardless of the ruling

23  in CalGen.

24           And that brings me to framing the issue.  Because I

25  think at its core, Your Honor, the matters are simple.  Should

74

1    convertible noteholders be compensated for the loss of all

2    their bargained for consideration or only some.  And I think as

3    we go through this it implicates kind of two key bankruptcy

4    policies.  One being the equality of treatment between a

5    similarly situated creditors and the other is kind of avoidance

6    of windfalls.  We have a theme here that his is solvent; the

7    equity is likely to receive meaningful distributions.  So if

8    you look at a world where you have two bondholders, one invests

9    in a straight bond that's nonconvertible with a higher coupon.

10   He has a tie of consideration that is principal and interest.

11   The other bondholder elects to invest in a convertible

12   instrument.  He has a pie with three slices.  He takes

13   principal less interest and he gets this right to convert over

14   time.  And that is the key here.  Because the question is all

15   right, the debtors want to eliminate the entire pie, but they

16   only want to pay principal and interest.  So the holder of the

17   straight bond will receive full compensation, the holder of the

18   convertible bond will receive less than whole, maybe two-

19   thirds, who knows what the percentage is but less than whole

20   compensation.  We think that issue is particularly acute in

21   this case, Your Honor, where the debtor is solvent and denial

22   of this claim in essence takes that value and that's not for

23   today, it's for another day to determine the quantum of

24   damages.  But it takes whatever that value is and redistributes

25   that wealth to the equity committee, who in our view, have no

75

1    cause to complain about this because it was their directors,

2    their management team who was selected by their directors, who

3    went out and chose access to capital markets when they did and

4    became obligated not only to pay the lower coupon but to keep

5    this convert right outstanding until 2014.  We have a no call

6    just like the lenders in CalGen to protect our consideration.

7    Now, the currency of the consideration is different but the no

8    call is designed to protect it, it protects our pot, the

9    interest and the conversion right.  Just like it protects the

10   straight bondholders entitlement to interest over the length of

11   the bond.

12              Which brings me, Your Honor, to I think the limited

13   scope of today's hearing.  It really is, is there liability, is

14   there a breach of contract claim that is allowable as a result

15   of the aggregation of the conversion right?  It is not amounts.

16   A lot of Ms. Beckerman's comments can go to amount.  But we

17   have to discount the likelihood that you would ever actually

18   convert.  Those are things we can hear experts testify on.

19   We've retained Dr. Hull, a professor at the University of

20   Toronto who has literally written a book on how you value,

21   converts and options.  And this is not some ivory tower

22   esoteric analysis, this is how these instruments trade every

23   day and which is the value of what our clients were receiving.

24   The procedural posture here, Your Honor, is on March 27th we

25   did file a supplement to the proof of claim.  I'll address the

76

1    alleged lateness at the end of -- end of my arguments.  But

2    it's clear from Mr. Cieri's comments at the outset that that

3    predated by months their filing of the Waterfall plan which

4    incurred may not be the plan they proceed with because they are

5    not seeking a plan sponsor reorganization plan.  Ultimately,

6    Judge, the debtors don't dispute several key aspects of the

7    converts.  I don't think they dispute that they obtained a

8    lower coupon in exchange for the granting of the convert

9    feature.  I don't think they dispute that it was a fundamental

10   aspect of the bargain for consideration.  What they dispute is

11   whether they have to pay anything for it if they eliminate it

12   even in the context of a solvent case when equity is receiving

13   meaningful distributions.  And I -- I have to harp on one point

14   here, Your Honor, which is we do have an unusual convertible

15   feature which is very often you'll see a convertible bond that

16   requires the bondholders even pre-bankruptcy to take their debt

17   and use that as currency to get the stock.  So that you never

18   have a situation where they received cash for their principal

19   and interest and get the stock.  They either get cash,

20   principal and interest or they convert and have their entire

21   claim satisfied with stock, that's not our indenture.  Our

22   indenture expressly provides that when we convert we receive

23   cash for principal and interest and there's a formula that

24   basically says okay, at the time you convert it how much above

25   the strike price was the stock trading at.  And that delta is

77

1    then treated through the distribution of stock.  And the

2    noteholders have made it clear on that, Your Honor, that we're

3    willing to live with that option through 2014.  We're not

4    looking for the elimination of that option solely to run it

5    here and try to quantify it and make the claim we suggested to

6    the debtor that we should replicate that, reinstate it, do

7    something and we'll take the risk that it's never in the money.

8    They've said that's unacceptable.  We want to cash all the

9    creditors out, we want to lower the burden of cashing it out

10   and we'd like to do that by eliminate your convert right and

11   not compensating you for it.

12           Now, Your Honor, let me just return to some of the

13   key points that I think they've missed.  The key nature of the

14   convert is the duration.  It is not capable of being eliminated

15   on any particular day.  We have the right to decide at our

16   economic discretion what day to convert from now to 2014.  We

17   have a no call in the document to make sure that the debtors

18   can't force us to take principal and interest.  The debtors

19   make much of the notion that there's a quick right, that if

20   there's a change of control the --

21           THE COURT:  You mean, you can exercise right now and

22   join Mr. Kaplan's group, is that what you're saying?

23           MR. DUNNE:  We could.

24           THE COURT:  Okay.

25           MR. DUNNE:  Though, we can't be forced to do it.

78

1    There's a difference between a foot and call which is key here.

2    We could do it but they can't force us to do it.  We have a

3    right to see how this plays out to 2014 and then decide whether

4    to join.

5                THE COURT:  Mr. Kaplan might be upset because then

6    you delude his group.

7                MR. DUNNE:  He might be but as I said it's his

8    agents, his directors that actually negotiated this deal.  He

9    can't complain about it.  He may be upset but he can't complain

10   about it.  The key element is duration, Your Honor.  The fact

11   that there's massive vol --

12               THE COURT:  All of these are with a very wide paint

13   brush because you're going to say his directors, and it may

14   very well be that his clientele came into existence two days

15   ago.

16               MR. DUNNE:  No, but it's clear.  And I'm glad to

17   brief this issue, Your Honor, that there are many cases that

18   say in a solvent debtor when you are talking about allowing

19   claims, equity cannot be heard in many circumstances when

20   you're looking to allow claims that would give creditors the

21   full benefit of their bargain.  Because it was the directors.

22   I agree with you, secondary markets they may have traded in and

23   are out, they may not be the same people who voted in 2004 for

24   that slate of directors but they have no cause to complain.

25               The key element, Your Honor, is duration.  If you

1  look at -- any court that has looked at Black-Scholls or Jump-

2  Diffusion or some of these other models other than this

3  intrinsic value model that they presuppose is the right test,

4  has rejected the intrinsic value model because you can't force

5  us.  With the no call and the other protections you can't force

6  us to put up or shut up today.  We have the right to either

7  have an extent to 2014 or be compensated for that loss.

8        Which brings me to the next key point which is

9  acceleration maturity does that move from 2014 to 2005?  On

10  that a couple of points.  I believe these are the same points

11  that came up in CalGen and in the make whole where they

12  basically said you know, this isn't a call in CalGen because

13  post maturity you don't call it you just pay principal and

14  interest that's due at maturity.  So how could there be a

15  breach of the no call where we've actually metaphysically, I

16  don't know how, but we've actually past the maturity date.  And

17  that did not prevent Your Honor from ruling, correctly I

18  believe, that there was an expectation with the no call that

19  that bucket of consideration would survive to the light of the

20  security and you would need to be compensated for it.

21  Textually what they miss -- their whole argument is off of a

22  form exhibit to the indenture, the form of note, which on it's

23  face says "to the extent that there's any inconsistency between

24  the note and the indenture in the terms the indenture

25  provides."  There's also nothing in the form of note that says

80

1    maturity is moved up from 2014.  He has to resort to not only

2    expert textual evidence but Black Law dictionary.  So no

3    contemporaneous evidence that they meant anything other than

4    2014 by maturity.

5            But let's talk about some of the inconsistencies that

6    would exist if you adopt their arguments, one of which we've

7    talked about.  Which is we've expressly had and preserved and

8    bargained for the right to convert post default in the

9    indenture.  That was there for a reason so that we couldn't

10   have this rush of maturity date or defaults that would deprive

11   us of that option value.  The other is that the indenture is

12   unambiguous, that we have the right to convert, among other

13   things as a number of triggers, but one of the triggers is that

14   anytime after September 30, 2013.  It doesn't say unless

15   maturity has been moved up, it is unambiguous.  If you accept

16   their reading we have an inconsistency which I submit is

17   resolved by the face of the note that says in terms of the

18   indenture provide and to prove why I don't think that Mr.

19   Kieselstein wants this reading is we have OID in these notes,

20   we have original issued discount in these notes.  And the note

21   also has on the face of it a statement that says "principal

22   amount of maturity equals 725 million dollars."  The accrued

23   amount on the petition was 547 million dollars without, unless

24   you accept Mr. Kieselstein's argument that the maturity was

25   moved up.  In which case the claim will increase by 175 million

81

1    dollars as a result of saying okay, that's what the document

2    says.  Principal amount of maturity is the amount stated on the

3    face of the form of note, 725 million dollars.  I don't believe

4    that's the case, Your Honor, because it's proving the

5    absurdity, I believe, of this textual analysis.

6         Which brings me to a related point.  Ultimately, Your

7    Honor, their whole argument assumes that they can elect our

8    remedies.  And the cases that have considered the election of

9    remedies, particularly the acceleration context, require an

10   affirmative act by the noteholders.  The put is a perfect

11   example of it, they make much of this notion that were there a

12   change of control outside of bankruptcy, we the convertible

13   noteholders, would have a right to put the securities for

14   principal and interest to the company and they would pay us

15   that amount with nothing for the convert.  They're actually

16   wrong a little on the indenture because within certain

17   parameters we actually cannot do that because it converts

18   valuable.  But put that aside that's a put, it's again our

19   election.  I agree that we have the right after a default, pre-

20   bankruptcy let's say to go to state court and try to have this

21   obligation satisfied by payment of principal and interest.  But

22   that's not what we did.  And only that would constitute an

23   election of remedies sufficient to say you're not compensated

24   for your loss of consideration.  They are trying to conflate

25   the two by saying okay, the petition date's acceleration, it's

82

1    election of remedies and it's maturity date.  And (a) those

2    arguments were made before and I believe you rejected them and

3    there's just no evidence of that in the indenture.  The seventh

4    circuit in the LDH case made an important point out of this

5    where they denied a prepayment premium to the lender who had

6    exercised remedies.  The debtors cite this case because of the

7    fact that the prepayment premium was denied but it was because

8    they tried to exercise their remedies.  They elected to lift

9    the stay to foreclose on their collateral.  Again, whatever

10   they got pursuant to state court remedies.  New York law is the

11   same, Your Honor.  New York Supreme Court has held that the

12   acceleration of immediate payment to the exclusion of other

13   rights "could be brought into being only by an election to

14   accelerate affirmatively exercised by the plaintiff obligee.

15   Any other holding would take the option of accelerating or not

16   accelerating away from the person for whose benefit the clause

17   is placed in the contract in the first place.  That's the

18   Simonim case.

19        Your Honor, let me just turn now to this argument

20   about 502(b) for a second and whether or not we look at just

21   the petition date to see whether the conversion right is in the

22   money right or not.  That's not what 502(b) says.  It doesn't

23   say that you adopt some intrinsic value task.  I think it's not

24   an issue for today because that's really quantum of damages.

25   What they're saying, Judge, is yes there may be liability but

83

1   let's look at it on the petition date and let's set it at zero.

2   I submit, Your Honor, that's precisely why we should take that

3   into account and move it to an evidentiary hearing where you

4   can have the benefit of hearing from Dr. Hull on this.  It also

5   leads to some absurd ramifications.  Let's assume, Your Honor,

6   that on the petition dates our strike price is three dollars

7   and eighty-five cents compared to what Calpine stock was

8   trading at which was much south of it, would lead you to say

9   you know, I don't have to give you the money on that date even

10  though the indentures say I can't price you out on any given

11  day I'm going to do it.

12        What if Calpine stock at confirmation was trading at

13  ten dollars a share, is that still an argument that anybody

14  with a straight face would submit that you would then take that

15  value that otherwise is contractually owed to us and give it to

16  the equity.  To say, yeah, 502(b) works that kind of windfall

17  for junior classes.  There is no evidence that it does that.

18  Indeed, we all know that there are a number of exceptions to

19  502(b).  502(b) also says that if you don't get unmatured

20  interest, you don't get post-petition interest.  But we all

21  know that what you do in a solvent debtor that there are a lot

22  of situations where 502(b) simply does not operate to dictate

23  that you put blinders on as of the petition date.  Think of a

24  landlord who had a below market lease on the petition date, two

25  years later it's rejected.  Would anybody contend that you

84

1    could prove up that that loan had no lender had no damages

2    because you have blinders on at the petition date and you say,

3    you know what, the market was pretty good on the petition date.

4    You therefore -- I know you can't actually mitigate now but you

5    have no damages.

6              THE COURT:  This is all conjecture, Mr. Dunne.

7              MR. DUNNE:  No.  It's the --

8              THE COURT:  I've read all of your papers.  Do you

9    have anything that you don't have in your papers?

10             MR. DUNNE:  One last point because I think I also

11   don't mean this which is on the petition -- one of the key

12   elements of valuing the conversion right as duration as I've

13   talked about, we go to 2014.  As of the petition date that's

14   nine years.  As of today that's only seven.  One of the key

15   drivers of value under a Black-Scholl's model is how long does

16   that option have to run.  I don't believe that the debtors

17   truly believe that to give us an extra two years on a Black-

18   Scholl's model.

19             Which brings me to a recent Delaware case, Your

20   Honor, July 20th of this year.  It's Lillis v. AT&T, 2007 WL

21   2110587.  Where the Delaware Chancellery Court was faced with

22   the issue of whether stock options that were being eliminated

23   as part of an extraordinary transaction, in that case an

24   acquisition through a merger, where the merger price was below

25   the strike price of those stock options.  And the argument was

85

1    exactly what the debtors and the other objectors are contending

2    here, that look you're out of time, you're out of luck, too bad

3    so sad, your strike price is above the merger price no damages.

4    The Delaware Chancellery Court said no, because that's not how

5    you value that option.  You have to look at the remaining

6    duration and they adopted a Black-Scholl's value to determine

7    the damages from the loss of that stock option.  So for

8    purposes of today, Your Honor, I submit that that's sufficient

9    for you to hold that there's liability, we'll come back and

10   we'll talk about damages.

11          Let me address subordination of the 510(b), Your

12   Honor.  A couple of points here.  I don't think anybody can ask

13   that compensation for your key bargain for consideration is

14   within the ambit of 510(b).  And by that I mean 510(b)

15   originated to deal with fraud under the securities laws.  The

16   language of it is broad, we all know that, we know how far the

17   cases have gone.  But none of them have said you know what, the

18   failure to pay your coupon, the failure to pay your interest is

19   510(b), because those are damages arising from the purchase or

20   sale of the security.  Going back to the pie analogy, Your

21   Honor, that's why it's not 510(b).  Because a straight

22   bondholder has principal and interest, we have principal,

23   interest and the conversion right which are all three buckets

24   of key bargain for consideration.  They had a no call where

25   they could not eliminate or otherwise call us of principal and

86

1    interest.  They could not eliminate that conversion right

2    prematurity.  So the compensation for the breach of those

3    covenants and promises are key buckets of our consideration and

4    not 510(b).  A point that I don't think that the debtors

5    dispute.

6         The point about equity risks.  There are cases and we

7    cite them, this is not an equity security, not defined in the

8    bankruptcy as an equity security.  Indeed, the securities law

9    defines it differently.  But for our universe of applicable law

10   it is not an equity security, it also is not one where we have

11   the risk that the cases talk about in 510(b).  Why, because our

12   principal and interest is not at risk.  We have the debt, this

13   is only an exchange for a lower coupon rate.  We agreed to take

14   that interest in the form of the conversion right.  But unlike

15   equity holders who put their dollars in and they never get

16   their dollars out, they remain equity.  We had the debt and it

17   was never at risk.  And I won't go through the cases, Your

18   Honor, but they're in our brief.

19        The last point, which is similar to the make whole

20   and the CalGen.  I don't think the argument that it was 510(b)

21   there, that the make whole or the CalGen compensation for the

22   breach of the no call was somehow subordinateable under 510(b).

23   But it is not.  Ours is exactly the same, Your Honor.  Our

24   argument is that we are being compensated for direct

25   consideration we bargained for that they are choosing to

87

1    eliminate completely under the plan.  One last point on this.

2    A lot of the cases that are cited throughout the briefs are not

3    that relevant on 510(b) given where we rank, if you accept that

4    it's 510(b).  Why?  Because a lot of those cases, the general

5    unsecured class, was the last class case on the vine.  So

6    whether or not those courts dropped them right below the

7    unsecured creditors carry with equity holders, somewhere else,

8    it didn't really matter because there was no skin in the game.

9    I think that the code is clear that even if it is 510(b) given

10   the definition of equity security which expressly excludes

11   converts we would be classified immediately junior to the

12   general unsecured claim but senior to the equity.

13           The last argument, the late file proof of claim.  The

14   original proof of claim filed last August, Your Honor, stated

15   that the debtors are obligated "for any and all other amounts

16   due or to become due under the indenture and the six percent

17   convertible notes whether now due or hereafter arising which

18   amounts may be unliquidated or contingent may become fixed and

19   liquidated in the future."  Here the contingent claims the

20   elimination of the conversion right under the plan constituting

21   another breach of the contract.  We also had a stipulation that

22   was entered by Your Honor in January which allowed the

23   principal and interest of the convert noteholders' claims and

24   expressly said we will reserve any litigation on contingent

25   claims for the plan process or the claim reconciliation

88

1    process.  Which Your Honor, is precisely where we are now I

2    submit.  What we did after we were retained was ask the

3    indentured trustee to clarify with detail, anticipating that

4    they would make this argument which we think should not

5    prevail, the clarification that they are -- if and to the

6    extent they seek to eliminate the conversion right, we need to

7    be compensated for that.  Your Honor, they have put on no

8    evidence today about prejudice, everything is to the contrary.

9    They clearly knew about our claim in March of 2007, three

10   months before the filing of the plan.  In May of 2007 I believe

11   Mr. Kieselstein stated to Your Honor that they were on track

12   for filing a plan by June 20th, there were discussions with

13   convertible noteholder groups about potential resolution of

14   their claim for the loss of the future right to convert.  But

15   that they were still on track.  Clearly, no prejudice.  They

16   put in no affidavits, produced no testimony or witnesses to

17   prove up prejudice.  And now we hear, despite the conclusory

18   statements that plan negotiations were at an advanced stage in

19   March, we're hearing that they're in the middle of a search for

20   a plan sponsor who would raise capital and inject equity

21   investments to cash out all the unsecured debt and provide a

22   fixed recovery to the equity.  I submit, Your Honor, that that

23   belies the notion that they were in advanced stages of

24   negotiating base.

25          The Enron case -- Your Honor, I want to point out one

89

 1    factual distinction there.  The second circuit (a) recognized

 2    that amendments, which I don't think this is, it's a supplement

 3    clarifying the proof of claim but that amendments are clearly

 4    allowed.  But in Enron the facts dealt with new debtors, they

 5    were guaranteeing claims that were being filed against other

 6    debtors.  So the original proof of claim was again one debtor

 7    but the guarantee claims had they been filed against other

 8    debtors so there was no -- there were clearly completely new

 9    proofs of claim against different debtors.  Who, when you ran

10    their claim register did not show any proof of claim with

11    respect to the debt amounts.

12             A couple of last points.  Your Honor, disallowance --

13             THE COURT:  Just one.

14             MR. DUNNE:  Okay.  One.

15             THE COURT:  You've gone way over anybody's allotted

16    time here.

17             MR. DUNNE:  And this goes to the proof of claim at

18    insolvency.  Equity here would gain a windfall by the

19    disallowance of this proof of claim.  And I submit, Your Honor,

20    that as a result even if it was an untimely late filed proof of

21    claim that otherwise shouldn't be allowed, insolvent estate

22    late filed claims are.  Section 726 says that in a liquidation

23    that late filed claims have priority over distributions to the

24    debtor and equity.  Under 1129(a)(7) the best interest test

25    says that a plan fails if we would do better in a hypothetical

90

1    Chapter 7 liquidation than we would under their plan.  That's

2    the reason frankly why post-petition interest is frequently

3    paid insolvent cases, because you have a best interest test.

4    If you look at where post-petition interest is slotted in at

5    726 it's actually below late filed claims.  So I --

6    particularly at this case in a solvent estate I don't know what

7    we're arguing about, Your Honor.  And with that unless Your

8    Honor has further questions?

9              THE COURT:  I have none.

10             MR. HANSEN:  Your Honor, I'll be very brief.  Kris

11   Hansen with Stroock & Stroock & Lavan on behalf of those

12   certain seven and three quarter percent convertible

13   noteholders.  We agree completely with Mr. Dunne's comments.

14   You read our papers, we have everything in the papers, Your

15   Honor.  I do want to point out for the Court that the language

16   in our indenture Section 10.15(d) that Ms. Beckerman referred,

17   that Mr. Kieselstein referred to, I want to read a little bit

18   of language for the Court because people glossed over it a bit

19   and it's critical to the analysis here.  Because our view is it

20   defeats the arguments on acceleration, the arguments on 502(b)

21   and then earlier in that provision the arguments with respect

22   to whether you have a traditional converter you have what's

23   here a contingent converter.  10.15(d) states "if an event of

24   default as set forth in Section 5.1(e) or (f) of the original

25   indentures," and those are bankruptcy events of default so the

91

1    seven and three quarters were specific.  So basically "in the

2    event of a default based upon bankruptcy has occurred and is

3    continuing, past tense, the company may not pay cash upon

4    conversion of any notes and instead will make payment only

5    through the diluted shares of common stock."  We think that's

6    critical because the other parties here have come to you and

7    said Your Honor, we don't really know exactly what it says.  It

8    can't be harmonious with the concept of if you have an event of

9    default the maturity date is brought forward and therefore you

10   no longer have the conversion right.  And so our read of this

11   even though it doesn't say it is that it must just be that

12   unique circumstance where you had a right to convert before the

13   bankruptcy and you will then take your form of consideration

14   after the bankruptcy has been filed.  That's not what the

15   provision says, the provision talks temporally it uses specific

16   language.  And I would note that unlike some of the other ones,

17   the Model T indentures for example in CalGen etcetera which

18   might have been based on ancient forms, these were negotiated

19   two years ago, this was dated June of 2005.  And so the intent

20   of these documents could be ferreted out to the extent that if

21   people don't think it's clear, we can have a further indentured

22   hearing on it.

23         But for today's purpose it says if that event of a

24   default, the bankruptcy default, has occurred and is continuing

25   the company may not pay cash upon conversion of the note.

92

1    Thereby stating pretty clearly that the conversion of the note

2    can take place in the post-bankruptcy context and eviscerating

3    all of the arguments laid out before you with respect to well,

4    gee Judge, you have to evaluate it at 502(b) as of the date of

5    the petition.  And gee Judge, you have to look at this

6    acceleration decision and say hey, it's gone.  It's not gone,

7    it expressly survives under our document.

8            And the only other point I'd make, Your Honor,

9    because we have gone way over with all these arguments is when

10   you look at Section 10.15(b) of the seven and three quarter

11   percent indenture it states clearly that these bonds upon

12   conversion, and again, Mr. Dunne explained it, if you're in the

13   money provides you both the cash recovery and the conversion

14   right.  We're not asserting that it's two legally distinct

15   claims that we can strip off from one another and go out into

16   public market places, strip it out and sell it, and then we

17   should have had a recovery for this piece and a recovery for

18   that piece.  We're saying to you that it's one claim but it's

19   two forms of consideration with respect to that claim under the

20   terms of the indenture.  And if you're going to take that right

21   away from us, just like that right was taken away with respect

22   to the CalGen holders that we should be compensated for it from

23   a breach perspective.  And I leave it at that, Your Honor.

24           MR. FREDERICKS:  Ian Fredericks with Young Conaway

25   Stargatt & Taylor on behalf of Manufacturers and the Trader's

93

1   Trust Company as indentured trustee.  I rise only to say that I

2   join in both Mr. Hansen's statements and adopt them for the

3   reasons they said.  I respectfully request that you overrule

4   the objection.  Thank you.

5          MS. REID:  Your Honor, Sarah Reid of Kelley Drye &

6   Warren on behalf of HSBC Bank as successor indentured trustee

7   to the six percents and also for the 4.75 percent contingent

8   convertibles.  I do join in the arguments of Mr. Dunne and Mr.

9   Hansen and respectfully request that you overrule the

10  objection.  I would, however, ask that whatever decision the

11  Court makes the Court gives the party an opportunity to review

12  any order because the one that was proposed by the debtor

13  obviously was wrong in my view in terms of the law.  If that

14  were to be related to what Your Honor rules we would have some

15  serious problems because it goes beyond those sections.  Thank

16  you, Your Honor.

17         THE COURT:  Anybody want to be heard in response?

18         MR. KIESELSTEIN:  Your Honor, we'll rest on the prior

19  statements.

20         THE COURT:  Very well.  I guess, you're waiting to

21  hear from me.  Calpine and it's affiliated debtors seek the

22  entry of an order granting the debtors' limited objection

23  pursuant to Section 502 of the Bankruptcy Code and Bankruptcy

24  Rule 3007 to claims filed by the holders of certain unsecured

25  convertible debt.  The noteholders for that convertible debt

94

1   object.

2           Between 2000 and 2005 Calpine issue four series of

3   unsecured convertible notes.  As of the commencement of these

4   Chapter 11 cases on December 20, 2005, the petition date,

5   convertible notes were outstanding in the aggregate principal

6   amount of approximately 1.8 billion dollars and consisted of

7   approximately 1.3 million dollars four percent convertible

8   senior notes due December 26, 2006, 547 million dollars six

9   percent contingent convertible senior notes due 2014, six

10  hundred and fifty million dollars 7.75 contingent convertible

11  senior notes due 2015 and 634 million dollars 4.75 contingent

12  convertible senior notes due 2023.

13          Generally, the convertible note indentures provide

14  that prior to maturity the holders may convert the notes into

15  cash and/or common stock.  Upon the occurrence of one of a

16  number of conditions precedent.  As long as no event of default

17  has occurred and provided one of the conversion conditions has

18  transpired converting holders of the 4.75, the six percent and

19  the 7.75 percent notes are entitled to receive (a) repayment of

20  principal in cash and (b) payment of any upside different

21  between the applicable conversion price and Calpine stock price

22  in shares of Calpine common stock.  Whereupon conversion the

23  stock price is lower than the strike price the holders are not

24  entitled to full repayment of the principal and may only

25  receive their conversion value in cash.  The indentures provide

95

1  that commencing a Chapter 11 case constitutes an event of

2  default.  Upon an event of default all notes shall be

3  "immediately due and payable" without any further action or

4  notice by the trustee or holders.  The debtors filing their

5  Chapter 11 cases constituted an event of default under the

6  notes indentures thus rendering the notes due and payable

7  immediately.  None of the conversion conditions were satisfied

8  on the petition date.  By order dated April 26, 2006 this Court

9  established August 1, 2006 as the bar date for filing proofs of

10 claim.

11      On or about July 19, 2006 Wilmington Trust Company,

12 as indentured trustee for the 7.5 percent notes, filed a proof

13 of claim asserting claims for (a) principal and interest and

14 (b) other unliquidated charges.  On or about July 27, 2006 HSBC

15 Bank, as successor indentured trustee for the four percent

16 notes, the six percent notes and the 4.75 percent notes filed

17 two proofs of claim asserting similar claims including "other

18 unliquidated amounts."  In connection with the four percent

19 notes and the six percent notes and the 4.75 percent notes no

20 mention was made in the original proofs of claim of any claim

21 by virtue of any loss of a conversion right.

22      On January 5, 2007 the debtors and HSBC entered into

23 a stipulation and order whereby the Court approved on January

24 30th pursuant to which the parties stipulated to allow claims

25 amounts for the principal and pre-petition accrued interest due

96

1    on account of inter alia each of the four percent notes, the

2    six percent notes and the 4.75 percent notes.  The parties

3    reserve for a later date the determination of the appropriate

4    rate of post-petition interest.  On March, April and May of

5    2007 the indentured trustees for the convertible notes filed

6    "supplemental" proofs of claims seeking in addition to

7    repayment of outstanding principal and accrued interest damages

8    for "any breach" of the conversion rights, collectively the new

9    claims.

10           On June 20, 2007 the debtors filed their plan and

11    disclosure statement and under the most likely scenario with

12    midpoint valuation and midpoint claims the debtors proposed to

13    pay the noteholders the full amount of their principal and

14    accrued interest as well as post-petition interest thereon at a

15    rate to be determined by the Court together with reasonable

16    pre-petition indentured trustees fees as provided for under the

17    indentures pursuant to the plan.

18           The debtors object to the new claims first on the

19    basis that they were not timely filed.  To the extent this

20    Court allows the noteholders to pursue their new claims the

21    debtors would also object to the new claims to the extent they

22    seek payment beyond principal and interest.  The official

23    committee of unsecured creditors and the official committee of

24    equity holders join in the debtors' objection to the new

25    claims.  Are the new claims timely or untimely?  The

97

1   noteholders filed their new claims approximately eight months

2   after the bar date without first seeking Court approval.  The

3   noteholders argue that the new claims are not new claims but

4   rather amendments to the noteholders original claims, I

5   disagree.  First, the new claims are not amendments because

6   they do not relate back to the original claims.  A claim

7   relates back to a timely filed claim if it "(1) corrects a

8   defect of form in the original claim, (2) describes the

9   original claim with greater particularity or (3) pleads a new

10  theory of recovery on the facts set forth in the original

11  claim."  See Midland Cogeneration Venture Limited v. In re

12  Enron, 419 F.3d 115, 133, (2d Cir. 2005), U.S. v. Kolstadt, 928

13  Fed 2d 171, 175, (5th Cir. 1991), "amendments to do not vitiate

14  the role of bar dates.  Indeed, courts that authorize

15  amendments must ensure that corrections or adjustments do not

16  set off wholly new grounds of liability.  Courts must subject

17  post bar date amendments to careful scrutiny to assure that

18  there was no attempt to file a new claim under the guise of

19  amendment," In re Enron Corp., 419 F.3d at 133, citing In re

20  Integrated Resources, 157 B.R. 66 and 70 (S.D.N.Y. 1993).  "A

21  claimant asserting relation back bears the burden of proof," In

22  re Enron Creditors Recovery Corp., 2007 W.L. 175, 653 at 5,

23  (Bankr. New York June 13, 2007.)  No application was ever made

24  to this Court to bring before this Court the opportunity to

25  pass on these amendments or alleged amendments.

98

1        Here the new claims do not correct a form defect in

2   the original claims, they do not describe the original claims

3   with more particularity and they do not plead a new theory of

4   recovery on the facts set forth in the original claims.

5   Instead they assert entirely new claims seeking in addition to

6   100 percent of the principal and interest due under the notes a

7   double recovery based on conversion rights, See Ameritrust Co.

8   v. Integrated Resources, 157 B.R. 66, 72 (S.D.N.Y. 1993), "The

9   record contains evidence that the appellee's banks amended

10  proofs of claims seek no interest in the amount of priority in

11  the bank's original claims.  This factor alone goes to support

12  three of the five factors that need to be considered when

13  balancing the equities."

14       Moreover the initial claims did not make any

15  meaningful reference to the conversion claims, See Enron 419

16  F.3d at 143, whereas the Court must determine "whether there

17  was a timely assertion of a similar claim or demand evidencing

18  an intention to hold the estate liable."  In Re Asia Global

19  Crossing Ltd., 324 B.R. 503, 508, 509, (Bankr. S.D.N.Y. 2005)

20  disallowing late amended claims because among other things the

21  initial claim asserted only a general damage claim and did not

22  provide notice of an amended claim.  Although the noteholders

23  have not quantified the new claims the debtors have been led to

24  believe that the amounts claimed could be in the hundreds of

25  millions of dollars.  In addition, the noteholders waited

99

1  nearly eight and in some cases ten months after the bar date to

2  file the new claims which to the extent they are cognizable at

3  all existed on the petition date.  See Enron 419 F.3d at 128,

4  "in determining how long is too long, Courts generally consider

5  the degree to which in the context of a particular proceeding

6  the delay may disrupt the judicial determination of the case."

7  The noteholders offer no excuse for this delay which has

8  disrupted the judicial administration of the case in multiple

9  ways.  First, the noteholders filed the new claims doing the

10  debtors' formulation of the plan and second, the timing of the

11  new claims forces the debtors to deal with them when they

12  should be focusing on the approval of the disclosure statement

13  and confirmation of the plan.  See Enron 419 F.3d at 122 citing

14  Silivanch v. Celebrity Cruises, Inc., 333 F.3d, 355, 368 (2d

15  Cir. 2003), "we and other circuits have focused on the third

16  factor the reason for the delay including whether it was within

17  the reasonable control of the movant."

18          In addition, as already noted the noteholders have

19  led the parties to believe without specifically setting it

20  forth that the amount sought under the new claims would be

21  substantial and in the hundreds of millions of dollars.  Indeed

22  they concede that the claim or claims are elephantine in size.

23  To the extent the new claims remain unresolved and unliquidated

24  as of confirmation the reorganized debtors may have to maintain

25  large reserves thereby delaying distributions to other

100

1    stakeholders who've timely filed proofs of claims and interest.

2    In addition to being time barred the new claims are without

3    merit.  A convertible debenture is an indivisible unit.  The

4    issuer has but one obligation to meet either redemption or

5    conversion, it can never be required to do both.  See Chock

6    Full O'Nuts v. U.S., 453 F.2d, 300 (2d Cir. 1971), likewise

7    the convertible notes debentures do not provide for recovery on

8    account of both debt and equity interest.  Instead like all

9    convertible debentures the convertible notes provide the

10   security of a debt instrument but allow the noteholders to

11   benefit from any future upside by converting their notes to

12   cash and common stock.  Once the noteholders have converted

13   their notes, however, they no longer hold debt interest to the

14   notes that have been converted.  Accordingly, the convertible

15   noteholders cannot possibly be entitled to receive payment of

16   their debt and damages on the account of a conversion right.

17   See 11 U.S.C. 1129(B)(1)(b).  See also Chock Full O'Nuts, 453

18   F.2d at 304, "convertible debentures provide for two mutually

19   modes of satisfaction."  By repaying the noteholders principal

20   accrued interest in full the debtors are rendering the

21   alternative performance as provided in the indenture.  See

22   Chock Full O'Nuts, 453 F.2d at 304, "the alternative to

23   conversion is that the issuer will redeem the debenture or pay

24   it at maturity.  In which event the conversion privilege will

25   be terminated."  Moreover, the conversion rights were not

101

1    exercisable as of the petition date when the notes were

2    accelerated and matured.  And thus the noteholders do not have

3    allowable claims with respect to the conversion rights, See 11

4    U.S.C. 502(b), a claim filed against the estate must be

5    determined "as of the date of the filing of the petition."  In

6    re Einstein Noah Bagel Corp., 257 B.R. 499, 507 (Bankr.

7    District of Arizona 2000.)  At the time the case was filed the

8    right to receive cash would not have yet matured because the

9    put right itself had not yet become exercisable.

10         Lastly, even if the new claimants were cognizable

11   they would be susceptible to subordination pursuant to Section

12   510(b) of the bankruptcy code as claims arising from the

13   purchase or sale of a security if the debtors.  See Rembroe v.

14   Dufrain, In re Med Diversified Inc., 461 F.3d 251, 259 (2d Cir.

15   2006), "because of the binding agreement between the parties to

16   turn a debt into an equity interest it is reasonably clear that

17   Rembroe's claims was in line with policy concerns underlying

18   Section 510(b)"  See in Re Enron Corp., 341 B.R. 141, 162-63

19   (Bankr. S.D.N.Y. 2006) "dealing with subordinating claims

20   arising from ownership of employee stock options and concluding

21   that the broad application of Section 510(b) is now quite

22   settled." In re BT1 Communications, 304 B.R. 601, 608 (Bankr.

23   E.D.N.Y. 2004), "holding nothing in Section 510(b)'s text

24   requires a subordinated claimant to be a shareholder."

25         In conclusion, for the reasons just set forth the new

102

1    claims were filed after the bar date and accordingly are time

2    barred.  Even were the new claims were to be allowed as timely

3    amendments the claims for damages on account of the conversion

4    rights under the indentures would be disallowed or at best

5    subordinated.  The four percent notes have already expired by

6    their turns and could not be entitled to conversion right

7    damages under any theory.  Accordingly, the debtors' limited

8    objection to the new claims is granted.  Settle an order

9    consistent with this decision.

10              MR. KIESELSTEIN:  Thank you, Your Honor.  I've given

11   counsel's comments regarding the order.  We'll puddle and

12   submit and order to Your Honor as soon as possible.

13              THE COURT:  Very well.  Do you have anything else?

14              MR. SELIGMAN:  Your Honor, the only matter that we

15   have left on the agenda was an initial conference with respect

16   to the Rosetta adversary.  We would like to take that up in a

17   chambers conference.

18              THE COURT:  Sure.  We'll do it in chambers after the

19   call.

20              MR. SELIGMAN:  Thank you, Your Honor.

21              (Whereupon these proceedings were concluded at 1:21

22   p.m.)

23

24

25

103

1

2                              I N D E X

3

4                            R U L I N G S

5   DESCRIPTION                                    PAGE      LINE

6   Debtors' motion approving settlement agreement  19        24

7   among PG&E, Delta Energy Center, LLC and Los

8   Medanos, LLC approved

9

10  Motion to authorize debtors to assume           21        4

11  certain leases and contracts re Gilroy

12  Facility approved

13

14  Motion to approve settlement agreement          22        2

15  between debtors and Turlock Irrigation

16  District approved

17

18  Debtors' motion for authorization to enter      43        8

19  into stipulation with Second Lien Committee

20  and Wilmington Trust granted

21

22  Matters 5 through 10 on the agenda approved in   44        22

23  accordance with status report

24

25

104

1

2                         I N D E X, cont'd

3

4                         R U L I N G S

5    DESCRIPTION                              PAGE        LINE

6

7    Debtors' limited objection to convertible    102        10

8    noteholder claim granted

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

105

1

2                              C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, court-approved transcriber, certify that the

5       foregoing is a correct transcript from the official electronic

6       sound recording of the proceedings in the above-entitled

7       matter.

8       Lisa Bar-Leib    Digitally signed by Lisa Bar-Leib
                          DN: cn=Lisa Bar-Leib, c=US
9       _____  Reason: I am the author of this document    August 10, 2007
                          Date: 2007.08.10 11:14:39 -04'00'

10      Signature of Transcriber              Date

11

12      Lisa Bar-Leib

13      typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25